## No. 14-1945

IN THE

# United States Court of Appeals

FOR THE FOURTH CIRCUIT

➤➤◄◄

STEPHEN V. KOLBE; ANDREW C. TURNER; WINK'S SPORTING GOODS, INC.; ATLANTIC GUNS, INC.; ASSOCIATED GUN CLUBS OF BALTIMORE, INC.; MARYLAND SHALL ISSUE, INC.; MARYLAND STATE RIFLE AND PISTOL ASSOCIATION, INC.; NATIONAL SHOOTING SPORTS FOUNDATION, INC.; MARYLAND LICENSED FIREARMS DEALERS ASSOCIATION, INC.,

*Plaintiffs-Appellants,*

*and*

SHAWN J. TARDY; MATTHEW GODWIN,

*Plaintiffs,*

*v.*

MARTIN J. O'MALLEY, Governor, in his official capacity as Governor of the State of Maryland; DOUGLAS F. GANSLER, in his official capacity as Attorney General of the State of Maryland; MARCUS L. BROWN, Colonel, in his official capacity as Secretary of the Department of State Police and Superintendent of the Maryland State Police; MARYLAND STATE POLICE,

*Defendants-Appellees.*

───────────

*On Appeal from the United States District Court
for the District of Maryland at Baltimore*

## BRIEF FOR PLAINTIFFS-APPELLANTS

John Parker Sweeney
T. Sky Woodward
James W. Porter, III
Marc A. Nardone
BRADLEY ARANT BOULT
   CUMMINGS LLP
*Attorneys for Plaintiffs-Appellants*
1615 L Street, NW, Suite 1350
Washington, DC 20036
202-393-7150

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1945__      Caption: __Kolbe, et al. v. O'Malley, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__See attached__

(name of party/amicus)

who __are Appellants__ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?  ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
      If yes, identify all such owners:

10/28/2013 SCC                          - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ John Parker Sweeney          Date: September 24, 2014

Counsel for: Appellants

## CERTIFICATE OF SERVICE
****************************

I certify that on  September 24, 2014  the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

n/a

/s/ John Parker Sweeney                     September 24, 2014
        (signature)                                   (date)

Attachment to Disclosure of Corporate Affiliations
and Other Interests Form
(Case No. 14-1945)

Stephen V. Kolbe, Andrew C. Turner, Wink's Sporting Goods, Inc., Atlantic Guns, Inc.,

Associated Gun Clubs of Baltimore, Inc., Maryland Shall Issue, Inc., Maryland State Rifle and

Pistol Association, Inc., and Maryland Licensed Firearms Dealers Association, Inc.

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1945__    Caption: __Kolbe, et al. v. O'Malley, et al._____

Pursuant to FRAP 26.1 and Local Rule 26.1,

__National Shooting Sports Foundation, Inc._____
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?      ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question) ☑YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

  None

6.      Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ John Parker Sweeney _____      Date: __September 24, 2014__

Counsel for: Appellant _____

## CERTIFICATE OF SERVICE
****************************

I certify that on _September 24, 2014_ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

 n/a

/s/ John Parker Sweeney _____      September 24, 2014 _____
          (signature)                                    (date)

- 2 -

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF ISSUES ................................................................2

STATEMENT OF THE CASE............................................................4

I.      COURSE OF PROCEEDINGS ...........................................4

II.     STATEMENT OF FACTS..................................................5

        A.      THE INDIVIDUAL PLAINTIFFS ARE LAW-ABIDING,
                RESPONSIBLE CITIZENS SEEKING TO EXERCISE
                THEIR FUNDAMENTAL RIGHTS..........................................5

        B.      THE ACT PROHIBITS ACQUISITION AND
                POSSESSION OF FIREARMS AND MAGAZINES
                COMMONLY KEPT FOR LAWFUL PURPOSES BY
                LAW-ABIDING CITIZENS ....................................................6

                1.      The Act Prohibits Acquisition and Possession of
                        Popular Semiautomatic Long Guns..................................6

                2.      The Act Prohibits Acquisition of Standard Capacity
                        Ammunition Magazines for Popular Firearms................8

                3.      The Prohibited Firearms and Magazines Are
                        Commonly Kept by Law-Abiding Citizens in
                        Maryland and Across the Country....................................8

                4.      The Prohibited Firearms and Magazines Are Kept for
                        Lawful Purposes in Maryland and Across the
                        Country ........................................................................11

                5.      The Prohibited Firearms Are Not More Dangerous
                        than Other Firearms ......................................................13

        C.      THE ACT'S FIREARM AND MAGAZINE
                PROHIBITIONS DO NOT ADVANCE PUBLIC SAFETY...14

i

D.     MARYLAND HAS PROVEN, LESS RESTRICTIVE ALTERNATIVES ...................................................................18

SUMMARY OF ARGUMENT ...........................................................19

ARGUMENT .......................................................................................21

I.     STANDARD OF REVIEW .....................................................21

II.     THE ACT'S PROHIBITION OF PROTECTED FIREARMS VIOLATES THE SECOND AMENDMENT ...................................21

A.     The Act Prohibits Acquisition and Possession of Popular Firearms Protected by the Second Amendment.......................22

B.     Protected Firearms Cannot Be Prohibited ...............................25

C.     The Act's Firearm Prohibition Is Unconstitutional Under Any Standard of Heightened Scrutiny ......................................28

1.     The Firearm Prohibition Cannot Survive Strict Scrutiny.............................................................................29

2.     The Firearm Prohibition Cannot Survive Even Intermediate Scrutiny. ...................................................33

III.     THE ACT'S PROHIBITION OF STANDARD MAGAZINES VIOLATES THE SECOND AMENDMENT ...................................36

A.     The Act Prohibits Acquisition of Standard Magazines for Popular Firearms Protected by the Second Amendment .........36

B.     Protected Magazines Cannot Be Prohibited .............................38

C.     The Act's Prohibition on Protected Magazines Is Unconstitutional Under Any Standard of Heightened Scrutiny ......................................................................................39

1.     The Magazine Prohibition Cannot Survive Strict Scrutiny.............................................................................39

2.     The Magazine Prohibition Cannot Survive Even Intermediate Scrutiny. ...................................................41

IV.   THE ACT VIOLATES THE EQUAL PROTECTION CLAUSE
OF THE FOURTEENTH AMENDMENT BY EXEMPTING
RETIRED LAW ENFORCEMENT OFFICERS ..............................43

V.   THE ACT IS UNCONSTITUTIONALLY VAGUE IN NOT
DEFINING "COPIES" OF PROHIBITED FIREARMS ..................44

VI.   THE DISTRICT COURT ERRED BOTH IN DENYING
PLAINTIFFS AND GRANTING THE STATE SUMMARY
JUDGMENT ON THE EVIDENTIARY RECORD .........................47

     A.   The District Court Erred in Denying Plaintiffs Summary
Judgment Based on Undisputed Material Facts.......................47

     B.   The District Court Erred in Granting the State Summary
Judgment Based on Inadmissible Evidence.............................48

          1.   The District Court Erred in Upholding the
Constitutionality of the Act Without Finding that
Substantial Evidence Supporting the Act Had Been
Before the Legislature ...................................................49

          2.   The District Court Erred in Relying upon Lay and
Expert Opinion Testimony Not Meeting the
Standards of Federal Rules of Evidence 701 and 702....53

     C.   The District Court Erred in Granting the State Summary
Judgment Based on Disputed Material Facts............................58

CONCLUSION........................................................................................61

CERTIFICATE OF COMPLIANCE.......................................................62

# TABLE OF AUTHORITIES

## Cases

*A.A. v. Raymond*, 2013 WL 3816565 (E.D. Cal. July 22, 2013) .............................55

*Bellotte v. Edwards*, 629 F.3d 526 (4th Cir. 2011) ....................................................32

*Carver v. Nixon*, 72 F.3d 633 (8th Cir. 1995)............................................................51

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ......................................................45

*Colo. Outfitters Ass'n v. Hickenlooper*, 2014 U.S. Dist. LEXIS 8702 (D. Colo. June 26, 2014) .............................................................................. 10, 12, 37, 39

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) ...........................55

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... passim

*Edwards v. District of Columbia*, 755 F.3d 996 (D.C. Cir. 2014)...........................21

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...........................................23

*Friedman v. City of Highland Park*, 2014 U.S. Dist. LEXIS 131363 (N.D. Ill. Sept. 18, 2014)...................................................................................... 10, 12

*Fyock v. City of Sunnyvale*, No. C-13-5807-RMW, 2014 U.S. Dist. LEXIS 29722 (N.D. Cal. March 5, 2014).........................................................................13

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ..................................................47

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011).......... 10, 12, 28, 33

*Hutchins v. D.C.*, 188 F.3d 531 (D.C. Cir. 1999) .....................................................49

*In re French*, 499 F.3d 345 (4th Cir. 2007) ..............................................................58

*Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014) ...............................................52

*Kolender v. Lawson*, 461 U.S. 352 (1983)................................................................45

*Kumho Tire Company v. Carmichael*, 526 U.S. 137 (1999) ............................. 54, 55

*Landell v. Sorrell*, 382 F.3d 91 (2d Cir. 2004) .......................................................51

*Libertarian Party of Va. v. Judd*, 718 F.3d 308 (4th Cir. 2013)..............................32

*Many Cultures, One Message v. Clements*, 830 F. Supp. 2d 1111 (W.D. Wash. 2011)................................................................................................................55

*McCorkle v. United States*, 559 F.2d 1258 (4th Cir. 1977) .....................................44

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) ................................... 25, 26

*Medical Institute of Minnesota v. National Ass'n of Trade and Technical Schools*, 817 F.2d 1310 (8th Cir. 1987) ...............................................................58

*Montes v. City of Yakima*, 2014 WL 4199364 (E.D. Wash. Aug. 22, 2014)..........55

*N.Y. State Rifle & Pistol Ass'n v. Cuomo,* 990 F. Supp. 2d 349 (W.D.N.Y Dec. 31, 2013)....................................................................................................... 10, 13

*PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111 (4th Cir. 2011) .............21

*Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522 (6th Cir. 1998).................................................................................................................46

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) ..............................51

*Satellite Broadcasting and Comm. Ass'n v. FCC*, 275 F.3d 337 (4th Cir. 2001) ...50

*Shew v. Malloy,* 994 F. Supp. 2d 234 (D. Conn. 2014) .................................... 10, 13

*Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002) .................................................44

*Sons of Confederate Veterans v. Comm'r of the Va. Dept. of Motor Vehicles*, 288 F.3d 621 (4th Cir. 2002) ..............................................................................32

*Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250 (6th Cir. 1994) ..........46

*Staples v. United States*, 511 U.S. 600 (1994).................................................. 23, 46

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014).................................................................58

*Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997) ................... passim

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012) ............................... 31, 34, 41

*United States v. Chester*, 628 F.3d 67381 (4th Cir. 2010)......................... 23, 25, 29

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013).........................................23

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) ...........................................23

*United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996) ...............................................21

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)........................... 30, 31

*Video Software Dealers' Ass'n v. Schwarzenegger*, 556 F.3d 950 (9th Cir. 2009)....................................................................................................51

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) ...................................... 31, 35

## Statutes

Fed. R. Civ. P. 56(a).................................................................................................58

Fed. R. Evid. 701 .....................................................................................................54

Fed. R. Evid. 702 ............................................................................................. passim

Md. Code Ann. Crim. L. § 4-302(7)(i) .......................................................................7

Md. Code Ann. Crim. L. § 4-303(a) ...........................................................................7

Md. Code Ann. Crim. L. § 4-305(a) .........................................................................17

Md. Code Ann. Crim. L. § 4-305(a)(2) .....................................................................41

Md. Code Ann. Crim. L. § 4-305(b)............................................................. 8, 17, 19

Md. Code Ann. Pub Saf. §§ 5-117, 5-118 ................................................................18

Md. Code Ann. Pub. Saf. § 5-101(r)(2) .............................................................. 7, 16

U.S. Const. amend II................................................................................................22

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322 sec. 110101 ..........................................................................................................14

## Other Authorities

Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 Geo. Wash. L. Rev. 703 (2012)...................................................29

Maryland State Police Handgun Roster,
   https://www.mdsp.org/Organization/SupportServicesBureau/LicensingDivisi
   on/MainLicensingPage/HandgunRoster/HandgunModels.aspx?manu=18128 ...16

Maryland State Police, Regulated Firearms Purchases, "When Should I
   Apply,"
   *https://www.mdsp.org/Organization/SupportServicesBureau/LicensingDivisi
   on/MainLicensingPage/LicensingandRegistration/Firearms/RegulatedFirear
   mPurchases.aspx* .................................................................................................18

## JURISDICTIONAL STATEMENT

Plaintiffs challenge provisions of the Maryland Firearm Safety Act of 2013 (the "Act") under the Second and Fourteenth Amendments to the United States Constitution. The U.S. District Court for the District of Maryland had subject matter jurisdiction pursuant to 28 U.S.C. § 1331. The District Court entered judgment on August 12, 2014, and Plaintiffs noticed their appeal on September 9, 2014. This appeal is from a final judgment that disposes of all claims of all parties. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether the Act's prohibition on acquisition and possession of popular semiautomatic long guns commonly kept for lawful purposes by law-abiding citizens violates the Second Amendment.

2. Whether the Act's prohibition on acquisition of standard capacity ammunition magazines for popular firearms commonly kept for lawful purposes by law-abiding citizens violates the Second Amendment.

3. Whether the Act violates the Equal Protection Clause of the Fourteenth Amendment by exempting retired law enforcement officers similarly situated to Plaintiffs by virtue of training and lawful use of the firearms.

4. Whether the Act is void for vagueness in not defining "copies" of Prohibited Firearms, requiring citizens to consult dealers, manufacturers, and lawyers to understand what is prohibited.

5. Whether the District Court erred in denying Plaintiffs summary judgment on the undisputed material facts that the Prohibited Firearms and Magazines were commonly kept for lawful purposes by law-abiding citizens.

6. Whether *Turner Broadcasting* requires that a court upholding an act curtailing a fundamental right must find that there was substantial evidence

2

actually before the legislature supporting inferences that the act would achieve the stated public interest.

7. Whether Federal Rules of Evidence 701 and 702 govern the admission of opinion evidence upon which a District Court may rely in a heightened scrutiny context.

8. Whether the District Court erred in granting the State summary judgment based on disputed material facts.

## STATEMENT OF THE CASE

I.    COURSE OF PROCEEDINGS

Plaintiffs filed their Complaint for injunctive and declaratory relief against Defendants (hereinafter, "the State") on September 26, 2013. Joint Appendix ("JA") 9. Plaintiffs filed a Motion for Temporary Restraining Order on September 27, 2013. *Id*. On October 1, 2013, the District Court held a hearing on Plaintiffs' Motion for Temporary Restraining Order, which it denied. JA 10-11. Plaintiffs filed the Third Amended Complaint on November 22, 2013. JA 12-13. Plaintiffs alleged that several sections of the Maryland Firearms Safety Act of 2013 (the "Act") violate the Second and Fourteenth Amendments to the United States Constitution. Plaintiffs also alleged that the Act's prohibitions on "assault weapons" and magazines capable of holding more than 10 rounds of ammunition violate the Second and Fourteenth Amendments, that the Act's exemptions for retired law enforcement officers violate the equal protection clause of the Fourteenth Amendment, and that the term "copies," as it is used in the Act, is unconstitutionally vague under the due process clause of the Fourteenth Amendment. JA 53-54.

On August 12, 2014, the District Court denied Plaintiffs' Cross-Motion for Summary Judgment, denied Plaintiffs' Motion to Exclude, and granted the State's Motion for Summary Judgment. JA 18. The District Court found that the Act

prohibits "a class of weapons that the plaintiffs desire to use for self-defense in the home," JA 181, and, therefore, went on to "assume" that the Prohibited Firearms and magazines were protected by the Second Amendment and that the Act "places some burden on the Second Amendment right." JA 179. The District Court nevertheless applied intermediate scrutiny and granted the State summary judgment, upholding the State's challenged firearm and magazine prohibitions. JA 181; 192. The District Court granted summary judgment for the State on Plaintiffs' equal protection claim, holding that "retired law enforcement officers are differently situated." JA 193. The District Court also granted summary judgment for the State on Plaintiffs' vagueness claim, holding the Act contains an identifiable core of prohibited conduct, JA 200, and Defendant Maryland State Police ("MSP") is available to respond to any questions as to whether a firearm is prohibited as a "copy." JA 201.

II.    STATEMENT OF FACTS

    A.    THE INDIVIDUAL PLAINTIFFS ARE LAW-ABIDING, RESPONSIBLE CITIZENS SEEKING TO EXERCISE THEIR FUNDAMENTAL RIGHTS.

Plaintiff Steven Kolbe is a husband, and father of two, who owns a small business. He purchased a handgun, which came with a standard magazine holding more than 10 rounds of ammunition, for self-defense. JA 1851. He wishes to purchase firearms and magazines prohibited by the Act, for self-defense. *Id.* Kolbe

knows first-hand the need for individuals to be able to defend themselves without police intervention, because he once waited over 30 minutes for police to respond to his business when an employee's boyfriend threatened to come to Kolbe's business and kill her. JA 1851-52.

Plaintiff Andrew Turner is a retired Master-At-Arms of the United States Navy who suffers partial paralysis of his right hand from an injury sustained while on active duty. JA 23. Turner has difficulty operating and reloading quickly certain firearms and, as a result, desires standard capacity magazines to be able to defend himself, should the need arise. JA 1855-56. As a member of the military, Turner received extensive training with firearms and magazines similar to those banned by the Act.

The other Plaintiffs are associations and businesses representing the interests of law-abiding, responsible citizens like Plaintiffs Kolbe and Turner. JA 24-27.

B.    THE ACT PROHIBITS ACQUISITION AND POSSESSION OF FIREARMS AND MAGAZINES COMMONLY KEPT FOR LAWFUL PURPOSES BY LAW-ABIDING CITIZENS.

1.    The Act Prohibits Acquisition and Possession of Popular Semiautomatic Long Guns.

The Act changed Maryland law allowing citizens to purchase and possess certain semiautomatic long guns after an enhanced background check to make it a crime to "transport an assault weapon into the State; or possess, sell, offer to sell, transfer, purchase, or receive an assault weapon." Md. Code Ann. Crim. L. § 4-

303(a). The Act contains an exception for the continued possession of an "assault weapon" that was possessed prior to October 1, 2013. *Id* § 4-303(b)(3). The Act defines the term "assault weapon" to include 68 enumerated models of popular semiautomatic rifles and shotguns and their "copies." *Id.* § 4-301(b) (defining "assault long gun"), (d)-(e) (defining "assault weapon" and "copycat weapon"); *see also* Md. Code Ann. Pub. Saf. § 5-101(r)(2) (listing the "assault long guns") (collectively, "Prohibited Firearms"). The semiautomatic AR-15 and AK-47 rifles – two of the most popular rifles sold today – are representative of the firearms prohibited by the Act. *See id.* § 5-101(r)(2)(ii), (xv).

Determining whether a firearm is prohibited as a "copy" requires a citizen to compare the internal components of a desired firearm with those of each of the Prohibited Firearms and determine whether the operational components are interchangeable. JA 2414. Defendant MSP has refused to provide manufacturers seeking to sell their products in Maryland with written confirmation that a specific firearm is not prohibited. JA 2687. Instead, Defendant MSP directs inquiring citizens to consult with a dealer, manufacturer, and/or an attorney to determine whether a firearm is prohibited. JA 2724.

The Act permits retiring law enforcement officers to receive "assault weapons" upon retirement. Md. Code Ann. Crim. L. § 4-302(7)(i). This exception does not require that a retiring officer have received any training on the use of the

firearm. *See id.* Retired law enforcement officers do not have the authority to engage in law enforcement activities once retired. JA 2281. Retired law enforcement officers are permitted to acquire and possess the Prohibited Firearms for the same lawful purposes for which Plaintiffs wish to acquire and keep them.

### 2. The Act Prohibits Acquisition of Standard Capacity Ammunition Magazines for Popular Firearms.

The Act changed prior State law allowing citizens to purchase standard magazines up to a capacity of 20, to make it a crime to "manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm." Md. Code Ann. Crim. L. § 4-305(b) ("Prohibited Magazines"). The Act contains an exception for retired law enforcement officers that permits them to manufacture, sell, offer for sale, purchase, receive, or transfer magazines with a capacity greater than 10 rounds of ammunition for any purpose, at any time and in any amount. *Id.* § 4-305(a)(2). This exception does not require a retired law enforcement officer to have had any training with the Prohibited Magazines. *See id.* The State offered no explanation of why the number 10 was chosen as a limit.

### 3. The Prohibited Firearms and Magazines Are Commonly Kept by Law-Abiding Citizens in Maryland and Across the Country.

There are at least eight million AR-15 and AK-47 style firearms in the United States. JA 1877. Firearms based on these two popular models accounted for

8

approximately 20 percent of firearm sales in 2012. JA 1879. The State admitted

that these two model firearms are the two most popular semiautomatic rifles. JA

2744.

In Maryland, the popularity of the Prohibited Firearms has been increasing

in the past decade. JA 2507. In 2013, the Prohibited Firearms comprised between

18 and 30 percent of all regulated firearm transfers in Maryland. *Id*.

There are over 75 million standard magazines with a capacity of over 10

rounds of ammunition in the United States. JA 1880. The majority of pistols are

sold with standard magazines holding more than 10 rounds of ammunition. JA

2122.

Firearms capable of firing more than 10 times without reloading have

existed since the late sixteenth century. JA 2250. Magazines with a standard

capacity between 10 and 20 rounds of ammunition have been sold in the civilian

market for over a hundred years. JA 2255. These magazines have proved so

popular that they are the standard magazines provided with the majority of

semiautomatic handguns and rifles sold today. JA 2122. Current magazine

capacities reflect the balance between the long-held desire to increase the amount

of ammunition one could have at the ready, JA 2250, and the difficulties of using a

firearm with too much weight. The Prohibited Magazines are the quintessential

magazines standard with popular firearms chosen by law-abiding citizens across the nation.

Every federal court to consider a state or local prohibition of similar firearms and magazines has found or assumed on the evidence that they are commonly possessed. *E.g., Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("*Heller II*") (firearms and magazines); *Friedman v. City of Highland Park*, No. 1:13-cv-9073, 2014 U.S. Dist. LEXIS 131363 at * 24 (N.D. Ill. Sept. 18, 2014) (firearms and magazines); *Colo. Outfitters Ass'n v. Hickenlooper*, No. 13-cv-01300-MSK-MJW, 2014 U.S. Dist. LEXIS 87021 at *46 (D. Colo. June 26, 2014) (magazines); *Fyock v. City of Sunnyvale*, No. C-13-5807-RMW, 2014 U.S. Dist. LEXIS 29722 at *15-*16 (N.D. Cal. March 5, 2014); *Shew v. Malloy,* 994 F. Supp. 2d 234, 245-46 (D. Conn. 2014) (firearms and magazines); *N.Y. State Rifle & Pistol Ass'n v. Cuomo,* 990 F. Supp. 2d 349, 365 (W.D.N.Y 2013) (firearms and magazines). The only federal appellate court to consider the issue held on the evidence that these firearms are in common use, based on numbers of manufactured firearms much lower than those in evidence here. *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use,' as the plaintiffs contend. Approximately 1.6 million AR-15s alone have been manufactured since 1998, and in 2007 this one popular

model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market.").

    4.    The Prohibited Firearms and Magazines Are Kept for Lawful Purposes in Maryland and Across the Country.

The most popular of the Prohibited Firearms, the AR-15, was created for, and marketed to, the civilian market beginning in 1963. JA 2259. The AR-15 quickly grew in popularity with civilian shooters and is "the most popular civilian rifle design in America." JA 2559. AR-15 style rifles have "consistently been used by the winning competitor for the past quarter of a century at the U.S. Civilian Marksmanship National Match" competition at Camp Perry, Ohio. JA 2090. These national data are in line with the lawful use of the Prohibited Firearms in Maryland: the Prohibited Firearms comprise approximately 60 percent of the firearms being used at any one time at ranges in Maryland. JA 1441.

The State admitted that the Prohibited Firearms are used for the lawful purposes of hunting and competitive marksmanship. JA 2335. These admissions comport with Plaintiffs' evidence that hunting and competitive marksmanship are two of the five most important reasons for owning a prohibited firearm, as reported by owners of these firearms. JA 1917.

The evidence demonstrates that the second most important reason cited by owners for owning a prohibited firearm is its usefulness for home defense. JA 1917. The State's expert witness Daniel Webster admitted that the Prohibited

Firearms are kept for self-defense. JA 2290-91. Both Plaintiffs Kolbe and Turner confirm this fact. JA 1851; 1856.

The Prohibited Magazines are kept by law-abiding citizens in Maryland for lawful purposes. Because the Prohibited Magazines were provided as standard equipment with many handguns, *supra* at, 9, law-abiding Maryland citizens who keep these handguns for self-defense also keep the Prohibited Magazines for the lawful purpose of self-defense. The Prohibited Magazines are especially useful for self-defense because it is difficult for citizens to change magazines while under the stress of defending themselves from an unexpected attack. JA 2123-24. Citizens who fire rounds in self-defense are under stress and frequently miss their assailant when attacked, just like law enforcement officers do, thus requiring more rounds for effective self-defense. JA 2123. Homeowners forced to confront more than one assailant would be seriously disadvantaged by having their ready ammunition supply arbitrarily restricted. JA 2123.

Every federal court to analyze the issue has found or assumed that the Prohibited Magazines are kept for lawful purposes. *See Heller II*, 670 F.3d at 1261(presuming that the Prohibited Magazines were commonly used or useful for lawful purposes); *Friedman*, 2014 U.S. Dist. LEXIS 131363 at *24 (analyzing firearm and magazine prohibitions under the Second Amendment); *Colo. Outfitters Ass'n*, 2014 U.S. Dist. LEXIS 87021 at *46 (analyzing a magazine prohibition

under the Second Amendment); *Fyock v. City of Sunnyvale*, No. C-13-5807-RMW, 2014 U.S. Dist. LEXIS 29722 at *15-*16 (N.D. Cal. March 5, 2014) (finding that the Prohibited Magazines are "typically possessed by law-abiding citizens for lawful purposes"); *Shew*, 994 F. Supp. 2d at 246 (presuming use for lawful purposes); *N.Y. State Rifle & Pistol Ass'n*, 990 F. Supp. 2d at 365 (presuming use for lawful purposes).

> 5.    The Prohibited Firearms Are Not More Dangerous than Other Firearms.

The Prohibited Firearms are not more dangerous than other non-prohibited long guns and handguns. The Prohibited Firearms function in the exact same manner as other semiautomatic long guns of the same caliber that can be freely acquired and possessed in Maryland. JA 2264. This is most clearly demonstrated by the Act's exemption of the AR-15 H-BAR, which fires the same round, has the same action, is the same size, and can accept the same attachments as the prohibited AR-15; the only difference being a slightly heavier barrel. JA 2270-71. The rounds fired by the majority of the Prohibited Firearms do not present a greater risk to bystanders from overpenetration of building materials, even when compared with handgun rounds. JA 2371-97.

The Prohibited Firearms are also rarely used by criminals. JA 2280. In fact, the Prohibited Firearms were not overrepresented in a study of mass shootings conducted by the State's expert Christopher Koper in 1997, JA 530, and

13

represented at most 1 of 28 firearms used in mass shootings as reported in Koper's

2004 study. JA 423.

### C. THE ACT'S FIREARM AND MAGAZINE PROHIBITIONS DO NOT ADVANCE PUBLIC SAFETY.

Congress enacted the Public Safety and Recreational Firearms Use

Protection Act ("Federal Ban") in 1994. *See* Violent Crime Control and Law

Enforcement Act of 1994, Pub. L. No. 103-322 §§ 110101 *et seq*. The Federal Ban

prohibited the purchase and sale of many of the long guns prohibited by the Act as

well as the purchase and sale of new magazines capable of holding more than 10

rounds of ammunition. *Id.* at §§ 110102-110103. Congress commissioned the

State's expert Dr. Christopher Koper to study its effects, and he reported that the

Federal Ban did not meaningfully impact crime. JA 411. He reported that the

Federal Ban did not reduce the criminal use of prohibited rifles. JA 410. He

reported that it did not reduce the criminal use of Prohibited Magazines. JA 410.

He reported that the Federal Ban was not effective in reducing the "lethality and

injuriousness of gun violence." JA 504. Finally, he reported that the Federal Ban

did not reduce the number of deaths or injuries caused by guns. JA 504. Koper

advised Congress that, were the Federal Ban to be renewed, its effects would be

difficult, if not impossible, to measure. JA 505. (Koper confirmed that these

conclusions remain true today and he is not aware of any expert who has made

different findings or come to different conclusions than him. JA 2299-2321.)
Congress did not extend the Federal Ban when it expired in 2004.

Koper testified that he could not state to a reasonable degree of scientific certainty that prohibiting the firearms at issue would have an impact on the number of mass shootings. JA 2316. This was confirmed by the testimony of Maryland State Police Capt. (Ret.) Jack McCauley, who served on a Maryland State Task Force designed to study access to firearms by those with mental illness: "The task force . . . came to the conclusion that the most important factor to preventing mass shootings was ensuring proper mental health care, treatment and training for law enforcement officers." JA 2280. In response to questioning by legislators, McCauley would have informed the Maryland General Assembly that the Act would not have a positive impact on crime generally or mass shootings specifically, but was prevented from doing so by a representative from Defendant Governor O'Malley's office. JA 2681-82.

Dr. Mark Gius, an economist who recently studied the effects of federal and state firearm prohibitions, confirmed Koper's findings and conclusions. Gius found that "state-level assault weapons bans had no statistically-significant effects on state-level gun-related murder rates." JA 2158. He also noted that the availability of the Prohibited Firearms and Magazines would not be a relevant variable in firearm crime, because "after the federal assault weapons ban expired in 2004,

gun-related murder rates continued to fall." JA 2161. With respect to the Act, he concluded that its impact on crime "will be non-existent." JA 2160-61.

Both researchers concluded that the ineffectiveness of the Federal Ban stemmed from the facts that criminals could substitute permitted firearms and magazines and that Prohibited Magazines could still be imported into the country. JA 355-56; 2159.

The Act exempts numerous firearms from its reach in the same way that the Federal Ban did. For example, the popular AR-15 is prohibited, unless it is equipped with a heavy barrel. Md. Code Ann. Pub. Saf. § 5-101(r)(2)(xv). An AR-15 equipped with a heavy barrel is functionally identical to an AR-15 with a standard barrel, except it weighs slightly more and is more accurate. JA 2271. Similarly, pistol versions of the prohibited rifles are sold lawfully in Maryland. *See* Maryland State Police Handgun Roster, https://www.mdsp.org/Organization/SupportServicesBureau/LicensingDivision/MainLicensingPage/HandgunRoster/HandgunModels.aspx?manu=18128 (approving for sale the SIGSAUER M400 and P-556 pistols, both of which are AR-15 platform handguns). Defendant MSP has approved for sale multiple pistols based on the AR-15 platform. *Id*. These handguns are identical to the AR-15 rifle (they fire the same rounds, can accept the same magazines, and can accept the same

16

accessories) except that they have no shoulder stock, are readily concealable, and are intended to be fired with one hand.

The Act permits an unlimited number of Prohibited Magazines to enter into Maryland because it does not criminalize the possession of a Prohibited Magazine or the transportation of a prohibited magazine into the state. Md. Code Ann. Crim. L. § 4-305(b). The Act permits retired law enforcement officers to sell the Prohibited Magazines to anyone they wish. Md. Code Ann. Crim. L. § 4-305(a).

There is no evidence that the Act is any more capable than the Federal Ban of having any impact on crime or the criminal use of the Prohibited Firearms and Magazines.

The statistics regarding firearm crime in Maryland make clear that permitting the sale and possession of the Prohibited Firearms does not pose a threat to public safety. In the decade following the expiration of the Federal Ban, during which the purchase and sale of Prohibited Firearms and Magazines increased in Maryland, *supra* at, 9, firearm crime in Maryland steadily declined. JA 2340. There also has never been a mass shooting in Maryland. JA 2296. Nor is there any evidence that the Prohibited Firearms are overrepresented in assaults on law enforcement officers in Maryland.

17

D.     MARYLAND HAS PROVEN, LESS RESTRICTIVE
       ALTERNATIVES.

Prior to the passage of the Act, Maryland required enhanced background

checks for purchases of both handguns and the firearms now prohibited by the Act.

*See* Md. Code Ann. Pub Saf. §§ 5-117, 5-118 (2003, 2011 Repl. Vol.). The

background check required a prospective purchaser to provide his "name, address,

Social Security number, place and date of birth, height, weight, race, eye and hair

color, signature, driver's or photographic identification soundex number, [and]

occupation." *Id.* § 5-118(b)(1). Defendant MSP would then thoroughly investigate

a prospective purchaser, including checking criminal records, mental health

records, protective orders, and court orders. *See* Maryland State Police, Regulated

Firearms Purchases, "When Should I Apply,"

*https://www.mdsp.org/Organization/SupportServicesBureau/LicensingDivision/Ma*

*inLicensingPage/LicensingandRegistration/Firearms/RegulatedFirearmPurchases.*

*aspx* (last visited October 30, 2014). This process was effective in preventing the

criminal use of the Prohibited Firearms, *see* JA 2280, and was less restrictive than

the Act because it permitted law-abiding, responsible citizens to purchase the

Prohibited Firearms, while still ensuring public safety.

Maryland also had a less restrictive magazine prohibition prior to the

passage of the Act. From 1994 until 2013, Maryland prohibited the acquisition of

magazines with a capacity of more than 20 rounds. Md. Code Ann. Crim. L. § 4-

18

305(b) (2002, 2012 Repl. Vol.). After the expiration of the Federal Ban in 2004, this restriction permitted law-abiding citizens to acquire the standard capacity magazines for which their firearms were designed and with which their firearms were sold, most of which were between 10 and 20 rounds. This prior restriction prohibited the extreme large-capacity magazines, such as 50- and 100-round drums.

## SUMMARY OF ARGUMENT

The District Court erred in granting summary judgment to the State, denying summary judgment to Plaintiffs, and holding that the Act does not violate the Second Amendment. The Second Amendment guarantees law-abiding, responsible citizens the right to acquire and keep firearms commonly kept for lawful purposes. The Act infringes upon this right by prohibiting the acquisition and possession of popular semiautomatic firearms that are commonly kept for lawful purposes. The Act also infringes upon this right by prohibiting the acquisition of standard magazines with a capacity of more than 10 rounds. The Act's prohibitions, like the District of Columbia's handgun ban found unconstitutional by the U.S. Supreme Court, fail any level of heightened constitutional scrutiny.

The District Court erred in rejecting Plaintiffs' Fourteenth Amendment challenges. The Act exempts retired law enforcement officers from its prohibitions in violation of the equal protection guarantee of the Fourteenth Amendment. The

District Court erred in holding that Plaintiffs are not similarly situated to retired law enforcement officers, as is made clear by the evidence before the District Court and the Ninth Circuit's reasoning in a case involving a challenge to a nearly identical law.

The District Court also erred in determining that the term "copies" is not unconstitutionally vague. The Act contains no guidance for a citizen to make a determination of whether a firearm is a "copy" and thus prohibited. The policy adopted by defendant MSP requires a citizen to have knowledge beyond what is reasonable to expect of the average firearm owner, and Defendant MSP has refused to provide guidance on the Act's applicability to specific firearms.

On the undisputed facts before the District Court, summary judgment could be granted only to Plaintiffs and not to the State. In granting summary judgment to the State, the District Court ignored the requirements of Federal Rule of Civil Procedure 56. The District Court also erred when ruling on Plaintiffs' evidentiary arguments. When upholding a statute under heightened scrutiny, a reviewing court must look to the evidence actually before the legislature to ensure that it was substantial. The District Court erred by failing to conduct this assessment and by relying solely on evidence that was not before the Maryland General Assembly. The District Court also abdicated its responsibility to act as a gatekeeper to ensure the reliability of the State's lay and expert opinion evidence under Federal Rules of

Evidence 701 and 702. The District Court also erred in granting the State's motion for summary judgment relying on disputed material facts.

## ARGUMENT

### I.   STANDARD OF REVIEW

The standard of review for all issues is *de novo* because the District Court resolved the case below on cross-motions for summary judgment. *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 119 (4th Cir. 2011). Review is also *de novo* for the District Court's assessment of the substantiality of the evidence before the legislature, *see e.g. Turner Broadcasting Systems v. FCC,* 520 U.S. 180, 195-98 (reviewing evidence *de novo* to determine if Congress's judgments were supported by substantial evidence); *Edwards v. District of Columbia*, 755 F.3d 996, 1000 (D.C. Cir. 2014) (applying a *de novo* standard of review to an intermediate scrutiny challenge), as well as the District Court's rulings under Rules 701 and 702. *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996) ("When a question about the acceptance or rejection of expert testimony arises on appeal, this court first undertakes a *de novo* review of whether the District Court properly followed the framework set forth in *Daubert*.").

### II.   THE ACT'S PROHIBITION OF PROTECTED FIREARMS VIOLATES THE SECOND AMENDMENT.

The Second Amendment issues in this case turn on the fundamental question of whether the firearms and magazines prohibited by the Act are protected by the

Second Amendment. If they are, then the Act's prohibitions are unconstitutional *per se* under the analysis set forth by the U.S. Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and the application of any interest balancing test is inappropriate. Even if this Court were to apply an interest balancing test, its prior decisions make clear that strict scrutiny is required. Under any level of heightened scrutiny, the Act fails constitutional muster.

      A.    The Act Prohibits Acquisition and Possession of Popular Firearms Protected by the Second Amendment.

The District Court was correct to assume on the evidence that the Prohibited Firearms are protected. The Second Amendment provides "[a] well regulated militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend II. The Supreme Court has interpreted this Amendment to protect firearms that law-abiding, responsible citizens commonly possess for lawful purposes.

*Heller* held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582. There can be no dispute that the firearms prohibited by the Act "constitute bearable arms." The State bears the burden of establishing that the Prohibited Firearms fall outside the scope of the Second Amendment's protections. *See United States v. Chester*, 628

22

F.3d 673, 680-81 (4th Cir. 2010).[1] The State cannot make the required showing on the record in this case.

Under *Heller*, the State must establish that the firearms prohibited by the Act are "not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. This standard strikes the balance between the historical understanding of the militia as being "formed from a pool of men bringing arms in common use at the time for lawful purposes like self defense," *id.*, and the "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id.* at 627. The Supreme Court has made clear that firearms are either typically kept for lawful purposes (and protected) or they are dangerous and unusual (and not protected). *Id.*

The Supreme Court has also opined on the issue of whether the Prohibited Firearms are lawfully possessed. In *Staples v. United States*, 511 U.S. 600 (1994), the Court stated that semiautomatic AR-15 style rifles are a "class" of firearms that "traditionally have been widely accepted as lawful possessions." 511 U.S. at 612. The undisputed facts in this case confirm the Supreme Court's statement in *Staples*. The State admitted that the Prohibited Firearms are possessed for the

---

[1]    *United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011) ("[I]f the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right . . . then the analysis can stop there.").

lawful purposes of hunting and competitive shooting, and the State's expert admitted that they are possessed for self-defense, *supra* at, 11, which was confirmed by Plaintiffs' evidence. *Supra* at, 11. Both Supreme Court precedent and the evidence here demonstrate that the Act prohibits the acquisition and possession of protected firearms.

The State cannot meet its burden of justifying the intrusion on protected conduct by arguing that the Prohibited Firearms may have attributes that make them attractive to criminals, for that argument has been foreclosed by the Supreme Court. The *Heller* Court held that the criminal use of firearms was irrelevant to whether they were protected; rather, the Supreme Court found only the popular choices of law-abiding citizens to be determinative of whether a particular class of firearms is protected. *Heller,* 554 U.S. at 636. Although Justice Breyer argued in his dissent that "the very attributes that make handguns particularly useful for self-defense are also what make them particularly dangerous," *id.* at 711, the *Heller* majority rejected that premise by holding that handguns are protected by the Second Amendment for the simple reason that they are chosen by law-abiding citizens for lawful purposes. *Id.* at 628-29. Because Plaintiffs have established that the Prohibited Firearms are possessed for lawful purposes by law-abiding citizens, the Second Amendment necessarily protects the Prohibited Firearms.

B.      Protected Firearms Cannot Be Prohibited.

This Court has provided a process for resolving a challenge under the

Second Amendment. The first step requires a determination " whether the

challenged law imposes a burden on conduct falling within the scope of the Second

Amendment's guarantee." *Chester*, 628 F.3d at 680 (internal quotation omitted).

The second step requires a court to analyze the extent of the burden on the Second

Amendment interests at stake. *Id.*

The Supreme Court held that a prohibition of a class of firearms is an

impermissible burden under the Second Amendment "[u]nder any of the standards

of scrutiny we have applied to enumerated constitutional rights." *Heller*, 554 U.S.

at 628. Were there any doubt that this is the correct understanding of the Supreme

Court's opinion in *Heller*, it was dispelled in *McDonald v. City of Chicago*, 130 S.

Ct. 3020 (2010) (plurality). The Supreme Court made clear that because the

Second Amendment "*applies* to handguns . . . citizens *must be permitted* to use

handguns for the core lawful purpose of self-defense." *Id*. at 3036 (emphasis

added) (internal quotations and brackets omitted).

The District Court found that the Act prohibits the acquisition and

possession of "a class of weapons that the plaintiffs desire to use for self-defense in

the home." JA 181. The Supreme Court in *Heller* struck a similar prohibition

because "[t]he handgun ban amounts to a prohibition of an entire class of 'arms'

25

that is overwhelmingly chosen by American society for that lawful purpose [self-defense]." *Heller*, 554 U.S. at 628. Moreover, the Act extends to Plaintiffs' homes, as did the law struck down by the Supreme Court. *Id.* ("The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute."). The necessary conclusion in this case is the same as that in *Heller* (substituting the class of Prohibited Firearms for the class of prohibited handguns): "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home [the Prohibited Firearms] would fail constitutional muster." *Id.* at 628-29.

The Supreme Court echoed this point when it confirmed that the Second Amendment extended to the states in *McDonald*, but rejected Justice Breyer's position that incorporation would require the analysis performed by the District Court here. As the Court's plurality opinion stated, "Justice BREYER is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions . . . . [W]hile his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion." *McDonald*, 130 S. Ct. at 3050.[2] The Supreme Court has eschewed the need to apply any of the familiar

---

[2]    Justice Breyer argued against incorporation of the Second Amendment because "determining the constitutionality of a particular state gun law requires finding answers to complex empirically based questions of a kind that legislatures are better able than courts to make," such as, "What sort of guns are necessary for self-defense? Handguns? Rifles? Semiautomatic weapons? When is a gun semi-automatic?" *McDonald*, 130 S. Ct. at 3126 (Breyer, J., dissenting).

levels of constitutional scrutiny with respect to prohibitions of a class of protected firearms; instead it has held such laws to be unconstitutional under any level of interest balancing.

The District Court erred in holding that "there is no evidence demonstrating [the] removal [of the Prohibited Firearms] will significantly impact the core protection of the Second Amendment" if other firearms remain available for Plaintiffs to use in self-defense. JA 181. The Supreme Court has rejected the argument that the government may prohibit a class of protected firearms because it leaves available other firearms. *Heller*, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed."). Similarly, the State cannot prohibit the most popular class of long guns on the grounds that other firearms remain available.

The State's arguments regarding the use of the Prohibited Firearms in crimes are similarly unavailing. Plaintiffs do not dispute that the Prohibited Firearms, like the handguns at issue in *Heller*, have been misused by criminals. But the criminal misuse of a protected firearm is not sufficient justification to prohibit its ownership by law-abiding citizens. As the Supreme Court noted, "the problem of handgun violence in this country" did not change the fact that a "prohibition of handguns"

27

was a policy choice taken "off the table" by the Second Amendment. *Heller*, 554 U.S. at 636.

This Court has never had an opportunity to consider a prohibition on a class of protected firearms that denies law-abiding citizens the right to keep protected firearms in their homes. In considering this issue of first impression, this Court is bound by the Supreme Court's decision in *Heller*. Thus, the only inquiry that this Court should conduct is to determine whether the firearms prohibited by the Act are protected by the Second Amendment. Because they are, the Act is simply unconstitutional.

C.    The Act's Firearm Prohibition Is Unconstitutional Under Any Standard of Heightened Scrutiny.

Even if this Court does not strike the Act's prohibitions outright, *Heller,* 554 U.S. at 628, this Court's own decisions make clear that strict scrutiny must apply, because the Act reaches into the homes of law-abiding citizens to deny their right to acquire and keep protected firearms. This is a standard the Act cannot satisfy. The Act fails even intermediate scrutiny review.[3]

---

[3]    The Supreme Court held unequivocally that rational basis review is not appropriate for reviewing laws that impact interests protected by the Second Amendment. *Heller*, 554 U.S. at 628 n.27. Thus, if this Court does proceed under a form of interest balancing, only a heightened level of scrutiny – strict or intermediate – could apply. *See Heller II*, 670 F.3d at 1271 (Kavanaugh, J., dissenting) (expressing preference for test based on "text, history, and tradition").

1.     The Firearm Prohibition Cannot Survive Strict Scrutiny.

Both this Court's Second Amendment precedent and the Supreme Court's

teachings in *Heller* make clear that strict scrutiny is the only level of constitutional

interest balancing that could be applicable to a prohibition on acquiring and

possessing protected firearms in the home.

The majority in *Heller* rejected the approach offered by Justice Breyer's

dissent of an interest balancing test, relying upon cases involving the intermediate

scrutiny standard. *See Heller*, 554 U.S. at 690 (Breyer, J., dissenting) (citing

*Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997)).[4] By applying

intermediate scrutiny, the District Court adopted the approach rejected expressly

by the majority in *Heller*.

This Court's application of *Heller* confirms Plaintiffs' reading of that case.

The level of constitutional scrutiny applied by this Court to a challenged law

depends upon the extent to which it impacts the fundamental right at issue. *E.g.,*

*Chester*, 628 F.3d at 682. This Court's decisions have made clear that a law

impacting Second Amendment interests triggers strict scrutiny when it reaches into

---

[4]     Professor Rostron, a staff attorney for the Brady Center to Prevent Gun Violence from 1999 to 2003, has also recognized: "[Lower courts] have effectively embraced the sort of interest-balancing approach that Justice Scalia condemned, adopting an intermediate scrutiny test and applying it in a way that is highly deferential to legislative determinations and that leads to all but the most drastic restrictions on guns being upheld." Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 Geo. Wash. L. Rev. 703, 706-707 (2012).

the homes of law-abiding, responsible citizens and prohibits them from having a protected firearm.

This Court first had an opportunity to apply *Heller* in *Chester*. Chester argued that the law disqualifying him from possessing a firearm because of his prior domestic violence conviction violated the Second Amendment because he was neither a felon or mentally ill. Chester argued that his challenge should have been analyzed under strict scrutiny because that disqualification burdened a fundamental right. *Id.* This Court rejected this argument, appling intermediate scrutiny to Chester's challenge because Chester was not a law-abiding, responsible citizen: "[W]e believe [Chester's] claim is not within the core right identified in *Heller* – the right of a *law-abiding*, *responsible* citizen to possess and carry a weapon for self-defense – by virtue of Chester's criminal history as a domestic violence misdemeanant." *Id.* at 683. The Court also suggested that, were Chester to have been a law-abiding, responsible citizen, it would have applied strict scrutiny. *Id.* ("Accordingly, we conclude that intermediate scrutiny is more appropriate than strict scrutiny for Chester and similarly situated persons.")

This Court next had occasion to opine on the appropriate level of scrutiny under the Second Amendment in *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011), in which it considered a Second Amendment challenge brought by a law-abiding citizen to a law criminalizing his possession of a firearm in a federal

30

park. The Court took notice that Masciandaro was a law-abiding citizen at the time of his arrest, but also noted that the law he challenged applied to public spaces, not the home. *Id.* at 470. In holding that intermediate scrutiny was applicable, this Court stated "as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." *Id.* The Court confirmed, however, that "any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *Id*. at 470. *See also United States v. Carter*, 669 F.3d 411, 416 (4th Cir. 2012) ("[W]e have noted that the application of strict scrutiny is important to protect the core right of self-defense identified in *Heller*[.]").

This Court's most recent pronouncement on the issue continued its unbroken line of decisions teaching that strict scrutiny is applicable to laws that impact law-abiding, responsible citizens in their homes. In *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013), this Court refused to apply strict scrutiny to a law that required citizens seeking a permit to carry a concealed firearm to demonstrate "good cause." *Id*. at 878. This Court explained that applying strict scrutiny to a law that regulated public carry permits would "place the right to arm oneself in public on equal footing with the right to arm oneself at home, *necessitating* that we apply strict scrutiny[.]" *Id*. (emphasis added).

31

The Supreme Court noted that "the home [is] where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628. Thus, this Court's teachings are required by *Heller*, which dictates that strict scrutiny *at a minimum* applies to laws that burden the right to keep and bear arms in the home. Because the Act's prohibition crosses that threshold and impacts the Second Amendment rights of law-abiding citizens in their homes, it must be subjected to strict scrutiny.

Strict scrutiny requires the State to establish that a law is narrowly tailored to achieve a compelling state interest. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 317 (4th Cir. 2013). A law is only narrowly tailored if it "is the least restrictive means available" to serve the compelling interest. *Sons of Confederate Veterans v. Comm'r of the Va. Dept. of Motor Vehicles*, 288 F.3d 621, 626 (4th Cir. 2002) (explaining the strict scrutiny standard in the context of viewpoint-based restrictions on speech). The Act's prohibition on "assault weapons" is not narrowly tailored because there is a less restrictive alternative: the background check process in place before the Act's passage.[5] The firearms regulated under that process have rarely, if ever, been used in crime including mass shootings and assaults on law

---

[5]    *See Bellotte v. Edwards*, 629 F.3d 415, 420 (4th Cir. 2011) (finding no indication that home occupants "had any tendency to violence in general . . . . To the contrary, the officers admit that holding concealed carry permits showed the Bellottes to be citizens in good standing who passed a background check.").

enforcement officers, *supra* at, 13, demonstrating that this less restrictive alternative has been effective in promoting Maryland's interest in public safety.

The State produced no evidence that the Act is the least restrictive means to achieving the asserted government interest in public safety. Nor could they. Because the Act prohibits the possession of the Prohibited Firearms in the home, this restriction is broader than necessary to achieve the asserted government interest.

For these reasons, strict scrutiny is the applicable level of constitutional review under this Court's precedent, and the Act fails utterly to meet this stringent standard. The State has never argued that the Act could pass strict scrutiny.

### 2. The Firearm Prohibition Cannot Survive Even Intermediate Scrutiny.

The Act cannot survive even the lower standard of intermediate scrutiny. The only federal appellate court to consider a similar prohibition stated that "the District must establish a tight 'fit' between the [challenged laws] and an important or substantial government interest, a fit that employs not necessarily the least restrictive means, but . . . a means narrowly tailored to achieve the desired objective." *Heller II*, 670 F.3d at 1258. The State made no effort to tailor the prohibitions.

It is not enough that expert witnesses and appointed law enforcement officers have offered unsubstantiated testimony regarding their beliefs that the Act

33

will be effective. *See Carter,* 669 F.3d at 418 (noting that the State may not "rely upon mere 'anecdote and supposition'" in defending a challenged law). Rather, the State must establish that the Maryland General Assembly drew reasonable inferences based on substantial evidence that are a "tight fit" to the asserted government interest. *Turner Broadcasting Systems, Inc. v. FCC*, 512 U.S. 622, 666 (1994). The District Court erred in considering only evidence that was never before the Maryland General Assembly because such evidence could not possibly have formed the basis for a reasonable inference by the legislature. Even considering the post-enactment evidence provided by the State, however, it is clear that the Act is not narrowly tailored.

The uncontroverted evidence demonstrates that a prohibition on the acquisition of popular firearms similar to the Act's prohibition was not successful at the federal level. *Supra* at, 13-14. After ten years of the Federal Ban being in effect, two government funded reports found no evidence of a decrease in the criminal use of banned long guns. *Supra* at, 13-14. These studies also found that the federal prohibition was not effective in reducing the lethality or injuriousness of gun violence. *Supra* at, 14. Any statewide prohibition can only be less effective because the surrounding states do not have similar prohibitions.

The record in this case demonstrates conclusively that firearm prohibitions do not advance public safety. *Supra* at, 14-15. Even if this evidence were not

34

present, however, *Heller* makes clear that a law tailored to prevent criminal access to protected firearms by prohibiting them altogether would not survive intermediate scrutiny. As Justice Breyer noted in his dissent, the District's prohibition on handguns was directed toward the firearms most commonly used by criminals within the city. *Heller*, 554 U.S. at 698 (Breyer, J., dissenting).[6] The majority opinion, however, found that the prohibition would fail "any of the standards of scrutiny" that could apply. *Id.* at 628. Thus, the Supreme Court held that banning the firearms used most frequently in crime failed intermediate scrutiny. Given that it is undisputed that the Prohibited Firearms are rarely, if at all, used in crime, JA 2280, the Act fails even intermediate scrutiny.

Plaintiffs take as seriously as the Supreme Court the potential for criminal misuse of firearms. "But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of [the Prohibited Firearms] held and used for self-defense in the home." *Heller*, 554 U.S. at 636. Maryland had in place a system that intruded significantly less upon the interests of law-abiding citizens and still promoted effectively the government's interest in public safety by providing enhanced background checks on purchasers

---

[6] Handguns are the firearms most used in crime in Maryland. *Woollard v. Gallagher*, 712 F.3d 865, 877(4th Cir. 2013) ("Handguns are the weapon of choice for criminal activity in Baltimore because they are small, relatively lightweight, easy to carry and conceal, easy to load and fire, deadly at short range, and ideal for surprise attacks. Furthermore, handguns have persisted as "the largest threat to the lives of Maryland's law enforcement officers.") (footnote and citations omitted).

of what are now Prohibited Firearms. *Supra* at, 17-18. Even under the intermediate scrutiny standard, the State's failure to narrowly tailor is fatal to the Act.

The Supreme Court instructed that banning protected arms from law-abiding citizens lacks the required fit with the government's safety interests under any test applied to fundamental rights. *Heller*, 554 U.S. at 628. Whether the law might further public safety or not, outright prohibiting the firearms from law-abiding citizens is an overbroad means of addressing criminal use because it infringes impermissibly a fundamental right.

III.   THE ACT'S PROHIBITION OF STANDARD MAGAZINES
       VIOLATES THE SECOND AMENDMENT.

The Act's prohibition of commonly kept magazines is unconstitutional in the same way that the Act's prohibition of commonly kept firearms is unconstitutional.

A.   The Act Prohibits Acquisition of Standard Magazines for Popular
     Firearms Protected by the Second Amendment.

The District Court was correct to "assume[]the [Act] infringes on the Second Amendment" and, therefore, the Prohibited Magazines are protected. JA 179. Magazines are protected by the Second Amendment because they are integral components to the functionality and utility of firearms and have no utility apart from firearms.  A ban on magazines with a capacity greater than 10 is no different than a ban on firearms capable of firing more than 10 rounds without reloading. So it is really the firearm equipped with the magazine, not the magazine itself, with

36

which the State is concerned. One of the major components of the *Heller* decision was that law-abiding, responsible citizens have the right to possess operable firearms for self-defense. Because restrictions on the capacity of magazines deny the right of law-abiding citizens to use their firearms in self-defense, they are protected under the rationale of *Heller*.

Every federal court to consider the issue has applied the Second Amendment to prohibitions of magazines above a certain capacity. *Supra* at, 12. The U.S. District Court for the District of Colorado noted when considering a prohibition of magazines capable of holding more than 15 rounds of ammunition "burdens the core right protected by the Second Amendment," *Colo. Outfitters Ass'n*, 2014 U.S. Dist. LEXIS 87021 at \*46, even though the Colorado 15-round prohibition left available the magazines that are commonly used by police and that are often sold with handguns. *See id.* at \*15, \*62-\*63.  The Act's prohibition reaches much further, prohibiting the standard magazines for the most popular firearms.

Federal courts have uniformly found Prohibited Magazines to be commonly kept for lawful purposes. *Supra* at, 12. The record in this case confirms the determinations of those courts: there are over 75 million magazines with a capacity greater than 10 rounds of ammunition in circulation within the United States. *Supra* at, 9. Such magazines are provided as standard equipment for the majority of

37

pistols and many of the most popular long guns sold in the United States. *Supra* at,

9. The Prohibited Magazines are protected by the Second Amendment.

      B.      Protected Magazines Cannot Be Prohibited.

      The Supreme Court has held that a legislature may not prohibit the

possession of arms protected by the Second Amendment. *Supra* at, Part II.B. The

magazines prohibited by the Act are the standard equipment sold with the

handguns at issue in *Heller*. Increased magazine capacity has been a goal of

firearms manufacturers since the advent of personal firearms. Firearms capable of

firing more than 10 shots without reloading have existed since the 1600s and were

commonplace by the middle of the nineteenth century. JA 2250. Detachable

magazines holding more than 10 rounds of ammunition have been lawfully owned

by civilians since the turn of the twentieth century. JA 2255. Today, the majority of

handguns – the "quintessential" self-defense weapon (*Heller*, 554 U.S. 629) – are

sold with magazines holding between 10 and 20 rounds of ammunition. JA 2122.

This is no accident. It is a reflection of the fact that law-abiding, responsible

citizens have felt it necessary to possess this amount of ammunition at the ready

for self-defense. In the same way that the Supreme Court has held that the

"quintessential" self-defense weapon cannot be prohibited, neither can the

"quintessential" standard magazine for handguns be prohibited.

The *Heller* Court held that a prohibition on the possession of handguns was unconstitutional and did so without applying any interest balancing test. The *Heller* Court also struck down the District's prohibition on having an operable firearm in the home. *Heller*, 554 U.S. at 630. The level of constitutional protection for having a fully operable firearm should extend to having a standard capacity magazine. This prohibition is unconstitutional under *Heller* and cannot stand.

C.    The Act's Prohibition on Protected Magazines Is Unconstitutional Under Any Standard of Heightened Scrutiny.

The Act's magazine prohibition implicates the core right of self-defense within the home. Thus, under this Court's precedent, strict scrutiny is warranted. Even under the lower standard of intermediate scrutiny, however, the prohibition fails.

1.    The Magazine Prohibition Cannot Survive Strict Scrutiny.

As explained above, this Court's decisions have made clear that laws impacting the core right of self-defense in the home warrant strict scrutiny. *Supra* at, 28-31. The Act's magazine prohibition cuts to the very heart of the core right of self-defense because it places an artificial, and arbitrary, restriction upon the number of rounds a law-abiding citizen may fire in defense of self and family in the home. Thus, the magazine prohibition must be analyzed under strict scrutiny. *See Colorado Outfitters,* 2014 U.S. Dist. LEXIS 87021 at *46 (noting that the

39

magazine prohibition implicated the core Second Amendment interest of self-defense in the home).

The Act's prohibition on magazines with a capacity of more than 10 rounds of ammunition is not narrowly tailored. The Act prohibits the transfer and receipt of such magazines for all purposes by all persons, except retired law enforcement officers. *Supra* at, 8. The Act is not tailored to affect only the criminal use of these magazines, nor does it restrict their sale to only law-abiding citizens. Moreover, it permits criminals intent on using a Prohibited Magazine to acquire one in a neighboring state and bring it into Maryland.

Maryland's statutory scheme before the passage of the Act demonstrates that the 10-round prohibition now in place is not the least restrictive alternative available. Before the Act, Maryland prohibited magazines with a capacity of more than 20 rounds of ammunition. Md. Code Ann. Crim. L. § 4-305(b) (2002, 2012 Repl. Vol.). The Act lowered the capacity restriction to 10 rounds of ammunition. The 20-round limit permitted law-abiding citizens to acquire the magazines most commonly provided with handguns, while still prohibiting the 50- and 100-round drums about which the State and its experts expressed concern. JA 2770. This alternative is less restrictive because it permits law-abiding citizens to access the standard magazines for which their firearms are designed but prohibits the super large-capacity magazines that the State contends are dangerous in mass shootings.

40

The Act is not narrowly tailored because it does not actually prevent criminals from possessing the Prohibited Magazines. The underlying theory of prohibiting magazines above a certain capacity is that the lack of general availability will dry up supply for criminals. *See* JA 548. But the Act does not actually prohibit anyone from bringing magazines of any capacity into Maryland. *Supra* at, 16. A criminal desiring to use a magazine of a specific capacity in a crime need only travel to a neighboring state and acquire the magazines he desires.[7] This "substitution" issue was cited in the failure of the Federal Ban. *Supra* at, 15. The only individuals impacted will be the law-abiding citizens who wish to receive a standard capacity magazine when purchasing firearms for self-defense.

   2.     The Magazine Prohibition Cannot Survive Even Intermediate
          Scrutiny.

The undisputed evidence in the record demonstrates that the federal prohibition on magazines with a capacity greater than 10 rounds of ammunition did not impact the criminal use of such magazines. *Supra* at, 14. As explained more fully below, there is no evidence beyond unsupported speculation that the Act will have any impact on the criminal use of these magazines. This is not sufficient to satisfy the State's burden. *Carter,* 669 F.3d at 418.

---

[7]     This assumes, of course, that the criminal would obey the Act with respect to purchasing the Prohibited Magazines. Other viable alternatives available to the criminal would be to purchase them illegally from someone who imported them into the state or from a retired law enforcement officer, who is exempt from the magazine prohibition. Md. Code Ann. Crim. L. § 4-305(a)(2).

41

The District Court attempted to justify the Act's prohibition by holding that the Act fixed the loopholes that caused the Federal Ban to be ineffective. JA 192. This is demonstrably inconsistent with the evidence. The Federal Ban permitted an unlimited number of magazines to be imported into the United States if they were manufactured before 1994. JA 409. This problem is magnified with the Act. The Act permits any number of magazines to be brought into the state, regardless of the time or place of manufacturing, from any other state. *Supra* at, 16. It is easier for a criminal to travel to a different state than to import a magazine from another country. There exists an inexhaustible supply of new magazines that can be brought into Maryland at any time from neighboring states. The same problems that lessened the effectiveness of the Federal Ban will cause the Act to have even less of a positive effect than the Federal Ban. Even on the implausible assumption that the ban will reduce criminal use of Prohibited Magazines, it still would not pass constitutional muster because (a) criminals can simply substitute other magazines or carry multiple guns, and (b) law-abiding citizens necessarily will be at a disadvantage in responding to an attacker prepared with a higher capacity magazine.

IV.    THE ACT VIOLATES THE EQUAL PROTECTION CLAUSE OF THE
FOURTEENTH AMENDMENT BY EXEMPTING RETIRED LAW
ENFORCEMENT OFFICERS.

The equal protection clause of the Fourteenth Amendment prohibits the

government from disparate treatment of similarly situated individuals. The Act

discriminates between similarly situated individuals by permitting retired law

enforcement officers to acquire and possess the Prohibited Firearms and

Magazines. *Supra* at, 6-8. The exemptions for retired law enforcement officers do

not require them to have had any training or experience with the Prohibited

Firearms and Magazines, and most have had no such training. JA 220. Some

Plaintiffs, including Plaintiff Turner, have extensive training and experience with

the Prohibited Firearms and Magazines. *Supra* at, 6.

The District Court denied Plaintiffs' equal protection challenge because it

ruled that retired law enforcement officers are differently situated from Plaintiffs,

finding the former have general training with firearms and had been entrusted with

the duty to ensure public safety. JA 193. These distinctions are beside the point.

Because some but not all retired law enforcement officers have relevant training

and some but not all Plaintiffs do as well, and both keep the Prohibited Magazines

for the same lawful purposes, they are similarly situated.

The Court of Appeals for the Ninth Circuit considered a nearly identical

exemption in the California "assault weapons" prohibition and found it

43

unconstitutional under rational basis review. *Silveira v. Lockyer*, 312 F.3d 1052, 1089-92 (9th Cir. 2002), *abrogated on other grounds by Heller*, 554 U.S. 570. California attempted to defend the law by arguing that "some peace officers receive more extensive training regarding the use of firearms than do members of the public." *Id.* at 1091. The Ninth Circuit rejected this argument, stating that "not only is the retired officers exception contrary to the purpose of the [assault weapons prohibition], its relationship to *any* legitimate state goal is so attenuated as to render the distinction arbitrary or irrational." *Id.* (internal quotation omitted) (emphasis in original).

The Act's exceptions for retired law enforcement officers are identical to those held to be unconstitutional by the Ninth Circuit, because they "arbitrarily and unreasonably afford[] a privilege to one group of individuals that is denied to others, including plaintiffs." *Id.* at 1091.[8]

## V. THE ACT IS UNCONSTITUTIONALLY VAGUE IN NOT DEFINING "COPIES" OF PROHIBITED FIREARMS.

The Act prohibits the possession of approximately 68 enumerated long guns and their "copies." *Supra* at, 6-7. The District Court's determination that the Act was not vague because it has an identifiable core of prohibited conduct – the list of 68 enumerated firearms – was error. It was also error for the District Court to

---

[8]     The exemption may not be severed because only the legislature may extend the scope of the prohibition, rendering the entire prohibition void. *McCorkle v. United States*, 559 F.2d 1258, 1261 (4th Cir. 1977).

uphold the Act on the ground that Defendant MSP has published standards by which a citizen purportedly can determine if a firearm is a "copy."

A statute is unconstitutionally vague if it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Put another way, a statute is unconstitutional if it fails "to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits[.]" *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (plurality opinion).

The vagueness problem is heightened in this case because the Act's firearm prohibition does not set forth a *scienter* requirement. Statutes burdening constitutional rights with criminal liability without a *mens rea* requirement are to be judged under the most exacting scrutiny for vagueness. *Morales*, 527 U.S. at 55. Thus, the appropriate test is whether "vagueness permeates" the challenged portion of the Act. *Id*.

For a firearm to be considered a "copy" under the Act, its internal components must be interchangeable with those of one of the enumerated firearms. JA 2414. This requires a citizen to acquire knowledge of the inner workings of all 68 of the enumerated Prohibited Firearms as well as the desired firearm. The Court of Appeals for the Sixth Circuit explained the problem with such a requirement:

45

"the average gun owner knows very little about how his gun operates or its design features." *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 253 (6th Cir. 1994) (holding that the phrase "slight modifications" in the definition of an "assault weapons" ban was unconstitutionally vague); *see also Staples*, 511 U.S. 600 (refusing to impute to a law-abiding citizen knowledge of the fully automatic capability of a long gun). In the same way that "an average gun owner does not know whether or not his weapon is a modification of another weapon," *Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 537 (6th Cir. 1998) (firearm owners could not be expected to know that level of detail about their firearms), the average gun owner does not know whether or not his firearm has internal components that are interchangeable with those of any of the 68 enumerated Prohibited Firearms. This problem is exacerbated by the fact that citizens cannot obtain the Prohibited Firearms to examine their internal components.

The District Court recognized that "consumers or dealers [may] still have questions about specific firearms," JA 201, but declined to find the term "copies" vague because Defendant MSP "is available to respond to their inquiries." JA 201. The District Court's reliance on MSP's willingness to assist consumers, however, was misplaced. Defendant MSP will not allow a citizen to request a ruling from MSP until he or she first consults a dealer, the manufacturer of the firearm in

question, and/or an attorney. *Supra* at, 7. Defendant MSP is not willing to provide written confirmation to manufacturers that a firearm can be sold legally in Maryland. JA 2687. In any event, it is up to the legislature, not Defendant MSP, to define crimes. The Maryland General Assembly could easily have set forth standards by which one is to judge whether a firearm is a "copy." By choosing not to do so, the legislature has set a "trap for the innocent by not providing fair warning." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

Law-abiding citizens seeking to purchase firearms to protect themselves and their families could easily be exposed to significant criminal penalty because they purchased a firearm without checking all of the myriad internal components of that firearm against those of 68 Prohibited Firearms that they cannot acquire. This is precisely the result that due process of law was designed to prevent.

VI.  **THE DISTRICT COURT ERRED BOTH IN DENYING PLAINTIFFS AND GRANTING THE STATE SUMMARY JUDGMENT ON THE EVIDENTIARY RECORD.**

A.  *The District Court Erred in Denying Plaintiffs Summary Judgment Based on Undisputed Material Facts.*

The undisputed evidence demonstrates that the Prohibited Firearms and Magazines are commonly acquired and kept for lawful purposes, including self-defense, competitive shooting, and hunting. *Supra* at, 8-10. Accordingly, the Prohibited Firearms and Magazines are not dangerous and unusual and are, therefore, protected by the Second Amendment. *Supra* at, 21-24.

47

Under *Heller*, the Act is flatly unconstitutional, because it prohibits the acquisition and possession of arms protected by the Second Amendment. There is no need for this Court to engage in any interest balancing test, because prohibitions on the acquisition and possession of protected arms by law-abiding citizens for use in the home are anathema to the Second Amendment under any analysis. *Heller*, 554 U.S. at 634-35.

Under either intermediate or strict scrutiny, Plaintiffs were entitled to summary judgment. Every social scientist to study prohibitions similar to the Act's has concluded that they are not effective in lessening firearm crime, the negative effects of firearm crime, or even the criminal use of the Prohibited Firearms and Magazines. *Supra* at, 13-15. Thus, the undisputed evidence demonstrates that there is no nexus between the asserted government interest of public safety and the Act's prohibitions of protected firearms and magazines. Moreover, proven, less restrictive alternatives were available.

B.    The District Court Erred in Granting the State Summary Judgment Based on Inadmissible Evidence.

The District Court failed to assess whether the evidence it considered was actually before the Maryland General Assembly when it passed the Act and whether there was substantial evidence supporting the Act before the legislature. Even to the extent the District Court is permitted to consider post-enactment evidence, it erred by denying Plaintiffs' Motion to Exclude.

48

1.    The District Court Erred in Upholding the Constitutionality of the Act Without Finding that Substantial Evidence Supporting the Act Had Been Before the Legislature.

In *Turner Broadcasting*, 512 U.S. at 665, the Supreme Court applied intermediate scrutiny to determine whether a federal law requiring cable broadcasters to carry certain enumerated channels violated the First Amendment. While a court must "accord substantial deference to the predictive judgments of Congress," the Supreme Court held that those judgments are not "insulated from meaningful review altogether." *Id* at 666. Rather, the court's obligation is to "exercise independent judgment," and "to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence." *Id.*

Courts following *Turner Broadcasting* have sought to ensure that the legislature "has drawn reasonable inferences based on substantial evidence" by examining the evidence actually before the legislature at the time of enactment. The U.S. Court of Appeals for the District of Columbia Circuit in *Hutchins v. D.C.*, 188 F.3d 531 (D.C. Cir. 1999), conducted an intermediate scrutiny analysis of a D.C. ordinance enacting a juvenile curfew. "In judging the closeness of the relationship between the means chosen (the curfew), and the government's interest, we see three interrelated concepts: the factual premises upon which the legislature based its decision, the logical connection the remedy has to those premises, and the scope of the remedy employed." *Id.* at 542. The court emphasized that, under

*Turner Broadcasting*, the factual premise for the legislature's decision advanced in the litigation must be the one actually relied upon by the legislature: "for a legislative judgment to warrant judicial deference, there must be a contemporaneous factual foundation from which the court can conclude that there is a close nexus between the burden on fundamental rights and the important state interest." *Id* at 567.

This Court has recognized the necessity of analyzing the substantiality of the evidence before the legislature. In *Satellite Broadcasting and Comm. Ass'n v. FCC*, 275 F.3d 337 (4th Cir. 2001), relied upon by the District Court in this case, JA 186, this Court applied the intermediate scrutiny standard articulated in *Turner Broadcasting*, reciting the Supreme Court's instruction that a reviewing court must "assure that . . . Congress has drawn reasonable inferences based on substantial evidence." *Id.* at 356. In describing its inquiry, this Court stated, "[w]e must decide whether Congress's factual predictions about the consequences of enacting a station-by-station copyright license were supported by substantial evidence *in the legislative record*." *Id.* at 357(citation to *Turner Broadcasting* omitted) (emphasis added). To the extent that this Court reviewed materials outside the legislative record, it did so "to confirm the reasonableness of Congress' predictions." *Id.* at 357-58. In other words, without an initial basis of substantial evidence before the legislature at the time of enactment, the statute could not pass heightened scrutiny

50

review. The Court went on to review the legislative record carefully to conclude that "each of Congress's predictions was supported by substantial evidence." *Id.* at 358.

Other U.S. Courts of Appeals have analyzed constitutional challenges to laws based only on evidence actually before the legislature. *See, e.g.*, *Video Software Dealers' Ass'n v. Schwarzenegger*, 556 F.3d 950 (9th Cir. 2009) (citing *Turner Broadcasting*, expressly premising findings on materials upon which the legislature "purportedly relied," and striking down challenged law because materials provided inadequate evidentiary basis for challenged law);  *Landell v. Sorrell*, 382 F.3d 91, 97-101 (2d Cir. 2004), *reversed on other grounds*, *Randall v. Sorrell* (citing *Turner Broadcasting,* expressly premising its conclusion on the legislative record the Vermont legislature put together to support its prediction, and upholding challenged law on the basis of that record); *Carver v. Nixon*, 72 F.3d 633, 644 (8th Cir. 1995) (citing *Turner Broadcasting* and striking down challenged law).

Still other U.S. Courts of Appeals have stated that *Turner Broadcasting* requires pre-enactment legislative consideration of evidence later offered to support a predictive judgment in court.  *See, e.g.*, *Peruta v. County of San Diego*, 742 F.3d 1144, 1176 (9th Cir. 2014) (citing *Turner Broadcasting* and observing that "deferring to the legislature's judgment … even though [the government could

51

not present the court] with much evidence to show how or why its legislators

arrived at this predictive judgment" was "not an appropriate application of

intermediate scrutiny"); *Kitchen v. Herbert*, 755 F.3d 1193, 1222-23 & n.10 (10th

Cir. 2014) (observing that if the court had been required to conduct a *Turner*

*Broadcasting* analysis, it would consider "circumstances in which lawmaking

authorities made factual findings regarding the feared risks before they

promulgated the challenged laws").

  In this case, the only evidence presented by the State to justify the

challenged portions of the Act that was actually before the Maryland General

Assembly were a one-paragraph statement by Daniel Webster, JA 2368, and the

testimony of Defendant Governor O'Malley. JA 1184.[9] The District Court did not

cite to or rely upon any of the evidence that was before the General Assembly.

None of the expert reports, outside materials, or declarations cited and relied upon

by the District Court were actually considered by the Maryland General Assembly.

  Webster's one-paragraph statement was based on Koper's 1997 Federal Ban

study, finding that the Federal Ban had no impact on crime and that the Prohibited

Firearms were rarely used in crimes, including mass shootings. JA 2368; 628.

Defendant O'Malley's testimony on the issues in this case consisted of four

---

[9]  The State also cited to the testimony of Chief Johnson before the Maryland General Assembly, but never actually put into evidence a transcript of what he said, nor did they even state the substance of his testimony. *See* JA 2944.

sentences that simply stated what the law prohibited. JA 1184. The State has not

carried its burden of demonstrating that the Act is constitutional based upon

substantial evidence that was before the Maryland General Assembly.

> 2. The District Court Erred in Relying upon Lay and Expert Opinion Testimony Not Meeting the Standards of Federal Rules of Evidence 701 and 702.

Even if such post-enactment evidence were admissible, the District Court

admitted and relied upon lay and expert opinion testimony that did not meet the

thresholds for admissibility set forth in Federal Rules of Evidence 701 and 702.

The District Court erred in rejecting Plaintiffs' challenges to the ballistics

opinions offered by the State's fact witness Henry Stawinski.[10] The court admitted

this evidence as lay opinion testimony because it mistakenly agreed "with [the

State] that none of this testimony contains expert opinions on ballistics." JA 166.

The District Court relied upon the disputed testimony of Stawinski that he

personally observed assault weapon rounds piercing soft body armor and shattering

glass. JA 166. The court also relied upon Stawinski's far broader opinions that

rounds fired from the Prohibited Firearms can penetrate walls and other home

structures and remain more effective than penetrating bullets fired from other guns.

---

[10]    The Court also relied upon the testimony of Brian Siebel before Congress.
JA 186. Siebel was a paid lobbyist who testified on behalf of the Brady Campaign
to Prevent Gun Violence. JA 1150. He was not qualified as an expert, designated
as a fact or expert witness by the State, nor subject to cross-examination. To
Plaintiffs' knowledge, he has never appeared as an expert in a legal proceeding.
The District Court erred in relying on this lay opinion testimony as well.

JA 189. Stawinski's personal observations of a bullet penetrating a ballistic vest or glass could not provide a basis for his ballistics opinions regarding a bullet penetrating a wall. For this reason, the District Court erred in admitting and relying upon his lay ballistics testimony. *See* Fed. R. Evid. 701 (requiring lay opinion testimony to be based on personally observed events). The unreliability of this evidence is made clear and is directly disputed by the unchallenged expert testimony from the former Supervisory Special Agent of the FBI Ballistic Research Facility, Buford Boone. JA 2163-70. He specifically recommended Prohibited Firearms for self-defense in the home because they did not overpenetrate as compared to other firearms, including handguns. JA 2168-69. The district court relied upon Stawinski's lay opinion and disregarded Boone's expert opinion.

The District Court refused to apply the familiar standard of Rule 702 that requires that an expert's opinion be stated to a reasonable degree of scientific certainty. JA 163 ("[A]pplying such a standard here would misapprehend the court's inquiry."). This is an abdication of the gatekeeping role of a trial court judge, and is not permitted under the Federal Rules of Evidence, or by binding precedent on this Court.

In *Kumho Tire Company v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court held that federal courts' "gatekeeping obligation" – their "special obligation" under Rule 702 to "ensure that any and all scientific testimony … is not only

relevant, but reliable" – applies not only to scientific testimony under *Daubert v.*

*Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), but "to *all* expert testimony."

526 U.S. at 147 (emphasis added); *see also id.* at 148-149 ("to all expert

testimony," "to all expert testimony," "to all experts," and "experts of all kinds");

*id.* at 158 (Scalia, J., concurring) ("I join the opinion of the Court, which makes

clear that the discretion it endorses – trial-court discretion in choosing the manner

of testing expert reliability – is not discretion to abandon the gatekeeping function.

I think it worth adding that it is not discretion to perform the function inadequately.

Rather, it is discretion to choose among *reasonable* means of excluding expertise

that is *fausse* and science that is junky.").

Following *Kumho Tire*, federal courts handling constitutional challenges

routinely subject proposed expert testimony to a rigorous reliability analysis under

Rule 702. *See, e.g.*, *Montes v. City of Yakima*, No. 12-CV-3108, 2014 WL 4199364

(E.D. Wash. Aug. 22, 2014) (Section 2 of Voting Rights Act); *A.A. v. Raymond*,

No. 2:13-cv-01167, 2013 WL 3816565 (E.D. Cal. July 22, 2013) (Equal Protection

Clause); *Many Cultures, One Message v. Clements*, 830 F. Supp. 2d 1111 (W.D.

Wash. 2011) (§ 1983 action). Rule 702 must be applied to ensure the reliability of

qualifying evidence, even in the context of a bench trial. *See Raymond*, *supra*,

2013 WL 3816565, at *4 ("Even in these cases, the court must still conduct the

*Daubert* analysis and make an explicit finding of the expert testimony's reliability, even if it does not conduct a separate *Daubert* hearing.").

By failing to conduct a proper Rule 702 analysis, the District Court never actually articulated the standard that it was applying to resolve Plaintiffs' Rule 702 challenges to the State's post-enactment evidence, and never established that the evidence was reliable.

This abdication was most apparent with respect to Plaintiffs' challenges to Koper's opinions. *See* JA 164. The trial court merely stated "Koper's testimony is well-suited to answer the question facing the court and is precisely the kind of evidence upon which other courts have relied . . . ." JA 164. The District Court never actually applied Rule 702 to Plaintiffs' Rule 702 challenge, abdicating its responsibility to do so, simply because other courts had relied upon Koper (none of which articulated a Rule 702 analysis upon which the District Court could rely).

Koper's opinions were inadmissible for another reason: they were directly contradicted by the evidence and data he cited to support them. Koper's data and reports on the Federal Ban all indicated that the Federal Ban, which was equally if not more robust than the Act's prohibitions, did not have any impact on criminal use of the Prohibited Firearms and Magazines. *Supra* at, 14. Despite this, Koper concluded that the Act could have the "potential" for a positive impact based on his study of the Federal Ban. JA 345. Given that Rule 702 requires that an expert's

opinion be based on "sufficient facts and data," and Koper's own facts and data contradict Koper's opinion, it should have been excluded.

Plaintiffs also challenged the expert opinions of Lucy Allen and Webster based on data compiled by the online magazine *Mother Jones* because the State failed to establish that the data were reliable. JA 3002-03. In rejecting Plaintiffs' challenges to Webster's and Allen's opinions based on these data, the District Court mistakenly concluded the data from this magazine "were subject to independent analysis by Koper and his graduate student." JA 165. Koper's declaration states "I have not independently investigated or researched the mass shooting incidents reported by *Mother Jones* but am simply using the data as it appears in *Mother Jones*'s updated data set." JA 351. The District Court erred by admitting and relying upon Allen's and Webster's opinions.

The District Court also inappropriately shifted the burden onto Plaintiffs to demonstrate that the State's expert evidence was inadmissible. The District Court stated mistakenly, with respect to the *Mother Jones* data, that "plaintiffs have offered nothing to suggest the *Mother Jones* data are unreliable or inaccurate." JA 165.[11] *Daubert*, 509 U.S. at 592 n.10 (establishing the admissibility of evidence is the proponent's burden).

---

[11]    To the contrary, as Plaintiffs noted in their Motion for Summary Judgment, JA 2890-91, data in *Mother Jones* was not peer reviewed and the definition of "assault weapon" used in *Mother Jones* included a multitude of firearms not banned by the Act and therefore overrepresented the use of the Prohibited Firearms

C.   The District Court Erred in Granting the State Summary Judgment
     Based on Disputed Material Facts.

Federal Rule of Civil Procedure 56 provides in pertinent part that "[t]he

court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The District Court erred by granting summary

judgment to the State in the face of genuine disputes of material fact. As the

Supreme Court recently held, "[s]ummary judgment is appropriate only if the

movant shows that there is no genuine issue as to any material fact and the movant

is entitled to judgment as a matter of law. In making that determination, a court

must view the evidence in the light most favorable to the opposing party." *Tolan v.*

*Cotton*, 134 S. Ct. 1861, 1866 (2014) (internal citations and quotation marks

omitted).

It is no answer to the District Court's failure to adhere to the summary

judgment standard that this action might well have been destined for a non-jury

trial. *In re French*, 499 F.3d 345, 359 (4th Cir. 2007); *Medical Institute of*

*Minnesota v. National Ass'n of Trade and Technical Schools*, 817 F.2d 1310, 1315

(8th Cir. 1987).

---

in crimes. Furthermore, as Plaintiffs asserted in their Motion to Exclude, JA 3002,
Webster testified that he did not even know how many of the instances reported by
*Mother Jones* involved firearms prohibited by the Act.

The District Court did not "view the evidence in the light most favorable" to Plaintiffs. The following material facts were disputed by Plaintiffs but were resolved against the Plaintiffs by the District Court:

- Whether the Prohibited Firearms have "military-style" features making them especially dangerous to law enforcement and civilians. *Compare* JA 186 *with* JA 2165-66.

- Whether the AR-15 is "essentially the same as the military's M-16 rifle." *Compare* JA 186 *with* JA 2127-28.

- Whether the difference in rate of fire from a semiautomatic and fully-automatic rifle is "minimal." *Compare* JA 186 *with* JA 2128.

- Whether the Prohibited Weapons are designed to cause "extensive damage." *Compare* JA 187 *with* JA 2168.

- Whether the Prohibited Firearms are designed for uses that distinguish them from traditional sporting rifles. *Compare* JA 187 *with* JA 2129-30.

- Whether certain features of the Prohibited Firearms, such as pistol grips and, in some cases, flash suppressors, provide criminals with a "military-style advantage" over law enforcement. *Compare* JA 187 *with* JA 2165-66.

- Whether rounds fired from Prohibited Firearms – "more so than rounds from many other types of guns" – have the capability to penetrate soft

59

body armor worn by law enforcement officers and many kinds of bullet-resistant glass. *Compare* JA 187-88 *with* JA 2280-81.

- Whether the Prohibited Firearms are disproportionately used in attacks against police officers. *Compare* JA 188 *with* JA 2280.

- Whether the Act will limit the availability to criminals of either Prohibited Firearms or Prohibited Magazines. *Compare* JA 188 *with supra* at, 13-17.

- Whether the penetrating capabilities of bullets fired from Prohibited Firearms are higher than those of other firearms. *Compare* JA 189 *with* JA 2371-97.

- Whether civilians receive the same kind of training that law enforcement officers receive with respect to the Prohibited Firearms and/or the Prohibited Magazines. *Compare* JA 189 *with supra* at, 6.

- Whether civilians using Prohibited Magazines fire more rounds per incident than police officers in self-defense situations. *Compare* JA 190 *with* JA 2097.

- Whether the Act closed any of the "loopholes" in the federal Assault Weapons Ban that would make the Act more effective. *Compare* JA 192 *with supra* at, 46-47.

- Whether Maryland State Police offers meaningful guidance to consumers and manufacturers so they know whether any particular firearm is a "copy" of an enumerated Prohibited Firearm. *Compare* JA 199-201 *with* JA 2687.

The disputed material facts listed above were material to the District Court's reasoning behind its grant of summary judgment to the State. For this reason alone, summary judgment should not have been granted to the State.

## CONCLUSION

For the reasons stated above, the Act's firearm and magazine prohibitions violate the Second and Fourteenth Amendments to the United States Constitution. Plaintiffs respectfully request that this Court reverse the judgment of the District Court and render a judgment in favor of Plaintiffs.

Respectfully submitted,

/s/ John Parker Sweeney
John Parker Sweeney
T. Sky Woodward
James W. Porter, III
Marc A. Nardone
*Attorneys for Appellants*
Bradley Arant Boult Cummings, LLP
1516 L Street, NW, Suite 1350
Washington, DC 20036
(202) 393-7150
jsweeney@babc.com

61

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,804 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as counted by the Microsoft Word counting function (including footnotes).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

Dated: November 4, 2014

/s/ John Parker Sweeney
John Parker Sweeney
*Attorney for Appellants*

## REQUEST FOR ORAL ARGUMENT

Plaintiffs hereby request oral argument before this Court.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of November, 2014, Appellants'
Brief and the parties' Joint Appendix were served, via electronic delivery to all
parties' counsel via the Court's appellate CM/ECF system which will forward
copies to Counsel of Record. I further certify that the Joint Appendix Under Seal
was served via next-day delivery to:

Matthew John Fader
Office of the Attorney General of Maryland
200 St. Paul Place
Baltimore, Maryland 21202


*/s/ John Parker Sweeney*
John Parker Sweeney

# ADDENDUM



1 of 1 DOCUMENT

Annotated Code of Maryland
Copyright 2014 by Matthew Bender and Company, Inc., a member of the LexisNexis Group
All rights reserved.

*** Statutes current through the 2013 General Assembly Regular Session ***
*** Annotations through November 20, 2013 ***

CRIMINAL LAW
TITLE 4. WEAPON CRIMES
SUBTITLE 3. ASSAULT WEAPONS AND DETACHABLE MAGAZINES.

**GO TO MARYLAND STATUTES ARCHIVE DIRECTORY**

*Md. CRIMINAL LAW Code Ann. § 4-301 (2014)*

§ 4-301. Definitions.


(a) In general. -- In this subtitle the following words have the meanings indicated.

(b) Assault long gun. -- "Assault long gun" means any assault weapon listed under *§ 5-101(r)(2) of the Public Safety Article.*

(c) Assault pistol. -- "Assault pistol" means any of the following firearms or a copy regardless of the producer or manufacturer:

(1) AA Arms AP-9 semiautomatic pistol;

(2) Bushmaster semiautomatic pistol;

(3) Claridge HI-TEC semiautomatic pistol;

(4) D Max Industries semiautomatic pistol;

(5) Encom MK-IV, MP-9, or MP-45 semiautomatic pistol;

(6) Heckler and Koch semiautomatic SP-89 pistol;

(7) Holmes MP-83 semiautomatic pistol;

(8) Ingram MAC 10/11 semiautomatic pistol and variations including the Partisan Avenger and the SWD Cobray;

(9) Intratec TEC-9/DC-9 semiautomatic pistol in any centerfire variation;

Md. CRIMINAL LAW Code Ann. § 4-301

(10) P.A.W.S. type semiautomatic pistol;

(11) Skorpion semiautomatic pistol;

(12) Spectre double action semiautomatic pistol (Sile, F.I.E., Mitchell);

(13) UZI semiautomatic pistol;

(14) Weaver Arms semiautomatic Nighthawk pistol; or

(15) Wilkinson semiautomatic "Linda" pistol.

(d) Assault weapon. -- "Assault weapon" means:

(1) an assault long gun;

(2) an assault pistol; or

(3) a copycat weapon.

(e) Copycat weapon. --

(1) "Copycat weapon" means:

(i) a semiautomatic centerfire rifle that can accept a detachable magazine and has any two of the following:

1. a folding stock;

2. a grenade launcher or flare launcher; or

3. a flash suppressor;

(ii) a semiautomatic centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds;

(iii) a semiautomatic centerfire rifle that has an overall length of less than 29 inches;

(iv) a semiautomatic pistol with a fixed magazine that can accept more than 10 rounds;

(v) a semiautomatic shotgun that has a folding stock; or

(vi) a shotgun with a revolving cylinder.

(2) "Copycat weapon" does not include an assault long gun or an assault pistol.

(f) Detachable magazine. -- "Detachable magazine" means an ammunition feeding device that can be removed readily from a firearm without requiring disassembly of the firearm action or without the use of a tool, including a bullet or cartridge.

(g) Flash suppressor. -- "Flash suppressor" means a device that functions, or is intended to function, to perceptibly reduce or redirect muzzle flash from the shooter's field of vision.

(h) Licensed firearms dealer. -- "Licensed firearms dealer" means a person who holds a dealer's license under Title 5, Subtitle 1 of the Public Safety Article.

**HISTORY:** An. Code 1957, art. 27, § 36H-1; 2002, ch. 26, § 2; 2013, ch. 427.

Md. CRIMINAL LAW Code Ann. § 4-301

**NOTES:** REVISOR'S NOTE

*This Revisor's note comprises information related to the revision by Acts 2002, ch. 26.*

This section is new language derived without substantive change from former Art. 27, § 36H-1.

In the introductory language of this section, the former word "specified" is deleted as surplusage.

Also in the introductory language of this section, the reference to the "producer or manufacturer" is substituted for the former reference to the "company [which] produced and manufactured the firearm" for brevity.

EFFECT OF AMENDMENTS. --Chapter 427, Acts 2013, effective October 1, 2013, substituted "Weapons" for "Pistols" in the Subtitle 3 heading; added (a), (b), and (d) through (h); redesignated accordingly; in the introductory language of (c) deleted "In this subtitle" at the beginning; and made related changes.

BILL REVIEW LETTER. --Chapter 427, Acts 2013, (Senate Bill 281) was approved for constitutionality and legal sufficiency. The provisions banning assault weapons and high capacity detachable magazines, armor piercing bullets satisfy the appropriate level of scrutiny and are constitutional as there is a substantial relationship between the banning of these weapons and the State's objective of controlling crime and protecting law enforcement officers. The licensing requirements and license fees for handguns are presumptively constitutional; specifically, the fees are constitutional administrative fees, not a revenue tax intended to raise money or inhibit the exercise of a constitutional right. The provisions that disqualify firearm possession due to mental health issues are likely to be found NIAA compliant. Other provisions relating to wear and carry permits, disqualifying crimes, lost and stolen guns and hunting would generally be found to be constitutional. (Letter of the Attorney General dated April 30, 2013.)

*CITED IN Christian v. State, 405 Md. 306, 951 A.2d 832 (2008); Evans v. State, 420 Md. 391, 23 A.3d 223 (2011); Pair v. State, 202 Md. App. 617, 33 A.3d 1024 (2011).*

NOTES APPLICABLE TO ENTIRE ARTICLE

EDITOR'S NOTE. --Some of the cases appearing in the notes to this article were decided under the former statutes in effect prior to the 2002 revision. These earlier cases have been moved to pertinent sections of the revised material where they may be used in interpreting the current statutes. Internal references have also been updated.

Editor's notes from legislation affecting the statutes from which the provisions of this article were derived may have been retained and may appear under pertinent provisions of this article.

Section 5, ch. 26, Acts 2002, provides that "§ 281 (i) of Article 27 -- Crimes and Punishments of the Annotated Code of Maryland be repealed and reenacted, with amendments, and transferred to the Session Laws, to read as follows:

1. The Department of Health and Mental Hygiene shall initially permit persons to register under Title 5, Subtitle 3 of the Criminal Law Article if the persons own or operate any establishment engaged in the manufacture, distribution or dispensing of any controlled dangerous substances prior to July 1, 1970, and who are registered or licensed by the State."

Section 6, ch. 26, Acts 2002, provides that "§§ 302 (a) through (c), inclusive, of Article 27 - Crimes and Punishments of the Annotated Code of Maryland be repealed and reenacted, with amendments, and transferred to the Session Laws, to read as follows:

(a) Prosecutions for any violation of law occurring prior to July 1, 1970, shall not be affected by these repealers or amendments, or abated by reason thereof.

(b) Civil seizures or forfeitures and injunctive proceedings commenced prior to July 1, 1970, shall not be affected by these repealers or amendments, or abated by reason thereof.

(c) All administrative proceedings pending before the Department of Health and Mental Hygiene on July 1, 1970, shall be continued and brought to final determination in accord with laws and regulations in effect prior to July 1, 1970. Such drugs placed under control prior to July 1, 1970, which are not listed within Schedules I through V shall automatically be controlled and listed in the appropriate schedule."

Section 7, ch. 26, Acts 2002, provides that "the continuity of every commission, office, department, agency or other unit is retained. The personnel, records, files, furniture, fixtures, and other properties and all appropriations, credits,

assets, liabilities, and obligations of each retained unit are continued as the personnel, records, files, furniture, fixtures, properties, appropriations, credits, assets, liabilities, and obligations of the unit under the laws enacted by this Act."

Section 8, ch. 26, Acts 2002, provides that "nothing in this Act affects the term of office of an appointed or elected member of any commission, office, department, agency, or other unit. An individual who is a member of a unit on the effective date of this Act shall remain a member for the balance of the term to which appointed or elected, unless the member sooner dies, resigns, or is removed under provisions of law."

Section 9, ch. 26, Acts 2002, provides that "except as expressly provided to the contrary in this Act, any transaction or employment status affected by or flowing from any change of nomenclature or any statute amended, repealed, or transferred by this Act and validly entered into or existing before the effective date of this Act and every right, duty, or interest flowing from a statute amended, repealed, or transferred by this Act remains valid after the effective date of this Act and may be terminated, completed, consummated, or enforced as required or allowed by any statute amended, repealed, or transferred by this Act as though the repeal, amendment, or transfer had not occurred. If a change in nomenclature involves a change in name or designation of any State unit, the successor unit shall be considered in all respects as having the powers and obligations granted the former unit."

Section 10, ch. 26, Acts 2002, provides that "except as expressly provided to the contrary in this Act, any person licensed, registered, certified, or issued a permit or certificate by any commission, office, department, agency, or other unit established or continued by any statute amended, repealed, or transferred by this Act is considered for all purposes to be licensed, registered, certified, or issued a permit or certificate by the appropriate unit continued under this Act for the duration of the term for which the license, registration, certification, or permit was issued, and may renew that authorization in accordance with the appropriate renewal provisions of this Act."

Section 11, ch. 26, Acts 2002, provides that "this Act does not rescind, supersede, change, or modify any rule adopted by the Court of Appeals that is or was in effect on the effective date of this Act concerning the practice and procedure in and the administration of the appellate courts and the other courts of this State."

Section 12, ch. 26, Acts 2002, provides that "the publisher of the Annotated Code of Maryland, in consultation with and subject to the approval of the Department of Legislative Services, shall correct, with no further action required by the General Assembly, cross-references and terminology rendered incorrect by this Act or by any other Act of the General Assembly of 2002 that affects provisions enacted by this Act. The publisher shall adequately describe any such correction in an editor's note following the section affected."

Section 13, ch. 26, Acts 2002, provides that "it is the intention of the General Assembly that, except as expressly provided in this Act, this Act shall be construed as a nonsubstantive revision, and may not otherwise be construed to render any substantive change in the criminal law of the State."

Section 14, ch. 26, Acts 2002, provides that "the catchlines, captions, and Revisor's Notes contained in this Act are not law and may not be considered to have been enacted as a part of this Act."

Section 15, ch. 26, Acts 2002, provides that § 3 of this act shall take effect July 1, 2003.

Section 16, ch. 26, Acts 2002, provides that, except as provided in § 15 of this act, this act shall take effect October 1, 2002.



1 of 1 DOCUMENT

Annotated Code of Maryland
Copyright 2014 by Matthew Bender and Company, Inc., a member of the LexisNexis Group
All rights reserved.

*** Statutes current through the 2013 General Assembly Regular Session ***
*** Annotations through November 20, 2013 ***

CRIMINAL LAW
TITLE 4.  WEAPON CRIMES
SUBTITLE 3.  ASSAULT WEAPONS AND DETACHABLE MAGAZINES.

**GO TO MARYLAND STATUTES ARCHIVE DIRECTORY**

*Md. CRIMINAL LAW Code Ann. § 4-302  (2014)*

§ 4-302. Scope of subtitle


This subtitle does not apply to:

(1) if acting within the scope of official business, personnel of the United States government or a unit of that government, members of the armed forces of the United States or of the National Guard, law enforcement personnel of the State or a local unit in the State, or a railroad police officer authorized under Title 3 of the Public Safety Article or *49 U.S.C. § 28101;*

(2) a firearm modified to render it permanently inoperative;

(3) possession, importation, manufacture, receipt for manufacture, shipment for manufacture, storage, purchases, sales, and transport to or by a licensed firearms dealer or manufacturer who is:

(i) providing or servicing an assault weapon or detachable magazine for a law enforcement unit or for personnel exempted under item (1) of this section;

(ii) acting to sell or transfer an assault weapon or detachable magazine to a licensed firearm dealer in another state or to an individual purchaser in another state through a licensed firearms dealer; or

(iii) acting to return to a customer in another state an assault weapon transferred to the licensed firearms dealer or manufacturer under the terms of a warranty or for repair;

(4) organizations that are required or authorized by federal law governing their specific business or activity to maintain assault weapons and applicable ammunition and detachable magazines;

(5) the receipt of an assault weapon or detachable magazine by inheritance, and possession of the inherited assault

weapon or detachable magazine, if the decedent lawfully possessed the assault weapon or detachable magazine and the person inheriting the assault weapon or detachable magazine is not otherwise disqualified from possessing a regulated firearm;

(6) the receipt of an assault weapon or detachable magazine by a personal representative of an estate for purposes of exercising the powers and duties of a personal representative of an estate;

(7) possession by a person who is retired in good standing from service with a law enforcement agency of the State or a local unit in the State and is not otherwise prohibited from receiving an assault weapon or detachable magazine if:

(i) the assault weapon or detachable magazine is sold or transferred to the person by the law enforcement agency on retirement; or

(ii) the assault weapon or detachable magazine was purchased or obtained by the person for official use with the law enforcement agency before retirement;

(8) possession or transport by an employee of an armored car company if the individual is acting within the scope of employment and has a permit issued under Title 5, Subtitle 3 of the Public Safety Article; or

(9) possession, receipt, and testing by, or shipping to or from:

(i) an ISO 17025 accredited, National Institute of Justice-approved ballistics testing laboratory; or

(ii) a facility or entity that manufactures or provides research and development testing, analysis, or engineering for personal protective equipment or vehicle protection systems.

**HISTORY:** An. Code 1957, art. 27, § 36H-2; 2002, ch. 26, § 2; 2013, ch. 427.

**NOTES:** REVISOR'S NOTE

*This Revisor's note comprises information related to the revision by Acts 2002, ch. 26.*

This section is new language derived without substantive change from former Art. 27, § 36H-2.

In item (1) of this section, the reference to "a unit" of the United States government is substituted for the former reference to "any agency or department of the United States" for brevity.

In the introductory language of item (3) and in item (3)(ii) of this section, the reference to a licensed "firearm[s]" dealer is substituted for the former incorrect reference to a licensed "gun" dealer.

In items (3)(i) and (ii), (4), (5), and (6) of this section, the references to an assault pistol "or detachable magazine[s]" are added for consistency within this subtitle.

In item (3)(i) of this section, the reference to "personnel" is substituted for the former reference to an "entity" to conform with the term used in item (1) of this section.

Also in item (3)(i) of this section, the word "unit" is substituted for the former word "agency" to conform with standard terminology used to describe governmental bodies. *See* General Revisor's Note to article.

In item (4) of this section, the former reference to federal "regulations" is deleted in light of the comprehensive reference to "federal law", which includes regulations.

Former Art. 27, § 36H-5(a), which exempted certain personnel, units, and transfers from the prohibition against manufacturing, selling, receiving, or transferring certain magazines under § 4-305 of this subtitle [former § 36H-5(b)], is deleted as redundant of this section.

DEFINED TERMS:

"Assault pistol"                        § 4-301
"State"                                 § 1-101

Md. CRIMINAL LAW Code Ann. § 4-302

EFFECT OF AMENDMENTS. --Chapter 427, Acts 2013, effective October 1, 2013, added "or a railroad police officer authorized under Title 3 of the Public Safety Article or *49 U.S.C. § 28101*" in (1); in the introductory language of (3) added "possession, importation, manufacture, receipt for manufacture, shipment for manufacture, storage"; in (3)(i), (3)(ii), (4), and (6) substituted "weapon" for "pistol" or variants; in (3)(ii) added "or to an individual purchaser in another state through a licensed firearms dealer; or"; added (3)(iii) and (7) through (9); rewrote (5); and made related changes.

BILL REVIEW LETTER. --Chapter 427, Acts 2013, (Senate Bill 281) was approved for constitutionality and legal sufficiency. The provisions banning assault weapons and high capacity detachable magazines, armor piercing bullets satisfy the appropriate level of scrutiny and are constitutional as there is a substantial relationship between the banning of these weapons and the State's objective of controlling crime and protecting law enforcement officers. The licensing requirements and license fees for handguns are presumptively constitutional; specifically, the fees are constitutional administrative fees, not a revenue tax intended to raise money or inhibit the exercise of a constitutional right. The provisions that disqualify firearm possession due to mental health issues are likely to be found NIAA compliant. Other provisions relating to wear and carry permits, disqualifying crimes, lost and stolen guns and hunting would generally be found to be constitutional. (Letter of the Attorney General dated April 30, 2013.)

USER NOTE: For more generally applicable notes, see notes under the first section of this part, subtitle, title, division or article.



1 of 1 DOCUMENT

Annotated Code of Maryland
Copyright 2014 by Matthew Bender and Company, Inc., a member of the LexisNexis Group
All rights reserved.

*** Statutes current through the 2013 General Assembly Regular Session ***
*** Annotations through November 20, 2013 ***

CRIMINAL LAW
TITLE 4.  WEAPON CRIMES
SUBTITLE 3.  ASSAULT WEAPONS AND DETACHABLE MAGAZINES.

**GO TO MARYLAND STATUTES ARCHIVE DIRECTORY**

*Md. CRIMINAL LAW Code Ann. § 4-303*  (2014)

§ 4-303. Assault weapons -- Prohibited


(a) In general. -- Except as provided in subsection (b) of this section, a person may not:

(1) transport an assault weapon into the State; or

(2) possess, sell, offer to sell, transfer, purchase, or receive an assault weapon.

(b) Exception. --

(1) A person who lawfully possessed an assault pistol before June 1, 1994, and who registered the assault pistol with the Secretary of State Police before August 1, 1994, may:

(i) continue to possess and transport the assault pistol; or

(ii) while carrying a court order requiring the surrender of the assault pistol, transport the assault pistol directly to the law enforcement unit, barracks, or station if the person has notified the law enforcement unit, barracks, or station that the person is transporting the assault pistol in accordance with a court order and the assault pistol is unloaded.

(2) A licensed firearms dealer may continue to possess, sell, offer for sale, or transfer an assault long gun or a copycat weapon that the licensed firearms dealer lawfully possessed on or before October 1, 2013.

(3) A person who lawfully possessed, has a purchase order for, or completed an application to purchase an assault long gun or a copycat weapon before October 1, 2013, may:

(i) possess and transport the assault long gun or copycat weapon; or

Md. CRIMINAL LAW Code Ann. § 4-303

(ii) while carrying a court order requiring the surrender of the assault long gun or copycat weapon, transport the assault long gun or copycat weapon directly to the law enforcement unit, barracks, or station if the person has notified the law enforcement unit, barracks, or station that the person is transporting the assault long gun or copycat weapon in accordance with a court order and the assault long gun or copycat weapon is unloaded.

(4) A person may transport an assault weapon to or from:

(i) an ISO 17025 accredited, National Institute of Justice-approved ballistics testing laboratory; or

(ii) a facility or entity that manufactures or provides research and development testing, analysis, or engineering for personal protective equipment or vehicle protection systems.

**HISTORY:** An. Code 1957, art. 27, § 36H-3; 2002, ch. 26, § 2; 2010, ch. 712; 2013, ch. 427.

**NOTES:** REVISOR'S NOTE
  *This Revisor's note comprises information related to the revision by Acts 2002, ch. 26.*
  This section is new language derived without substantive change from former Art. 27, § 36H-3.
  In the introductory language of subsection (a) of this section, the former phrase "[s]ubject to the provisions of this subheading" is deleted as redundant of § 4-302 of this subtitle, which specifies that the exemptions contained in that section apply to the entire subtitle.
  Also in the introductory language of subsection (a) of this section, the former effective date "June 1, 1994" is deleted as obsolete.
  In subsection (a)(2) of this section, the former phrase "in the State" is deleted because the State's jurisdiction is limited to activities within the State.

DEFINED TERMS:

| | |
|---|---|
| "Assault pistol" | § 4-301 |
| "Person" | § 1-101 |

EFFECT OF AMENDMENTS. --Chapter 712, Acts 2010, effective October 1, 2010, added the (b)(1) designation; added (b)(2); and made related and stylistic changes.
  Chapter 427, Acts 2013, effective October 1, 2013, substituted "weapon" for "pistol" in (a)(1) and (a)(2); added the (b)(1) designation and redesignated accordingly; in (b)(1)(i) added "and transport"; and added (b)(2) through (b)(4).

BILL REVIEW LETTER. --Chapter 427, Acts 2013, (Senate Bill 281) was approved for constitutionality and legal sufficiency. The provisions banning assault weapons and high capacity detachable magazines, armor piercing bullets satisfy the appropriate level of scrutiny and are constitutional as there is a substantial relationship between the banning of these weapons and the State's objective of controlling crime and protecting law enforcement officers. The licensing requirements and license fees for handguns are presumptively constitutional; specifically, the fees are constitutional administrative fees, not a revenue tax intended to raise money or inhibit the exercise of a constitutional right. The provisions that disqualify firearm possession due to mental health issues are likely to be found NIAA compliant. Other provisions relating to wear and carry permits, disqualifying crimes, lost and stolen guns and hunting would generally be found to be constitutional. (Letter of the Attorney General dated April 30, 2013.)

*CITED IN State v. Phillips, 210 Md. App. 239, 63 A.3d 51 (2013).*

USER NOTE: For more generally applicable notes, see notes under the first section of this part, subtitle, title, division or article.



1 of 1 DOCUMENT

Annotated Code of Maryland
Copyright 2014 by Matthew Bender and Company, Inc., a member of the LexisNexis Group
All rights reserved.

*** Statutes current through the 2013 General Assembly Regular Session ***
*** Annotations through November 20, 2013 ***

CRIMINAL LAW
TITLE 4.  WEAPON CRIMES
SUBTITLE 3.  ASSAULT WEAPONS AND DETACHABLE MAGAZINES.

**GO TO MARYLAND STATUTES ARCHIVE DIRECTORY**

*Md. CRIMINAL LAW Code Ann. § 4-305  (2014)*

§ 4-305. Detachable magazines -- Prohibited


  (a) Scope of section. -- This section does not apply to:

    (1) a .22 caliber rifle with a tubular magazine; or

    (2) a law enforcement officer or a person who retired in good standing from service with a law enforcement agency of the United States, the State, or any law enforcement agency in the State.

   (b) Prohibited. -- A person may not manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm.

**HISTORY:** An. Code 1957, art. 27, § 36H-5(b); 2002, ch. 26, § 2; 2013, ch. 427.

**NOTES:** REVISOR'S NOTE
   *This Revisor's note comprises information related to the revision by Acts 2002, ch. 26.*
  This section is new language derived without substantive change from former Art. 27, § 36H-5(b).
  The former reference to "any type of" firearm is deleted as surplusage.

DEFINED TERM:

  "Person"                                    § 1-101


EFFECT OF AMENDMENTS. --Chapter 427, Acts 2013, effective October 1, 2013, added the (a)(1) designation and

added (a)(2); in (b) substituted "10 rounds" for "20 rounds"; and made related changes.

BILL REVIEW LETTER. --Chapter 427, Acts 2013, (Senate Bill 281) was approved for constitutionality and legal sufficiency. The provisions banning assault weapons and high capacity detachable magazines, armor piercing bullets satisfy the appropriate level of scrutiny and are constitutional as there is a substantial relationship between the banning of these weapons and the State's objective of controlling crime and protecting law enforcement officers. The licensing requirements and license fees for handguns are presumptively constitutional; specifically, the fees are constitutional administrative fees, not a revenue tax intended to raise money or inhibit the exercise of a constitutional right. The provisions that disqualify firearm possession due to mental health issues are likely to be found NIAA compliant. Other provisions relating to wear and carry permits, disqualifying crimes, lost and stolen guns and hunting would generally be found to be constitutional. (Letter of the Attorney General dated April 30, 2013.)

USER NOTE: For more generally applicable notes, see notes under the first section of this part, subtitle, title, division or article.

Appeal: 14-1945    Doc: 26    Filed: 11/04/2014    Pg: 90 of 99



1 of 1 DOCUMENT

Annotated Code of Maryland
Copyright 2013 by Matthew Bender and Company, Inc., a member of the LexisNexis Group
All rights reserved.

*** Statutes current through the 2013 General Assembly Regular Session ***
*** Annotations current through October 7, 2013 ***

PUBLIC SAFETY
TITLE 5.  FIREARMS
SUBTITLE 1.  REGULATED FIREARMS

**GO TO MARYLAND STATUTES ARCHIVE DIRECTORY**

*Md. PUBLIC SAFETY Code Ann. § 5-101  (2013)*

§ 5-101. Definitions

(a) In general. -- In this subtitle the following words have the meanings indicated.

(b) Antique firearm. -- "Antique firearm" has the meaning stated in *§ 4-201 of the Criminal Law Article.*

(b-1) Convicted of a disqualifying crime. --

(1) "Convicted of a disqualifying crime" includes:

(i) a case in which a person received probation before judgment for a crime of violence; and

(ii) a case in which a person received probation before judgment in a domestically related crime as defined in *§ 6-233 of the Criminal Procedure Article.*

(2) "Convicted of a disqualifying crime" does not include a case in which a person received a probation before judgment:

(i) for assault in the second degree; or

(ii) that was expunged under Title 10, Subtitle 1 of the Criminal Procedure Article.

(c) Crime of violence. -- "Crime of violence" means:

(1) abduction;

(2) arson in the first degree;

(3) assault in the first or second degree;

(4) burglary in the first, second, or third degree;

(5) carjacking and armed carjacking;

(6) escape in the first degree;

(7) kidnapping;

(8) voluntary manslaughter;

(9) maiming as previously proscribed under former Article 27, § 386 of the Code;

(10) mayhem as previously proscribed under former *Article 27, § 384 of the Code*;

(11) murder in the first or second degree;

(12) rape in the first or second degree;

(13) robbery;

(14) robbery with a dangerous weapon;

(15) sexual offense in the first, second, or third degree;

(16) an attempt to commit any of the crimes listed in items (1) through (15) of this subsection; or

(17) assault with intent to commit any of the crimes listed in items (1) through (15) of this subsection or a crime punishable by imprisonment for more than 1 year.

(d) Dealer. -- "Dealer" means a person who is engaged in the business of:

(1) selling, renting, or transferring firearms at wholesale or retail; or

(2) repairing firearms.

(e) Dealer's license. -- "Dealer's license" means a State regulated firearms dealer's license.

(f) Designated law enforcement agency. -- "Designated law enforcement agency" means a law enforcement agency that the Secretary designates to process applications to purchase regulated firearms for secondary sales.

(g) Disqualifying crime. -- "Disqualifying crime" means:

(1) a crime of violence;

(2) a violation classified as a felony in the State; or

(3) a violation classified as a misdemeanor in the State that carries a statutory penalty of more than 2 years.

(h) Firearm. --

(1) "Firearm" means:

(i) a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of

an explosive; or

    (ii) the frame or receiver of such a weapon.

  (2) "Firearm" includes a starter gun.

(i) Firearm applicant. -- "Firearm applicant" means a person who makes a firearm application.

(j) Firearm application. -- "Firearm application" means an application to purchase, rent, or transfer a regulated firearm.

(k) Fugitive from justice. -- "Fugitive from justice" means a person who has fled to avoid prosecution or giving testimony in a criminal proceeding.

(l) Habitual drunkard. -- "Habitual drunkard" means a person who has been found guilty of any three crimes under § 21-902(a), (b), or (c) of the Transportation Article, one of which occurred in the past year.

(m) Habitual user. -- "Habitual user" means a person who has been found guilty of two controlled dangerous substance crimes, one of which occurred in the past 5 years.

(n) Handgun. --

  (1) "Handgun" means a firearm with a barrel less than 16 inches in length.

  (2) "Handgun" includes signal, starter, and blank pistols.

(o) Handgun qualification license. -- "Handgun qualification license" means a license issued by the Secretary that authorizes a person to purchase, rent, or receive a handgun.

(p) Licensee. -- "Licensee" means a person who holds a dealer's license.

(q) Qualified handgun instructor. -- "Qualified handgun instructor" means a certified firearms instructor who:

  (1) is recognized by the Maryland Police and Correctional Training commissions;

  (2) has a qualified handgun instructor license issued by the Secretary; or

  (3) has a certification issued by a nationally recognized firearms organization.

(r) Regulated firearm. -- "Regulated firearm" means:

  (1) a handgun; or

  (2) a firearm that is any of the following specific assault weapons or their copies, regardless of which company produced and manufactured that assault weapon:

    (i) American Arms Spectre da Semiautomatic carbine;

    (ii) AK-47 in all forms;

    (iii) Algimec AGM-1 type semi-auto;

    (iv) AR 100 type semi-auto;

    (v) AR 180 type semi-auto;

Md. PUBLIC SAFETY Code Ann. § 5-101

(vi) Argentine L.S.R. semi-auto;

(vii) Australian Automatic Arms SAR type semi-auto;

(viii) Auto-Ordnance Thompson M1 and 1927 semi-automatics;

(ix) Barrett light .50 cal. semi-auto;

(x) Beretta AR70 type semi-auto;

(xi) Bushmaster semi-auto rifle;

(xii) Calico models M-100 and M-900;

(xiii) CIS SR 88 type semi-auto;

(xiv) Claridge HI TEC C-9 carbines;

(xv) Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle;

(xvi) Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K-1, and K-2;

(xvii) Dragunov Chinese made semi-auto;

(xviii) Famas semi-auto (.223 caliber);

(xix) Feather AT-9 semi-auto;

(xx) FN LAR and FN FAL assault rifle;

(xxi) FNC semi-auto type carbine;

(xxii) F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun;

(xxiii) Steyr-AUG-SA semi-auto;

(xxiv) Galil models AR and ARM semi-auto;

(xxv) Heckler and Koch HK-91 A3, HK-93 A2, HK-94 A2 and A3;

(xxvi) Holmes model 88 shotgun;

(xxvii) Avtomat Kalashnikov semiautomatic rifle in any format;

(xxviii) Manchester Arms "Commando" MK-45, MK-9;

(xxix) Mandell TAC-1 semi-auto carbine;

(xxx) Mossberg model 500 Bullpup assault shotgun;

(xxxi) Sterling Mark 6;

(xxxii) P.A.W.S. carbine;

(xxxiii) Ruger mini-14 folding stock model (.223 caliber);

(xxxiv) SIG 550/551 assault rifle (.223 caliber);

(xxxv) SKS with detachable magazine;

(xxxvi) AP-74 Commando type semi-auto;

(xxxvii) Springfield Armory BM-59, SAR-48, G3, SAR-3, M-21 sniper rifle, M1A, excluding the M1 Garand;

(xxxviii) Street sweeper assault type shotgun;

(xxxix) Striker 12 assault shotgun in all formats;

(xl) Unique F11 semi-auto type;

(xli) Daewoo USAS 12 semi-auto shotgun;

(xlii) UZI 9mm carbine or rifle;

(xliii) Valmet M-76 and M-78 semi-auto;

(xliv) Weaver Arms "Nighthawk" semi-auto carbine; or

(xlv) Wilkinson Arms 9mm semi-auto "Terry".

(s) Rent. -- "Rent" means the temporary transfer for consideration of a regulated firearm that is taken from the property of the owner of the regulated firearm.

(t) Secondary sale. -- "Secondary sale" means a sale of a regulated firearm in which neither party to the sale:

(1) is a licensee;

(2) is licensed by the federal government as a firearms dealer;

(3) devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of earning a profit through the repeated purchase and resale of firearms; or

(4) repairs firearms as a regular course of trade or business.

(u) Secretary. -- "Secretary" means the Secretary of State Police or the Secretary's designee.

(v) Straw purchase. -- "Straw purchase" means a sale of a regulated firearm in which a person uses another, known as the straw purchaser, to:

(1) complete the application to purchase a regulated firearm;

(2) take initial possession of the regulated firearm; and

(3) subsequently transfer the regulated firearm to the person.

**HISTORY:** An. Code 1957, art. 27, §§ 441(a)-(j), (l)-(n), (r)-(w), 442(f)(1), (h)(2)(i)1-3, 443(e)(4)(iii)1-3, (j)(2)(i)-(iii), 445(b)(1)(i)-(iii), (3), (d)(1)(i)-(iii), (3); 2003, ch. 5, § 2; 2013, ch. 427.

**NOTES:** CROSS REFERENCES. --For present provisions concerning machine guns, see Title 4, Subtitle 4 of the Criminal Law Article.

EFFECT OF AMENDMENTS. --Chapter 427, Acts 2013, effective October 1, 2013, added (b-1), (o), and (q) and redesignated accordingly.

BILL REVIEW LETTER. --Chapter 427, Acts 2013, (Senate Bill 281) was approved for constitutionality and legal sufficiency. The licensing requirements and license fees for handguns are presumptively constitutional; specifically, the fees are constitutional administrative fees, not a revenue tax intended to raise money or inhibit the exercise of a constitutional right. (Letter of the Attorney General dated April 30, 2013.)

### LexisNexis 50 State Surveys, Legislation & Regulations

Gun Control

UNIVERSITY OF BALTIMORE LAW FORUM. --For article, "A Unique Approach to Handgun Control," see 19.1 U. Balt. Law Forum 6 (1988).

For article, "House Bill 1131: An Enigma," see 19.1 U. Balt. Law Forum 7 (1988).

LEGISLATIVE INTENT. --Subsection (g) is intended to prevent those who have already demonstrated a propensity for violence, as evidenced by a conviction of a crime of violence, from possessing handguns. *Johnson v. State, 67 Md. App. 347, 507 A.2d 1134,* cert. denied, *307 Md. 260,* cert. denied, *479 U.S. 993107 S. Ct. 59493 L. Ed. 2d 595 (1986).*

The unit of prosecution for former Article 27, § 449(e) (now codified at § 5-133 of this subtitle) is the prohibited act of illegal possession of a firearm, and the statute does not support multiple convictions based on several prior qualifying offenses under former Article 27, § 445(d) (now codified at subsection (g) of this section), and § 5-133 of this subtitle, where there is only a single act of possession; thus, where defendant was convicted and sentenced for the unlawful possession of a firearm by a person previously convicted of a crime of violence, the unlawful possession of a firearm by a person previously convicted of a felony, and the unlawful possession of a firearm by a person previously convicted of a misdemeanor with a penalty of over two years of incarceration based on the possession of a single regulated firearm on a single occasion, only one of the three convictions could stand. *Melton v. State, 379 Md. 471, 842 A.2d 743 (2004).*

CONJUNCTION WITH FEDERAL LAW. --This subtitle should be read in conjunction with federal handgun laws. *Department of Pub. Safety & Correctional Servs. v. Berg, 342 Md. 126, 674 A.2d 513 (1996).*

Although conviction for possession of cocaine was neither required to be reported on application to purchase handgun nor one of the statutorily enumerated offenses, federal law prohibits the sale, receipt, and possession of a handgun when a prospective buyer has been convicted of a crime that is punishable by imprisonment for a term of more than one year, pursuant to the Handgun Control Act of 1968, *18 U.S.C. § 921* et seq. *Department of Pub. Safety & Correctional Servs. v. Berg, 342 Md. 126, 674 A.2d 513 (1996).*

As this section was not preempted by federal law, the Handgun Permit Review Board properly denied an applicant's permit based on a disqualifying offense which occurred out of state. *Brown v. Handgun Permit Review Bd., 188 Md. App. 455, 982 A.2d 830 (2009),* cert. denied, *412 Md. 495, 988 A.2d 1008 (2010).*

HABITUAL DRUNKARD AND HABITUAL USER --City policy requiring plaintiff, who was taken into custody for an emergency psychiatric evaluation pursuant to *§ 10-622 of the Health - General Article* but was never formally committed pursuant to *§ 10-619 of the Health - General Article* or charged with any crime, to fill out the city police department's application for return of firearms before returning seized firearms that plaintiff was licensed to hold under State and federal law exceeded the city's authority under State law because (1) *§ 4-209(a) of the Criminal Law Article* precluded the city from imposing its own requirements with regard to plaintiff's having and holding firearms that the State and federal governments had licensed him to have and hold; (2) the State police presumably had authority under §§ 5-105 and 5-122 of this subtitle to revoke a license to possess firearms if a licensee were deemed to present a danger

to himself or others; (3) *art. 23A, § 2(b)(10) of the Code* was inapplicable due to the fact that the case did not involve explosive materials or the discharge of firearms; (4) § 5-103 of this subtitle, which contained exceptions similar to the carve-outs in §§ 5-102 and 5-119 of this subtitle, did not provide an exception for transfers made to local law enforcement agencies; (5) §§ 5-133(b) and 5-134 of this subtitle, which set out qualifications for the possession, sale, rental, or transfer of firearms, confined determinations regarding whether a person was a habitual drunkard or a habitual drug user and whether a person suffered from a mental disorder by referring to the definitions set forth in (l) and (m) of this section, *§ 10-101(f)(2) of the Health - General Article*, and § 5-133(b)(6) of this subtitle; (6) §§ 5-133(b) and 5-134 of this subtitle did not contain a catch-all provision for detaining otherwise duly licensed firearms based on generalized concerns about public safety; (7) although § 5-104 of this subtitle only preempted local restrictions on sales of firearms, §§ 5-133(a) and 5-134(a) of this subtitle preempted restrictions on the possession and transfer of firearms; and (8) the city's argument that this subtitle did not apply to the return of seized firearms conflicted with *§ 13-203(b)(2) of the Criminal Procedure Article.* However, the wrongful deprivation of plaintiff's firearms did not violate procedural or substantive due process because (1) plaintiff could seek the return of his property in the State courts pursuant to *§ 1-203 of the Criminal Procedure Article* and *§§ 1-501 and 4-401(2) of the Courts Article*; and (2) the city's conduct was not egregiously unacceptable, outrageous, or conscience-shocking. *Mora v. City of Gaithersburg, 462 F. Supp. 2d 675 (D. Md. 2006),* aff'd in part, modified on procedural grounds, *519 F.3d 216 (4th Cir. Md. 2008).*

MERE POSSESSION. --Mere possession of a sawed-off shotgun is not a crime. *United States v. One 1967 Ford Thunderbird, 316 F. Supp. 391 (D. Md. 1970),* aff'd, *441 F.2d 1164 (4th Cir. 1971).*

"CRIME OF VIOLENCE." --The General Assembly intended attempted voluntary manslaughter to serve as a predicate crime of violence under prior similar provision. *Cox v. State, 311 Md. 326, 534 A.2d 1333 (1988).*

A crime of violence includes attempted murder and robbery with a deadly weapon. *Hoffert v. State, 319 Md. 377, 572 A.2d 536 (1990).*

A conviction for involuntary manslaughter may support a conviction under *§ 4-202 et seq. of the Criminal Law Article* for use of a handgun in the commission of any felony or any "crime of violence" as defined in a prior similar provision. *Browne v. State, 321 Md. 583, 583 A.2d 1042 (1991).*

Plain language of former Article 27, § 441(e) (now subsection (e) of this section) indicated that the former crime of housebreaking in the daytime was not a crime of violence that could be a predicate offense for imposition of a mandatory enhanced sentence upon a subsequent conviction of unlawful firearm possession; the housebreaking statute did not include the element of entry that was part of all the burglary statutes with which it was replaced. *Price v. State, 378 Md. 378, 835 A.2d 1221 (2003).*

Plain language of former art. 27, § 449 of the Code, much of which remained part of § 5-133 of this subtitle, made it clear that for an enhanced sentence to be imposed, a defendant had to have been convicted of a crime of violence and of a felony; there was no need to consider legislative history that might indicate the contrary given the clarity of the language. *Stanley v. State, 390 Md. 175, 887 A.2d 1078 (2005).*

CRIMES OF VIOLENCE BY JUVENILES. --State's Attorney has discretion whether to file a petition against a juvenile only when a juvenile, 16 years or older, commits a crime of violence; as to other felonies committed by a juvenile, 16 years or older, the State's Attorney must comply with the statutorily required procedure set forth in *§ 3-810 et seq. of the Courts Article. State v. Patrick A., 312 Md. 482, 540 A.2d 810 (1988).*

NO DISTINGUISHING OF BASIC ROBBERY AND ROBBERY WITH DEADLY WEAPON REQUIRED. --Both basic robbery and robbery with a deadly weapon under Title 3, Subtitle 4 of the Criminal Law Article constitute the same common law felony of "robbery," and for purposes of the definition of crime of violence, there is no reason to distinguish between them. *Whack v. State, 288 Md. 137, 416 A.2d 265 (1980),* appeal dismissed, *450 U.S. 990101 S. Ct. 168868 L. Ed. 2d 189 (1981).*

ASSAULT WITH INTENT TO PREVENT LAWFUL APPREHENSION AND DETAINER. --Assault with intent to prevent lawful apprehension and detainer is a form of aggravated assault which clearly falls within the definition of a

crime of violence for the purpose of establishing the crime of use of a handgun in the commission of a crime of violence. *Sangster v. State, 70 Md. App. 456, 521 A.2d 811 (1987),* aff'd, *312 Md. 560, 541 A.2d 637 (1988).*

MANUFACTURERS OF SATURDAY NIGHT SPECIALS STRICTLY LIABLE FOR INJURIES. --As Saturday night specials have no legitimate purpose under this subtitle, it is consistent with public policy to hold the manufacturers and marketers of such handguns strictly liable for injuries to innocent persons arising from the criminal use of their products. *Kelley v. R.G. Indus., Inc., 304 Md. 124, 497 A.2d 1143 (1985).*

DEFINITION OF "HANDGUN" UNDER §§ 5-301 AND 5-401 OF THIS ARTICLE. --The definition of "handgun" under §§ 5-301 and 5-401 of this article applies to offense established by *§ 4-202 et seq. of the Criminal Law Article*, and not the broader definition contained in a prior similar provision. *York v. State, 56 Md. App. 222, 467 A.2d 552 (1983),* cert. denied, *299 Md. 137 (1984).*

"FIREARM." --Defendant was entitled to a new trial on the charge of possession of a firearm by a disqualified person, because the trial judge erred in telling the jury, without qualification, that a starter pistol was a firearm; the trial judge should have instructed the jury that a starter pistol could only be "firearm" if it expelled, was designed to expel, or could readily be converted to expel a projectile by action of explosive. *Walker v. State, 192 Md. App. 678, 995 A.2d 1044 (2010).*

 Defendant convicted of violating § 5-142 of this subtitle was not guilty of a crime because (1) the statute contained no penalty provision, and (2) the penalty provision in § 5-143(b) of this subtitle did not apply, as (1) § 5-142 of this subtitle did not explicitly refer to § 5-143 of this subtitle, (2) § 5-143 of this subtitle referred only to a "regulated firearm," while § 5-142 of this subtitle referred to firearms, nor (3) were the acts barred by § 5-143 of this subtitle synonymous to the acts barred by § 5-142 of this subtitle. *Evans v. State, 420 Md. 391, 23 A.3d 223 (2011).*

 Defendant was properly convicted of a violation of § 5-133(c) of this subtitle, even if the firearm defendant possessed were inoperable, because no language in the statutory definition of "firearm" in (h)(1)(i) of this section required operability, and a court would not judicially insert language into a statute to impose a limitation not stated by the legislature. *Moore v. State, 424 Md. 118, 34 A.3d 513 (2011).*

 Defendant was properly convicted of a violation of § 5-133(c) of this subtitle, even if the firearm defendant possessed were inoperable, because, under § 5-101(h)(1)(i) of this section, a firearm included weapons designed to expel a projectile by the action of an explosive, or which could be so converted, including inoperable firearms. *Moore v. State, 424 Md. 118, 34 A.3d 513 (2011).*

 Defendant was properly convicted of a violation of § 5-133(c) of this subtitle, even if the firearm defendant possessed were inoperable, because (h)(1)(ii) of this section, defining "firearm" as including only a component, did not require operability. *Moore v. State, 424 Md. 118, 34 A.3d 513 (2011).*

 Defendant was properly convicted of a violation of § 5-133(c) of this subtitle, even if the firearm defendant possessed were inoperable, because the statute's federal analogue in *18 U.S.C.S. § 921*(a)(3) did not require operability. *Moore v. State, 424 Md. 118, 34 A.3d 513 (2011).*

 Defendant was properly convicted of a violation of (c), even if the firearm defendant possessed were inoperable, because the requirement that a "handgun," under *§ 4-201 of the Criminal Law Article,* be operable did not require a different conclusion, as the different definitions could coexist. *Moore v. State, 424 Md. 118, 34 A.3d 513 (2011).*

"REGULATED FIREARM." --To come within the definition of "regulated firearm," a copy of a designated assault weapon must be similar in its internal components and function to the designated weapon. Cosmetic similarity to an enumerated assault weapon alone would not bring a weapon within the regulated firearms law. Rather, in order for a firearm to be considered a copy of a listed assault weapon, and therefore governed by the regulated firearms law, there must be a similarity between the internal components and function of the firearm in question and those of one of the listed weapons. A determination as to whether a particular firearm bears such similarity is a factual question entrusted in the first instance to the Department of State Police. *95 Op. Atty. Gen. 101* (May 24, 2010).

 Evidence was sufficient to support the conviction of illegal possession of a regulated firearm; the evidence was sufficient that the recovered gun was a "regulated firearm" because the gun was variously described as "a Mack 10 or

Tech 9," "a handgun," and "an assault pistol." *Jones v. State, -- Md. App. --, -- A.3d --, 2013 Md. App. LEXIS 102* (Sept. 4, 2013).

APPLICANT TO DENY POTENTIALLY DISQUALIFYING CIRCUMSTANCES IN APPLICATION. --This section requires the applicant to deny all potentially disqualifying circumstances in the application itself; the police have the power to deny the application only if it is incomplete or any information on it is false, and that power should not be deemed discretionary. *Love v. Pepersack, 47 F.3d 120 (4th Cir. 1995),* cert. denied, *516 U.S. 813, 116 S. Ct. 64, 133 L. Ed. 2d 27 (1995).*

DISQUALIFYING CRIME. --Because defendant's prior conviction for attempted felony theft was a conviction for a misdemeanor for which defendant could have been subjected to a prison term of more than two years, the prior conviction was a "disqualifying crime" within the meaning of (g). *Wyatt v. State, 169 Md. App. 394, 901 A.2d 271 (2006).*

As the Handgun Permit Review Board could rationally infer from the handgun permit applicant's admissions that during an incident the applicant was in personal possession of a pipe, which he intended to use in the "altercation" against an unidentified "male," and that he was later convicted of committing that same act, such a D.C. conviction for possession of a dangerous weapon would be equivalent to a Maryland conviction for wearing or carrying a dangerous weapon; thus, the permit was properly denied based on the applicant committing a disqualifying crime. *Brown v. Handgun Permit Review Bd., 188 Md. App. 455, 982 A.2d 830 (2009),* cert. denied, *412 Md. 495, 988 A.2d 1008 (2010).*

When an individual sought renewal of a permit to carry a concealed weapon, but was previously convicted of a crime, the statutory penalty to be considered under (g)(3), when determining whether the individual was disqualified from such renewal, was the penalty that existed for the crime, or the crime's current equivalent, at the time of the application for a permit or renewal application to carry or otherwise possess a regulated firearm. *Md. State Police v. McLean, 197 Md. App. 430, 14 A.3d 658 (2011).*

Licensee was disqualified from a renewal of the licensee's permit to carry a concealed weapon because (1) the penalty was considered, to find if the licensee was convicted of a "disqualifying crime," under 101(g)(3), and was, therefore, barred from possessing a regulated firearm, under § 5-133(b)(1) of this subtitle, was the penalty existing when the licensee applied for renewal, as one convicted of a violation that "carries" a penalty of over two years was disqualified, and "carries" was in the present tense, and (2) the penalty for the crime of which the licensee had been convicted, which was six months in jail when the licensee was convicted, but was subsequently increased to three years in prison, when the licensee applied for a renewal, disqualified the licensee. *Md. State Police v. McLean, 197 Md. App. 430, 14 A.3d 658 (2011).*

When a licensee sought renewal of the licensee's permit to carry a concealed weapon, the licensee's prior conviction for breaking and entering a storehouse disqualified the licensee from renewal, even though, when the licensee was convicted, the maximum penalty for the crime was six months in jail, because the crime was subsequently incorporated into fourth degree burglary, for which the maximum penalty was three years in prison, making the crime a "disqualifying crime," as whether the crime's penalty made the crime a disqualifying crime was considered at the time of the licensee's renewal application. *Md. State Police v. McLean, 197 Md. App. 430, 14 A.3d 658 (2011).*

Applicant was not entitled to the renewal of the applicant's Maryland permit to carry a concealed weapon because the applicant was ineligible to possess a handgun under § 5-133(b)(1) of this subtitle and (g) of this section as the applicant was convicted of an offense in the District of Columbia, which offense was the equivalent of *§ 4-203(a) of the Criminal Law Article. McCloud v. Dep't of State Police, 200 Md. App. 725, 28 A.3d 214 (2011).*

OUT-OF-STATE CONVICTION AS DISQUALIFYING CRIME. --Applicant's request for a handgun permit was properly denied because applicant had been convicted in the District of Columbia of trying to carry a pistol without a license, and (g)(3) of this section and § 5-133(b)(1) of this subtitle, which defined a disqualifying crime, included out-of-state convictions. *McCloud v. Dep't of State Police, 426 Md. 473, 44 A.3d 993 (2012).*

MERGER. --The convictions and sentences for wearing, carrying, or transporting a handgun under *§ 4-202 et seq. of the Criminal Law Article* and for possessing a pistol or revolver by a person who has been convicted of a crime of violence

Md. PUBLIC SAFETY Code Ann. § 5-101

under this section do not merge. *Frazier v. State, 318 Md. 597, 569 A.2d 684 (1990).*

*APPLIED IN Washington v. State, 180 Md. App. 458, 951 A.2d 885 (2008); State v. Daughtry, 419 Md. 35, 18 A.3d 60 (2011).*

*QUOTED IN Wimbish v. State, 201 Md. App. 239, 29 A.3d 635 (2011); McNeal v. State, 426 Md. 455, 44 A.3d 982 (2012).*

*CITED IN State v. Carroll, 383 Md. 438, 859 A.2d 1138 (2004); Christian v. State, 405 Md. 306, 951 A.2d 832 (2008); Nash v. State, 191 Md. App. 386, 991 A.2d 831 (2010),* cert. denied, *415 Md. 42, 2010 Md. LEXIS 436 (2010); Pair v. State, 202 Md. App. 617, 33 A.3d 1024 (2011); Snyder v. State, 210 Md. App. 370, 63 A.3d 128 (2013).*