**BRIAN E. FROSH**
*Attorney General*



**ELIZABETH F. HARRIS**
*Chief Deputy Attorney General*

**THIRUVENDRAN VIGNARAJAH**
*Deputy Attorney General*

# STATE OF MARYLAND
## OFFICE OF THE ATTORNEY GENERAL

FACSIMILE NO.
410-576-6955

WRITER'S DIRECT DIAL NO. 410-576-7906
E-MAIL ADDRESS: mattfader@oag.state.md.us

October 19, 2015

Via CM/ECF

Patricia S. Connor, Clerk of Court
United States Court of Appeals for the Fourth Circuit
1100 East Main Street, Suite 501
Richmond, Virginia 23219-3517

      Re:    *Stephen V. Kolbe, et al. v. Lawrence J. Hogan, Jr., et al.*, No. 14-1945

Dear Ms. Connor:

      The Defendants-Appellees submit this letter under Federal Rule of Appellate Procedure 28(j). On October 20, 2015, the United States Court of Appeals for the Second Circuit rendered a consolidated decision in *New York State Rifle and Pistol Association, Inc., et al.* v. *Cuomo, et al.*, No. 14-36-cv, and *Connecticut Citizens' Defense League, et al. v. Malloy, et al.*, No. 14-319-cv (slip opinion attached). In that decision, the court upheld against Second Amendment challenges assault weapons and large capacity magazine bans enacted by New York and Connecticut, respectively. The Second Circuit's decision affirmed in relevant part two district court decisions discussed in briefing by both parties in this case, *New York State Rifle & Pistol Ass'n v. Cuomo*, 990 F. Supp. 2d 349 (W.D.N.Y. 2013) and *Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014). *See* ECF No. 26, Brief for Plaintiffs-Appellants at 10, 13 (citing both cases); ECF No. 52, Brief of Defendants-Appellees at 18, 22, 29, 51 (citing both cases).

      Applying the same two-part test that is applied to challenges under the Second Amendment by this Court, the Second Circuit first examined whether the Second Amendment applies to the assault weapons and large-capacity magazines bans at issue. Finding the weapons and magazines at issue to be in "common use," slip op. at 25, but not reaching a conclusion as to whether they are "typically possessed by law-abiding citizens for lawful purposes," *id.* at 28, the Second Circuit nonetheless proceeded to "assume for the sake of argument" that the laws "ban weapons protected by the Second Amendment," *id.*

Determining that the burden imposed by the bans was "real" but not "severe," the Second Circuit determined that "intermediate, rather than strict, scrutiny is appropriate." *Id.* at 36. Applying intermediate scrutiny, the Second Circuit held that, with the exception of two provisions not at issue in this action, the assault weapons and large capacity magazines bans before it "are substantially—even if not perfectly—related to the articulated governmental interest." *Id.* at 36-43. Thus, the court concluded, the bans "survive intermediate scrutiny."

Respectfully submitted,

 /s/ Matthew J. Fader
MATTHEW J. FADER
Assistant Attorney General
Tel. 410-576-7906
mfader@oag.state.md.us

Counsel for Defendants-Appellees

cc:     Counsel of record (via CM/ECF)

14-36-cv(L); 14-319-cv
*New York State Rifle & Pistol Ass'n, Inc., et al. v. Cuomo, et al.*
*Connecticut Citizens' Defense League, et al. v. Malloy, et al.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30

# In the
# United States Court of Appeals
## for the Second Circuit

———————

AUGUST TERM 2014

———————

Nos. 14-36-cv (Lead); 14-37-cv (XAP)

NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC., WESTCHESTER COUNTY FIREARMS OWNERS ASSOCIATION, INC., SPORTSMEN'S ASSOCIATION FOR FIREARMS EDUCATION, INC., NEW YORK STATE AMATEUR TRAPSHOOTING ASSOCIATION, INC., BEDELL CUSTOM, BEIKIRCH AMMUNITION CORPORATION, BLUELINE TACTICAL & POLICE SUPPLY, LLC, BATAVIA MARINE & SPORTING SUPPLY, WILLIAM NOJAY, THOMAS GALVIN, ROGER HORVATH,

*Plaintiffs-Appellants-Cross-Appellees,*

*v.*

ANDREW M. CUOMO, in his official capacity as Governor of the State of New York, ERIC T. SCHNEIDERMAN, in his official capacity as Attorney General of the State of New York, JOSEPH A. D'AMICO, in his official capacity as Superintendent of the New York State Police,

*Defendants-Appellees-Cross-Appellants,*

GERALD J. GILL, in his official capacity as Chief of Police for the Town
of Lancaster, New York, LAWRENCE FRIEDMAN,

*Defendants-Appellees,*

FRANK A. SEDITA, III, in his official capacity as District Attorney for
Erie County,

*Defendant.*

On Appeal from the United States District Court
for the Western District of New York

————————

No. 14-319-cv

THE CONNECTICUT CITIZENS' DEFENSE LEAGUE, THE COALITION OF
CONNECTICUT SPORTSMEN, JUNE SHEW, RABBI MITCHELL ROCKLIN,
STEPHANIE CYPHER, PETER OWENS, BRIAN MCCLAIN, ANDREW
MUELLER, HILLER SPORTS, LLC, MD SHOOTING SPORTS, LLC,

*Plaintiffs-Appellants,*

*v.*

DANNEL P. MALLOY, in his official capacity as Governor of the State
of Connecticut, KEVIN T. KANE, in his official capacity as Chief
State's Attorney of the State of Connecticut, DORA B. SCHRIRO, in her
official capacity as Commissioner of the Connecticut Department of
Emergency Services and Public Protection, DAVID I. COHEN, in his
official capacity as State's Attorney for the Stamford/Norwalk
Judicial District, Geographical Areas Nos. 1 and 20, JOHN C. SMRIGA,

1    in his official capacity as State's Attorney for the Fairfield Judicial
2    District, Geographical Area No. 2, MAUREEN PLATT, in her official
3    capacity as State's Attorney for the Waterbury Judicial District,
4    Geographical Area No. 4, KEVIN D. LAWLOR, in his official capacity
5    as State's Attorney for the Ansonia/Milford Judicial District,
6    Geographical Areas Nos. 5 and 22, MICHAEL DEARINGTON, in his
7    official capacity as State's Attorney for the New Haven Judicial
8    District, Geographical Area Nos. 7 and 23, PETER A. MCSHANE, in his
9    official capacity as State's Attorney for the Middlesex Judicial
10    District, Geographical Area No. 9, MICHAEL L. REGAN, in his official
11    capacity as State's Attorney for the New London Judicial District,
12    Geographical Area Nos. 10 and 21, PATRICIA M. FROEHLICH, GAIL P.
13    HARDY, in her official capacity as State's Attorney for the Hartford
14    Judicial District, Geographical Areas Nos. 12, 13, and 14, BRIAN
15    PRELESKI, in his official capacity as State's Attorney for the New
16    Britain Judicial District, Geographical Area Nos. 15 and 17, DAVID
17    SHEPACK, in his official capacity as State's Attorney for the Litchfield
18    Judicial District, Geographical Area No. 18, MATTHEW C. GEDANSKY,
19    in his official capacity as State's Attorney for the Tolland Judicial
20    District, Geographical Area No. 19, STEPHEN J. SEDENSKY III, in his
21    official capacity as State's Attorney for the Danbury Judicial District,
22    Geographical Area No. 3,

24    *Defendants-Appellees.*

26    On Appeal from the United States District Court
27    for the District of Connecticut

30    ARGUED: DECEMBER 9, 2014
31    DECIDED: OCTOBER 19, 2015

1   Before: CABRANES, LOHIER, and DRONEY, *Circuit Judges*.

2   ──────────

3

4       Before the Court are two appeals challenging gun-control
5   legislation enacted by the New York and Connecticut legislatures in
6   the wake of the 2012 mass murders at Sandy Hook Elementary
7   School in Newtown, Connecticut. The New York and Connecticut
8   laws at issue prohibit the possession of certain semiautomatic
9   "assault weapons" and large-capacity magazines. Following the
10  entry of summary judgment in favor of defendants on the central
11  claims in both the Western District of New York (William M.
12  Skretny, *Chief Judge*) and the District of Connecticut (Alfred V.
13  Covello, *Judge*), plaintiffs in both suits now press two arguments on
14  appeal. First, they challenge the constitutionality of the statutes
15  under the Second Amendment; and second, they challenge certain
16  provisions of the statutes as unconstitutionally vague. Defendants in
17  the New York action also cross-appeal the District Court's
18  invalidation of New York's seven-round load limit and voiding of
19  two statutory provisions as facially unconstitutionally vague.

20      We hold that the core provisions of the New York and
21  Connecticut laws prohibiting possession of semiautomatic assault
22  weapons and large-capacity magazines do not violate the Second
23  Amendment, and that the challenged individual provisions are not
24  void for vagueness. The particular provision of New York's law
25  regulating load limits, however, does not survive the requisite
26  scrutiny. One further specific provision—Connecticut's prohibition
27  on the non-semiautomatic Remington 7615—unconstitutionally
28  infringes upon the Second Amendment right. Accordingly, we
29  **AFFIRM** in part the judgment of the District Court for the District of
30  Connecticut insofar as it upheld the prohibition of semiautomatic
31  assault weapons and large-capacity magazines, and **REVERSE** in
32  part its holding with respect to the Remington 7615. With respect to

the judgment of the District Court for the Western District of New York, we **REVERSE** in part certain vagueness holdings, and we otherwise **AFFIRM** that judgment insofar as it upheld the prohibition of semiautomatic assault weapons and large-capacity magazines and invalidated the load limit.

————————

DAVID THOMPSON, Charles J. Cooper, Peter A. Patterson, Cooper & Kirk, PLLC, Washington DC, AND Brian T. Stapleton, Matthew S. Lerner, Goldberg Segalla LLP, White Plains, NY, Stephen P. Halbrook, Fairfax, VA, *for Plaintiffs-Appellants.*

BARBARA D. UNDERWOOD, Solicitor General of the State of New York (Anisha S. Dasgupta, Claude S. Platton, Office of the Solicitor General, *on the brief*), *for* Eric T. Schneiderman, Attorney General for the State of New York, New York, NY, *for Defendants-Appellees-Cross-Appellants Andrew M. Cuomo, et al.*

MAURA B. MURPHY OSBORNE, Assistant Attorney General of the State of Connecticut (Perry Zinn Rowthorn, Michael K. Skold, Gregory T. D'Auria, Office of the Attorney General, *on the brief*), *for* George Jepsen, Attorney General of the State of Connecticut, Hartford, CT, *for Defendants-Appellees Dannel P. Malloy, et al.*

————————

1   J OSÉ A. C ABRANES, *Circuit Judge*:

2

3       Before the Court are two appeals challenging gun-control

4   legislation enacted by the New York and Connecticut legislatures in

5   the wake of the 2012 mass murders at Sandy Hook Elementary

6   School in Newtown, Connecticut. The New York and Connecticut

7   laws at issue prohibit the possession of certain semiautomatic

8   "assault weapons" and large-capacity magazines. Following the

9   entry of summary judgment in favor of defendants on the central

10   claims in both the Western District of New York (William M.

11   Skretny, *Chief Judge*) and the District of Connecticut (Alfred V.

12   Covello, *Judge*), plaintiffs in both suits now press two arguments on

13   appeal. First, they challenge the constitutionality of the statutes

14   under the Second Amendment; and second, they challenge certain

15   provisions of the statutes as unconstitutionally vague. Defendants in

16   the New York action also cross-appeal the District Court's

17   invalidation of New York's separate seven-round load limit and

18   voiding of two statutory provisions as facially unconstitutionally

19   vague.

20       We hold that the core provisions of the New York and

21   Connecticut laws prohibiting possession of semiautomatic assault

22   weapons and large-capacity magazines do not violate the Second

23   Amendment, and that the challenged individual provisions are not

24   void for vagueness. The particular provision of New York's law

25   regulating load limits, however, does not survive the requisite

26   scrutiny. One further specific provision—Connecticut's prohibition

27   on the non-semiautomatic Remington 7615—unconstitutionally

infringes upon the Second Amendment right. Accordingly, we **AFFIRM** in part the judgment of the District Court for the District of Connecticut insofar as it upheld the prohibition of semiautomatic assault weapons and large-capacity magazines, and **REVERSE** in part its holding with respect to the Remington. With respect to the judgment of the District Court for the Western District of New York, we **REVERSE** in part certain vagueness holdings, and we otherwise **AFFIRM** that judgment insofar as it upheld the prohibition of semiautomatic assault weapons and large-capacity magazines and invalidated the load limit.

## BACKGROUND

### I. Prior "Assault Weapon" Legislation

New York and Connecticut have long restricted possession of certain automatic and semiautomatic firearms that came to be known as "assault weapons." In 1993, Connecticut's General Assembly adopted the state's first assault-weapon ban, which criminalized the possession of firearms "capable of fully automatic, semiautomatic or burst fire at the option of the user," including 67 specifically enumerated semiautomatic firearms.[1]

The following year, after five years of hearings on the harms thought to be caused by certain firearms, the U.S. Congress enacted legislation restricting the manufacture, transfer, and possession of

---

[1] 1993 Conn. Pub. Acts 93-306, § 1(a) (J.A., No. 14-319-cv, at 943).

1 certain "semiautomatic assault weapons."[2] The 1994 federal statute
2 defined "semiautomatic assault weapons" in two ways. First, it
3 catalogued 18 specifically prohibited firearms, including, as relevant
4 here, the Colt AR-15. Second, it introduced a "two-feature test,"
5 which prohibited any semiautomatic firearm that contained at least
6 two listed military-style features, including a telescoping stock, a
7 conspicuously protruding pistol grip, a bayonet mount, a flash
8 suppressor, and a grenade launcher. The federal statute also
9 prohibited magazines with a capacity of more than ten rounds of
10 ammunition, or which could be "readily restored or converted to
11 accept" more than 10 rounds.[3] The federal assault-weapons ban
12 expired in 2004, pursuant to its sunset provision.[4]

13 Following the passage of the federal assault-weapons ban,
14 both New York, in 2000, and Connecticut, in 2001, enacted
15 legislation that closely mirrored the federal statute, including the
16 two-feature test for prohibited semiautomatic firearms.[5] Unlike the
17 federal statute, however, these state laws contained no sunset

---

[2] Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. XI, subtit. A § 110102(b), 108 Stat. 1796, 1997.

[3] *Id.* § 110103.

[4] *Id.* § 110105.

[5] *See* Act of Aug. 8, 2000, ch. 189, § 10, 2000 N.Y. Laws 2788, 2792 (J.A., No. 14-36-cv, at 923-30); 2001 Conn. Pub. Acts 01-130, § 1 (J.A., No. 14-319-cv, at 949-60). Like the federal statute, the 2000 New York statute also restricted the possession of certain large-capacity magazines.

1   provisions and thus remained in force until amended by the statutes
2   at issue here.

3       On December 14, 2012, a gunman shot his way into Sandy
4   Hook Elementary School in Newtown, Connecticut and murdered
5   twenty first-graders and six adults using a semiautomatic AR-15-
6   type rifle with ten large-capacity magazines. This appalling attack,
7   in addition to other recent mass shootings, provided the immediate
8   impetus for the legislation at issue in this appeal.[6]

9   **II.    The New York Legislation**

10      New York enacted the Secure Ammunition and Firearms
11  Enforcement Act (SAFE Act) on January 15, 2013.[7] The SAFE Act
12  expands the definition of prohibited "assault weapons" by replacing
13  the prior two-feature test with a stricter one-feature test.  As the
14  name suggests, the new test defines a semiautomatic firearm as a
15  prohibited "assault weapon" if it contains any one of an enumerated
16  list of military-style features, including a telescoping stock, a
17  conspicuously protruding pistol grip, a thumbhole stock, a bayonet
18  mount, a flash suppressor, a barrel shroud, and a grenade launcher.[8]

---

[6] *See* Defendants' Br., No. 14-36-cv, at 10-11; Defendants' Br., No. 14-319-cv, at 11 & n.3.

[7] Act of Jan. 15, 2013, ch. 1, 2013 N.Y. Laws 1, *amended by* Act of Mar. 29, 2013, ch. 57, pt. FF, 2013 N.Y. Laws 290, 389.

[8] The prohibited features depend on whether the semiautomatic weapon is a rifle, pistol, or shotgun, though the lists overlap significantly:

"Assault weapon" means

1    This statutory definition encompasses, and thereby bans, the

2    semiautomatic weapon used by the mass-shooter at Sandy Hook.

3    New York law makes the possession, manufacture, transport, or

4    disposal of an "assault weapon" a felony.[9] Pursuant to the SAFE

---

      (a) a *semiautomatic rifle* that has an ability to accept a detachable magazine and has at least one of the following characteristics: (i) a folding or telescoping stock; (ii) a pistol grip that protrudes conspicuously beneath the action of the weapon; (iii) a thumbhole stock; (iv) a second handgrip or a protruding grip that can be held by the non-trigger hand; (v) a bayonet mount; (vi) a flash suppressor, muzzle break, muzzle compensator, or threaded barrel designed to accommodate a flash suppressor, muzzle break, or muzzle compensator; (vii) a grenade launcher; or

      (b) a *semiautomatic shotgun* that has at least one of the following characteristics: (i) a folding or telescoping stock; (ii) a thumbhole stock; (iii) a second handgrip or a protruding grip that can be held by the non-trigger hand; (iv) a fixed magazine capacity in excess of seven rounds; (v) an ability to accept a detachable magazine; or

      (c) a *semiautomatic pistol* that has an ability to accept a detachable magazine and has at least one of the following characteristics: (i) a folding or telescoping stock; (ii) a thumbhole stock; (iii) a second handgrip or a protruding grip that can be held by the non-trigger hand; (iv) capacity to accept an ammunition magazine that attaches to the pistol outside of the pistol grip; (v) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer; (vi) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the non-trigger hand without being burned; (vii) a manufactured weight of fifty ounces or more when the pistol is unloaded; or (viii) a semiautomatic version of an automatic rifle, shotgun or firearm . . . .

N.Y. Penal Law § 265.00(22) (emphasis supplied).

    [9] *Id.* §§ 265.02(7), 265.10.

1   Act's grandfather clause, however, pre-existing lawful owners of
2   banned assault weapons may continue to possess them if they
3   register those weapons with the New York State Police.[10]

4        The SAFE Act also bans magazines that can hold more than
5   ten rounds of ammunition or that can be readily restored or
6   converted to accept more than ten rounds.[11] Although New York
7   had restricted possession of such magazines since 2000, the SAFE
8   Act eliminated a grandfather clause for magazines manufactured
9   before September 1994.

10       The SAFE Act's large-capacity-magazine ban contains an
11  additional, unique prohibition on possession of a magazine *loaded*
12  with more than seven rounds of ammunition.[12] (For the purpose of
13  this definition, a round is a single unit of ammunition.) As originally
14  enacted, the SAFE Act would have imposed a magazine *capacity*
15  restriction of seven rounds. Because very few seven-round
16  magazines are manufactured, however, the law was subsequently
17  amended to impose a ten-round *capacity* restriction coupled with a
18  seven-round *load limit*. Thus, as amended, the statute permits a New
19  York gun owner to possess a magazine capable of holding up to ten

---

[10] *Id.* § 265.00(22)(g)(v).

[11] *Id.* § 265.00(23)(a).

[12] *Id.* § 265.37.

1    rounds, but he may not fully load it outside of a firing range or
2    official shooting competition.[13]

3    **III.    The Connecticut Legislation**

4         Several months after New York passed the SAFE Act, and
5    after extensive public hearings and legislative and executive study,
6    Connecticut adopted "An Act Concerning Gun Violence Prevention
7    and Children's Safety" on April 4, 2013, and later amended the
8    statute on June 18, 2013.[14] Like its New York analogue, the
9    Connecticut legislation replaced the state's two-feature definition of
10   prohibited "assault weapons" with a stricter one-feature test,[15] using
11   a list of military-style features similar to New York's, including a
12   telescoping stock, a thumbhole stock, a forward pistol grip, a flash
13   suppressor, a grenade launcher, and a threaded barrel capable of
14   accepting a flash suppressor or silencer.[16] Unlike its counterpart in

---

[13] *Id.* § 265.20(a)(7-f).

[14] 2013 Conn. Pub. Act 13-3, *as amended by* 2013 Conn. Pub. Act 13-220.

[15] Conn. Gen. Stat. § 53-202a(1)(E).

[16] *Id.* §§ 53-202a(1)(E), 53-202b(a)(1), 53-202c(a). Like New York's SAFE Act, Connecticut's statute differentiates among semiautomatic rifles, pistols, and shotguns:

"Assault weapon" means . . .[a]ny semiautomatic firearm . . . that meets the following criteria:

(i) A semiautomatic, centerfire *rifle* that has an ability to accept a detachable magazine and has at least one of the following: (I) A folding or telescoping stock; (II) Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an

12

1    New York, the Connecticut legislation additionally bans 183

2    particular assault weapons listed by make and model, as well as

3    "copies or duplicates" of most of those firearms.[17] The Connecticut

---

individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing; (III) A forward pistol grip; (IV) A flash suppressor; or (V) A grenade launcher or flare launcher; or

     (ii) A semiautomatic, centerfire *rifle* that has a fixed magazine with the ability to accept more than ten rounds; or

     (iii) A semiautomatic, centerfire *rifle* that has an overall length of less than thirty inches; or

     (iv) A semiautomatic *pistol* that has an ability to accept a detachable magazine and has at least one of the following: (I) An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip; (II) A threaded barrel capable of accepting a flash suppressor, forward pistol grip or silencer; (III) A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel; or (IV) A second hand grip; or

     (v) A semiautomatic *pistol* with a fixed magazine that has the ability to accept more than ten rounds; or

     (vi) A semiautomatic *shotgun* that has both of the following: (I) A folding or telescoping stock; and (II) Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing; or (vii) A semiautomatic shotgun that has the ability to accept a detachable magazine; or (viii) A shotgun with a revolving cylinder . . . .

     *Id.* § 53-202a(1) (emphasis supplied).

     [17] *Id.* at § 53-202a(1); *see also* Plaintiffs' Br., No. 14-319-cv, at 5; Defendants' Br., No. 14-319-cv, at 14. Of these 183 specifically enumerated prohibited

1   law makes it a felony to transport, import, sell, or possess
2   semiautomatic "assault weapons," and it also contains a grandfather
3   clause permitting pre-existing owners of assault weapons to
4   continue to possess their firearms if properly registered with the
5   state.[18]

6       The June 2013 amendment to the Connecticut legislation
7   criminalizes the possession of "[l]arge capacity magazine[s]" that
8   can hold, or can be "readily restored or converted to accept," more
9   than ten rounds of ammunition.[19] Unlike its New York counterpart,
10  however, the Connecticut legislation contains no additional "load
11  limit" rule.

12  **IV.   Procedural History**

13      Plaintiffs—a combination of advocacy groups, businesses, and
14  individual gun owners—filed suit against the governors of New
15  York and Connecticut and other state officials, first in the Western
16  District of New York on March 21, 2013 and then in the District of
17  Connecticut on May 22, 2013. In both actions, plaintiffs sought
18  declaratory and injunctive relief for alleged infringement of their

---

weapons, all but one are semiautomatic weapons. The single non-semiautomatic
firearm is the Remington Tactical Rifle Model 7615, a pump-action rifle.
Defendants' Br., No. 14-319-cv, at 58.

[18] Conn. Gen. Stat. § 53-202d(a)(2)(A).

[19] *Id.* § 53-202w(a)(1). As with prohibited firearms, pre-ban owners of
prohibited magazines can retain them if registered with the state. *Id.* § 53-
202x(a)(1).

1   constitutional rights. Specifically, plaintiffs contended that the
2   statutes' prohibitions on semiautomatic assault weapons and large-
3   capacity magazines violate their Second Amendment rights, and
4   that numerous specific provisions of each statute are
5   unconstitutionally vague. In the New York action, plaintiffs also
6   challenged the seven-round load limit as a violation of the Second
7   Amendment.[20]

8        Following plaintiffs' motions for preliminary injunctions,
9   parties in both suits cross-moved for summary judgment. On
10   December 31, 2013, Chief Judge Skretny of the Western District of
11   New York granted in part and denied in part the cross-motions for
12   summary judgment.[21] Specifically, the District Court found that
13   New York's ban on assault weapons and large capacity magazines
14   burdened plaintiffs' Second Amendment rights, but did not violate
15   the Second Amendment upon application of so-called intermediate
16   scrutiny.[22] The Court also held, however, that the seven-round load
17   limit did not survive intermediate scrutiny. The Court further found
18   that three specific provisions were unconstitutionally vague, and

---

[20] Plaintiffs brought additional claims for violation of the Commerce Clause (in the New York action) and the Equal Protection Clause (in the Connecticut action). The District Courts dismissed these claims, which are not at issue on appeal.

[21] *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo* ("*NYSRPA*"), 990 F. Supp. 2d 349 (W.D.N.Y. 2013).

[22] *See post* Section V.d-V.e for further discussion of intermediate scrutiny analysis.

1    hence void,[23] but denied plaintiffs' motion regarding the remaining

2    provisions challenged for vagueness.[24] In sum, Chief Judge Skretny

3    upheld as constitutional, upon intermediate scrutiny, the core

4    provisions of New York's SAFE Act restricting semiautomatic

5    assault weapons and large-capacity magazines, but struck down

6    certain marginal aspects of the law.

7        On January 30, 2014, Judge Covello of the District of

8    Connecticut granted defendants' motion for summary judgment in

9    its entirety.[25] Like his counterpart in New York, Judge Covello held

---

[23] The three voided provisions of New York's SAFE Act were (1) the prohibition on pistols with a detachable magazine that are "a semiautomatic version of an automatic rifle, shotgun or firearm," N.Y. Penal Law § 265.00(22)(c)(viii); (2) the identification of the misspelled military-style feature "muzzle break," *id.* § 265.00(22)(a)(vi), which defendants concede has no accepted meaning and was converted to read "muzzle brake," *see* Defendants' Br., No. 14-36-cv, at 22; and (3) an erroneous "and if" clause appearing in N.Y. Penal Law § 265.36, which the District Court found to be "incomplete and entirely indecipherable." *NYSRPA*, 990 F. Supp. 2d at 376. Defendants do not challenge on appeal the District Court's ruling on this third ("and if") provision.

[24] As relevant here, the District Court dismissed plaintiffs' vagueness claims as to the following provisions: (1) the prohibition of magazines that "can be readily restored or converted to accept" more than ten ammunition rounds, N.Y. Penal Law § 265.00(23)(a); (2) the prohibition on semiautomatic shotguns with a "fixed magazine capacity in excess of seven rounds," *id.* § 265.00 (22)(b)(iv); and (3) the exclusion from restriction of semiautomatic shotguns "that cannot hold more than five rounds of ammunition in a fixed or detachable magazine," *id.* § 265.00(22)(g)(iii). The Court also rejected four additional vagueness challenges that plaintiffs do not pursue on appeal. *See NYSRPA*, 990 F. Supp. 2d at 374-78.

[25] *Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014).

1    that the Connecticut legislation burdened plaintiffs' Second
2    Amendment rights, applied intermediate scrutiny, and concluded
3    that the prohibition on semiautomatic assault weapons and large-
4    capacity magazines was fully consistent with the Second
5    Amendment. He also dismissed all of plaintiffs' vagueness claims.[26]

6    Plaintiffs thereafter appealed. In the New York action only,
7    defendants cross-appeal the District Court's judgment insofar as it
8    invalidated the SAFE Act's seven-round load limit and voided as
9    unconstitutionally vague the SAFE Act's prohibitions on the
10   misspelled "muzzle break"[27] and "semiautomatic version[s]" of an
11   automatic rifle, shotgun, or firearm.[28]

12                           **DISCUSSION**

13   These appeals present two questions: *first*, whether the Second
14   Amendment permits the regulation of the assault weapons and
15   large-capacity magazines at issue here; and *second*, whether the
16   challenged provisions of the statutes provide constitutionally
17   sufficient notice of the conduct proscribed.

---

[26] Because both judges resolved the parties' motions for summary judgment, they simultaneously denied as moot plaintiffs' respective motions for preliminary injunctions.

[27] N.Y. Penal Law § 265.00(22)(a)(vi); *see ante* note 23 and accompanying text.

[28] *Id.* § 265.00(22)(c)(viii); *see ante* note 23 and accompanying text.

1    We review *de novo* a district court's order granting summary
2    judgment, construing the evidence in the light most favorable to the
3    non-moving party.[29] As relevant here, we also "review *de novo* the
4    district court's legal conclusions, including those interpreting and
5    determining the constitutionality of a statute."[30] Pursuant to Federal
6    Rule of Civil Procedure 56(a), summary judgment is appropriate
7    where "there is no genuine dispute as to any material fact and the
8    movant is entitled to judgment as a matter of law."

9    **V.    Second Amendment Challenge**

10    We conclude that the core challenged prohibitions of assault
11    weapons and large-capacity magazines do not violate the Second
12    Amendment. Guided by the teachings of the Supreme Court, our
13    own jurisprudence, and the examples provided by our sister circuits,
14    we adopt a two-step analytical framework, determining first
15    whether the regulated weapons fall within the protections of the
16    Second Amendment and then deciding and applying the
17    appropriate level of constitutional scrutiny. Only two specific
18    provisions—New York's seven-round load limit, and Connecticut's
19    prohibition on the non-semiautomatic Remington 7615—are
20    unconstitutional.

21

---

[29] *Delaney v. Bank of America Corp.*, 766 F.3d 163, 167 (2d Cir. 2014).

[30] *United States v. Stewart*, 590 F.3d 93, 109 (2d Cir. 2009).

1    **a.** *Heller* **and** *McDonald*

2        The Second Amendment provides that "[a] well regulated

3    Militia, being necessary to the security of a free State, the right of the

4    people to keep and bear Arms, shall not be infringed."[31] Our

5    analysis of that amendment begins with the seminal decision in

6    *District of Columbia v. Heller*.[32] In *Heller*, the Supreme Court, based on

7    an extensive textual and historical analysis, announced that the

8    Second Amendment's operative clause codified a pre-existing

9    "*individual* right to possess and carry weapons."[33] Recognizing,

10   however, that "the right secured by the Second Amendment is not

11   unlimited," *Heller* emphasized that "the right was not a right to keep

12   and carry any weapon whatsoever in any manner whatsoever and

13   for whatever purpose."[34] Instead, the Second Amendment protects

14   only those weapons "'in common use'" by citizens "for lawful

15   purposes like self-defense."[35]

16       Having established these basic precepts, *Heller* concluded that

17   the District of Columbia's ban on possession of handguns was

18   unconstitutional under the Second Amendment.[36] The Supreme

---

[31] U.S. Const. amend. II.

[32] 554 U.S. 570 (2008).

[33] *Id.* at 592 (emphasis supplied).

[34] *Id.* at 626.

[35] *Id.* at 624 (citing *United States v. Miller*, 307 U.S. 174, 179 (1939)).

[36] *Heller*, 554 U.S. at 635.

1  Court noted that "handguns are the most popular weapon chosen
2  by Americans for self-defense in the home," where, the Court
3  observed, "the need for defense of self, family, and property is most
4  acute."[37]

5  *Heller* stopped well short of extending its rationale to other
6  firearms restrictions. Indeed, *Heller* explicitly identified as
7  "presumptively lawful" such "regulatory measures" as
8  "prohibitions on the possession of firearms by felons and the
9  mentally ill, . . . laws forbidding the carrying of firearms in sensitive
10  places such as schools and government buildings, [and] laws
11  imposing conditions and qualifications on the commercial sale of
12  arms."[38] Most importantly here, *Heller* also endorsed the "historical
13  tradition of prohibiting the carrying of dangerous and unusual
14  weapons."[39]

15  Aside from these broad guidelines, *Heller* offered little
16  guidance for resolving future Second Amendment challenges. The
17  Court did imply that such challenges are subject to one of "the
18  standards of scrutiny that we have applied to enumerated
19  constitutional rights," though it declined to say which,[40] accepting

---

[37] *Id.* at 628-29.

[38] *Id.* at 626-27 & n.26.

[39] *Id.* at 627 (internal quotation marks omitted).

[40] *Id.* at 628.

1  that many applications of the Second Amendment would remain "in

2  doubt."[41]

3      That doubt persisted after *McDonald v. City of Chicago*, in

4  which the Supreme Court invalidated municipal statutes banning

5  handguns in the home.[42] *McDonald* was a landmark case in one

6  respect—the Court held for the first time that the Fourteenth

7  Amendment "incorporates" the Second Amendment against the

8  states.[43] Otherwise, *McDonald* did not expand upon *Heller*'s analysis

9  and simply reiterated *Heller*'s assurances regarding the viability of

10  many gun-control provisions.[44] Neither *Heller* nor *McDonald*, then,

11  delineated the precise scope of the Second Amendment or the

12  standards by which lower courts should assess the constitutionality

13  of firearms restrictions.

14

15

---

[41] *Id.* at 635.

[42] 561 U.S. 742 (2010). *See, e.g.*, Joseph Blocher, *New Approaches to Old Questions in Gun Scholarship*, 50 TULSA L. REV. 477, 478 (2015) ("*Heller* and *McDonald* provoked as many questions as they answered," creating a "resulting void [that] invites and practically demands more scholarship.").

[43] *See generally* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 1317 (3d ed. 2000) (describing the process by which Amendments initially designed to limit the powers of the federal government came to be applied to actions of the states).

[44] 561 U.S. at 786 (opinion of Alito, J.).

1            **b. Analytical Rubric**

2        Lacking more detailed guidance from the Supreme Court, this

3    Circuit has begun to develop a framework for determining the

4    constitutionality of firearm restrictions.[45] It requires a two-step

5    inquiry.

6        First, we consider whether the restriction burdens conduct

7    protected by the Second Amendment.[46] If the challenged restriction

8    does not implicate conduct within the scope of the Second

9    Amendment, our analysis ends and the legislation stands.

10   Otherwise, we move to the second step of our inquiry, in which we

11   must determine and apply the appropriate level of scrutiny.[47]

12       This two-step rubric flows from the dictates of *Heller* and

13   *McDonald* and our own precedents in *Kachalsky* and *Decastro*.[48] It also

14   broadly comports with the prevailing two-step approach of other

15   courts, including the Third, Fourth, Fifth, Sixth, Seventh, Ninth,

16   Tenth, Eleventh, and D.C. Circuits,[49] and with the approach used in

17   "other areas of constitutional law."[50]

---

[45] *See Kachalsky v. Cty. of Westchester*, 701 F.3d 81 (2d Cir. 2012); *United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012).

[46] *Kachalsky*, 701 F.3d at 93.

[47] *See id*.

[48] *See ante* note 45.

[49] *See GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015); *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013);

### c. First Step: Whether the Second Amendment Applies

As an initial matter, then, we must determine whether the challenged legislation impinges upon conduct protected by the Second Amendment. The Second Amendment protects only "the sorts of weapons" that are (1) "in common use"[51] and (2) "typically possessed by law-abiding citizens for lawful purposes."[52] We consider each requirement in turn.

### i. Common Use

The parties contest whether the assault weapons at issue here are commonly owned. Plaintiffs argue that the weapons at issue are owned in large numbers by law-abiding Americans. They present statistics showing that nearly four million units of a single assault weapon, the popular AR-15, have been manufactured between 1986

---

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1252 (D.C. Cir. 2011); *Ezell v. City of Chicago*, 651 F.3d 684, 702-03 (7th Cir. 2011); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).

[50] *Decastro*, 682 F.3d at 167; *see Heller*, 554 U.S. at 595; *Kachalsky*, 701 F.3d at 94.

[51] *Heller*, 554 U.S. at 627.

[52] *Id.* at 625. In addition, the weapons must actually be used lawfully. *Id.* Because the laws at issue restrict the mere possession of assault weapons, and not how or why they are used, we need not consider that additional limitation.

and March 2013.[53] Plaintiffs further assert that only 7.5 percent of assault-weapon owners are active law enforcement officers,[54] and that most owners of assault weapons own only one or two such weapons, such that the banned firearms are not concentrated in a small number of homes, but rather spread widely among the gun-owning public.[55] Defendants counter that assault weapons only represent about two percent of the nation's firearms (admittedly amounting to approximately seven million guns).[56] Moreover, defendants argue that the statistics inflate the number of individual civilian owners because many of these weapons are purchased by law enforcement or smuggled to criminals, and many civilian gun owners own multiple assault weapons.

This much is clear: Americans own millions of the firearms that the challenged legislation prohibits.

The same is true of large-capacity magazines, as defined by the New York and Connecticut statutes. Though fewer statistics are available for magazines, those statistics suggest that about 25 million large-capacity magazines were available in 1995, shortly after the federal assault weapons ban was enacted, and nearly 50 million such

---

[53] J.A., No. 14-319-cv, at 146.

[54] J.A., No. 14-36-cv, at 162.

[55] Plaintiffs' Reply Br., No. 14-36-cv, at 6-7.

[56] *See* J.A., No. 14-36-cv, at 1091; J.A., No. 14-319-cv, at 2251.

1    magazines—or nearly two large-capacity magazines for each gun

2    capable of accepting one—were approved for import by 2000.[57]

3          Even accepting the most conservative estimates cited by the

4    parties and by amici, the assault weapons and large-capacity

5    magazines at issue are "in common use" as that term was used in

6    *Heller*. The D.C. Circuit reached the same conclusion in its well-

7    reasoned decision in *Heller II*, which upheld the constitutionality of a

8    District of Columbia gun-control act substantially similar to those at

9    issue here.[58]

10         To be sure, as defendants note, these assault weapons and

11    large-capacity magazines are not as commonly owned as the

12    handguns at issue in *Heller*, which were "the most popular weapon

13    chosen by Americans for self-defense in the home."[59] But nothing in

14    *Heller* limited its holding to handguns; indeed, the Court

15    emphasized that "the Second Amendment extends, prima facie, to

16    *all* instruments that constitute bearable arms," not just to a small

17    subset.[60]

18

---

[57] J.A., No. 14-319-cv, at 578.

[58] *Heller II*, 670 F.3d at 1261 (finding that the AR-15 and magazines with capacities exceeding ten rounds were in "common use" as defined by *Heller*).

[59] *Heller*, 554 U.S. at 629.

[60] *Id.* at 582 (emphasis supplied).

1           **ii.  Typical Possession**

2           We must next determine whether assault weapons and large-
3    capacity magazines are "typically possessed by law-abiding citizens
4    for lawful purposes."[61] While "common use" is an objective and
5    largely statistical inquiry, "typical[] possess[ion]" requires us to look
6    into both broad patterns of use and the subjective motives of gun
7    owners.

8           The parties offer competing evidence about these weapons'
9    "typical use." Plaintiffs suggest that assault weapons are among the
10   safest and most effective firearms for civilian self-defense.[62]
11   Defendants disagree, arguing that these weapons are used
12   disproportionately in gun crimes, rather than for lawful pursuits like
13   self-defense and hunting.[63]

14          Even if defendants are correct,[64] however, the same could be
15   said for the handguns in *Heller.* Though handguns comprise only
16   about one-third of the nation's firearms, by some estimates they

---

[61] *Id.* at 625.

[62] J.A., No. 14-319-cv, at 753-66 (declaration of ballistics researcher).

[63] *See* Defendants' Br., No. 14-319-cv, at 38-46; *see also* J.A., No. 14-319-cv at 1365-74, 1699-1715 (affidavits of chiefs of police opining that assault weapons may not be well suited for self-defense, especially in an urban environment); J.A., No. 14-319-cv, at 1395-1413.

[64] Plaintiffs take issue with the research methodology, and point to studies undermining the conclusion of disproportionate use. *See* Plaintiffs' Reply Br., No. 14-36-cv, at 15-17; *see also* J.A., No. 14-36-cv, at 464-65, 489-90.

account for 71 percent to 83 percent of the firearms used in murders and 84 percent to 90 percent of the firearms used in other violent crimes.[65] That evidence of disproportionate criminal use did not prevent the Supreme Court from holding that handguns merited constitutional protection.

Looking solely at a weapon's association with crime, then, is insufficient. We must also consider more broadly whether the weapon is "dangerous and unusual" in the hands of law-abiding civilians. *Heller* expressly highlighted "weapons that are most useful in military service," such as the fully automatic M-16 rifle, as weapons that could be banned without implicating the Second Amendment.[66] But this analysis is difficult to manage in practice. Because the AR-15 is "the civilian version of the military's M-16 rifle,"[67] defendants urge that it should be treated identically for Second Amendment purposes. But the Supreme Court's very choice of descriptor for the AR-15—the "civilian version"—could instead imply that such guns are "traditionally have been widely accepted as lawful."[68]

---

[65] Plaintiffs' Reply Br., No. 14-36-cv, at 15-18; *see also Heller*, 554 U.S. at 698 (Breyer, J., dissenting) (discussing similar statistics suggesting that handguns "appear to be a very popular weapon among criminals").

[66] 554 U.S. at 627 (internal quotation marks omitted).

[67] *Staples v. United States*, 511 U.S. 600, 603 (1994).

[68] *Id.* at 612.

1      Ultimately, then, neither the Supreme Court's categories nor
2   the evidence in the record cleanly resolves the question of whether
3   semiautomatic assault weapons and large-capacity magazines are
4   "typically possessed by law-abiding citizens for lawful purposes."[69]
5   Confronting this record, Chief Judge Skretny reasonably found that
6   reliable empirical evidence of lawful possession for lawful purposes
7   was "elusive,"[70] beyond ownership statistics.[71] We agree.

8      In the absence of clearer guidance from the Supreme Court or
9   stronger evidence in the record, we follow the approach taken by the
10  District Courts and by the D.C. Circuit in *Heller II* and assume for
11  the sake of argument that these "commonly used" weapons and
12  magazines are also "typically possessed by law-abiding citizens for
13  lawful purposes."[72] In short, we proceed on the assumption that
14  these laws ban weapons protected by the Second Amendment. This
15  assumption is warranted at this stage, because, as explained *post*
16  Section V.e, the statutes at issue nonetheless largely pass
17  constitutional muster.[73]

---

[69] *Heller*, 554 U.S. at 625.

[70] *NYSRPA*, 990 F. Supp. 2d at 365.

[71] On a substantially similar record, Judge Covello of the District of Connecticut came to the same conclusion, finding only that the relevant weapons were "*presumably*[] used for lawful purposes." *Shew*, 994 F. Supp. 2d at 246 (emphasis supplied).

[72] *See Heller II*, 670 F. 3d at 1260-61 (quoting *Heller*, 554 U.S. at 625).

[73] Though we *assume without deciding* that the bulk of the challenged legislation is entitled to Second Amendment protection, we *decide* as much with

1      **d.  Second Step: Level of Scrutiny**

2         Having concluded that the statutes impinge upon Second

3   Amendment rights, we must next determine and apply the

4   appropriate level of scrutiny.[74] We employ the familiar "levels of

---

respect to Connecticut's prohibition of the Remington Tactical 7615, a non-semiautomatic pump-action rifle. *See* Defendants' Br., No. 14-319-cv, at 58.

*Heller* emphasizes that the "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582. In other words, it identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting. *See Ezell*, 651 F.3d at 702-03 ("[I]f *the government can establish* that a challenged firearms law regulates activity falling outside the scope of the Second Amendment . . . then the analysis can stop there . . . ." (emphasis supplied)); *cf. Virginia v. Black*, 538 U.S. 343, 369 (2003) (Scalia, J., concurring in part, concurring in the judgment in part, and dissenting in part) (defining "prima facie evidence" as that which, "if unexplained or uncontradicted, is sufficient to sustain a judgment in favor of the issue which it supports" (quoting Black's Law Dictionary 1190 (6th ed.1990)). Because the State, focused on semiautomatic weapons, *see post* note 112, has failed to make any argument that this pump-action rifle is dangerous, unusual, or otherwise not within the ambit of Second Amendment protection, the presumption that the Amendment applies remains unrebutted.

To be sure, *Heller* also noted that certain "presumptively lawful regulatory measures" ostensibly fall outside of the Second Amendment's *prima facie* protections. *Id.* at 627 n.26. Nonetheless, like the D.C. Circuit in *Heller II*, we conclude that these particular restrictions are not entitled to "a *presumption* of validity." *Heller II*, 670 F.3d at 1260 (emphasis supplied).

We emphasize that our holding with respect to the Remington 7615—at both steps of our analysis—reflects the State's failure to present any argument at all regarding this weapon or others like it. We do not foreclose the possibility that states could in the future present evidence to support such a prohibition.

[74] Plaintiffs' effort to avoid the two-step framework laid out here is unavailing. They argue that the application of means-ends scrutiny in this case

1    scrutiny" analysis introduced in the famous Footnote Four of *United*

2    *States v. Carolene Products Co.*,[75] and begin by asking which level of

3    judicial "scrutiny" applies.

4        Though *Heller* did not specify the precise level of scrutiny

5    applicable to firearms regulations, it rejected mere rational basis

6    review as insufficient for the type of regulation challenged there.[76]

---

would be an "exercise in futility." Plaintiff's Br., No. 14-36-cv, at 13 (quoting *Kachalsky*, 701 F.3d at 89 n.9); Plaintiff's Br., No. 14-319-cv, at 12 (same). We reject that argument. As plaintiffs themselves concede, this Court made very clear in *Kachalsky* that "*Heller*'s reluctance to announce a standard of review" should *not* be interpreted as a "signal that courts must look solely to the text, history, and tradition of the Second Amendment to determine whether a state can limit the right without applying any sort of means-end scrutiny." 701 F.3d at 89 n.9. On the contrary, *Heller* indicated that the typical "standards of scrutiny" analysis *should* apply to regulations impinging upon Second Amendment rights, but that D.C.'s handgun ban would fail "[u]nder any of the standards of scrutiny." 554 U.S. at 628.

[75] 304 U.S. 144, 152 n.4 (1938); *see Heller*, 554 U.S. at 628 n.27.

[76] 554 U.S. at 628 n.27. At the same time, *Heller*'s approval of certain "presumptively lawful regulatory measures," *id.* at 627 n. 26, has been construed by some to rule out strict scrutiny as well. Indeed, Justice Breyer's dissent states, without opposition from the Court's opinion, that "the majority implicitly, and appropriately, reject[ed] th[e] suggestion [to apply strict scrutiny to gun regulations] by broadly approving a set of laws . . . whose constitutionality under a strict scrutiny standard would be far from clear." *Id.* at 688 (Breyer, J., dissenting). Chief Judge Skretny cited this interpretation with approbation. *NYSRPA*, 990 F. Supp. 2d at 366. Upon closer inspection, however, we think it likely that the *Heller* majority identified these "presumptively lawful" measures in an attempt to clarify the scope of the Second Amendment's reach in the first place—the first step of our framework—but not to intimate a view as to whether strict scrutiny applies in the second step.

1 At the same time, this Court and our sister Circuits have suggested
2 that heightened scrutiny is not always appropriate. In determining
3 whether heightened scrutiny applies, we consider two factors: (1)
4 "how close the law comes to the core of the Second Amendment
5 right" and (2) "the severity of the law's burden on the right."[77] Laws
6 that neither implicate the core protections of the Second
7 Amendment nor substantially burden their exercise do not receive
8 heightened scrutiny.

9 ### i. The Core of the Right

10 By their terms, the statutes at issue implicate the core of the
11 Second Amendment's protections by extending into the home,
12 "where the need for defense of self, family and property is most
13 acute."[78] Semiautomatic assault weapons and large-capacity
14 magazines are commonly owned by many law-abiding Americans,
15 and their complete prohibition, including within the home, requires
16 us to consider the scope of Second Amendment guarantees "at their
17 zenith."[79] At the same time, the regulated weapons are not nearly as
18 popularly owned and used for self-defense as the handgun, that

---

[77] *See Ezell*, 651 F.3d at 703.

[78] *Heller*, 554 U.S. at 628. This conclusion is predicated on our earlier *assumption* that the commonly used firearms at issue are also typically used for self-defense or other lawful purposes, and thus the prohibitions implicate the Second Amendment right. *See ante* V.c.ii.

[79] *Kachalsky*, 701 F.3d at 89.

1    "quintessential self-defense weapon."[80] Thus these statutes implicate

2    Second Amendment rights, but not to the same extent as the laws at

3    issue in *Heller* and *McDonald*.

4                    **ii.  The Severity of the Burden**

5         In *Decastro*, we explained that heightened scrutiny need not

6    apply to "any marginal, incremental or even appreciable restraint on

7    the right to keep and bear arms."[81] Rather, "heightened scrutiny is

8    triggered *only* by those restrictions that (like the complete

9    prohibition on handguns struck down in *Heller*) operate as a

10   substantial burden on the ability of law-abiding citizens to possess

11   and use a firearm for . . . lawful purposes."[82] Our later decision in

12   *Kachalsky* confirmed this approach, concluding that "some form of

13   heightened scrutiny would be appropriate" for regulations that

14   impose a "substantial burden" on Second Amendment rights.[83]

15        The practice of applying heightened scrutiny only to laws that

16   "burden the Second Amendment right *substantially*" is, as we noted

17   in *Decastro*, broadly consistent with our approach to other

18   fundamental constitutional rights, including those protected by the

19   First and Fourteenth Amendments.[84] We typically require a

---

[80] *Heller*, 554 U.S. at 629.

[81] *Decastro*, 682 F.3d at 166.

[82] *Id.* (emphasis supplied).

[83] 701 F.3d at 93.

[84] *Decastro*, 682 F.3d at 166-67 (emphasis supplied).

1   threshold showing to trigger heightened scrutiny of laws alleged to
2   implicate such constitutional contexts as takings, voting rights, and
3   free speech.[85] Though we have historically expressed "hesitan[ce] to
4   import *substantive* First Amendment principles wholesale into
5   Second Amendment jurisprudence,"[86] we readily "consult principles
6   from other areas of constitutional law, including the First
7   Amendment" in determining whether a law "substantially burdens
8   Second Amendment rights."[87]

9       The scope of the legislative restriction and the availability of
10  alternatives factor into our analysis of the "degree to which the
11  challenged law burdens the right."[88] No "substantial burden"
12  exists—and hence heightened scrutiny is not triggered—"if
13  adequate alternatives remain for law-abiding citizens to acquire a
14  firearm for self-defense."[89]

15      The laws at issue are both broad and burdensome. Unlike
16  statutes that "merely regulate the *manner* in which persons may

---

[85] *Id.*

[86] *Kachalsky*, 701 F.3d at 91 (emphasis in original).

[87] *Decastro*, 682 F.3d at 167.

[88] *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010).

[89] *Decastro*, 682 F.3d at 168; *see also Heller II*, 670 F.3d at 1262 (drawing the comparison to First Amendment speech restrictions, whereby "severe burdens" that "don't leave open ample alternative channels" trigger strict scrutiny, while restrictions that "leave open ample alternative channels" are merely "modest burdens" and require only "a mild form of intermediate scrutiny").

1    exercise their Second Amendment rights," these laws impose an
2    outright ban statewide.[90] The "absolute *prohibition*" instituted in both
3    states thus creates a "serious encroachment" on the Second
4    Amendment right.[91] These statutes are not mere "marginal,
5    incremental or even appreciable restraint[s] on the right to keep and
6    bear arms."[92] They impose a substantial burden on Second
7    Amendment rights and therefore trigger the application of some
8    form of heightened scrutiny.

9        Heightened scrutiny need not, however, "be akin to strict
10   scrutiny when a law burdens the Second Amendment"—
11   particularly when that burden does not constrain the Amendment's
12   "core" area of protection.[93] The instant bans are dissimilar from
13   D.C.'s unconstitutional prohibition of "an entire class of 'arms' that
14   is overwhelmingly chosen by American society for [the] lawful
15   purpose" of self-defense.[94] New York and Connecticut have not
16   banned an entire class of arms. Indeed, plaintiffs themselves

---

[90] *Chovan*, 735 F.3d at 1138.

[91] *Ezell*, 651 F.3d at 705, 708.

[92] *Decastro*, 682 F.3d at 166. The legislation at issue is thus easily distinguished from a New York statute imposing a gun-licensing fee of $100 per year, which we found to be no more than a "marginal, incremental or even appreciable restraint" on Second Amendment rights. *Kwong v. Bloomberg*, 723 F.3d 160, 167 (2d Cir. 2013). The regulation in *Kwong* involved neither the outright prohibition of weapons in common use nor any direct limitation on the exercise of Second Amendment rights within the home.

[93] *Kachalsky*, 701 F.3d at 93.

[94] *Heller*, 554 U.S. at 628.

1    acknowledge that there is no class of firearms known as
2    "semiautomatic assault weapons"—a descriptor they call purely
3    political in nature.[95] Plaintiffs nonetheless argue that the legislation
4    does prohibit "firearms of a universally recognized *type*—
5    semiautomatic."[96] Not so. Rather, both New York and Connecticut
6    ban only a limited subset of semiautomatic firearms, which contain
7    one or more enumerated military-style features. As *Heller* makes
8    plain, the fact that the statutes at issue do *not* ban "an entire class of
9    'arms'" makes the restrictions substantially less burdensome.[97] In
10   both states, citizens may continue to arm themselves with non-
11   semiautomatic weapons *or* with any semiautomatic gun that does
12   not contain any of the enumerated military-style features. Similarly,
13   while citizens may not acquire high-capacity magazines, they can
14   purchase any number of magazines with a capacity of ten or fewer
15   rounds. In sum, numerous "alternatives remain for law-abiding
16   citizens to acquire a firearm for self-defense."[98] We agree with the

---

[95] Plaintiffs' Br., No. 14-36-cv, at 17; Plaintiffs' Br., No. 14-319-cv, at 16.

[96] Plaintiff's Br., No. 14-319-cv, at 31.

[97] *See* 554 U.S. at 628.

[98] *Decastro*, 682 F.3d at 168. Plaintiffs' related argument—that the availability of unbanned firearms "is irrelevant under *Heller*," *see* Plaintiffs' Br., No. 14-36-cv, at 32—rests on a misapprehension of the Supreme Court's logic. To be sure, *Heller* did indicate that "[i]t is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." 554 U.S. at 629. But *Heller* went on to explain that handguns are protected as "the most popular weapon chosen by Americans for self-defense in the home." *Id.* Of course, the same cannot be said of the weapons at issue here. *Heller* explicitly endorsed prohibitions against any "weapons not

1   D.C. Circuit that "the prohibition of semi-automatic rifles and large-

2   capacity magazines does not effectively disarm individuals or

3   substantially affect their ability to defend themselves."[99] The burden

4   imposed by the challenged legislation is real, but it is not "severe."[100]

5       Accordingly, we conclude that intermediate, rather than strict,

6   scrutiny is appropriate. This conclusion coheres not only with that

7   reached by the D.C. Circuit when considering substantially similar

8   gun-control laws, but also with the analyses undertaken by other

9   courts, many of which have applied intermediate scrutiny to laws

10  implicating the Second Amendment.[101]

11      **e.  Application of Intermediate Scrutiny**

12      Though "intermediate scrutiny" may have different

13  connotations in different contexts,[102] here the key question is

14  whether the statutes at issue are "substantially related to the

---

typically possessed by law-abiding citizens for lawful purposes," including, for example, short-barreled shotguns. *Id.* at 625.  Our consideration of available alternatives for self-defense thus squares with *Heller*'s focus on protecting that "core lawful purpose" of the Second Amendment right. *Id.* at 630.

[99] *Heller II*, 670 F.3d at 1262.

[100] *See id.*

[101] *See, e.g., Chovan*, 735 F.3d at 1138; *Nat'l Rifle Ass'n of Am.*, 700 F.3d at 207; *Chester*, 628 F.3d at 683; *Reese*, 627 F.3d at 802; *Marzzarella*, 614 F.3d at 97.

[102] *Ernst J. v. Stone*, 452 F.3d 186, 200 n.10 (2d Cir. 2006) (noting that intermediate scrutiny carries different meanings depending on the area of law in which it arises, and then applying the same definition of intermediate scrutiny used here).

1    achievement of an important governmental interest."[103] It is beyond
2    cavil that both states have "substantial, indeed compelling,
3    governmental interests in public safety and crime prevention."[104] We
4    need only inquire, then, whether the challenged laws are
5    "substantially related" to the achievement of that governmental
6    interest. We conclude that the prohibitions on semiautomatic assault
7    weapons and large-capacity magazines meet this standard.

8                    **i.  Prohibition on "Assault Weapons"**

9         To survive intermediate scrutiny, the "fit between the
10   challenged regulation [and the government interest] need only be
11   substantial, not perfect."[105] Unlike strict scrutiny analysis, we need
12   not ensure that the statute is "narrowly tailored" or the "least
13   restrictive available means to serve the stated governmental
14   interest."[106] Moreover, we have observed that state regulation of the
15   right to bear arms "has always been more robust" than analogous
16   regulation of other constitutional rights.[107] So long as the defendants

---

[103] *Kachalsky*, 701 F.3d at 96.

[104] *Id.* at 97; *see also Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted." (internal quotation marks omitted)).

[105] *Kachalsky*, 701 F.3d at 97 (internal quotation marks omitted).

[106] *Id.*

[107] *Id.* at 100. States are permitted to restrict the right to bear arms by felons and the mentally ill, while equivalent restrictions on the right to speech or religious freedoms among those populations would unquestionably be unconstitutional. *Id.*

1    produce evidence that "fairly support[s]" their rationale, the laws

2    will pass constitutional muster.[108]

3         In making this determination, we afford "substantial

4    deference to the predictive judgments of the legislature."[109] We

5    remain mindful that, "[i]n the context of firearm regulation, the

6    legislature is 'far better equipped than the judiciary' to make

7    sensitive public policy judgments (within constitutional limits)

8    concerning the dangers in carrying firearms and the manner to

9    combat those risks."[110] Our role, therefore, is only to assure

10   ourselves that, in formulating their respective laws, New York and

11   Connecticut have "drawn reasonable inferences based on substantial

12   evidence."[111]

13         Both states have done so with respect to their prohibitions on

14   certain semiautomatic firearms.[112] At least since the enactment of the

---

[108] *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) (plurality).

[109] *Kachalsky*, 701 F.3d at 97 (quoting *Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n*, 520 U.S. 180, 195 (1997) (brackets omitted)).

[110] *Kachalsky*, 701 F.3d at 97 (quoting *Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n*, 512 U.S. 622, 665 (1994)) (opinion of Kennedy, J.)).

[111] *Turner Broad. Sys.*, 520 U.S. at 195.

[112] Though Connecticut's ban on semiautomatic firearms passes intermediate scrutiny, its prohibition of a single non-semiautomatic weapon, the Remington 7615, does not. Focused as it was on the rationale for banning semiautomatic weapons, Connecticut fails to set forth the requisite "substantial evidence" with respect to the pump-action Remington 7615. *Id.* at 195; *see also*

1    federal assault-weapons ban, semiautomatic assault weapons have

2    been understood to pose unusual risks. When used, these weapons

3    tend to result in more numerous wounds, more serious wounds, and

4    more victims.[113] These weapons are disproportionately used in

5    crime, and particularly in criminal mass shootings like the attack in

6    Newtown.[114] They are also disproportionately used to kill law

7    enforcement officers: one study shows that between 1998 and 2001,

8    assault weapons were used to gun down at least twenty percent of

9    officers killed in the line of duty.[115]

10          The record reveals that defendants have tailored the

11    legislation at issue to address these particularly hazardous weapons.

12    The dangers posed by some of the military-style features prohibited

13    by the statutes—such as grenade launchers and silencers—are

14    manifest and incontrovertible.[116] As for the other enumerated

---

*ante* note 73. Accordingly, we hold that this singular provision of Connecticut's legislation is unconstitutional.

[113] *See* Defendant's Br., No. 14-36-cv, at 48 (quoting J.A., No. 14-36-cv, at 733-34).

[114] *See id.* at 49 (citing J.A., No. 14-36-cv 565, 727, 729).

[115] *See* J.A., No. 14-36-cv, at 1261 (citing Violence Policy Center study).

[116] Indeed, plaintiffs have not seriously attempted to argue—either here or before the District Court—that such features are protected by the Second Amendment at all, much less that their prohibition should fail intermediate scrutiny. *See NYSRPA*, 990 F. Supp. 2d at 369-70 ("Plaintiffs do not explicitly argue that the Act's regulation of firearms with [grenade launchers, bayonet mounts, or silencers] violates the Second Amendment."); *cf. Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."); *United*

1   military-style features—such as the flash suppressor, protruding
2   grip, and barrel shrouds—New York and Connecticut have
3   determined, as did the U.S. Congress, that the "net effect of these
4   military combat features is a capability for lethality—more wounds,
5   more serious, in more victims—far beyond that of other firearms in
6   general, including other semiautomatic guns."[117] Indeed, plaintiffs
7   explicitly contend that these features improve a firearm's
8   "accuracy," "comfort," and "utility."[118] This circumlocution is, as
9   Chief Judge Skretny observed, a milder way of saying that these
10  features make the weapons more deadly.[119]

11      The legislation is also specifically targeted to prevent mass
12  shootings like that in Newtown, in which the shooter used a
13  semiautomatic assault weapon. Plaintiffs complain that mass
14  shootings are "particularly rare events" and thus, even if successful,
15  the legislation will have a "minimal impact" on most violent

---

*States v. Amer*, 110 F.3d 873, 879 (2d Cir. 1997) (finding that defendant forfeited
one of his constitutional arguments by failing to raise it before the District Court).

[117] J.A., No. 14-36-cv, at 733-34.

[118] Plaintiffs' Br., No. 14-36-cv, at 20; Plaintiffs' Br., No. 14-319-cv, at 19-20.

[119] *NYSRPA*, 990 F. Supp. 2d at 368.

1    crime.[120] That may be so. But gun-control legislation "need not strike

2    at all evils at the same time" to be constitutional.[121]

3          Defendants also have adduced evidence that the regulations

4    will achieve their intended end of reducing circulation of assault

5    weapons among criminals.[122] Plaintiffs counter—without record

6    evidence—that the statutes will primarily disarm law-abiding

7    citizens and will thus impair the very public-safety objectives they

8    were designed to achieve.[123] Given the dearth of evidence that law-

9    abiding citizens typically use these weapons for self-defense, *see ante*

10    Section V.c.ii, plaintiffs' concerns are speculative at best, and

11    certainly not strong enough to overcome the "substantial deference"

12    we owe to "predictive judgments of the legislature" on matters of

13    public safety.[124] The mere possibility that some subset of people

14    intent on breaking the law will indeed ignore these statutes does not

15    make them unconstitutional.

---

[120] Plaintiffs' Br., No. 14-36-cv, at 48-49; Plaintiffs' Br., No. 14-319-cv, at 48-49.

[121] *Nat'l Rifle Ass'n of Am.*, 700 F.3d at 211 (quoting *Buckley v. Valeo*, 424 U.S. 1, 105 (1976)).

[122] *See* Defendants' Br., No. 14-319-cv, at 71-75 (citing, *inter alia*, research by Prof. Christopher S. Koper, evaluating the impact of the federal assault weapons ban, J.A., No. 14-319-cv, at 1404).

[123] Plaintiffs' Br., No. 14-36-cv, at 45-46; Plaintiffs' Br., No. 14-319-cv, at 45-46.

[124] *Kachalsky*, 701 F.3d at 97 (quoting *Turner Broad. Sys.*, 520 U.S. at 195 (brackets omitted)).

1    Ultimately, "[i]t is the legislature's job, not ours, to weigh

2  conflicting evidence and make policy judgments."[125] We must

3  merely ensure that the challenged laws are substantially—even if

4  not perfectly—related to the articulated governmental interest. The

5  prohibition of semiautomatic assault weapons passes this test.[126]

6            **ii.  Prohibition on Large-Capacity Magazines**

7    The same logic applies *a fortiori* to the restrictions on large-

8  capacity magazines.[127] The record evidence suggests that large-

9  capacity magazines may "present even greater dangers to crime and

10  violence than assault weapons alone, in part because they are more

11  prevalent and can be and are used . . . in both assault weapons and

12  non-assault   weapons."[128]   Large-capacity   magazines   are

13  disproportionately  used  in  mass  shootings,  like  the  one  in

---

[125] *Id.* at 99.

[126] *Cf. Heller II*, 670 F.3d at 1263 ("[T]he evidence demonstrates a ban on assault weapons is likely to promote the Government's interest in crime control . . . ."). Again, our holding is limited insofar as it does not apply to Connecticut's prohibition of the non-semiautomatic Remington 7615.

[127] *Amici* argue that large-capacity magazines are entirely outside of Second Amendment protection for the independent reason that such magazines constitute firearm "accessories" rather than protected "arms." *See* Br. of *Amici Curiae* Law Center To Prevent Gun Violence and New Yorkers Against Gun Violence, No. 14-36-cv, at 8-13; Br. of *Amici Curiae* Law Center To Prevent Gun Violence, Connecticut Against Gun Violence, and Cleveland School Remembers, No. 14-319-cv, at 10-14. Because we conclude that the prohibition of large-capacity magazines would survive the requisite scrutiny, we need not reach the merits of this additional argument.

[128] J.A., No. 14-319-cv, at 1400.

1   Newtown, in which the shooter used multiple large-capacity
2   magazines to fire 154 rounds in less than five minutes.[129] Like assault
3   weapons, large-capacity magazines result in "more shots fired,
4   persons wounded, and wounds per victim than do other gun
5   attacks."[130] Professor Christopher Koper, a firearms expert relied
6   upon by all parties in both states, stated that it is "particularly" the
7   ban on large-capacity magazines that has the greatest "potential to
8   prevent and limit shootings in the state over the long-run."[131]

9       We therefore conclude that New York and Connecticut have
10  adequately established a substantial relationship between the
11  prohibition of both semiautomatic assault weapons and large-
12  capacity magazines and the important—indeed, compelling—state
13  interest in controlling crime. These prohibitions survive
14  intermediate scrutiny.

15              **iii.  Seven-Round Load Limit**

16      Though the key provisions of both statutes pass constitutional
17  muster on this record, another aspect of New York's SAFE Act does
18  not: the seven-round load limit, which makes it "unlawful for a

---

[129] Defendants' Br., No. 14-319-cv, at 11, 38-39.

[130] *Heller II*, 670 F.3d at 1263 (internal quotation marks omitted); *see also* Defendants' Br., No. 14-36-cv, at 59-60.

[131] J.A., No. 14-319-cv, at 1410.

43

1  person to knowingly possess an ammunition feeding device where
2  such device contains more than seven rounds of ammunition."[132]

3      As noted above, the seven-round load limit was a second-best
4  solution. New York determined that only magazines containing
5  seven rounds or fewer can be safely possessed, but it also recognized
6  that seven-round magazines are difficult to obtain commercially. Its
7  compromise was to permit gun owners to use ten-round magazines
8  if they were loaded with seven or fewer rounds.[133]

9      On the record before us, we cannot conclude that New York
10  has presented sufficient evidence that a seven-round load limit
11  would best protect public safety. Here we are considering not a
12  capacity restriction, but rather a load limit. Nothing in the SAFE Act
13  will outlaw or reduce the number of ten-round magazines in
14  circulation. It will not decrease their availability or in any way
15  frustrate the access of those who intend to use ten-round magazines
16  for mass shootings or other crimes. It is thus entirely untethered
17  from the stated rationale of reducing the number of assault weapons
18  and large capacity magazines in circulation.[134] New York has failed
19  to present evidence that the mere existence of this load limit will
20  convince any would-be malefactors to load magazines capable of
21  holding ten rounds with only the permissible seven.

---

[132] N.Y. Penal Law § 265.37; *see ante* notes 12-13 and accompanying text.

[133] *See* Defendants' Br., No. 14-36-cv, at 15-16.

[134] *See id.* at 55.

1    To be sure, the mere possibility of criminal disregard of the
2    laws does not foreclose an attempt by the state to enact firearm
3    regulations. But on intermediate scrutiny review, the state cannot
4    "get away with shoddy data or reasoning."[135] To survive
5    intermediate scrutiny, the defendants must show "*reasonable*
6    inferences based on *substantial* evidence" that the statutes are
7    substantially related to the governmental interest.[136] With respect to
8    the load limit provision alone, New York has failed to do so.

9    **VI.    Vagueness Challenge**

10    We turn now to plaintiffs' second challenge to the New York
11    and Connecticut laws—their claim that provisions of both statutes
12    are unconstitutionally vague. The New York defendants cross-
13    appeal Chief Judge Skretny's ruling that two provisions of the SAFE
14    Act are void because of vagueness.

15    **a.  Legal Standards**

16    Grounded in due process principles, the void-for-vagueness
17    doctrine provides that "[n]o one may be required at peril of life,
18    liberty or property to speculate as to the meaning of penal
19    statutes."[137] The doctrine requires that "a penal statute define the

---

[135] *Alameda Books*, 535 U.S. at 438.

[136] *Turner Broad. Sys.*, 520 U.S. at 195 (emphasis supplied).

[137] *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 287 (1961); *see also Cunney v. Bd. of Trustees of Vill. of Grand View, N.Y.*, 660 F.3d 612, 620 (2d Cir. 2011).

1    criminal offense with sufficient definiteness that ordinary people can
2    understand what conduct is prohibited and in a manner that does
3    not encourage arbitrary and discriminatory enforcement."[138] Statutes
4    carrying criminal penalties or implicating the exercise of
5    constitutional rights, like the ones at issue here, are subject to a
6    "more stringent" vagueness standard than are civil or economic
7    regulations.[139] However, the doctrine does not require "'meticulous
8    specificity'" of statutes, recognizing that "language is necessarily
9    marked by a degree of imprecision."[140]

10       Because plaintiffs pursue this "pre-enforcement" appeal
11   before they have been charged with any violation of law, it
12   constitutes a "facial," rather than "as-applied," challenge.[141] Under
13   the standard set forth by the Supreme Court in *United States v.*
14   *Salerno*, to succeed on a facial challenge, "the challenger must
15   establish that *no set of circumstances* exists under which the Act

---

[138] *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

[139] *Vill. of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982).

[140] *Thibodeau v. Portuondo*, 486 F.3d 61, 66 (2d Cir. 2007) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)).

[141] *See Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 685-86 (2d Cir. 1996).

1    would be valid."[142] As a result, a facial challenge to a legislative

2    enactment is "the most difficult challenge to mount successfully."[143]

3        Seeking to avoid this prohibitively high bar, plaintiffs urge us

4    to follow the different approach that a plurality of the Supreme

5    Court took in *City of Chicago v. Morales*.[144] In that case, three Justices

6    held that a criminal law lacking a *mens rea* requirement and

7    burdening a constitutional right "is subject to facial attack" "[w]hen

8    vagueness permeates the text of such a law."[145] This Court, however,

9    has determined that, because the test set forth by the *Morales*

10   plurality has not been adopted by the Supreme Court as a whole, we

11   are not required to apply it.[146] We have previously declined to

12   specify a preference for either test,[147] and we need not do so here,

13   because the challenged provisions are sufficiently clear to survive a

14   facial challenge under either approach.

15

16

---

[142] 481 U.S. 739, 745 (1987) (emphasis supplied).

[143] *Id*.

[144] 527 U.S. 41 (1999); *see also* Plaintiffs' Br., No. 14-319-cv, at 52-54; Plaintiffs' Br., No. 14-36-cv, at 52-56.

[145] 527 U.S. at 55.

[146] *United States v. Rybicki*, 354 F.3d 124, 131-32 (2d Cir. 2003) (en banc).

[147] *Id*. at 132 n.3.

1      **b. Application**

2           **i.** "**Can be readily restored or converted to accept**"

3           Both the New York and Connecticut statutes criminalize the
4      possession of magazines that "can be readily restored or converted
5      to accept" more than ten rounds of ammunition.[148] In both suits,
6      plaintiffs allege that the phrase is unconstitutionally vague because
7      whether a magazine "can be readily restored or converted" depends
8      upon the knowledge, skill, and tools available to the particular
9      restorer, and the statutes are silent on these details.[149]

10          This statutory language dates at least to the 1994 federal
11     assault-weapons ban and later appeared in New York's 2000 law. As
12     Chief Judge Skretny noted, there is no record evidence that it has
13     given rise to confusion at any time in the past two decades.[150] This
14     Court found a similar phrase in another gun law—"may readily be
15     converted"—to be "sufficiently definite" as to provide "clear[]
16     warn[ing]" of its meaning.[151] Plaintiffs' reliance on a Sixth Circuit

---

[148] N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.36; Conn. Gen. Stat. § 53-202w(a)(1).

[149] Plaintiffs' Br., No. 14-36-cv, at 58-59; Plaintiffs' Br., No. 14-319-cv, at 58-60.

[150] *NYSRPA*, 990 F. Supp. 2d at 376.

[151] *U.S. v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns*, 443 F.2d 463, 464-65 (2d Cir. 1971) (rejecting a vagueness challenge in a civil forfeiture context, and finding that the phrase clearly meant a gun "which can be converted by a relatively simple operation taking only a few minutes").

1   case that interpreted a *different* phrase—"may be restored" without

2   the modifier "readily"—is inapposite.[152]

3        Plaintiffs' purported concern—that this provision might be

4   unfairly used to prosecute an ordinary citizen for owning a

5   magazine that only a gunsmith equipped with technical knowledge

6   and specialized tools could "readily convert"[153]—is implausible.

7   Should such a prosecution ever occur, the defendant could bring an

8   "as applied" vagueness challenge, grounded in the facts and context

9   of a particular set of charges. That improbable scenario cannot,

10  however, adequately support the *facial* challenge plaintiffs attempt

11  to bring here.

12       In sum, we affirm the judgments of both District Courts

13  finding that this phrase is not unconstitutionally vague.

14               **ii.  Capacity of Tubular Magazines**

15       The New York plaintiffs contend the SAFE Act's ten-round

16  magazine restriction[154] is vague insofar as it extends to tubular

17  magazines, the capacity of which varies according to the size of the

18  particular shells that are loaded. This challenge fails as a threshold

19  matter for the reasons stated by the District Court: the provision is

---

[152] Plaintiffs' Br., No. 14-36-cv, at 58; Plaintiffs' Br., No. 14-319-cv, at 58-59; *see Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 537 (6th Cir. 1998).

[153] *See* Plaintiffs' Br., No. 14-36-cv, at 58-59; Plaintiffs' Br., No. 14-319-cv, at 58-59.

[154] N.Y. Penal Law § 265.00(23).

1    only potentially vague when applied to a specific (non-standard)
2    use, and hence is neither vague in all circumstances (as required
3    under *Salerno*) nor permeated with vagueness (as required by the
4    *Morales* plurality). Moreover, like the "readily converted" language,
5    this capacity restriction was also included in the 1994 federal
6    assault-weapons ban, without any record evidence of confusion
7    during the ensuing decades.

8                        **iii.  "Copies or Duplicates"**

9           Plaintiffs challenge the Connecticut statute's definition of
10   assault weapon to include certain specified firearms and any "copies
11   or duplicates thereof with the capability of" the listed models.[155]
12   They argue that the provision provides inadequate notice of which
13   firearms in particular are prohibited.

14          We review the statutory language within its context, relying if
15   necessary on the canons of statutory construction and legislative
16   history.[156] In the context of the legislation as a whole, this "copies or
17   duplicates" language is not unconstitutionally vague. All firearms
18   that the statute prohibits by model name *also* exhibit at least one of
19   the prohibited military-style features.[157] Hence, the statute provides

---

[155] Conn. Gen. Stat. § 53-202a(1)(B)-(D).

[156] *Commack Self-Service Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 213 (2d Cir. 2012).

[157] The Connecticut legislation prohibited only a single firearm, the Remington 7615, which lacked military-style features. Because we have already held that Connecticut's ban on the Remington 7615 is unconstitutional, *see ante*

1   two independent means by which an individual may determine if
2   his firearm is prohibited: he may consult the list of illegal models
3   and, if still concerned that the firearm may be an unlawful "copy or
4   duplicate," he may cross-reference the list of prohibited military-
5   style features.

6       In this manner, the Connecticut legislation avoids the
7   deficiency of an assault-weapons ban struck down by a sister Circuit
8   as unconstitutionally vague in *Springfield Armory, Inc. v. City of*
9   *Columbus*.[158] In *Springfield*, the municipal ordinance at issue defined
10  assault weapons simply by naming 46 individual models and
11  extending the prohibition to weapons with "slight modifications or
12  enhancements" to the listed firearms. The Sixth Circuit explained
13  that the ordinance was invalid because it "outlaw[ed] certain brand
14  names without including within the prohibition similar assault
15  weapons of the same type, function or capability [and] . . . without
16  providing any explanation for its selections [of prohibited
17  firearms]."[159] The Sixth Circuit found it significant that the ordinance
18  offered no "explanation for drafting the ordinance in terms of brand
19  name rather than generic type or category of weapon."[160] In the
20  instant case, by contrast, Connecticut has provided not only an

---

notes 73 and 112, plaintiffs' challenge to the "copies or duplicates" provision is
moot regarding copies or duplicates of the Remington 7615 itself.

[158] 29 F.3d 250, 252 (6th Cir. 1994).

[159] *Id*.

[160] *Id*.

1   itemized list of prohibited models but also the military-style features

2   test, which functions as an explanation of the "generic type or

3   category of weapon" outlawed.

4       We therefore agree with Judge Covello that the "copies or

5   duplicate" provision of the Connecticut statute at issue here is

6   sufficiently definite to survive a void-for-vagueness challenge.

7                              **iv. "Version"**

8       We apply similar logic to our analysis of New York's

9   prohibition of semiautomatic pistols that are "semiautomatic

10  version[s] of an automatic rifle, shotgun or firearm."[161] In this case,

11  Chief Judge Skretny held that the provision was unconstitutionally

12  vague, reasoning that "an ordinary person cannot know whether

13  any single semiautomatic pistol is a 'version' of an automatic one."[162]

14  The District Court also expressed concern that the lack of criteria

15  might encourage arbitrary and discriminatory enforcement.[163]

16      We disagree. The SAFE Act's terminology has been used in

17  multiple state and federal firearms statutes, including the 1994

18  federal assault-weapons ban, as well as in government reports,

19  judicial decisions, and published books.[164] Plaintiffs have shown no

---

[161] N.Y. Penal Law § 265.00(22)(c)(viii).

[162] *NYSRPA*, 990 F. Supp. 2d at 377.

[163] *Id*.

[164] Defendants' Br., No. 14-36-cv, at 81-83.

1   evidence of confusion arising from this long-standing formulation.
2   Though plaintiffs are correct that, as a general proposition,
3   repetition does not save a vague term, in the particular
4   circumstances presented here—repeated use for decades, without
5   evidence of mischief or misunderstanding—suggests that the
6   language is comprehensible. Further, the SAFE Act provides
7   additional notice of prohibited conduct by requiring the creation of a
8   website listing unlawful weapons and containing additional
9   information.[165] If, in fact, as the District Court fears, this language
10  results in arbitrary and discriminatory enforcement, those charged
11  under the statute can and should seek recourse in an "as applied"
12  challenge. We cannot conclude, however, that the provision is vague
13  in all circumstances or permeated with vagueness on its face. We
14  therefore reverse so much of the District Court's judgment as holds
15  New York Penal Law § 265.00(22)(c)(viii) void because of vagueness.

16                    **v.  "Muzzle Break"**

17      Finally, Chief Judge Skretny also struck down as
18  impermissibly vague a provision of New York's SAFE Act that listed
19  among prohibited military-style features such muzzle attachments
20  as "a flash suppressor, *muzzle break*, muzzle compensator, or
21  threaded barrel designed to accommodate a flash suppressor, *muzzle*

---

[165] N.Y. Penal Law § 400.00(16-a)(b). The New York State Police also
maintains a telephone line to answer the questions of gun owners. *See*
Defendants' Reply Br., No. 14-36-cv, at 26.

1  *break*, or muzzle compensator."[166] All parties agree that a "muzzle

2  *brake*" is a firearm attachment that reduces recoil. However, the

3  SAFE Act misspelled the term as "muzzle *break*." On the basis of this

4  misspelling, the District Court held the references to muzzle

5  "breaks" to be unconstitutionally vague, reasoning that "an ordinary

6  person cannot be 'informed as to what the State commands or

7  forbids.'"[167]

8      This is, in our view, an overstatement. Because the misspelled

9  homophone "muzzle break" has no accepted meaning, there is no

10  meaningful risk that a party might confuse the legislature's intent.

11  Further, its placement within a list of muzzle attachments makes the

12  misspelled term's meaning even clearer. What is more, because the

13  adjacent statutory term "muzzle compensator" is synonymous with

14  muzzle brake, and thus independently covers the prohibited

15  conduct, this issue is of little moment. Nonetheless, vagueness

16  doctrine requires only that the statute provide "sufficiently definite

17  warning as to the proscribed conduct when measured by common

18  understanding and practices."[168] This provision has done so.

19  Accordingly, we reverse so much of the District Court's judgment as

20  holds New York Penal Law § 265.00(22)(a)(vi) unconstitutionally

21  vague.

---

[166] N.Y. Penal Law § 265.00(22)(a)(vi) (emphasis supplied).

[167] *NYSRPA*, 990 F. Supp. 2d at 377 (quoting *Cunney*, 660 F.3d at 620).

[168] *United States v. Farhane*, 634 F.3d 127, 139 (2d Cir. 2011) (internal quotation marks omitted).

1 **CONCLUSION**

2 To summarize, we hold as follows:

3 (1) The core prohibitions by New York and Connecticut of
4 assault weapons and large-capacity magazines do not
5 violate the Second Amendment.

6 (a) We assume that the majority of the prohibited
7 conduct falls within the scope of Second
8 Amendment protections. The statutes are
9 appropriately evaluated under the constitutional
10 standard of "intermediate scrutiny"—that is,
11 whether they are "substantially related to the
12 achievement of an important governmental
13 interest."
14 (b) Because the prohibitions are substantially related
15 to the important governmental interests of public
16 safety and crime reduction, they pass
17 constitutional muster.

18 We therefore **AFFIRM** the relevant portions of the
19 judgments of the Western District of New York and the
20 District of Connecticut insofar as they upheld the
21 constitutionality of state prohibitions on semiautomatic
22 assault weapons and large-capacity magazines.

23 (2) We hold that the specific prohibition on the non-
24 semiautomatic Remington 7615 falls within the scope of

1    Second Amendment protection and subsequently fails
2    intermediate scrutiny. Accordingly, we **REVERSE** that
3    limited portion of the judgment of the District of
4    Connecticut. In doing so, we emphasize the limited
5    nature of our holding with respect to the Remington
6    7615, in that it merely reflects the presumption required
7    by the Supreme Court in *District of Columbia v. Heller*
8    that the Second Amendment extends to all bearable
9    arms, and that the State, by failing to present any
10   argument at all regarding this weapon or others like it,
11   has failed to rebut that presumption. We do not
12   foreclose the possibility that States could in the future
13   present evidence to support such a prohibition.

14   (3)   New York's seven-round load limit does not survive
15         intermediate scrutiny in the absence of requisite record
16         evidence and a substantial relationship between the
17         statutory provision and important state safety interests.
18         We therefore **AFFIRM** the judgment of the Western
19         District of New York insofar as it held this provision
20         unconstitutional.

21   (4)   No challenged provision in either statute is
22         unconstitutionally vague. Accordingly, we **AFFIRM** the
23         judgments of the District of Connecticut and the
24         Western District of New York insofar as they denied
25         vagueness challenges to provisions involving the
26         capacity of tubular magazines, "copies or duplicates,"

1    or a firearm's ability to "be readily restored or
2    converted." We **REVERSE** the judgment of the Western
3    District of New York insofar as it found language
4    pertaining to "versions" and "muzzle breaks" to be
5    unconstitutionally vague.