No. 14-1945

_____

In The

# United States Court of Appeals
# For the Fourth Circuit

Stephen V. Kolbe, et al.,

*Plaintiffs-Appellants*

v.

Lawrence J. Hogan, Jr., Governor, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland at Baltimore

**Brief of the Brady Center to Prevent Gun Violence as *Amicus Curiae* in Support of Defendants-appellees' Petition for Rehearing *En Banc***

Jonathan E. Lowy
Kelly Sampson
Brady Center to
Prevent Gun Violence
840 First St. N.E., Suite 400
Washington, D.C. 20002
(202) 289-7319
jlowy@bradymail.org

Elliott Schulder
Suzan F. Charlton
Amit R. Vora
  *Counsel of Record*
Covington & Burling LLP
850 Tenth St. N.W.
Washington, D.C. 20001-4956
(202) 662-6000
avora@cov.com

*Counsel for Amicus Curiae*

February 25, 2016

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1945__     Caption: __Kolbe v. Hogan__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__The Brady Center to Prevent Gun Violence__
(name of party/amicus)

who is ____amicus curiae____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☐ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: *Amit Vora*      Date: February 25, 2016

Counsel for: Brady Center to Prevent Gun Violence

## CERTIFICATE OF SERVICE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I certify that on February 25, 2016 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

*Amit Vora*
(signature)

February 25, 2016
(date)

# TABLE OF CONTENTS

|  | Page |
|---|---|
| STATEMENT OF INTEREST | 1 |
| STATEMENT OF PURPOSE | 1 |
| ARGUMENT | 2 |
| CONCLUSION | 9 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*District of Columbia v. Heller*,
 554 U.S. 570 (2008)..........................................................................................2

*Friedman v. City of Highland Park, Illinois*,
 784 F.3d 406 (7th Cir. 2015) ............................................................................7

*Fyock v. Sunnyvale*,
 779 F.3d 991 (9th Cir. 2015) ............................................................................8

*Heller v. District of Columbia*,
 670 F.3d 1244 (D.C. Cir. 2011)........................................................................8

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
 990 F. Supp. 2d 349 (W.D.N.Y. 2013)..............................................................5

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
 804 F.3d 242 (2d Cir. 2015) .....................................................................5, 7, 8

**Constitutional Amendment, Statute, and Rule**

U.S. Const. amend. II................................................................................................1, 2, 7

Md. Code Ann., Crim. Law §§ 4-301 *et seq*......................................................*passim*

Fed. R. App. P. 29..............................................................................................................1

**Other Authorities and Sources**

Kevin Ashton, *The Physics of Mass Killing* (Jan. 24, 2013),
 http://kevinjashton.com/2013/01/24/the-physics-of-mass-killing/......................6

Mark Follman et al., *More Than Half of Mass Shooters Used Assault Weapons and High-Capacity Magazines, Mother Jones* (Feb. 27, 2013), http://www.motherjones.com/politics/2013/02/assault-weapons-high-capacity-magazines-mass-shootings-feinstein ............................. 6

Douglas F. Gansler, Attorney General of Maryland, *Letter Regarding Senate Bill 281, The Firearm Safety Act of 2013*, (Apr. 30, 2013), http://mgaleg.maryland.gov/2013RS/ag_letters/sb0281.pdf .............................. 4

Christopher Koper, *America's Experience with the Federal Assault Weapons Ban, 1994–2004*, in *Reducing Gun Violence in America* (Daniel W. Webster and Jon S. Vernick eds., 2013). ........................................... 7

Mayors Against Illegal Guns, *Mass Shootings Since January 20, 2009* (Feb. 2013), http://www.washingtonpost.com/blogs/wonkblog/files/2013/02/mass_shootings_2009-13_-_jan_29_12pm1.pdf ....................................................... 7

U.S. Dep't of Treasury, *Studying the Sporting Suitability of Modified Semiauto-matic Assault Rifles* (Apr. 1998), https://www.atf.gov/files/firearms/industry/april-1998-sporting-suitability-of-modified-semiautomatic-assault-rifles.pdf ..................................... 5

Daniel W. Webster, Director of the Johns Hopkins Center for Gun Policy and Research, *Testimony in Support of HB 294–Firearm Safety Act of 2013 Before the Maryland House Judiciary Committee* (2013), http://mgaleg.maryland.gov/2013RS/ag_letters/sb0281.pdf ........................... 4, 5

## STATEMENT OF INTEREST

The Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. In support of that mission, the Brady Center files this brief as *amicus curiae* in support of Defendants-Appellees' petition for rehearing *en banc*.[1]

The Brady Center has a substantial interest in ensuring that the Second Amendment is not interpreted or applied in a way that would jeopardize the public's interest in protecting families and communities from the effects of gun violence. Through its Legal Action Project, the Brady Center has filed *amicus* briefs in numerous cases involving firearms regulations.

## STATEMENT OF PURPOSE

The impact of the panel majority's opinion on public safety is a matter of exceptional importance. Indeed, the danger of leaving the opinion intact must not be underestimated: it would maintain the unprecedented holding that Maryland's restriction on military-style weaponry imposes a "substantial burden" on Second

---

[1] Pursuant to Fed. R. App. P. 29(c)(5), the Brady Center states that no counsel for a party authored this brief in whole or in part, and no person or entity other than *amicus curiae*, its members, or its counsel, contributed money that was intended to fund preparing or submitting this brief. Pursuant to Fed. R. App. P. 29(a), the Brady Center states that all parties have consented to the filing of this brief.

Amendment rights and thereby implicates strict scrutiny. All parties to this dispute must surely agree with certain basic premises: mass shootings are tragic, they erupt too frequently, and they should and can be prevented without substantial impingement on Second Amendment rights. The Firearm Safety Act of 2013 (the "Act" or "FSA") is a logical extension of these fundamental truths. *See* Md. Code Ann., Crim. Law §§ 4-301 *et seq*. The Act is intended to reduce the frequency of mass shootings by prohibiting the possession and transfer of certain military-style assault weapons and high-capacity magazines, which are especially ill-suited for what the Supreme Court has called the "core protection" of the Second Amendment, the "defense of hearth and home," *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008).

## ARGUMENT

In passing the Firearm Safety Act of 2013, the Maryland legislature chose a common-sense approach to stem the tide of mass shootings. The legislature addressed certain military-style assault weapons and high-capacity magazines because those are often the tools selected to perpetrate these tragedies. It is not difficult to recall examples of the carnage and havoc that such "weapons of choice" have wreaked on the innocent:

- **Columbine, Colorado**: On April 20, 1999, at Columbine High School, two students killed 13 and wounded 23 classmates and teachers, using Intratec TEC-DC9 assault pistols, a Hi-Point 9mm Carbine, a Savage 67H pump-action shotgun, and a Savage 311-D 12-gauge shotgun.

- **Blacksburg, Virginia**: On April 16, 2007, at Virginia Tech, a student killed 32 people and wounded 17 others, using two semi-automatic pistols: a Glock 19, which comes standard with a high-capacity magazine, and a Walther P22.

- **Aurora, Colorado:** On July 20, 2012, at a movie theater, a young man killed 12 people and injured 58, using a Smith & Wesson M&P15 (an AR-15 type weapon) equipped with a 100-round drum magazine, as well as a Remington 870 12-gauge shotgun and a Glock .40 semi-automatic pistol.

- **Newtown, Connecticut**: On December 14, 2012, at Sandy Hook Elementary School, a young man shot and killed 20 first graders and 6 educators, using semi-automatic firearms with high-capacity magazines: a Bushmaster XM15-ES2 rifle, a Glock 20SF semi-automatic pistol, a Sig Sauer P226 semi-automatic pistol, and an Izhmash Saiga-12 semi-automatic shotgun.

- **San Bernardino, California**: On December 2, 2015, at an office holiday party, a married couple killed 14 and injured 22 co-workers, using two .223-

caliber semi-automatic rifles (a DPMS Panther Arms A15 and a Smith & Wesson M&P15, also an AR-15-type weapon), two 9 mm caliber semi-automatic pistols, and an explosive device.

In each case, the shooter used an "exceptionally lethal weapon[] of war" (Slip op. at 68 (King, J., dissenting))—i.e., a semi-automatic assault weapon or a high-capacity magazine—that would fall within Maryland's Firearm Safety Act.

In passing the Act, the Maryland legislature considered substantial evidence regarding the lethality of assault weapons and their lack of utility as a common method of self-defense. It heard testimony that "[a]ssault weapons and other firearms with large capacity ammunition feeding devices are commonly used in mass shootings and the greater the ammunition capacity of the firearm used in a mass shooting, the more victims were injured or killed by gunfire."[2] It received evidence that the drastic increase in the number of assault weapons available since the federal assault weapons ban expired in 2004 presented significant dangers to communities and substantial risks to law enforcement personnel.[3] Furthermore, the

---

[2] *See* Daniel W. Webster, Director of the Johns Hopkins Center for Gun Policy and Research, *Testimony in Support of HB 294–Firearm Safety Act of 2013 Before the Maryland House Judiciary Committee* (2013), http://mgaleg.maryland.gov/2013RS/ag_letters/sb0281.pdf, at 26.

[3] *See* Douglas F. Gansler, Attorney General of Maryland, *Letter Regarding Senate Bill 281, The Firearm Safety Act of 2013*, (Apr. 30, 2013), http://mgaleg.maryland.gov/2013RS/ag_letters/sb0281.pdf, at 5 (citing the testi-
(continued…)

legislature considered evidence that the assault weapons prohibited by the Act are not likely to be useful for the purpose of self-defense in the home, nor are they commonly used for that purpose.[4]

In exercising the Maryland legislature's considered judgment, the Act prohibits weapon features that do not relate to the utility of the weapons for self-defense (or even for sporting purposes), but rather to their utility for mass murder. For example, the Act prohibits certain semi-automatic rifles that have any two of the following: a folding stock, a grenade or flare launcher, or a flash suppressor. *See* Md. Code Ann., Crim. Law § 4-301(e)(1)(i). While the danger of a rifle equipped with a grenade or a flare launcher is obvious, a folding stock, too, threatens public safety: it "allow[s] the firearm to be fired from the folded position, yet it cannot be fired nearly as accurately as with an open stock."[5] Consequently, folding stocks increase the risk of injury to innocent bystanders. They also enable the weapon to be easily concealed and transported.[6]

---

mony of Baltimore County Police Chief Jim Johnson).

[4] *See* Webster, *supra* note 2.

[5] U.S. Dep't of Treasury, *Studying the Sporting Suitability of Modified Semiautomatic Assault Rifles* (Apr. 1998), https://www.atf.gov/files/firearms/industry/april-1998-sporting-suitability-of-modified-semiautomatic-assault-rifles.pdf ("*Sporting Suitability Study*").

[6] *See N.Y. State Rifle & Pistol Ass'n v. Cuomo,* 990 F. Supp. 2d 349, 370 (W.D.N.Y. 2013) (noting that "[f]olding and telescoping stocks aid concealability and portability"), *aff'd*, 804 F.3d 242 (2d Cir. 2015).

–5–

By the same token, the function of a flash suppressor is to

> disperse[] the muzzle flash when the firearm is fired to help conceal the shooter's position, especially at night … [and] assist in controlling the "muzzle climb" of the rifle, particularly when fired as a fully automatic weapon.[7]

Thus, "[f]rom the standpoint of a traditional sporting firearm, there is no particular benefit in suppressing muzzle flash."[8] Its utility is for violence, not sport.

Indeed, statistical research on mass shootings confirms that military-style assault weapons and high-capacity magazines are associated with a significantly higher rate of injury and death than other firearms:

- Of the 62 mass shootings that occurred in the United States from 1982 to 2012, 33 involved assault weapons, high-capacity magazines, or both.[9]

- For mass shootings from 1984 to 2012, more rounds fired per minute correlated to higher numbers of people hit and killed.[10]

- For mass shootings from January 2009 to January 2013, the use of assault weapons or high-capacity magazines resulted in more than double the num-

---

[7] *See Sporting Suitability Study*, *supra* note 5, at Exhibit 5.

[8] *See id.*

[9] *See* Mark Follman et al., *More Than Half of Mass Shooters Used Assault Weapons and High-Capacity Magazines*, Mother Jones (Feb. 27, 2013), http://www.motherjones.com/politics/2013/02/assault-weapons-high-capacity-magazines-mass-shootings-feinstein.

[10] *See* Kevin Ashton, *The Physics of Mass Killing* (Jan. 24, 2013), http://kevinjashton.com/2013/01/24/the-physics-of-mass-killing/.

ber of people shot and over 50 percent more people killed.[11]

- Recent mass shootings not involving assault weapons or high-capacity magazines resulted in an average of 7 people shot and 5.4 deaths, whereas shootings involving assault weapons or high-capacity magazines resulted in an average of 15.6 people shot (123% more) and 8.4 deaths (54% more).[12]

The FSA was enacted precisely to combat these devastating effects. Yet, the panel majority disregarded this evidence and instead required that the FSA be subject to strict scrutiny.

The unprecedented nature of this decision presents a conflict with other Courts of Appeals, presenting a question of exceptional importance for this Court to resolve. In fact, other Courts of Appeals have credited much of the same empirical data cited above in upholding, against Second Amendment challenge, legislation resembling the Maryland FSA. *See New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 262 (2d Cir. 2015); *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 411 (7th Cir. 2015) ("But assault weapons with large-

---

[11] *See* Christopher Koper, *America's Experience with the Federal Assault Weapons Ban, 1994–2004*, in *Reducing Gun Violence in America* 157, 167 (Daniel W. Webster and Jon S. Vernick eds., 2013).

[12] *See* Mayors Against Illegal Guns, *Mass Shootings Since January 20, 2009* (Feb. 2013), http://www.washingtonpost.com/blogs/wonkblog/files/2013/02/mass_shootings_2009-13_-_jan_29_12pm1.pdf, at 1.

capacity magazines can fire more shots, faster, and thus can be more dangerous in aggregate. Why else are they the weapons of choice in mass shootings? A ban on assault weapons and large-capacity magazines might not prevent shootings . . . but it may reduce the carnage if a mass shooting occurs."); *Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015) (noting "evidence that the use of large-capacity magazines results in more gunshots fired, results in more gunshot wounds per victim, and increases the lethality of gunshot injuries," "that large-capacity magazines are disproportionately used in mass shootings as well as crimes against law enforcement," and "studies showing that a reduction in the number of large-capacity magazines in circulation may decrease the use of such magazines in gun crimes"); *accord Heller v. District of Columbia*, 670 F.3d 1244, 1262-63 (D.C. Cir. 2011).

As the Second Circuit found in upholding analogous New York and Connecticut laws:

> At least since the enactment of the federal assault-weapons ban, semiautomatic assault weapons have been understood to pose unusual risks. When used, these weapons tend to result in more numerous wounds, more serious wounds, and more victims. These weapons are disproportionately used in crime, and particularly in criminal mass shootings like the attack in Newtown. They are also disproportionately used to kill law enforcement officers: one study shows that between 1998 and 2001, assault weapons were used to gun down at least twenty percent of officers killed in the line of duty.

*New York State Rifle & Pistol Ass'n*, 804 F.3d at 262.

## CONCLUSION

The State's public safety concerns are well documented and extremely serious. Yet, the panel majority's requirement that the Act be subject to strict scrutiny is unprecedented and could substantially undermine the State's ability to fulfill its public safety obligations. These issues are of such exceptional importance that they warrant this full Court's attention and consideration. Accordingly, *amicus* submits that Defendants-Appellees' petition for rehearing *en banc* should be granted.

Respectfully submitted,

/s/ Amit R. Vora

| | |
|---|---|
| Jonathan E. Lowy | Elliott Schulder |
| Kelly Sampson | Suzan F. Charlton |
| BRADY CENTER TO | Amit R. Vora |
| PREVENT GUN VIOLENCE | *Counsel of Record* |
| 840 First St. N.E., Suite 400 | COVINGTON & BURLING LLP |
| Washington, D.C. 20002 | 850 Tenth St. N.W. |
| (202) 289-7319 | Washington, D.C. 20001-4956 |
| jlowy@bradymail.org | (202) 662-6000 |
| | avora@cov.com |

*COUNSEL FOR AMICUS CURIAE*

February 25, 2016

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a) AND RULE 35(b)(2)**

This brief complies with the type-volume limitations of Fed. R. App. P. 29(d), 32(a)(7)(B) and 35(b)(2) because this brief contains 1,853 words, excluding material not counted under Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


Dated: February 25, 2016           /s/ Amit R. Vora
                                   Amit R. Vora

                                   *Attorney for Amicus Curiae*

# CERTIFICATE OF SERVICE

I certify that on February 25, 2016, the foregoing **Brief of the Brady Center To Prevent Gun Violence as *Amicus Curiae* in Support of Defendants-Appellees' Petition For Rehearing *En Banc*** was served on all parties or their counsel of record through the CM/ECF system.

Dated: February 25, 2016  /s/ Amit R. Vora
Amit R. Vora

*Attorney for Amicus Curiae*

DC: 5982008-1