No. 14-1945

In The
United States Court of Appeals
For the Fourth Circuit

STEPHEN V. KOLBE, et al.,

Plaintiffs-Appellants,

v.

LAWRENCE J. HOGAN, JR., GOVERNOR, et al.,

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MARYLAND AT BALTIMORE

**SUPPLEMENTAL BRIEF AMICI CURIAE OF
THE CONGRESS OF RACIAL EQUALITY, PINK PISTOLS, AND
WOMEN AGAINST GUN CONTROL IN SUPPORT OF APPELLANTS**

Brian S. Koukoutchos
28 Eagle Trace
Mandeville, LA 70471
(985) 626-5052

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1945__    Caption: __Kolbe, et al. v. Hogan, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Congress of Racial Equality__
(name of party/amicus)

_____

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                              ☑ YES ☐ NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                                 ☐ YES ☑ NO
        If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?     ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Brian Stuart Koukoutchos     Date: April 11, 2016

Counsel for: Congress of Racial Equality

# CERTIFICATE OF SERVICE
***************************

I certify that on ___April 11, 2016___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/ Brian Stuart Koukoutchos                              April 11, 2016
(signature)                                                        (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1945__     Caption: __Kolbe, et al. v. Hogan, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Pink Pistols__
(name of party/amicus)

_____

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                  ☑ YES ☐ NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                      ☐ YES ☑ NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Brian Stuart Koukoutchos              Date: April 11, 2016

Counsel for: Pink Pistols

# CERTIFICATE OF SERVICE
**************************

I certify that on _____April 11, 2016_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/ Brian Stuart Koukoutchos                         April 11, 2016
(signature)                                          (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1945__      Caption: __Kolbe, et al. v. Hogan, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Women Against Gun Control__
(name of party/amicus)

_____

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                              ☑ YES ☐ NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        ☐ YES ☑ NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Brian Stuart Koukoutchos                    Date:    April 11, 2016

Counsel for: Women Against Gun Control

# CERTIFICATE OF SERVICE
****************************

I certify that on ____April 11, 2016____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/ Brian Stuart Koukoutchos                         April 11, 2016
(signature)                                              (date)

## INTEREST OF AMICI CURIAE

At issue in this case is the question of whether the Second Amendment may be treated by the courts as a second-class right. Amici Pink Pistols, the Congress of Racial Equality, and Women Against Gun Control are particularly sensitive to this issue because their membership consists of political minorities who have historically been denied equal enjoyment of the liberties enumerated in the Bill of Rights. Once courts permit political majorities to chip away at one enumerated right (such as the right to bear arms), ***all such rights are at risk***, especially for those whom society and the law have sidelined for so long. Furthermore, Amici represent segments of the population that are disproportionately the targets of armed criminal violence and that vigorously support the right to bear arms. CORE, The Congress of Racial Equality, has been one of America's leading African-American civil rights organizations since its founding in 1942. Pink Pistols is a national society that honors gender and sexual diversity and advocates the responsible use of firearms for self-defense. Its creed is: "Without self-defense, there are no gay rights." Women Against Gun Control has been a leading national advocacy group for Second Amendment rights for more than two decades. Its motto is: "The Second Amendment *is* the Equal Rights Amendment."[1]

---

[1] This brief was not authored in whole or in part by a party's counsel, nor has a party or a party's counsel contributed money to fund its submission. No one other than amici, their members, and their counsel funded this submission.

# ARGUMENT

**STRICT SCRUTINY IS THE PROPER STANDARD OF RE-
VIEW FOR STATUTES THAT OUTLAW AN ENTIRE CATE-
GORY OF FIREARMS COMMONLY USED BY LAW-
ABIDING CITIZENS FOR THE CORE SECOND AMEND-
MENT PURPOSE OF SELF-DEFENSE IN THE HOME.**

I.    STRICT SCRUTINY IS APPROPRIATE FOR STATUTES THAT
      REACH INTO THE PRIVATE PRECINCTS OF THE HOME, WHERE
      SECOND AMENDMENT RIGHTS ARE AT THEIR ZENITH.

Because this Court has ruled that there "exists a clearly-defined fundamental right to possess firearms for self-defense within the home," *United States v. Masciandaro*, 638 F.3d 458, 467 (4th Cir. 2011), Maryland's ban on protected arms plainly "imposes a burden on conduct falling within the scope of the Second Amendment's guarantee," *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). It is beyond dispute that, as the panel observed, the Maryland Firearm Safety Act ("FSA") "bans law-abiding citizens . . . from possessing the vast majority of semi-automatic rifles commonly kept by several million American citizens for defending their families and homes and other lawful purposes." Slip op. 6. The panel clove tightly to the Supreme Court's jurisprudence in holding that, by reaching past a dwelling's threshold to regulate—indeed, to criminalize—the possession of particular firearms for self-defense in one's home, the FSA "implicates the 'core' of the Second Amendment: 'the right of law-abiding, responsible citizens to use arms

in defense of hearth and home.' " Slip op. 35 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634, 635 (2008)).

Even decisions that have refused Second Amendment protection have conceded that "[w]hat we know from [*Heller*] is that Second Amendment guarantees are at their zenith within the home." *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012). Thus what is "[a]t stake here is a 'basic right . . . that the Framers and ratifiers of the Fourteenth Amendment counted . . . among those fundamental rights necessary to our system of ordered liberty.' " Slip op. 35 (second omission in original) (citation omitted) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767, 778 (2010)). In *Heller* the Supreme Court "went to great lengths to emphasize the special place that the home—an individual's private property— occupies in our society." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1259 (11th Cir. 2012). Accordingly, *Heller* struck down the District of Columbia's handgun ban while stressing that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. *Heller* thus indicates that no interest can be so compelling, and no law can be sufficiently tailored to any such interest, to justify a wholesale ban on protected firearms in the home.

**II.** **STRICT SCRUTINY IS APPROPRIATE FOR STATUTES THAT BAN AN ENTIRE CLASS OF CIVILIAN FIREARMS COMMONLY OWNED BY LAW-ABIDING CITIZENS.**

As the panel correctly noted, the FSA bans "most semi-automatic rifles," Slip op. 8, and the "list of prohibited weapons includes the semi-automatic rifle models most popular by far among American citizens, the AR-15 'and all imitations . . . .' " Slip op. 9 (quoting the statute). Thus "Maryland law imposes a complete ban on the possession by law-abiding citizens of AR-15 style rifles—the most popular class of centerfire semi-automatic rifles in the United States." Slip op. 35–36. The dissenting opinion revolves around denial of this central, proven fact, even though the district court below found that American civilians own at least eight million semi-automatic rifles that Maryland now classifies as "Assault Weapons." *See Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 788 (D. Md. 2014), *aff'd in part, vacated in part*, -- F. 3d --, 2016 WL425829 (4th Cir. Feb. 4, 2016). Such widespread popularity qualifies the AR-15 and its clones under the formulations for constitutionally protected firearms that were adopted by the Supreme Court in *Heller*: to wit, the AR-15 has been "overwhelmingly chosen by American society"

and is "in common use" and "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624, 625, 628.[2]

The challenged Maryland firearms ban, and the arguments of those who defend it, depend far too much on the appearance of certain semi-automatic rifles that are demonized as "assault weapons"—a category that does not actually exist in firearms taxonomy. The "military-style" aesthetics that so preoccupy the FSA's defenders are both misleading and irrelevant, and may constitute the ultimate triumph of form over substance. But with the Second Amendment, as with so many things in both law and life, it is substance, not style, that matters. Indeed, even if it were appropriate to classify the firearms outlawed by the FSA according to their style rather than their function and use, said classification would nonetheless define—and outlaw—"an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose [of self-defense]." *Heller*, 554 U.S. at

---

[2] The semi-automatic AR-15 and its clones account for 60% of all civilian rifles sold each year in the United States. *See* Dan Haar, *America's Rifle: Rise of the AR-15*, Hartford Courant, Mar. 9, 2013, http://goo.gl/tltueo (last visited Feb. 29, 2016); *see also* Guns & Ammo Book of the AR-15 at 4 (Eric R. Poole ed., 2013). There are 200 manufacturers of AR-type rifles. *See* David M. Fortier, *AR Trends: What Is Hot and What Is Not*, Shotgun News (Mar. 20, 2014). Hundreds of companies manufacture semi-automatic AR-15s for civilian use, *see generally* Gun Digest 2013 268–69, 455–63, 497–99 (Jerry Lee ed., 67th ed. 2012) (listing manufacturers of civilian semi-automatic AR-15-type rifles). The popularity of the firearm has spawned an entire industry devoted to customizing it. *See, e.g.*, Guns & Ammo Book of the AR-15, *supra*, at i–ii, 9, 24–27, 30–32, 34, 35, 48–52, 63, 70, 75–76, 88, 90–92, 94, 95, 123, 135, 137, 160–61; *see also* Christopher R. Bartocci, Black Rifle II: The M16 Into The 21st Century i–ii, xxv (R. Blake Stevens ed., 2004). The versatile AR-15 is widely used for hunting; indeed, the .223 Remington cartridge that it fires—mischaracterized as unusually lethal and uniquely destructive, *see* Slip op. at 69–71—was in truth developed from a ***hunting*** cartridge, not a military round. *See* Gary Paul Johnston & Thomas B. Nelson, The World's Assault Rifles 19–20, 23, 1036 (2010).

628. And ***that,*** as the Court made clear in *Heller*, is what the Second Amendment will not countenance.

The panel was thus entirely correct in concluding that "[a] wholesale ban on an entire class of common firearms is much closer to the total handgun ban at issue in *Heller* than more incidental restrictions that might be properly subject to intermediate scrutiny. The law here 'goes beyond mere regulation' and is instead 'a total prohibition of possession of certain types of arms.' " Slip op. 44 (citation omitted). *See also United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010) (stressing that the ban in *Heller* was subject to exacting scrutiny because "[i]t did not just regulate possession of handguns; it prohibited it."). "In this way, Maryland's outright ban on LCMs and 'assault weapons' is akin to a law that 'foreclose[s] an entire medium of expression.' " Slip op. 45 (alteration in original) (quoting *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994)). "Such laws receive exceptionally rigorous review in the analogous context of the First Amendment," the panel explained, "and we see no reason for a different method here." *Id.*

In *Heller* the Supreme Court drew frequently on First Amendment doctrines and concepts while interpreting the Second Amendment. For example, in determining that the Second Amendment protects an individual right, the Court emphasized that the Second Amendment, like the First, "use[s] the phrase 'right of the people.' " *Heller*, 554 U.S. at 579. In rejecting as "bordering on the frivolous" the

argument "that only those arms in existence in the 18th century are protected by the Second Amendment," the Court reasoned that "[j]ust as the First Amendment protects modern forms of communications, . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. And in acknowledging that the Second Amendment is subject to historically grounded limitations, the Court indicated that in this regard it is no different than the First. *See id.* at 595, 635.

By drawing so many parallels between the Second Amendment and the First Amendment, *Heller* makes clear that the two Amendments are due equal respect and that the Second is not be treated as "second-class" or "singled out for special— and specially unfavorable—treatment." *McDonald*, 561 U.S. at 778–79, 780 (opinion of Alito, J.). Amici Pink Pistols, the Congress of Racial Equality, and Women Against Gun Control are particularly sensitive to this issue because their membership consists of political minorities who have historically been denied equal enjoyment of the liberties enshrined in the Bill of Rights. Once the courts permit political majorities to chip away at one enumerated right (such as the right to bear arms), ***all such rights are at risk***, especially for those whom society and the law have sidelined for so long.

Outright bans receive particularly skeptical judicial review under both the First and Second Amendments:

In *United States v. Stevens*, the Court echoed *Heller*: "The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it. The Constitution is not a document 'prescribing limits, and declaring that those limits may be passed at pleasure.' "

*Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1283–84 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (citing *United States v. Stevens*, 559 U.S. 460, 470 (2010) (quoting *Marbury v. Madison*, 5 U.S. 137, 178 (1803))); *see also Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 124 (1991) (Kennedy, J., concurring) (When the "regulated content has the full protection of the First Amendment," that "is itself a full and sufficient reason for holding the statute unconstitutional. In my view it is both unnecessary and incorrect to ask whether the State can show that the statute is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." (internal quotation marks omitted)).

An outright ban on protected firearms, just like an outright ban on protected speech, strikes at the very heart of a fundamental, enumerated constitutional right. To avoid treating the Second Amendment as a "second-class" right, such a ban must be reviewed under strict scrutiny. *See, e.g.*, *Brown v. Entertainment Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011) (applying First Amendment strict scrutiny to

law targeting content of protected speech); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (applying First Amendment strict scrutiny to law targeting practices of particular religion). A wholesale ban is the antithesis of a reasonable time, place, or manner restriction: it prohibits use of banned arms at any time, in any place, and in any manner. Constitutionally acceptable time, place, and manner restrictions must "leave open ample alternative channels for communication of the information" in question. *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014). "Additional restrictions such as an absolute prohibition on a particular type of expression" trigger strict scrutiny. *United States v. Grace*, 461 U.S. 171, 177 (1983).

First Amendment time, place, and manner doctrine thus militates against applying mere intermediate scrutiny to a ban on protected arms, and the same is true of First Amendment case law applying intermediate scrutiny to other types of laws restricting speech. Laws restricting commercial speech, for example, are subject to mere intermediate scrutiny, but this is because the Court has deemed such speech to occupy a "subordinate position in the scale of First Amendment values." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). Similarly, laws restricting "expressive conduct within the outer perimeters of the First Amendment"—such as nude dancing—likewise are subject to intermediate scrutiny. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991). But this case is not about the Second Amend-

ment equivalent of a sales advertisement or a strip club. It is about the possession by law-abiding citizens of commonly owned firearms in the home for the purpose of self-defense, and that occupies the preeminent position in the scale of Second Amendment values and lies at the very core of the right guaranteed by the Second Amendment. *See Heller*, 554 U.S. at 628–29. Such a sweeping ban on firearms that reaches into the hallowed interior of a law-abiding citizen's home should be subject to strict scrutiny.

This conclusion is consistent with the reasoning of a number of decisions applying the Second Amendment. Thus in *NRA v. BATFE*, the Fifth Circuit stated that "[a] regulation that threatens a right at the core of the Second Amendment . . . triggers strict scrutiny." 700 F.3d 185, 195 (5th Cir. 2012). *See also Mance v. Holder*, 74 F. Supp. 3d 795, 806 (N.D. Tex. 2015) ("A law that burdens the core of the Second Amendment guarantee—for example, the right of law-abiding, responsible citizens to use arms in defense of hearth and home—would trigger strict scrutiny.")(citations omitted) (internal quotation mark), *appeal filed sub nom. Mance v. Lynch*, No. 15-10311 (5th Cir. Apr. 14, 2015). And in *United States v. Masciandaro*, this Court noted that "'any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny.'" Slip op. 40 (quoting *Masciandaro*, 638 F.3d at 470). The standard of proof required of the State to justify its firearms restrictions is necessarily greater here

than it was in *Masciandaro* or in *Chester*, 628 F.3d at 683, because unlike criminal defendants who raise Second Amendment defenses to criminal prosecution, the plaintiffs here are not criminals, but are instead the "***law-abiding, responsible*** citizen[s]," whose Second Amendment rights receive full solicitude. *Chester*, 628 F.3d at 683 (emphasis added by the Fourth Circuit) (citing *Heller*, 554 U.S. at 635). *See also Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) ("Here . . . the plaintiffs are the 'law-abiding, responsible citizens' whose Second Amendment rights are entitled to full solicitude under *Heller*." (emphasis omitted)).

The State's argument that the panel decision is an outlier is both irrelevant and unavailing. As the panel explained, the "meaning of the Constitution does not depend on a popular vote of the circuits and it is neither improper nor imprudent for us to disagree with the other circuits addressing this issue. We are not a rubber stamp." Slip op. 45. It is worth remembering that, until the Court of Appeals for the District of Columbia Circuit struck down the handgun ban in *Heller*—in a decision thereafter affirmed by the Supreme Court—***virtually every federal court in the nation had misunderstood and incorrectly applied the Second Amendment for more than two centuries***.[3] To accept anything less than strict scrutiny here out

---

[3] The sole exception is the Fifth Circuit's opinion in *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), where a federal restriction on firearms possession by persons subject to domestic violence restraining orders was upheld, but not before the Court of Appeals held that the Second

of a wish to be consistent with some decisions by other courts would be *in*consistent with this Court's proud tradition of independent judgment.

## CONCLUSION

The panel correctly applied the principles for evaluating categorical bans on particular firearms that were laid down by the Supreme Court in *Heller*. Insofar as the firearms categorically banned by the Maryland Act are "arms 'in common use at the time' for lawful purposes like self-defense," *Heller*, 554 U.S. at 624, or are arms "typically possessed by law-abiding citizens for lawful purposes," *id.* at 625, they are within the scope of the Second Amendment and categorical prohibitions on them—especially within the home—are subject to the strictest judicial scrutiny.

---

Amendment protects an individual right to keep and bear arms, rather than merely a collective right to gather and be armed as a militia: "[M]indful that almost all of our sister circuits have rejected any individual rights view of the Second Amendment," the Fifth Circuit opined that those other courts had decided Second Amendment claims "without sufficient articulated examination of the history and text of the Second Amendment." *Id.* at 227. The Supreme Court in *Heller* came to the same conclusion. *See* 554 U.S. at 621–24.

April 11, 2016

Respectfully submitted,

s/BRIAN STUART KOUKOUTCHOS
BRIAN STUART KOUKOUTCHOS
28 Eagle Trace
Mandeville, LA 70471
(985) 626-5052
bkoukoutchos@gmail.com

*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** 14-1945          **Caption:** Kolbe, et al. v. Hogan, et. al.

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

☑ this brief contains _____3,073_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐ this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this brief has been prepared in a proportionally spaced typeface using
Microsoft Word Processing_____ [*identify word processing program*] in
Times Roman Numeral 14pt._____ [*identify font size and type style*]; **or**

☐ this brief has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Brian Stuart Koukoutchos_____

Attorney for Amici_____

Dated: April 11, 2016_____

# CERTIFICATE OF SERVICE

I certify that on April 11, 2016, the foregoing brief and its accompanying motion were served on all parties or their counsel of record through the CM/ECF system.


<u>s/ Brian Stuart Koukoutchos</u>
Brian Stuart Koukoutchos