_____

No. 14-1945
_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT
_____

## STEPHEN V. KOLBE, *et al.*,

*Plaintiffs-Appellants,*

v.

## LAWRENCE J. HOGAN, JR., GOVERNOR, *et al.*,

*Defendants-Appellees.*
_____

On Appeal from the United States District Court
for the District of Maryland
(Catherine C. Blake, District Judge)
_____

## SUPPLEMENTAL BRIEF OF DEFENDANTS-APPELLEES
_____

BRIAN E. FROSH
Attorney General of Maryland

MATTHEW J. FADER
JENNIFER L. KATZ
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7906
mfader@oag.state.md.us

April 11, 2016                      Attorneys for Appellees

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

I.  DECISIONS OF OTHER FEDERAL APPELLATE COURTS ISSUED AFTER
    INITIAL BRIEFING SUPPORT APPLYING INTERMEDIATE SCRUTINY AND
    UPHOLDING THE CHALLENGED LAW. ...........................................................3

    A.  Federal Appellate Courts Have Unanimously Rejected
        Application of Strict Scrutiny to Laws Prohibiting Assault
        Weapons and Large-Capacity Magazines, and Have Upheld the
        Challenged Laws. ...................................................................................3

        *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo* ............................4

        *Fyock v. Sunnyvale* ...............................................................................8

        *Friedman v. City of Highland Park* .....................................................10

    B.  Federal Appellate Courts Have Continued to Reject Application
        of Strict Scrutiny in Other Second Amendment Challenges ...............12

    C.  If the Challenged Law Implicates the Second Amendment at all,
        It Is Subject to at Most Intermediate Scrutiny, and It Satisfies that
        Standard. .............................................................................................14

II. UPDATED, PUBLICLY-AVAILABLE EVIDENCE FURTHER SUPPORTS THE
    PREDICTIVE JUDGMENT OF THE MARYLAND LEGISLATURE. ..........................20

CONCLUSION ....................................................................................................22

# TABLE OF AUTHORITIES

Page

## Cases

*Bonidy v. United States Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015) ...................13

*Caetano v. Massachusetts*, ___ U.S. ___, 2016 WL 1078932
   (Mar. 21, 2016) .......................................................................13, 14

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... *passim*

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015)................. *passim*

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ......................................... *passim*

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011).................. 3, 16, 19

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015)..............................13

*Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953
   (9th Cir. 2014)..........................................................................................9

*Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016) .......................................... 15, 16, 18

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...................................................4

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242
   (2d Cir. 2015).................................................................................*passim*

*Turner Broad. Sys., Inc. v. Federal Commc'ns Comm'n*,
   520 U.S. 180 (1997) .................................................................................7

*Tyler v. Hillsdale County Sheriff's Dep't*, 775 F.3d 308 (6th Cir. 2014)...............12

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010).........................................18

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)..................................18

*United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015) ...........................13

*United States v. Miller*, 307 U.S. 174 (1939) ........................................................11

*United States v. Shields*, 789 F.3d 733 (7th Cir. 2015) ..........................................13

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) .............................. 5, 6, 18, 19

**Statutes**

18 U.S.C. § 922(g)(1) ................................................................................13

18 U.S.C. § 922(g)(4) ................................................................................13

18 U.S.C. § 922(g)(5)(A) ...........................................................................13

**Miscellaneous**

4 Blackstone, *Commentaries on the Laws of England* (1769) ...................8

**INTRODUCTION**

The Second Amendment does not deprive the States of the ability to pass reasonable legislation in an attempt to protect their citizens from the devastating effects of firearm violence in a manner that has little or no burden on self-defense. The plaintiffs ask this Court to create a constitutional right to wield the particular weapon of one's choice—regardless of how dangerous the weapon is or how tenuous of a connection it may have to self-defense—as long as the weapon passes some unstated, amorphous threshold of popularity. Taking isolated phrases from the Supreme Court's landmark decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), out of context, the plaintiffs contend that the Supreme Court mandated this exclusive focus on popularity. The plaintiffs are wrong. As every federal appellate court that has addressed the constitutionality of a similar law has ruled, the Second Amendment right recognized in *Heller* does not strip the States of the ability to prohibit particularly dangerous firearms and magazines, nor does the Second Amendment prioritize an individual's desire to own a particular firearm, among many alternatives, over a state legislature's reasonable judgment as to how best to protect its citizens from the devastating effects of firearm violence.

This supplemental brief addresses two types of developments that have occurred since initial briefs were filed. First, the federal courts of appeals have reached further consensus as to how to address certain aspects of Second

Amendment claims in general, and challenges to prohibitions similar to that under review here in particular. Decisions of other federal appellate courts have uniformly rejected application of strict scrutiny to laws prohibiting assault weapons and large capacity magazines and, to the extent they have reached the merits, have upheld the constitutionality of those laws on substantially the same, or lesser, evidence than that presented in this case. These legal developments provide additional support for the correctness of the district court's decision in this case that, even if the challenged law implicates the Second Amendment right, it is subject to no greater than intermediate scrutiny, and is constitutional.

Second, the intervening months since initial briefs were filed have unfortunately also brought additional validation that the firearms prohibited by Maryland are involved disproportionately in mass shootings and murders of law enforcement officers, and incidents involving them result in more shots fired and people injured than when they are not used. Maryland's law is reasonably adapted to the State's compelling government interests in public safety and reducing the negative effects of firearm violence, and is constitutional.

# ARGUMENT

## I. DECISIONS OF OTHER FEDERAL APPELLATE COURTS ISSUED AFTER INITIAL BRIEFING SUPPORT APPLYING INTERMEDIATE SCRUTINY AND UPHOLDING THE CHALLENGED LAW.

### A. Federal Appellate Courts Have Unanimously Rejected Application of Strict Scrutiny to Laws Prohibiting Assault Weapons and Large-Capacity Magazines, and Have Upheld the Challenged Laws.

When initial briefs were filed, the only federal appellate decision on the constitutionality of a law prohibiting assault weapons or large-capacity magazines was the decision of the United States Court of Appeals for the District of Columbia Circuit in *Heller v. District of Columbia*, 670 F.3d 1244, 1260-64 (D.C. Cir. 2011) ("*Heller II*"). In *Heller II*, the D.C. Circuit assumed without deciding that the law at issue implicated the Second Amendment, decided that intermediate scrutiny would apply to such a challenge, and determined the law constitutional. *Id.* at 1264. Since that time, the Second, Seventh, and Ninth circuits have all issued decisions in cases challenging similar laws. *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) ("*NYSRPA*");[1] *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir.), *cert. denied* 136 S. Ct. 447 (2015); *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015). All three of those courts joined the D.C. Circuit in rejecting the

---

[1] The plaintiffs challenging the Connecticut statute filed a petition for writ of certiorari with the United States Supreme Court on February 11, 2016. *Shew v. Malloy*, Case No. 15-1030. According to the Supreme Court on-line docket, a response is due on or before May 16, 2016.

application of strict scrutiny, *NYSRPA*, 804 F.3d at 260-61; *Friedman*, 784 F.3d at 410; *Fyock*, 779 F.3d at 998-99; both of the courts that applied some traditional level of scrutiny joined the D.C. Circuit in applying intermediate scrutiny, *NYSRPA*, 804 F.3d at 260-61; *Fyock*, 779 F.3d at 998-99; and both of the courts that ruled on the merits joined the D.C. Circuit in upholding the laws on substantially the same, or lesser, evidence than that presented in this case, *see NYSRPA*, 804 F.3d at 261-64; *Friedman*, 784 F.3d at 411-12.

### New York State Rifle & Pistol Ass'n, Inc. v. Cuomo

In *NYSRPA*, the Second Circuit resolved challenges to New York and Connecticut laws that prohibited ownership of assault weapons and large-capacity magazines. New York and Connecticut had enacted variations of such laws in 2000 and 2001, respectively, and, like Maryland, both had strengthened the laws in the wake of the murder of 26 elementary school students and teachers in Newtown, Connecticut in December 2012 by a gunman wielding an assault rifle and utilizing multiple large-capacity magazines. *NYSRPA*, 804 F.3d at 248-51.

The Second Circuit grounded its legal analysis in its review of the Supreme Court's decisions in *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). *NYSRPA*, 804 F.3d at 253-54. The court observed that the Supreme Court's decisions in those cases, which invalidated complete bans on the possession of handguns, were focused on the status of the handgun as "the most popular weapon

chosen by Americans for self-defense in the home," *NYSRPA*, 804 F.3d at 253 (quoting *Heller*, 554 U.S. at 628-29), and that the Supreme Court "stopped well short of extending its rationale to other firearms restrictions," *NYSRPA*, 804 F.3d at 253.

Applying the same "two-step inquiry" adopted by this Court, *see Woollard v. Gallagher*, 712 F.3d 865, 874-75 (4th Cir.), *cert. denied*, 134 S. Ct. 422 (2013), the Second Circuit first asked "whether the restriction burdens conduct protected by the Second Amendment," *id.* at 254, an inquiry the court further sub-divided into two questions: (1) is the arm at issue in "common use"; and (2) is the arm at issue typically possessed by law-abiding citizens for lawful purposes. *Id.* at 255-57. Without much analysis, the Second Circuit determined that because Americans own "millions" of the firearms and magazines at issue, they are "'in common use' as that term was used in *Heller*.'" *Id.* at 255. The court found the second question more difficult. Although identifying the inquiry as requiring consideration of "whether the weapon is 'dangerous and unusual' in the hands of law-abiding civilians," the court did not engage in that inquiry, finding it "difficult to manage in practice." *Id.* at 256. Instead, finding that the statutes would "pass constitutional muster" even if they implicated the Second Amendment right, the court "assum[ed] for the sake of argument" that the statute burdens protected conduct. *Id.* at 257.

Turning to the selection of the level of scrutiny, the Second Circuit considered two factors: "how close the law comes to the core of the Second Amendment right"

and "the severity of the law's burden on the right." *Id.* at 258. The court believed that the statutes implicate the core Second Amendment right to some extent, because they apply within the home, but not to nearly the same extent as would a ban on handguns, because the weapons at issue "are not nearly as popularly owned and used for self-defense as the handgun." *Id.* at 258.

In examining the severity of the burden, the court considered both the scope of the restriction and the availability of alternatives. *Id.* at 259. Finding the laws at issue "both broad and burdensome," because they impose an absolute ban, the court held that they "trigger the application of some form of heightened scrutiny." *Id.* at 259-60. In determining *which* form of heightened scrutiny, the court focused on the availability of alternatives for the exercise of the Second Amendment right. Thus, the court observed that the laws at issue do not ban an entire class of weapons, and that citizens in both States may "continue to arm themselves with non-semiautomatic weapons *or* with any semiautomatic gun that" is not banned. *Id.* at 260 (emphasis in original). Similarly, citizens "can purchase any number of magazines with a capacity of ten or fewer rounds." *Id.* Thus, the court held, the "burden imposed by the challenged legislation is real, but it is not 'severe,'" and intermediate scrutiny is therefore the appropriate level of scrutiny. *Id.*

Applying intermediate scrutiny, the Second Circuit observed that it was "beyond cavil" that the government's interests were "substantial, indeed

compelling," and proceeded to address whether the challenged laws were substantially related to the achievement of those interests, *id.* at 261, an inquiry in which the proper role of the court is not to re-weigh the evidence, but to assure itself that the States had "drawn reasonable inferences based on substantial evidence," *id.* at 261-62 (quoting *Turner Broad. Sys., Inc. v. Federal Commc'ns Comm'n*, 520 U.S. 180, 195 (1997)).  The Second Circuit observed that "assault weapons have been understood to pose unusual risks," in that they "tend to result in more numerous wounds, more serious wounds, and more victims" than other weapons, and are disproportionately used in mass shootings and murders of law enforcement officers. *Id.* at 262.  While assault weapons are thus "particularly hazardous weapons," *id.*, large-capacity magazines may be even more dangerous, are also disproportionately used in mass shootings, and result in more shots fired, persons wounded, and wounds per victim, than when lower-capacity magazines are used, *id.* at 263-64.  Based on this evidence, the court held that there is a substantial relationship between the prohibitions and the important governmental interests at issue, and the laws "survive intermediate scrutiny."  *Id.* at 264.[2]

_____

[2] The Second Circuit struck as unconstitutional one aspect of New York's law that is not replicated in Maryland's law, a prohibition on loading more than seven rounds into a magazine.  804 F.3d at 264.

The Second Circuit also rejected vagueness challenges to several aspects of the New York and Connecticut statutes, including a challenge to Connecticut's prohibition against "copies or duplicates" of prohibited firearms. *Id.* at 265-69.

### *Fyock v. Sunnyvale*

In *Fyock*, the Ninth Circuit affirmed the district court's denial of a motion for preliminary injunction against an ordinance, adopted by the City of Sunnyvale, California, prohibiting possession of large-capacity magazines. 779 F.3d 991. In analyzing whether large-capacity magazines fall outside the scope of the Second Amendment's protection as "dangerous and unusual weapons,"[3] the Ninth Circuit identified the relevant question as "whether the weapon has uniquely dangerous propensities and whether the weapon is commonly possessed by law-abiding citizens for lawful purposes." *Id.* at 997. The court held that the district court had not abused its discretion in inferring that large-capacity magazines were not excluded from protection because, although Sunnyvale had presented evidence regarding the "increased danger posed by large-capacity magazines," it had not presented evidence that they were also unusual. *Id.* at 998.

---

[3] The earliest formulation of the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" that was cited by the Court in *Heller*, and the only one cited in that case that predates the ratification of the Second Amendment, is in Blackstone's *Commentaries on the Laws of England*. *See* 554 U.S. at 627. Blackstone referred to the crime of carrying "dangerous *or* unusual weapons." 4 Blackstone, *Commentaries on the Laws of England* 148-49 (1769) (emphasis added).

To determine the appropriate level of scrutiny, the court applied the same test as the Second Circuit, asking: "(1) how closely the law comes to the core of the Second Amendment right; and (2) how severely, if at all, the law burdens that right." *Id.* at 998. Thus, "[i]ntermediate scrutiny is appropriate if the regulation does not implicate the core Second Amendment right *or* does not place a substantial burden on that right." *Id.* at 998-99 (citing *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 964 (9th Cir. 2014)). Although the court found that Sunnyvale's law "may implicate the core of the Second Amendment," because it applies within the home, the court nonetheless "agree[d] that intermediate scrutiny is appropriate" because, among other reasons, the prohibition: (1) was not as sweeping as a complete ban on handguns, (2) did not affect possession of "the 'quintessential self-defense weapon'—the handgun," (3) applied to "only a subset of magazines that are over a certain capacity" without rendering "any lawfully possessed firearms inoperable," and (4) did not "restrict the number of magazines that an individual may possess." *Id.* at 999.

The Ninth Circuit held that the district court had not abused its discretion in finding that the ordinance was likely to survive intermediate scrutiny. *Id.* at 1000-01. Finding it "self-evident" that Sunnyvale's interests "are substantial and important government interests," the court turned to whether there was a reasonable fit between the ordinance and these interests. *Id.* at 1000. Looking to evidence "that the use of

large-capacity magazines results in more gunshots fired, results in more gunshot wounds per victim, and increases the lethality of gunshot injuries"; that large-capacity magazines are used disproportionately in mass shootings and crimes against law enforcement; and that "a reduction in the number of large-capacity magazines in circulation may decrease the use of such magazines in gun crime," the court affirmed the district court's judgment. *Id.* at 1000-01.

### *Friedman v. City of Highland Park*

In *Friedman*, the Seventh Circuit took a different analytical approach to a Second Amendment challenge to a municipal ordinance prohibiting "possession of assault weapons or large-capacity magazines," 784 F.3d at 407, but nonetheless upheld the ordinance.

In reviewing the framework established by *Heller*, the Seventh Circuit addressed the contention that laws fall within or outside of the protection of the Second Amendment based on "how common a weapon is at the time of litigation." *Id.* at 408-09. Noting that many of the prohibitions that the Supreme Court identified as longstanding, and thus presumptively lawful, were not enacted until the twentieth century, the court observed that it cannot be the case that the "passage of time creates an easement across the Second Amendment" if a law goes unchallenged for an indeterminate period of time. *Id.* at 408. The court similarly rejected as "absurd" the circular logic suggesting that a "particular weapon" could not be banned if it

were popular, but could be banned, and remain so, as long as the ban went into effect before the weapon became popular. *Id.* at 409. "A law's existence can't be the source of its own constitutional validity." *Id.*

Thus, rejecting the suggestion that "common use" of a weapon insulates it from government-imposed restrictions, the Seventh Circuit concluded that both *Heller* and the Supreme Court's earlier decision in *United States v. Miller*, 307 U.S. 174 (1939), "contemplated that the weapons properly in private hands for militia use might change" not only through facts such as "innovation by firearms manufacturers," but also "through legal regulation." 784 F.3d at 409.

Eschewing traditional levels of scrutiny, and attempting to identify an analysis rooted in the rationale of *Heller*, the Seventh Circuit thought it "better to ask whether a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' . . . and whether law-abiding citizens retain adequate means of self-defense." *Id.* at 410 (quoting *Heller*, 554 U.S. at 622-25). Finding that the challenged law did not run afoul of the Second Amendment under the first part of this formulation, the court turned to whether the statute left law-abiding citizens adequate means of self-defense, and concluded that it did. *Id.* at 410-11. Although the court did not dispute that assault weapons and large-capacity might be beneficial for self-defense, it concluded that because they "can fire more shots, faster," they

"can be more dangerous in the aggregate" than other weapons. Indeed, the court posited, "[w]hy else are they the weapons of choice in mass shootings?" *Id.* at 411. Observing that the ordinance left "residents with many self-defense options," the court upheld the challenged ordinance as constitutional. *Id.* at 411.

In dissent, Judge Manion stated that he would have applied strict scrutiny to strike down the challenged ordinance to the extent it applies within the home. *Id.* at 412-19. Believing that because the "extent of danger—real or imagined—that a citizen faces at home is a matter only that person can assess in full," *id.* at 413, Judge Manion concluded that the "right to self-defense is largely meaningless if it does not include the right to choose the most effective means of defending oneself," *id.* at 418. Thus, Judge Manion would apply strict scrutiny to any law purporting to limit that choice. To the extent the law applies outside the home, Judge Manion would have applied intermediate scrutiny, and upheld the law. *Id.* at 419.

## B. Federal Appellate Courts Have Continued to Reject Application of Strict Scrutiny in Other Second Amendment Challenges.

When initial briefs were filed, a single federal appellate court, the United States Court of Appeals for the Sixth Circuit, had held that strict scrutiny should apply to Second Amendment challenges. In *Tyler v. Hillsdale County Sheriff's Dep't*, 775 F.3d 308, 328-29 (6th Cir. 2014), *reh'g en banc granted* (6th Cir. Apr. 21, 2015), a divided panel of the Sixth Circuit applied strict scrutiny to a challenge

to 18 U.S.C. § 922(g)(4), the federal prohibition on possession of a firearm by a person who has been committed to a mental institution. On April 21, 2015, the Sixth Circuit granted rehearing en banc, thus vacating the panel's decision. The full court has not yet issued its decision in the case, and, aside from the panel decision in this case, no other federal appellate court has held that strict scrutiny applies to Second Amendment challenges. To the contrary, federal appellate courts adjudicating Second Amendment challenges have continued to apply standards of scrutiny that are no greater than intermediate scrutiny. *See, e.g.*, *Heller v. District of Columbia*, 801 F.3d 264, 272 (D.C. Cir. 2015) (applying intermediate scrutiny to the District's firearm registration requirements); *United States v. Meza-Rodriguez*, 798 F.3d 664, 672-73 (7th Cir. 2015) (applying standard "akin to intermediate scrutiny" to Second Amendment challenge to 18 U.S.C. § 922(g)(5)(A)); *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) (applying intermediate scrutiny to restriction on public carry on United States Postal Service property); *United States v. Shields*, 789 F.3d 733, 750-51 (7th Cir.) (application of § 922(g)(1) to defendant was "substantially related to the Government's important interest in keeping firearms away from violent felons"), *cert. denied,* 136 S. Ct. 420 (2015).

The sole Second Amendment decision of the Supreme Court issued since initial briefing did not address the applicable standard of scrutiny. In *Caetano v. Massachusetts*, ___ U.S. ___, 2016 WL 1078932 (Mar. 21, 2016) (per curiam), the

Court issued a five-paragraph opinion that was limited to rejecting "three explanations" the Supreme Judicial Court of Massachusetts had provided in upholding a Massachusetts law prohibiting the possession of stun guns. The first two of those explanations amounted to a conclusion that stun guns were not entitled to protection under the Second Amendment because they were not in common use in 1791, a rationale that the Court had expressly rejected in *Heller*. *Caetano*, 2016 WL 1078932 at *1 (quoting *Heller*, 554 U.S. at 582). The third explanation the Court rejected was that stun guns were not protected because they were not readily adaptable to use in the military, another proposition already rejected in *Heller*. *Id.* at *1 (quoting *Heller*, 554 U.S. at 624-25).[4]

### C. If the Challenged Law Implicates the Second Amendment at All, It Is Subject to at Most Intermediate Scrutiny, and It Satisfies that Standard.

Taken together, these recent legal developments shed additional light on the proper analysis of the law challenged in this case, and confirm the correctness of the

---

[4] The Court did not adopt the position of the concurrence by Justice Alito, joined by Justice Thomas, that "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Id.* at *4 (Alito, J., concurring in judgment). Moreover, although Justices Alito and Thomas concluded that the lower court erred in its interpretation of whether a stun gun is "dangerous," the per curiam decision does not reach that issue. *Id.* Justice Alito, in effect, concludes that "dangerous," as used in "dangerous and unusual," cannot possibly be used in its ordinary sense, because then it would apply to virtually every arm covered by the Second Amendment. *Id.* However, Justice Alito does not identify a plausible alternative interpretation of the term that would not render it superfluous.

district court's judgment upholding the constitutionality of the challenged law. *See also* Appellees' Br. at 14-43.

The area in which the most uncertainty remains among the federal appellate courts to have addressed similar laws concerns the first prong of the two-prong analysis applied by this and other circuits. Perhaps reading more into the *Heller* Court's use of the phrase "in common use" than the Court intended, the Second and Ninth Circuits in *NYSRPA* and *Fyock*, respectively, treat the inquiry as satisfied based solely on manufacturing statistics. *NYSRPA*, 804 F.3d at 255; *Fyock*, 779 F.3d at 997-98. However, as discussed in *Friedman*, that focus is circular and provides an insufficient explanation for the categories of restrictions the Supreme Court identified in *Heller* as presumptively lawful. 784 F.3d at 408-09. And although the Second and Ninth Circuits resolved this first stage of the scope inquiry in favor of the plaintiffs in those cases, neither reached a conclusion as to whether the firearms and magazines typically were possessed by law-abiding citizens for lawful purposes. *NYSRPA*, 804 F.3d at 256-57; *Fyock*, 779 F.3d at 998.[5]

---

[5] The panel majority compared the defendants' contention that large-capacity magazines are not arms covered by the Second Amendment as akin to an argument that an essential component of a firearm, such as a firing pin, would not be protected by the Second Amendment. *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), *reh'g en banc granted* (4th Cir. Mar. 4, 2016). To the contrary, although a firing pin is a necessary component to the operation of firearms, a *large-capacity* magazine has not been identified as a necessary component to the operation of *any* firearm. Appellees' Br. at 26-27. Any firearm that has been supplied with a large-capacity

Other federal appellate courts have shown more agreement, and clarity, as to the other critical parts of the analysis. Not including the panel decision in this case, all four federal appellate court decisions addressing assault weapons and large-capacity magazine bans have rejected strict scrutiny. Three of those four, assessing both how close the challenged laws come to the core of the Second Amendment right *and* the severity of the burden, have found that any burden imposed by the challenged laws on the core Second Amendment right is not severe. *NYSRPA*, 840 F.3d at 259-60; *Fyock*, 779 F.3d at 998-99; and *Heller II*, 670 F.3d at 1262. Similarly, any burden Maryland's law imposes on the Second Amendment right, if any, is far from severe, and leaves open ample alternatives for exercising the Second Amendment right, including the lawful possession of handguns, other semiautomatic long guns and non-semiautomatic long guns. Appellees' Br. at 23-25, 29-30, 33-42.[6] Although *Friedman* does not adopt the same analysis as these other courts, it

---

magazine can be supplied with a compliant magazine, with the sole difference being the number of rounds that can be fired without reloading.

     [6] The decision of the panel majority in this case alternately describes the firearms prohibited by Maryland's law narrowly, such as "the AR-15 platform or pattern rifles and its copies or imitations," *Kolbe* 813 F.3d at 180 n.11, and broadly, such as all "semi-automatic rifles," *id.* at 171, 179. Neither description is entirely accurate. The challenged law prohibits specifically-enumerated, military-style long guns that share characteristics that make them particularly suited for offensive, military-style assaults, along with their copies. Appellees' Br. at 2-7, 9-10, 18-19, 34-36. Although most, but not all, of the firearms fall into the subcategory of semiautomatic rifles, they do not comprise that entire subcategory, nor has Maryland purported to ban all semiautomatic rifles. *See, e.g.*, *Kolbe*, 813 F.3d at 169 n.4

does address the availability of alternatives for exercising the Second Amendment right, and reaches the same conclusion. *Friedman*, 784 F.3d at 410-11.[7]

These decisions are consistent with the Supreme Court's decision in *Heller*, in which the Court rejected the notion that its interpretation of the Second Amendment would lead to a wholesale overturning of laws, instead reassuring that it "should not be thought" that prior decisions upholding firearms restrictions "would necessarily have come out differently" under *Heller*'s interpretation. 554 U.S. at 624 n.24. The Court also identified a non-exhaustive set of types of laws that it presumed would fall *outside* of Second Amendment protection, *id.* at 626-27 & n.26, acknowledged a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *id.* at 627, and assumed, therefore, that "weapons that are most useful in military services—M-16 rifles and the like—may be banned," *id.* Application of strict scrutiny cannot be easily reconciled with these express assurances. *See, e.g.*, *Heller*, 554 U.S. at 688 (Breyer, J., dissenting) (stating,

---

("Citizens might also legally possess other semi-automatic rifles that are not listed under § 5-101(r)(2) . . . .").

[7] The plaintiffs mistakenly contend that this analysis is foreclosed by the Supreme Court's rejection in *Heller* of the argument that all handguns may be banned as long as some long guns are not. 554 U.S. at 629. Not only is the class of handguns much broader and more expansive than the much smaller subcategory of semiautomatic long guns with specific military features, but the Court based its conclusion on the handgun's status as "the quintessential self-defense weapon." *Id.* The weapons and magazines at issue in this case do not share that status.

without opposition from the majority, that the majority's broad approval of a set of laws as presumptively lawful "implicitly, and appropriately, rejects" the suggestion that strict scrutiny should apply).

The decisions of these other courts are also consistent with panel precedent from this Circuit, which has consistently rejected the notion that strict scrutiny is required "whenever a law impinges upon a [fundamental] right." *Woollard*, 712 F.3d at 878 (quoting *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010)). In determining the applicable standard of scrutiny, a court must take into account "the nature of a person's Second Amendment interest, the extent to which those interests are burdened by government regulation, and the strength of the government's justifications for the regulation." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011); *see also Chester*, 628 F.3d at 682 (choice of level of scrutiny "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right").[8]  In this case, these factors weigh

---

[8] The plaintiffs' suggestion that prior panels in this Circuit have already decided that strict scrutiny would apply wherever a firearms regulation had any application inside the home, Appellants' Br. at 30-31, is incorrect.  As Judge King has correctly pointed out, those panels did not decide "whether strict scrutiny always, or even ever, applies to regulations burdening the right of self-defense in the home" because the issue was not before them.  *Kolbe*, 813 F.3d at 197.  The passage on which the plaintiffs rely from *Masciandaro* did not decide whether strict scrutiny would apply to a regulation with effect within the home, but merely made an assumption in the course of explaining its holding that laws with effect solely outside the home are subject to no greater than intermediate scrutiny.  638 F.3d at 470.  The passage on which the plaintiffs rely from *Woollard* does not describe the Court's

strongly in favor of application of a level of scrutiny no greater than intermediate scrutiny. The challenged law imposes at most a minimal burden on the Second Amendment right, and the State's justifications are strong. Appellees' Br. at 18-25, 27-29.

The Second, Seventh, Ninth, and D.C. Circuits also all reached similar conclusions, based on similar evidence, regarding the dangerousness of the firearms or magazines at issue, which are disproportionately represented in mass shootings and murders of law enforcement officers, and which, when used, result in more shots fired and individuals wounded than when they are not used. *NYSRPA*, 804 F.3d at 261-64; *Fyock*, 779 F.3d at 1000-01; *Friedman*, 784 F.3d at 410-11; and *Heller II*, 670 F.3d at 1262-64. In light of that, it is unsurprising that the three other circuit courts to have reached a determination on the merits all upheld the constitutionality of the challenged legislation. *NYSRPA*, 804 F.3d at 261-64; *Friedman*, 784 F.3d at 410-11; and *Heller II*, 670 F.3d at 1262-64. This Court should join the Second, Seventh, Ninth, and D.C. Circuits in faithfully applying the Supreme Court's decision in *Heller* and upholding the constitutionality of laws prohibiting assault weapons and large-capacity magazines.

---

analysis at all, but a contention of the plaintiffs in that case that the Court rejected. *Woollard*, 712 F.3d at 878.

**II.    UPDATED, PUBLICLY-AVAILABLE EVIDENCE FURTHER SUPPORTS THE PREDICTIVE JUDGMENT OF THE MARYLAND LEGISLATURE.**

Updated, publicly-available evidence further confirms that assault weapons are disproportionately used in mass shootings and murders of law enforcement officers.  Defendants' initial brief referenced an investigation by *Mother Jones* magazine reviewing publicly-available data on 62 public mass shootings between 1982 and 2012, of which 21% involved an assault rifle.  Appellees' Br. at 20-21.  Using public sources, *Mother Jones* has updated its data set regarding the type of weapons used in 13 public mass shootings since the end of 2012.[9]  Of those, more the 38% (at least five) involved assault weapons.[10]  Moreover, consistent with the studies of Professor Koper discussed in defendants' initial brief, *see* Appellees' Br. at 21, that data indicates that those five shootings involved, on average, more persons non-fatally wounded (9.8 compared to 2), more fatalities (7.4 compared to 6.6), and

---

[9] *See* Mark Follman, Gavin Aronsen, and Deanna Pan, *US Mass Shootings, 1982-2016:  Data from Mother Jones's Investigation*, updated February 25, 2016, available at http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data (last visited Apr. 6, 2016).  *Mother Jones* does not appear to have updated its investigation regarding the use of large-capacity magazines in such mass public shootings.

[10] These incidents include shootings occurring on February 25, 2016 in Hesston, Kansas; December 2, 2015 in San Bernardino, California; October 1, 2015 in Roseburg, Oregon; July 16, 2015 in Chattanooga, Tennessee; and June 7, 2013 in Santa Monica, California.

more total persons wounded (17.2 compared to 8.6), than the eight public mass shootings that did not involve assault weapons.

As to murders of law enforcement officers, defendants' initial brief cited evidence collected by the Federal Bureau of Investigation that, of 493 law enforcement murders from 2003 through 2012, 18.7% were committed by rifle, including 11% with rifles using the caliber of ammunition used most commonly in AR-15s and AK-47s. Appellees' Br. at 21-22 & n.3. The Federal Bureau of Investigation reports even higher percentages for the most recently reported two-year period, 2013–2014, with 19.2% of murders of law enforcement officers committed by rifle (15 of 78), including 15.4% using the caliber of ammunition used most commonly in AR-15s and AK-47s (12 of 78).[11] Thus, updated information provides even further support that assault weapons are used disproportionately to their ownership numbers in mass shootings and the murder of law enforcement officers.

---

[11] *See* 2014 Law Enforcement Officers Feloniously Killed and Assaulted, Tables 29 and 37, available at https://www.fbi.gov/about-us/cjis/ucr/leoka/2014/officers-feloniously-killed/main (last visited Apr. 6, 2016).

# CONCLUSION

This Court should affirm the judgment of the district court.

BRIAN E. FROSH
Attorney General of Maryland

s/ Matthew J. Fader
MATTHEW J. FADER
JENNIFER L. KATZ
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
Tel. 410-576-7906
mfader@oag.state.md.us

April 11, 2016                                 Attorneys for Appellees

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,307 words, excluding the parts of the brief exempted by Fed R. App. P. 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed R. App. P. 32(a)(5) and the type style requirements of Fed R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font.


/s/ Matthew J. Fader
Matthew J. Fader

April 11, 2016                              Attorney for Defendants-Appellees

**CERTIFICATE OF SERVICE**

I certify that, on this 11th day of April 2016, I electronically filed with the Clerk of the Court via the CM/ECF System the foregoing Supplemental Brief of Defendants-Appellees, which will cause the petition to be delivered electronically to all counsel of record, and that on the 12th day of April, 2016, I will cause two copies of the brief to be sent by first class mail to counsel for the Appellants, as follows:

John Parker Sweeney
T. Sky Woodward
James W. Porter, III
Bradley, Arant Boult Cummings LLP
1615 L Street, NW, Suite 1350
Washington, DC 20036

/s Matthew J. Fader
Matthew J. Fader