**No. 14-1945**

In the
# United States Court of Appeals
# for the Fourth Circuit

◆

**STEPHEN KOLBE,** *et al.*,
Plaintiffs-Appellants

v.

**LAWRENCE J. HOGAN, JR., GOVERNOR,** *et al.*,
Defendants-Appellees

◆

On Appeal from the United States District Court
for the District of Maryland
No. 1:13-cv-02841-CCB (Hon. Catherine C. Blake)

◆

**APPELLANTS' SUPPLEMENTAL EN BANC BRIEF**

◆

John Parker Sweeney
T. Sky Woodward
James W. Porter, III
Marc A. Nardone
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
P (202) 719-8216
F (202) 719-8316
JSweeney@babc.com

Attorneys for Appellants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION .................................................................................1

STATEMENT OF PROCEEDINGS .......................................................2

  I.  Maryland prohibits a class of popular firearms and standard magazines. ......2

  II.  Plaintiffs are law-abiding citizens .................................................3

  III.  The Panel held the FSA's burden on the core Second Amendment right is substantial, requiring strict scrutiny under *Heller* ...........................................4

  IV.  The Panel applied this Court's two-part Second Amendment analysis .........5

    A. Step 1: Do the FSA's bans implicate Second Amendment rights?..........6

      1. Holding that the Banned Firearms and Magazines are in common use ................................................................6

      2. Holding that the Banned Firearms and Magazines are typically kept for lawful purposes.................................................8

      3. Holding that the Banned Firearms and Magazines are not "dangerous and unusual."........................................................10

    B. Step 2: What level of heightened scrutiny applies? ..............................10

      1. Holding that the bans burden the core right.....................................11

      2. Holding that the burden is substantial, requiring strict scrutiny.......12

STATEMENT OF SUPPLEMENTAL FACTS ....................................13

  I.  The Banned Firearms and Magazines are increasingly popular. .................14

  II.  The Banned Firearms are popular for self-defense and other lawful purposes.............................................................15

  III.  The Banned Firearms and Magazines are particularly well-suited for home defense. ......................................................16

  IV.  The Banned Firearms are less frequently used in crime than other protected firearms. ......................................................17

SUMMARY OF ARGUMENT ...........................................................18

ARGUMENT ....................................................................................20

I.    *Heller* demands no less than strict scrutiny here ..........................................20

      A. This Court's Second Amendment precedent is clear, consistent, and
      faithful to *Heller* .................................................................................23

      B. The Panel applied this Court's two-part analysis, substantially agreeing
      with other Circuit Courts following that approach, except holding the
      substantial burden on the core right requires strict scrutiny.........................28
            1. Step 1: The bans burden the core right ............................................29
            2. Step 2: Strict scrutiny applies ........................................................31

II.   This Court must adhere to its Second Amendment precedent requiring no
      less than strict scrutiny of a prohibition burdening the core right................38

      A. This Court's precedent appropriately protects the core right identified in
      *Heller* ....................................................................................................39

      B. This Court should maintain its precedent requiring the satisfaction of both
      elements of a conjunctive test.......................................................................42

      C. Abandoning this Court's precedent would produce anomalous and unjust
      results that are inconsistent with *Heller* .......................................................46

CONCLUSION .......................................................................................................49

# TABLE OF AUTHORITIES

**Cases**

*Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012).............................. 46, 47

*Caetano v. Massachusetts*, 577 U.S. __, No. 14-10078 (March 21, 2016)
(per curiam) ........................................................................... 19, 35, 44, 45

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ............................................33

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .........................................38

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015)............ 33, 34, 38

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ................................. 5, 30, 31, 37

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)............ 5, 29, 30, 31

*Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014)............37

*Kodak v. Holder*, 342 Fed. App'x. 907 (4th Cir. 2009) .................................... 27, 35

*Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016) ................................................ passim

*Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014) .......................................3, 38

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .............................. 4, 19, 22, 43

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
804 F.3d 242 (2d Cir. 2015)................................................................... passim

*Staples v. United States*, 511 U.S. 600 (1994).......................................................3, 9

*Sundowner Ass'n v. Wood Cnty. Comm'n*, Case No. 2:14-cv-00193,
2014 WL 3962495 (S.D. W. Va. Aug. 13, 2014) ....................................47

*United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012) ........................... 39, 48

*United States v. Chafin*, 423 Fed. App'x 342 (4th Cir. 2011) ................................40

*United States v. Chapman*, 666 F.3d 220 (4th Cir. 2012) ...........................................40

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010).................................... passim

*United States v. Elkins*, 495 Fed. App'x 330 (4th Cir. 2012) ................................39

*United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008) ..........................................46

*United States v. Glisson*, 460 Fed. App'x 259 (4th Cir. 2012)................................40

*United States v. Guerrero-Lexo*, 446 Fed. App'x 610 (4th Cir. 2011)....................40

*United States v. Larson*, 502 Fed. App'x 336 (4th Cir. 2013).................................39

*United States v. Mahin*, 668 F.3d 119 (4th Cir. 2012)..............................................40

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)........................................5

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)............... 23, 25, 34, 46

*United States v. Medford*, 661 F.3d 746 (4th Cir. 2011) ........................................44

*United States v. Miller*, 307 U.S. 174 (1939) ...........................................................6

*United States v. Moore*, 27 F.3d 969 (4th Cir. 1994) ..............................................44

*United States v. Moore*, 666 F.3d 313 (4th Cir. 2012) .............................................40

*United States v. Mudlock*, 483 Fed. App'x 823 (4th Cir. 2012).............................40

*United States v. Parodi*, 703 F.2d 768 (4th Cir. 1983).............................................44

*United States v. Pruess*, 416 Fed. App'x 274 (4th Cir. 2011) ................................40

*United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012) ............................................39

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010)...............................................5

*United States v. Robinson*, 814 F.3d 201 (4th Cir. 2016)................................. 44, 45

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ..................................... 34, 38

*United States v. Smoot*, 690 F.3d 215 (4th Cir. 2012).............................................39

*United States v. Staten*, 666 F.3d 154 (4th Cir. 2011)...................................... 40, 48

*United States v. Tooley*, 468 Fed. App'x 357 (4th Cir. 2012)................................40

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013).................................... passim

**Other Authorities**

78 Cong. Rec. 11400 (1934).....................................................................................21

NSSF, Firearms Retailer Survey Report (2015 ed.) ................................................16

NSSF, Shooting Sports Participation in the
United States in 2014 (2015 ed.)...................................................................... 15, 16

## INTRODUCTION

At issue in this case are laws identical to those struck down in *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010), except the laws in this case apply to a different, yet equally protected, class of arms. This Court should confirm the Panel's well-reasoned decision and hold that strict scrutiny applies to the challenged prohibitions because they burden the core right of law-abiding citizens to self-defense in their homes. Application of strict scrutiny is essential to ensure the uniformity of this Court's Second Amendment decisions, and the conformity of those decisions with binding United States Supreme Court precedent. No lesser standard will achieve that purpose. This Court should adhere to its existing precedent that protects the core self-defense rights of law-abiding citizens consistent with the State's interest in public safety. Failing to do so would disrupt a cohesive and rational approach applied by this Court. This Court should not walk away from the cogent legal framework it has spent years developing.[1]

---

[1] Plaintiffs focus here on their Second Amendment challenge, incorporate their briefs filed previously, and are not waiving any positions asserted in those briefs.

**STATEMENT OF PROCEEDINGS**

## I.    Maryland prohibits a class of popular firearms and standard magazines.

"In April 2013, Maryland passed the Firearm Safety Act ('FSA'), which, among other things, bans law-abiding citizens, with the exception of retired law enforcement officers, from possessing the vast majority of semi-automatic rifles commonly kept by several million American citizens for defending their families and homes and other lawful purposes." *Kolbe v. Hogan*, 813 F.3d 160, 168 (4th Cir. 2016) (vacated March 4, 2016). Maryland "imposes a complete ban on the possession by law-abiding citizens of AR-15 style rifles—the most popular class of centerfire semi-automatic rifles in the United States." *Id.* at 180. "Plaintiffs contend[] that the 'assault weapons' ban trenches upon the core Second Amendment right to keep firearms in defense of hearth and home [and] that the FSA's ban of certain larger-capacity detachable magazines ('LCMs') likewise violates the Second Amendment." *Id.* at 168. "The district court rejected Plaintiffs' Second Amendment challenges, concluding that the 'assault weapons' and larger-capacity magazine bans passed constitutional muster under intermediate scrutiny review." *Id.*[2]

---

[2] The district court also denied Plaintiffs' equal protection and vagueness claims, and the Panel opinion held that the challenged prohibitions did not violate the Equal Protection or Due Process Clauses of the Fourteenth Amendment. Plaintiffs respectfully disagree for the reasons stated in their prior briefs before the Panel, as well as in the dissenting opinion of Chief Judge Traxler. *Kolbe*, 813 F.3d at 199 (concluding that "*retired* law enforcement officers who are no longer charged with

As the district court found and the Panel affirmed, the Maryland "ban on semi-automatic rifles and larger-capacity magazines burdens the availability and use of a *class* of arms for self-defense in the home, where the protection afforded by the Second Amendment is at its greatest." *Id.* at 179 (emphasis added); *see also Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 790 (D. Md. 2014) (finding that the bans "remove a *class* of weapons that the plaintiffs desire to use for self-defense in the home" (emphasis added; original emphasis omitted)). This finding by the district court, never contested in this Court by the State, also finds support in the Supreme Court's opinion in *Staples v. United States*, 511 U.S. 600 (1994), holding that semi-automatic firearms, including the AR-15 at issue both there and here, are a "*class* of weapons" that "traditionally have been widely accepted as lawful possessions." *Id.* at 612 n.5 (emphasis added).

## II.  Plaintiffs are law-abiding citizens.

"Plaintiff Stephen Kolbe is a life-long resident of Maryland who resides in Towson and owns a small business in Baltimore County." *Kolbe*, 813 F.3d at 170. "Various personal experiences, including an incident in which an employee's ex-boyfriend threatened to come kill her at work but police did not respond for thirty minutes, and Kolbe's family's close proximity to 'a high-traffic public highway,'

---

protecting the public are similarly situated to Plaintiffs.") (Traxler, C.J., dissenting) (emphasis in original).

J.A. 1852, have caused Kolbe to conclude that he needs to keep firearms for the purpose of 'self-defense in [his] home.' J.A. 1851." *Id.* (alterations in original).

Plaintiff Andrew Turner is a Maryland resident and former member of the United States Navy. "While on active duty in the United States Navy, Turner suffered an injury that makes it difficult for him to operate firearms and thus necessitates 'access to full-capacity magazines . . . to ensure,' among other things, his ability to defend himself in his home. J.A. 1856." *Id.*[3]

"Plaintiffs Kolbe and Turner both seek to acquire and keep semi-automatic rifles, equipped with LCMs, in their homes primarily for self-defense," *id.* at 175-76, and they are prevented from doing so by the FSA. *Id.* at 170.

## III. The Panel held the FSA's burden on the core Second Amendment right is substantial, requiring strict scrutiny under *Heller*.

Prohibition of the popular semi-automatic rifles and standard magazines at issue (the "Banned Firearms" and "Banned Magazines") "implicates the core protection of the Second Amendment – 'the right of law-abiding responsible citizens to use arms in defense of hearth and home,'" and thus, the Panel held, this Court is "compelled by *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed. 2d 894 (2010), as well as [this Court's] own precedent in the wake

---

[3] The remaining Plaintiffs are businesses and associations bringing suit "on their own behalf and on behalf of their members." *Id.* at 170.

of these decisions, to conclude that the burden is substantial and strict scrutiny is the applicable standard of review for Plaintiffs' Second Amendment claim." *Id.* at 168 (internal quotation marks and citations omitted).

## IV. The Panel applied this Court's two-part Second Amendment analysis.

Resolution of this case begins with the familiar two-part analysis adopted by this Court in *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010), and applied by other Circuit Courts,[4] for cases involving challenges under the Second Amendment. "First, [this Court] ask[s] 'whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.' *Chester*, 628 F.3d at 680 (internal quotation marks omitted)." *Kolbe*, 813 F.3d at 171-72. "The answer to this question requires an 'historical inquiry' into 'whether the conduct at issue was understood to be within the scope of the right at the time of ratification.' [*Chester*, 628 F.3d at 680]; *see Heller*, 554 U.S. at 626-27." *Kolbe*, 813 F.3d at 172. "If the answer to this initial inquiry is no, 'the challenged law is valid.' *Chester*, 628 F.3d at 680. However, '[i]f the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move

---

[4] *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 254 (2d Cir. 2015); *Fyock v. Sunnyvale*, 779 F.3d 991, 996 (9th Cir. 2015); *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) ("*Heller II*"); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).

5

to the second step of applying an appropriate form of means-end scrutiny.' *Id.*"
*Kolbe*, 813 F.3d at 172.

### A.    Step 1: Do the FSA's bans implicate Second Amendment rights?

Whether a challenged law implicates the Second Amendment is determined by examining whether the conduct affected by the law was historically understood to be protected by the Second Amendment. *Id.* Because "[t]he statute prohibits all forms of possession of any [Banned Firearms,] a law-abiding citizen cannot keep any of these weapons in the home for any reason, including the defense of self and family." *Id.* Accordingly, the conduct being regulated in this case is "an individual's possession of a firearm in the home for self-defense," *id.*, and the Supreme Court already has conducted the necessary historical analysis and has held this conduct to be protected under the Second Amendment in *Heller*. *Id.*

### 1.    Holding that the Banned Firearms and Magazines are in common use.

Because this case involves the prohibition of a class of firearms, the Panel confirmed the proper evaluation entails whether that "particular class of weapons prohibited or regulated by the statute are themselves protected by the Second Amendment." *Id.* at 173. The Supreme Court's criteria from *Heller* (which in turn derived from *United States v. Miller*, 307 U.S. 174 (1939)), requires examining whether the Banned Firearms and Magazines are "typically possessed by law-

abiding citizens for lawful purposes." *Kolbe*, 814 F.3d at 173 (internal quotation marks and citation omitted). "Like a number of courts that have previously considered this question, [the Panel had] little difficulty in concluding that the banned semi-automatic rifles are *in common use* by law-abiding citizens." *Id.* at 174 (emphasis in original). The relevant data are "the present-day use of these firearms nationwide." *Id.* Plaintiffs' evidence, as well as the findings of those other courts, demonstrates that "it is beyond dispute from the record . . ., which contains much of the same evidence cited in [similar cases in other Circuits], that law-abiding citizens commonly possess semi-automatic rifles such as the AR-15." *Id.*[5]

Turning next to the Banned Magazines, "the record in this case shows unequivocally that LCMs are commonly kept by American citizens, as there are more than 75 million such magazines in circulation in the United States. In fact, these magazines are so common that they are standard." *Id.* Again, this is

---

[5] The following undisputed facts highlight common possession of the Banned Firearms:

> Between 1990 and 2012, more than 8 million AR- and AK-platform semi-automatic rifles alone were manufactured in or imported into the United States. J.A. 1877. In 2012, semi-automatic sporting rifles accounted for twenty percent of all retail firearms sales. J.A. 1880. For perspective, we note that in 2012, the number of AR- and AK-style weapons manufactured and imported into the United States was more than double the number of Ford F-150 trucks sold, the most commonly sold vehicle in the United States. J.A. 1878.

*Kolbe*, 813 F.3d at 174.

demonstrated by Plaintiffs' evidence (J.A. 2122), as well as findings of other courts in similar cases. *Kolbe*, 813 F.3d at 174-75 (collecting cases).

The Panel rejected the State's argument that magazines are not protected by the Second Amendment because they are not bearable arms, emphasizing that the State's argument would permit the government to circumvent *Heller* by banning individual components of handguns: "[i]n our view, the right to possess firearms for protection implies a corresponding right to possess component parts necessary to make the firearms operable." *Id*. at 175 (internal quotation marks and citation omitted). "To the extent that firearms equipped with detachable magazines are commonly possessed by law-abiding citizens for lawful purposes, there must also be an ancillary right to possess the magazines necessary to render those firearms operable." *Id*.

### 2. Holding that the Banned Firearms and Magazines are typically kept for lawful purposes.

Plaintiffs Kolbe and Turner seek to acquire Banned Firearms and Magazines for home self-defense, and there is "evidence suggesting that they are not alone in this regard," including an expert's presentation of "survey evidence showing that self-defense was a primary reason for the purchase of [Banned Firearms] and a 1989 Report from the Bureau of Alcohol, Tobacco, and Firearms indicat[ing] that self-

defense was a suitable purpose for semi-automatic rifles." *Kolbe*, 813 F.3d at 175-76.

The Panel did not find persuasive the State's argument that the Banned Firearms and Magazines are not actually used in self-defense: "[t]he State's position flows from a hyper-technical, out-of-context parsing of the Supreme Court's statement in *Heller* that the sorts of weapons protected were those in common *use* at the time." *Id*. (emphasis in original) (internal quotation marks and citation omitted). "The proper standard under *Heller* is whether the prohibited weapons and magazines are typically *possessed* by law-abiding citizens for lawful purposes as a matter of history and tradition, not whether the magazines are often actually employed in self-defense incidents." *Id.* (emphasis in original) (internal quotation marks and citation omitted).

Finally, there is "nothing in the record demonstrating that law-abiding citizens have been historically prohibited from possessing semi-automatic rifles and LCMs." *Id*. "Nothing in the record suggests any such tradition with respect to semi-automatic rifles or LCMs." *Id.* "In fact, the Supreme Court . . . hinted at the opposite, stating that 'certain categories of guns,' such as 'machineguns . . .' have a 'quasi-suspect character,' but that 'guns falling outside those categories traditionally have been widely accepted as lawful possessions.'" *Id*. (quoting *Staples*, 511 U.S. at 611-12).

### 3. Holding that the Banned Firearms and Magazines are not "dangerous and unusual."

The Panel recognized that "*Heller* focused on whether the weapons were *typically* or *commonly* possessed, not whether they reached or exceeded some undefined level of dangerousness," and rejected the State's "unusually dangerous" test because it "reads too much into *Heller*." *Id.* at 177 (emphasis in original). "[N]o statute or case has mentioned, much less adopted, the State's newly proffered standard." *Id.*

"Nothing in *Heller* suggests that courts considering a Second Amendment challenge must decide whether a weapon is 'unusually dangerous.'" *Id.* at 177. "Furthermore, *Heller* refers to 'dangerous' and 'unusual' conjunctively, suggesting that even a dangerous weapon may enjoy constitutional protection if it is widely employed for lawful purposes, i.e., not 'unusual.'" *Id.* at 178. Even "[f]ounding era understandings of what it means for something to be 'unusual' reflect that the firearm must be rare to be considered "unusual.'" *Id.*

"In sum, semi-automatic rifles and LCMs are commonly used for lawful purposes, and therefore come within the coverage of the Second Amendment." *Id.*

### B. Step 2: What level of heightened scrutiny applies?

Having determined that the Banned Firearms and Magazines are protected by the Second Amendment, what remained was to determine whether and to what

extent the bans burden the core Second Amendment right to select the appropriate means-end scrutiny: "[u]nless the Supreme Court directs us to the contrary, we will apply 'an appropriate means-end scrutiny' to determine whether firearm regulations can apply to acts coming under the protection of the Second Amendment," *id.* at 178 n.9, but "[i]n a Second Amendment challenge, we will not conduct rational basis review." *Id.* at 179 n.10. To select the proper level of scrutiny, the Panel considered "the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.* at 179 (internal quotation marks and citations omitted). "[A]ny law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny," *id.* at 181-82 (internal quotation marks and citation omitted), but "[a] less severe regulation – a regulation that does not encroach on the core of the Second Amendment – requires a less demanding means-ends showing." *Id.* at 179 (internal quotation marks and citation omitted).

### 1. Holding that the bans burden the core right.

Maryland's "ban on semi-automatic rifles and larger-capacity magazines burdens the availability and use of a class of arms for self-defense in the home, where the protection afforded by the Second Amendment is at its greatest." *Id.* "Moreover, the FSA also reaches *every* instance where an AR-15 platform semi-automatic rifle or LCM might be preferable to handguns or bolt-action rifles – for example hunting,

recreational shooting, or competitive marksmanship events, all of which are lawful purposes protected by the Constitution." *Id*. at 180 (emphasis in original).

> ### 2. Holding that the burden is substantial, requiring strict scrutiny.

"[T]he challenged provisions of the FSA substantially burden" Second Amendment rights, and this burden "is not merely incidental," *id.* at 180, because they infringe on "the core Second Amendment right to defend oneself and one's family in the home with a firearm that is commonly possessed by law-abiding citizens for such lawful purposes." *Id.* "[T]he fact that handguns, bolt-action and other manually-loaded long guns, and, as noted earlier, a few semi-automatic rifles are still available for self-defense does not mitigate [the] burden." *Id.* "Indeed, the Supreme Court rejected essentially the same argument in *Heller* – that the District of Columbia's handgun ban did not unconstitutionally burden the right to self-defense because the law permitted the possession of long guns for home defense." *Id*. at 181 (citing *Heller*, 554 U.S. at 629).

Although a "semi-automatic rifle may not be 'the quintessential self-defense weapon,'" "[t]here are legitimate reasons for citizens to favor a semi-automatic rifle over handguns in defending themselves and their families at home." *Id.*[6] "Similarly,

---

[6] *See also Kolbe*, 813 F.3d at 181 ("The record contains evidence suggesting that 'handguns are inherently less accurate than long guns' as they 'are more difficult to steady' and 'absorb less of the recoil . . ., reducing accuracy.' J.A. 2131. This might

a citizen's ability to defend himself and his home is enhanced with a LCM." *Id*.

"Strict scrutiny, then, is the appropriate level of scrutiny to apply to the ban of

semiautomatic rifles and magazines holding more than 10 rounds." *Id*. at 182.

## STATEMENT OF SUPPLEMENTAL FACTS[7]

The FSA prohibits the acquisition and possession of the vast majority of semi-

automatic rifles commonly kept by millions of law-abiding citizens for defending

their families and homes, as well as the acquisition of standard-capacity ammunition

magazines for these rifles and most popular handguns. The popular AR-15 style

rifles and the other Banned Firearms are semi-automatic rifles commonly chosen by

millions of individuals throughout the country for lawful purposes that include self-

defense, hunting, and recreational shooting. The Banned Firearms are rarely used in

---

be an important consideration for a typical homeowner, who 'under the extreme
duress of an armed and advancing attacker is likely to fire at, but miss, his or her
target.' J.A. 2123. 'Nervousness and anxiety, lighting conditions, the presence of
physical obstacles . . . and the mechanics of retreat are all factors which contribute
to [the] likelihood' that the homeowner will shoot at but miss a home invader. J.A.
2123. These factors could also affect an individual's ability to reload a firearm
quickly during a home invasion." (alterations in original)).

[7] Plaintiffs incorporate their prior fact statements in briefs filed previously and focus
here on updating those facts. The Curcuruto Supplemental Declaration, NSSF
Firearms Retailer Survey Report (2015), and NSSF Shooting Sports Participation in
the United States in 2014 are subject to a pending Motion to Supplement the Joint
Appendix.

crime; the number of all rifles used in crimes has been dropping at the same time as millions of the Banned Firearms have been made available to the public.

## I.     The Banned Firearms and Magazines are increasingly popular.

When the parties first briefed these issues in the district court, the data demonstrated that there were more than 8 million of the Banned Firearms in the United States, J.A. 1877, and that these firearms accounted for approximately 20% of firearm sales in 2012. J.A. 1879. The AR-15 has grown in popularity with citizens since its introduction into the market in 1963 and is "the most popular civilian rifle design in America." J.A. 2259. Even the State has admitted that AR-15 style firearms are the most popular semiautomatic rifles in the United States. J.A. 2744. Data from more recent years have confirmed that the popularity of these types of firearms has continued to rise among law-abiding citizens: in the two years since Plaintiffs first presented the latest data then available (1990-2012), there have been more than an additional 3.5 million of the Banned Firearms produced or imported into the United States (currently available data only goes through 2014), bringing the total to nearly 12 million – or one for every 20 adults. *See* Curcuruto Supplemental Declaration at ¶ 4. While the Maryland ban has been in effect, more than 1 million of the Banned Firearms have been imported or manufactured. *Id.* at ¶ 5.

Recent figures confirm Plaintiffs' initial data regarding magazines as well. The majority of semi-automatic handguns and rifles are sold with standard

magazines holding more than 10 rounds of ammunition. J.A. 2122. When Plaintiffs initially brought this suit, the available data showed that there were more than 75 million magazines with a capacity greater than 10 rounds in circulation. Current data demonstrate that, through 2014, there are more than 100 million such magazines in circulation, representing approximately 50% of all magazines. *See* Curcuruto Supplemental Declaration at ¶ 7.

## II. The Banned Firearms are popular for self-defense and other lawful purposes.

The data at the time this case was initiated demonstrated that Banned Firearms are typically possessed for lawful purposes, including self-defense. Second only to recreational target shooting, the most important reason cited by owners for owning one of the Banned Firearms is its usefulness for home defense. J.A. 1917. Recent data confirm that almost 60% of all firearm purchasers engage in recreational shooting in order to maintain their self-defense proficiency. NSSF, Shooting Sports Participation in the United States in 2014 at iv (2015 ed.). Plaintiffs Kolbe and Turner confirmed that they desire to own the Banned Firearms for home self-defense. J.A. 1851, 1856. Even the State's expert, Dr. Daniel Webster, a Maryland researcher on firearm laws, readily assumed that they are kept for self-defense. J.A. 2290-91. More recent data confirm Dr. Webster's assumption. In 2014, retailers again reported that "personal-protection purposes" was one of three primary reasons,

15

along with recreational shooting and hunting, why their customers purchased Banned Firearms. NSSF, Firearms Retailer Survey Report at 8 (2015 ed.).

The lawful uses of the Banned Firearms are not limited to self-defense. "For the past quarter of a century AR15s have consistently been used by winning competitors at the U.S. Civilian Marksmanship National Match target shooting championships held each year at Camp Perry, Ohio[,]" J.A. 2090, and represent approximately 60% of the firearms in use at any one time at ranges in Maryland. J.A. 1865. Recent national survey data show that these Banned Firearms were chosen over handguns, traditional rifles, and shotguns more than 30% of the time for both hunting and recreational shooting nationwide. NSSF, Shooting Sports Participation in the United States in 2014 at xi-xii (2015 ed.).

III. **The Banned Firearms and Magazines are particularly well-suited for home defense**.

The Banned Firearms share a number of characteristics that make them particularly suitable for lawful use, including self-defense. They are small-caliber rifles of intermediate power, J.A. 2261-62, making it easy for citizens to become proficient with them because they produce relatively little recoil, which is a particular benefit for citizens of small stature. J.A. 2182. These firearms are highly adaptable to individual users, with adjustable stocks that make the firearms safer and easier to shoot for individuals of any size. *Id*. Moreover, these firearms are more

accurate than handguns because they have a longer barrel, and are more precise than shotguns because they fire a single projectile. J.A. 2179-81. These are important safety features for citizens using these firearms in self-defense, because they reduce the risk of unintended consequences from missed shots. J.A. 2181. Standard capacity magazines allow a homeowner to "have quick and ready access to ammunition in quantities sufficient to provide a meaningful opportunity to defend herself and/or her loved ones." J.A. 2123.

## IV. The Banned Firearms are less frequently used in crime than other protected firearms.

The Panel found that "most murders in America are committed with handguns." *Kolbe*, 813 F.3d at 177 (internal quotation marks, citation, and alteration omitted). The Panel also found that the "use of handguns in the number of overall homicides is out of proportion to the ownership of handguns." *Id.* at 178.[8]

---

[8] In *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013), this Court reviewed and summarized the State of Maryland's evidence regarding the use of handguns in Maryland crime:

> '97.4% of all homicides by firearm were committed with handguns,' and handguns were 'the weapon of choice' for robberies and carjackings. [J.A.] at 116-17; *see also id.* at 110 (explaining that '[h]andguns are the weapon of choice for criminal activity in Baltimore because they are small, relatively lightweight, easy to carry and conceal, easy to load and fire, deadly at short range, and ideal for surprise attacks'). Furthermore, handguns have persisted as 'the largest threat to the lives of Maryland's law enforcement officers.' *Id.* at 117 (recounting that, 'of the 158 Maryland law enforcement officers who have died in the line of duty from non-vehicular, non-natural causes,

Recent data confirm the 2006 data relied upon by the Panel. Since 2006,[9] handguns have been used in between 80% and 90% of all murders committed with a firearm in which the firearm type is known. And, except for 2009, handguns have been used in more than 87% of all such murders in each of those years. By contrast, the use of rifles in murders has decreased from 5% to 4% since 2006. Thus, despite an additional 8.6 million Banned Firearms being produced or imported since 2006, (Curcuruto Supplemental Declaration at ¶ 6), rifles are being used *less* frequently in murders since that time. Further underscoring these data is the fact that in each year between 2006 and 2014, rifles (*all* rifles – not just Banned Firearms) were used in homicides less often than hands, fists, and feet were used as lethal weapons.

## SUMMARY OF ARGUMENT

A unanimous Supreme Court recently confirmed the Second Amendment jurisprudence that underlies this Court's precedent. "The [Supreme] Court has held

---

132 — or 83.5% — died as the result of intentional gunfire, usually from a handgun').
*Id*. at 877.

[9] All data in this discussion are taken from the FBI Uniform Crime Reporting Data, available at https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10shrtbl08.xls (2006-2009) or https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2014/crime-in-the-u.s.-2014/tables/expanded-homicide-data/expanded_homicide_data_table_8_murder_victims_by_weapon_2010-2014.xls (2010-2014).

that 'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding,' and that this 'Second Amendment right is fully applicable to the States.'"[10] Moreover, as this Court recognizes, the Supreme Court in *Heller* "clearly staked out the core of the Second Amendment" and "explained that 'whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'"[11]

This Second Amendment jurisprudence provides the starting point for this Court's analysis of the issues in this case. Applying that jurisprudence should be straightforward because the facts of this case fit more closely with *Heller* and *McDonald* than any other case previously considered by this Court since *Heller*. And there can be no doubt that the popular Banned Firearms and Magazines "constitute bearable arms" that are protected by the Second Amendment precisely because they are commonly chosen by law-abiding citizens for lawful purposes.

---

[10] *Caetano v. Massachusetts*, 577 U.S. __, No. 14-10078, Slip Op. at 1 (March 21, 2016) (per curiam) (quoting *Heller*, 554 U.S. at 582, and *McDonald*, 561 U.S. at 750) (granting certiorari, vacating the judgment of the Supreme Judicial Court of Massachusetts upholding statewide ban on stun guns, and remanding the case).

[11] *Chester*, 628 F.3d at 676 (quoting *Heller*, 554 U.S. at 635) (alteration in original).

Once this Court has determined that the Second Amendment is implicated by a prohibition of a class of protected arms, the Supreme Court's Second Amendment jurisprudence and this Court's precedent mandate the application of strict scrutiny where the burden on the core right is substantial. The Supreme Court's recent decision*,* as well as other intervening precedent of this Court and other Courts of Appeals, confirm that this Court has adopted the correct Second Amendment framework. Because Supreme Court jurisprudence and this Court's precedent compel the application of strict scrutiny, and because there is no just reason to revise this Court's precedent, this Court should require strict scrutiny be applied.

## ARGUMENT

### I.     *Heller* demands no less than strict scrutiny here.

In *Heller*, the Supreme Court analyzed District of Columbia laws that prohibited the registration, and therefore possession, of handguns and mandated that all firearms be kept inoperable while within the District. *Heller*, 554 U.S. at 574. The Court examined extensively the historical tradition of firearm ownership in the United States and concluded that the Second Amendment, as historically understood, protects a law-abiding citizen's right to possess a firearm for lawful purposes. *Id.* at 595. Moreover, the Court held that the "central component" of the Second Amendment's protection is the ability to possess a firearm for self-defense. *Id.* at 599.

Applying these principles to the District's prohibitions, the Court held that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," the challenged bans "would fail constitutional muster." *Id.* at 628-29. [12] The Court held these laws to be unconstitutional without applying any test because the laws banned "an entire class of 'arms'" that is "in common use" and "typically possessed by law-abiding citizens for lawful purposes," and that "prohibition extend[ed] . . . to the home, where the need for defense of self, family, and property is most acute." *Id.* at 625, 628. [13] The *Heller* Court addressed basic

---

[12] Plaintiffs maintain that this Court should follow *Heller* and hold the challenged laws to be unconstitutional without resorting to any means-end test. *See* Opening Br. of Plaintiffs-Appellants at 25-28. Although the Panel rejected this argument, *Kolbe*, 813 F.3d at 178 n.9, Plaintiffs respectfully request that this Court compare the Maryland bans with the District's laws challenged in *Heller* – both involve prohibitions of a class of protected arms that extend into the home – and apply the same reasoning as the *Heller* Court to conclude the Maryland laws are unconstitutional.

[13] The *Heller* Court did not coin a new test. The test for whether a firearm is protected by the Second Amendment has always been whether it is commonly kept for lawful purposes. The legislative history for the National Firearms Act of 1934 ("NFA"), which was passed in reaction to uncontrolled criminal activity in Chicago and New York, makes it clear that Congress did not believe that it had the authority to regulate firearms which were commonly kept for lawful purposes. 78 Cong. Rec. 11400 (1934). Hence, machine guns and sawed-off shotguns were added to the NFA's prohibitions, but handguns which were at that time, as now, the most frequent firearm of choice for criminals, were excluded. This distinction was acknowledged by the *Miller* Court, which upheld the NFA, holding that a sawed-off shotgun was not protected by the Second Amendment because it was not useful for military service as that concept was understood at the time of ratification, because it was not the kind of firearm that was commonly kept for lawful purposes in the home by law-

"who, where, and what" questions associated with the protections of the Second Amendment, holding that the Second Amendment protects the interests of law-abiding citizens, that it protects those interests at least in the home, and that it protects even handguns (the firearms most frequently used by criminals).

As noted above, Maryland has banned an "entire class of arms that is overwhelmingly chosen by American society" for lawful purposes. *Id.* at 627 (internal quotation marks and citations omitted). And there is no dispute that the Maryland prohibitions extend into the homes of law-abiding citizens "where the need for defense of self, family, and property is most acute." Moreover, the bans' onerous burden cannot be ameliorated by the availability of other arms, as the *Heller* Court held: "[i]t is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.* long guns) is allowed." *Id.* at 629.

---

abiding citizens. 307 U.S. at 178. The Supreme Court again recognized this bright-line in *Staples*, when it held that a criminal defendant could not be on notice that the very firearm at issue here, the AR-15, was potentially subject to criminal regulation under the NFA, because it was a *class* of firearms commonly kept for lawful purposes. 511 U.S. at 611-12. Subsequently, *Heller*, 554 U.S. at 624-25, and *McDonald*, 130 S.Ct. at 3044, reiterated this venerable test in reaching their conclusions. In simplest terms, a ban on a class of firearms that are commonly kept for lawful purposes cannot survive the Second Amendment.

The bans at issue here parallel those at issue in *Heller*, and this Court should hold them to be unconstitutional, just as the *Heller* Court held the analogous District of Columbia bans unconstitutional. At a minimum, this Court must apply the most stringent form of means-end scrutiny because the Maryland bans prohibit the possession of an entire class of protected arms in the home for self-defense.

**A.     This Court's Second Amendment precedent is clear, consistent, and faithful to *Heller*.**

This Court has had occasion to address, in some fashion, the same "who, where, and what" questions addressed by the Supreme Court in *Heller*. In so doing, this Court consistently has applied a bright line between laws that prohibit the possession of protected arms outside the home, or by persons who are not law-abiding, on the one hand, and laws that prohibit the possession of protected arms within the homes of law-abiding citizens on the other.[14] This Court consistently has held that prohibitions that fall into the first category are to be analyzed under intermediate scrutiny, while declaring that prohibitions that fall into the second category – burdening the core Second Amendment right of law-abiding citizens to

---

[14] *See, e.g., United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) (sometimes referred to as *Chester II*, because it followed an unpublished per curiam decision that was subsequently vacated on panel rehearing, *id*. at 678): *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011); *United States v. Carter*, 669 F.3d 411 (4th Cir. 2012); and *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013).

possess protected arms in the home for self-defense – must be analyzed under strict scrutiny. These holdings respect the lines drawn by *Heller* as well as the fundamental rights of law-abiding citizens.

In *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010), this Court adopted the two-part analysis it has applied uniformly in its Second Amendment cases ever since, examining a "who" question under the Second Amendment. Under the first step of the two-part analysis, this Court's historical review failed to reveal "that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors." *Id.* at 681. The Court "assume[d], therefore, that Chester's Second Amendment rights are intact and that he is entitled to some measure of Second Amendment protection to keep and possess firearms in his home." *Id.* at 681-82. This Court then applied intermediate scrutiny to Chester's challenge to his criminal conviction for possession of a firearm in the home because he was not a law-abiding citizen after his criminal conviction for domestic violence. *Id.* at 682-83. The Court indicated that, had Chester been a law-abiding citizen, it would have applied strict scrutiny to a prohibition that reached into his home. *Id.* at 683 ("[W]e believe his claim is not within the core right identified in *Heller* – the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense – by virtue of Chester's criminal history as a domestic violence misdemeanant. Accordingly, we conclude that intermediate scrutiny is more

appropriate than strict scrutiny for Chester and similarly situated persons.") (citation omitted).

In *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011), this Court considered a "where" question. While Masciandaro was a law-abiding citizen at the time of his arrest, the prohibition that he challenged applied to his behavior in a public park, not in his home. *Id*. at 470. Thus, this Court held that intermediate scrutiny was applicable, explaining that "as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." *Id*. The Court, however, "assume[d] that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *Id*. The Court went on to emphasize that "this longstanding out-of-the-home/in-the-home distinction bears directly on the level of scrutiny applicable." *Id.* Finally, the Court concluded: "[w]hile we find the application of strict scrutiny important to protect the core right of the self-defense of a law-abiding citizen in his home ('where the need for defense of self, family, and property is most acute,' *Heller*, 128 S. Ct. at 2817), we conclude that a lesser showing is necessary with respect to laws that burden the right to keep and bear arms outside of the home." *Id.* at 471.

A year later, this Court again had occasion to address a "who" question and confirmed that its Second Amendment jurisprudence would require strict scrutiny as

the appropriate level of review for prohibitions that impact the right of law-abiding citizens to possess arms within their homes. In *United States v. Carter*, 669 F.3d 411 (4th Cir. 2012), this Court reiterated that *Heller* "noted that the right to keep and bear arms was understood by the founding generation to encompass not only militia service, but also 'self-defense and hunting,' and that, indeed, self-defense constituted 'the *central component* of the right.'" *Id.* at 414 (citations omitted) (emphasis in original). Quoting *Heller*, the *Carter* Court emphasized that "the right to self-defense is at its zenith within the home 'where the need for defense of self, family, and property is most acute.'" *Id*. at 415 (citations omitted). This Court then applied the two-part analysis of *Chester*, *id*. at 415-16, and assumed without deciding that, notwithstanding Carter's status as a marijuana user, the federal dispossession statute implicated his Second Amendment rights. *Id*. at 416. Turning to the second part of the analysis, determining and applying the applicable level of scrutiny, the Court applied intermediate scrutiny because Carter was not law-abiding but reconfirmed its statement in *Masciandaro*: "[W]e have noted that the application of strict scrutiny is important to protect the core right of self-defense identified in *Heller*[.]". *Id.*

The following year, this Court once again confirmed the bright line distinction between restrictions that reach into the homes of law-abiding citizens and those that do not (addressing yet another "where" question). In *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013), this Court continued its unbroken line of decisions teaching

26

that strict scrutiny is applicable to prohibitions that impact the Second Amendment rights of law-abiding citizens in their homes. In that case, this Court declined to apply strict scrutiny to a law that required citizens to demonstrate "a good and substantial reason" to obtain a permit to carry a concealed firearm outside the home. 712 F.3d at 878. This Court explained that Woollard's request for the Court to apply strict scrutiny to a law that regulated public carry permits would "place the right to arm oneself in public on equal footing with the right to arm oneself at home, necessitating that we apply strict scrutiny[.]" *Id*. The Court went on to apply intermediate scrutiny because the restricted conduct was outside the home, reiterating that, when "ruling in *Masciandaro* that intermediate scrutiny applies to laws burdening the assumed right to carry firearms in public, we recognized a 'longstanding out-of-the-home/in-the-home distinction bear[ing] directly on the level of scrutiny applicable.'" *Id*.

Finally, once prior to this case, this Court considered and answered a "what" question. Prior to *Chester*, this Court addressed a challenge to the federal ban on armor piercing ammunition, in an unpublished per curiam decision, rejected the argument that such ammunition is protected under the Second Amendment because it is required by an effective modern citizen militia, and agreed with the district court that such ammunition is not protected because it is not "in common use by law-abiding citizens." *Kodak v. Holder*, 342 Fed. App'x 907, 908-09 (4th Cir. 2009).

This line of cases demonstrates that this Court has regularly addressed the same kind of questions that the *Heller* Court addressed. This Court's holdings respect the bright line drawn by the Supreme Court, declaring that the highest level of scrutiny is reserved for, and must be applied to, laws that "amount[] to a prohibition of an entire class of arms" that burden the core right of law-abiding citizens to defend their "home[s], where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628; *see also Kolbe*, 813 F.3d at 171.

> **B. The Panel applied this Court's two-part analysis, substantially agreeing with other Circuit Courts following that approach, except holding the substantial burden on the core right requires strict scrutiny.**

This case presents only the second instance in which this Court has been called upon to address a "what" question under the Second Amendment.[15] A brief review of the Panel's two-part analysis, juxtaposed with the analyses of other courts considering similar bans, compels the application of no less than strict scrutiny.

---

[15] To answer this question, this Court need only follow the *Heller* criteria for determining whether a firearm is protected under the Second Amendment – *i.e.* is it commonly owned and typically kept for lawful purposes? Because the record in this case demonstrates unequivocally that the answer to this query is "yes," the Banned Firearms and Magazines are protected and they cannot be prohibited under *Heller*. *See supra* n.12.

## 1.    Step 1: The bans burden the core right.

The Panel in this case faithfully applied the framework that this Court has spent the last six years honing. First, the Panel conducted an "historical inquiry," concluding that the conduct being regulated in this case was "an individual's possession of a firearm in the home for self-defense," and that the Supreme Court already had conducted the necessary historical analysis and had held this conduct to be protected under the Second Amendment in *Heller*. *Kolbe*, 813 F.3d at 172.[16]

The Panel then considered "whether the particular class of weapons prohibited or regulated by statute are themselves protected by the Second Amendment." *Id.* at 173. The Panel had "little difficulty concluding that the banned semi-automatic rifles are *in common use* by law-abiding citizens." *Id.* at 174 (emphasis in original).[17] The Panel then reviewed the evidence and concluded that

---

[16] *See also Heller II*, 670 F.3d at 1260 ("[T]he [*Heller*] Court also said the Second Amendment protects the right to keep and bear arms"); *Cuomo*, 804 F.3d at 253 ("*Heller* . . . codified a pre-existing individual right to possess and carry weapons." (internal quotation marks, citation, and emphasis omitted)).

[17] *See also Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend."); *Cuomo*, 804 F.3d at 255 ("Even accepting the most conservative estimates . . ., the assault weapons and large-capacity magazines at issue are in common use").

"semi-automatic rifles and LCMs are commonly used for lawful purposes, and therefore come within the coverage of the Second Amendment." *Id*. at 178.[18]

The Panel rejected a novel argument advanced by the State: that the Banned Firearms were "unusually dangerous," a twist on the "dangerous and unusual" language employed in *Heller*. *Id*. at 177. The Panel rejected that interpretation as ignoring the Supreme Court's deliberate use of the conjunctive in its "dangerous and unusual" language. *Id*. at 178.[19] The Panel observed that the rare use of the Banned Firearms in murders, even including mass shootings, could hardly justify their ban when the indisputably protected handgun is responsible for most murders. *Id*. at 177-

---

[18] *See also Heller II*, 670 F.3d at 1261 ("[A]ssuming [the prohibitions] impinge upon the right protected by the Second Amendment[.]"); *Cuomo*, 804 F.3d at 257 ("[W]e . . . assume for the sake of argument that these 'commonly used' weapons and magazines are also 'typically possessed by law-abiding citizens for lawful purposes.' (citation omitted)); *Fyock*, 779 F.3d at 998 ("And, to the extent that certain firearms capable of use with a magazine – e.g., certain semiautomatic handguns – are commonly possessed by law-abiding citizens for lawful purposes, our case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable.").

[19] *See also Heller II*, 670 F.3d at 1260-61 (rejecting the argument that the firearms and magazines at issue were dangerous and unusual because they were "in common use"); *Fyock*, 779 F.3d at 998 (noting that "[a]lthough Sunnyvale presented evidence regarding the increased danger posed by large-capacity magazines, it did not present significant evidence to show that large capacity magazines are also 'unusual.'").

78.[20] Moreover, because the Banned Firearms and Magazines are commonly used for lawful purposes, they cannot be rare and unusual so as to fall within the "dangerous and unusual" language. *Id*. at 177-78.[21] The Panel also rejected the State's argument that the Banned magazines were not protected because they did not constitute arms. *Id*. at 175.[22]

## 2. Step 2: Strict scrutiny applies.

Having determined that the Second Amendment covers the Banned Firearms and Magazines, the Panel moved next to consider the applicable level of scrutiny. The Panel concluded that the prohibitions "substantially burden" the core Second Amendment right by "impos[ing] a complete ban on the possession by law-abiding citizens of AR-15 style rifles – the most popular class of centerfire semi-automatic rifles in the United States." *Id*. at 180. The Panel reviewed the "legitimate reasons

---

[20] *See also Cuomo*, 804 F.3d at 256 ("Looking solely at a weapon's association with crime, then, is insufficient. We must also consider more broadly whether the weapon is 'dangerous and unusual' in the hands of law-abiding civilians.").

[21] *See also Cuomo*, 804 F.3d at 257 ("[W]e . . . assume for the sake of argument that these 'commonly used' weapons and magazines are also "typically possessed by law-abiding citizens for lawful purposes." (citation omitted)).

[22] *See also Heller II*, 670 F.3d at 1261 (noting the District's argument that magazines are not "arms," but instead focusing on whether they are in common use and typical possession); *Fyock*, 779 F.3d at 998 ("[T]here must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable.").

for citizens to favor a semi-automatic rifle" over other firearms and concluded "for a law-abiding citizen who, for whatever reason, chooses to protect his home with a semi-automatic rifle instead of a semi-automatic handgun …, the FSA significantly burdens the exercise of the right to arm oneself at home." *Id*. at 181.[23]

The Panel concluded by reviewing and confirming this Court's framework for Second Amendment determination: "As we have noted on previous occasions, 'any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny.' . . . Strict scrutiny, then, is the appropriate level of scrutiny to apply to the ban of semi-automatic rifles and magazines holding more than 10 rounds." *Id*. at 181-82 (citations omitted).

It is at this point that the Panel diverged from the other Circuit Courts. The Panel was "compelled by *Heller* and *McDonald*, as well as [this Court's] own precedent in the wake of these decisions, to conclude that the burden is substantial and strict scrutiny is the applicable standard of review for Plaintiffs' Second Amendment claim." *Id*. at 168 (internal quotation marks and citation omitted). "We

---

[23] *See also Cuomo*, 804 F.3d at 259-60 ("The 'absolute prohibition' instituted in both states thus creates a 'serious encroachment' on the Second Amendment right. These statutes are not mere 'marginal, incremental or even appreciable restraint[s] on the right to keep and bear arms.' They impose a substantial burden on Second Amendment rights and therefore trigger the application of some form of heightened scrutiny." (citation and emphasis omitted)).

require strict scrutiny here not because it aligns with our personal policy preferences but because we believe it is compelled by the law set out in *Heller* and *Chester*." *Id*. at 184.

The Panel's divergence from the opinions of other Circuit Courts' on the issue of the proper level of scrutiny was necessary to conform with *Heller*. Other Circuit Courts simply have not been faithful to *Heller*, nor as clear and consistent in their precedent. This Court should not follow those opinions because they do not defer sufficiently to the core right and advance constitutional analyses that would not be tolerated in any other context.[24]

The Seventh Circuit's decision in *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406 (7th Cir. 2015), where the "court conjured its own test, asking 'whether a regulation bans weapons that were common at the time of ratification or those that

---

[24] This Court's Second Amendment precedent is informed by First Amendment precedent applying strict scrutiny to analogous burdens on free speech rights, *Kolbe*, 813 F.3d at 183, and the First Amendment decisions further support the application of strict scrutiny here. Just as laws that foreclose an entire medium of expression are subjected to strict scrutiny under the First Amendment notwithstanding the availability of alternative means of expression, *City of Ladue v. Gilleo*, 512 U.S. 43 (1994), so too should be laws that foreclose an entire class of protected firearms from lawful use. *See id*. at 55 ("Our prior decisions have voiced particular concern with laws that foreclose an entire medium of expression. . . . Although prohibitions foreclosing entire media may be completely free of content or viewpoint discrimination, the danger they pose to the freedom of speech is readily apparent – by eliminating a common means of speaking, such measures can suppress too much speech." (internal citations omitted)).

have some reasonable relationship to the preservation or efficiency of a well-regulated militia, and whether law-abiding citizens retain adequate means of self-defense' . . . cannot be reconciled with *Heller*." *Kolbe*, 813 F.3d at 182.

With respect to the level of applicable scrutiny, the Seventh Circuit upheld the district court's determination that the city's firearm and magazine prohibitions are constitutional. In so doing, that court expressly rejected the two-part analysis and adopted a novel test:

> But instead of trying to decide what "level" of scrutiny applies, and how it works, inquiries that do not resolve any concrete dispute, we think it better to ask whether a regulation bans weapons that were common at the time of ratification or those that have "some reasonable relationship to the preservation or efficiency of a well regulated militia," and whether law-abiding citizens retain adequate means of self-defense.

*Friedman*, 784 F.3d at 410 (citations omitted).

This test is flatly contrary to *Heller* and even preexisting Seventh Circuit precedent.[25] *Heller* rejected as "bordering on the frivolous" the position that only firearms in existence at the time of ratification are protected by the Second

_____

[25] *See, e.g., United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc) (applying intermediate scrutiny). This Court parted ways with the Seventh Circuit after that court vacated the *Skoien* panel opinion and decided the case en banc, applying intermediate scrutiny without any analysis of the proper level of means-end test. Despite the Seventh Circuit's decision to vacate its panel opinion, this Court found the panel opinion persuasive and continued to rely upon it. *See, e.g., Chester*, 628 F.3d at 677; *Masciandaro*, 638 F.3d at 470-71; *Carter*, 669 F.3d at 415-16.

Amendment. *Heller*, 554 U.S. at 582. *Heller* also explained that focusing on the militia clause of the Second Amendment is not appropriate because "modern developments have limited the degree of fit between the prefatory clause and the protected right." *Id.* at 628; *see also Kodak*, 342 Fed. App'x at 908-09. Finally, *Heller* rejected the argument that a prohibition on protected firearms is permissible so long as citizens retain adequate means of self-defense. *Heller*, 554 U.S. at 628-29. Thus, the test adopted by the Seventh Circuit has been rejected by the Supreme Court in *Heller* and should not guide this Court's determination of this case.

In *Caetano*, the Supreme Court recently confirmed *Heller* in this regard, dismissing the identical rationale advanced by the Seventh Circuit in *Friedman*, and reiterated its holding in *Heller* that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, including those that were not in existence at the time of founding." *Caetano*, Slip Op. at 1 (internal quotation marks and citation omitted). The Court expressly rejected the rationale advanced by the Supreme Judicial Court of Massachusetts "that stun guns are not protected because they were not in common use at the time of the Second Amendment's enactment," *id.*, explaining "[t]his is inconsistent with *Heller*'s clear statement that the Second Amendment extends . . . to . . . arms . . . that were not in existence at the time of the founding." *Id.* (internal quotation marks and citations omitted). Similarly to the Seventh Circuit in *Friedman*, the Massachusetts court had used a "contemporary

lens and found nothing in the record to suggest that [stun guns] are readily adaptable to use in the military." *Id.* (internal quotations marks and citation omitted). The Supreme Court also rejected that rationale because "*Heller* rejected the proposition that only those weapons useful in warfare are protected." *Id.* (internal quotation marks and citations omitted).

Similarly, the recent decisions in *Cuomo* and *Fyock*, applying intermediate scrutiny after "rather conclusorily determining that the bans in those cases did not impose any significant burden on the Second Amendment right" because other firearms remained available, are "without persuasive reasoning and simply incorrect." *Kolbe*, 813 F.3d at 183.

In *Cuomo* and *Fyock,* the Second and Ninth Circuits also considered challenges to laws similar to those at issue here. The Second Circuit held that the "laws at issue are both broad and burdensome. Unlike statutes that 'merely regulate the manner in which persons may exercise their Second Amendment rights,' these laws impose an outright ban statewide. The 'absolute prohibition' instituted in both states thus creates a 'serious encroachment' on the Second Amendment right." *Cuomo*, 804 F.3d at 259 (citation and emphasis omitted). Although holding that this "substantial burden on Second Amendment rights . . . trigger[s] the application of some form of heightened scrutiny" *id.* at 259-60, the Second Circuit applied intermediate scrutiny because the laws had "not banned an entire class of arms." *Id*.

at 260.[26] Finding "New York and Connecticut ban only a limited subset of semiautomatic firearms, which contain one or more enumerated military style features," *id*., that court concluded that the burden "is real, but it is not 'severe.'" *Id*. Because citizens can arm themselves with other firearms and magazines, the Second Circuit applied intermediate scrutiny. Similarly, the Ninth Circuit ruled in *Fyock* that the magazine ban there did not impose a severe burden and applied intermediate scrutiny as well because "firearm regulations which leave open alternative channels for self-defense are less likely to place a severe burden on the Second Amendment right than those which do not." *Fyock*, 779 F.3d at 999 (quoting *Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953, 961 (9th Cir. 2014)).

The other courts erred by examining the availability of other firearms to mitigate the substantial burden, a focus the Panel correctly concluded is foreclosed by *Heller*. *Kolbe*, 813 F.3d at 182. In addition to being substantively incorrect under *Heller*, these cases are distinguishable because of the critical difference between their factual records and the record in this case. The district court in this case made a factual finding – unchallenged in this Court by the State and accepted by the Panel

---

[26] Specifically, *Cuomo* involved two different firearm and magazine prohibitions in New York and Connecticut that each imposed different criteria for determining what firearms are banned, both of which differ from those imposed by the FSA. *Compare Cuomo*, 804 F.3d at 249-250, *with Kolbe*, 813 F.3d at 168-170.

– that the laws at issue "remove a *class* of weapons that the plaintiffs desire to use for self-defense in the home." *Kolbe*, 42 F. Supp. 3d at 790 (emphasis added and original emphasis omitted). No other court has found that any of the challenged laws prohibit a *class* of firearms. This critical finding makes this case closer than any other to *Heller*. This distinction undermines any persuasive power the opinions of other Circuits might otherwise have.

## II. This Court must adhere to its Second Amendment precedent requiring no less than strict scrutiny of a prohibition burdening the core right.

No other Circuit Court has crafted a complete and consistent scheme for addressing Second Amendment challenges like this Court has.[27] No other Circuit Court has drawn the clear cut distinction between inside the home and outside the home emanating from *Heller*, or repeatedly indicated that the application of strict scrutiny is necessary to safeguard the core right of armed self-defense inside the home.

---

[27] This Court's consistency can be contrasted with the inconsistency in the Seventh Circuit's Second Amendment jurisprudence. *Compare Friedman*, 784 F.3d 406 (applying a test that asks whether a firearm was in existence at the time of the ratification of the Second Amendment) *with Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) (applying the two-step analysis used by this Court) *and Skoien*, 614 F.3d 638 (applying intermediate scrutiny without any analysis of the proper level of means-end test).

**A.    This Court's precedent appropriately protects the core right identified in *Heller*.**

This Court is the only federal appellate court to have developed a robust, clear, and consistent Second Amendment jurisprudence. This Court's precedent provides appropriate protection for the Second Amendment's core right by declaring that strict scrutiny must apply when a prohibition burdens law-abiding citizens in their homes. This Court in *Chester* surveyed the landscape of the budding Second Amendment case law and adopted the two-step framework that several other Circuits had employed. This Court then developed the details of this framework into a coherent and comprehensive set of rules that have guided the courts within this Circuit.[28] In so doing, this Court has drawn important distinctions, explained above:

---

[28] This Court has relied extensively upon the Second Amendment distinctions drawn in *Chester* and *Masciandaro*. *United States v. Larson*, 502 Fed. App'x 336 (4th Cir. 2013) (per curiam) (relying upon *Chester* to hold that 18 U.S.C. § 922(g)(8) was constitutional as applied to defendant Larson under intermediate scrutiny, which this Court applied because Larson was not law-abiding); *United States v. Pruess*, 703 F.3d 242, 247 (4th Cir. 2012) (relying upon *Chester* for its Second Amendment framework but acknowledging that, because Pruess was challenging a presumptively lawful statute, the Court "can conclude without a full *Chester* analysis that Pruess' conduct lies outside the scope of the Second Amendment's protection"); *United States v. Carpio-Leon*, 701 F.3d 974, 982 (4th Cir. 2012) (relying upon both *Chester* and *Masciandaro* to hold that "the Second Amendment right to bear arms does not extend to *illegal* aliens" (emphasis in original)); *United States v. Elkins*, 495 Fed. App'x 330 (4th Cir. 2012) (per curiam) (relying upon *Chester* to hold that 18 U.S.C. § 922(g)(8) was constitutional as applied to defendant Elkins under intermediate scrutiny, which this Court applied because Elkins was not law-abiding); *United States v. Smoot*, 690 F.3d 215, 221 (4th Cir. 2012) (relying upon *Chester* for its Second Amendment framework but acknowledging that, because Smoot was

challenging a presumptively lawful statute, "the *Chester* analysis is more streamlined"); *United States v. Mudlock*, 483 Fed. App'x 823 (4th Cir. 2012) (per curiam) (relying upon *Chester* to hold that 18 U.S.C. § 922(g)(8) was constitutional as applied to defendant Mudlock under intermediate scrutiny, which this Court applied because Mudlock was not law-abiding); *United States v. Tooley*, 468 Fed. App'x 357 (4th Cir. 2012) (relying upon *Chester* to hold that 18 U.S.C. § 922(g)(9) was constitutional, facially and as applied to defendant Tooley, under intermediate scrutiny, which this Court applied because Tooley was not law-abiding); *United States v. Mahin*, 668 F.3d 119 (4th Cir. 2012) (relying upon *Chester* to hold that 18 U.S.C. § 922(g)(8) was constitutional in the face of a facial challenge, under intermediate scrutiny, which this Court applied because Mahin was not law-abiding); *United States v. Moore*, 666 F.3d 313 (4th Cir. 2012) (relying upon *Chester* and *Masciandaro* to hold that 18 U.S.C. § 922(g)(1) was constitutional, facially and as applied to defendant Moore, under intermediate scrutiny, which this Court applied because Moore was not law-abiding); *Moore*, 666 F.3d at 317-18 (holding that when an individual brings a facial challenge to a presumptively lawful statute, as that phrase was used in *Heller*, "the *Chester* analysis is more streamlined"); *United States v. Glisson*, 460 Fed. App'x 259 (4th Cir. 2012) (per curiam) (relying upon *Chester* for its Second Amendment framework but remanding the case to district court for both parties to develop a more fulsome record); *United States v. Chapman*, 666 F.3d 220, 226 (4th Cir. 2012) (relying upon *Chester* to hold that 18 U.S.C. § 922(g)(8) was constitutional as applied to defendant Chapman under intermediate scrutiny, which this Court applied because "Chapman's claim is not within the core right identified in *Heller* – the right of a law-abiding, *responsible* citizen to possess and carry a weapon for self-defense" (emphasis in original)); *United States v. Staten*, 666 F.3d 154 (4th Cir. 2011) (relying upon *Chester* and *Masciandaro* to hold that 18 U.S.C. § 922(g)(9) was constitutional under intermediate scrutiny, which this Court applied because Staten was not law-abiding); *Staten*, 666 F.3d at 159 n.3 ("We held that strict scrutiny did not apply because Chester's criminal history as a domestic violence misdemeanant took him outside the core right of the Second Amendment identified in *Heller*, which is the right of a law-abiding responsible citizen to possess and carry a weapon for self-defense."); *United States v. Guerrero-Lexo*, 446 Fed. App'x 610,611 (4th Cir. 2011) (per curiam) (relying upon *Chester* for its Second Amendment framework but remanding the case to district court for both parties to develop a more fulsome record); *United States v. Chafin*, 423 Fed. App'x 342 (4th Cir. 2011) (per curiam) (relying upon *Chester* for its Second Amendment framework but holding that the Second Amendment does not protect an individual's right to sell firearms); *United States v. Pruess*, 416 Fed. App'x 274, 275 (4th Cir. 2011) (per

(1) between law-abiding and non-law-abiding citizens and (2) with respect to law-abiding citizens, between restrictions that burden Second Amendment rights outside of the home and those that burden the core right in the home. These distinctions respect the critical difference, referenced in *Heller*, between law-abiding citizens and citizens who do not obey the law and also implements *Heller*'s holding that the home is "where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628; *see also Woollard*, 712 F.3d at 878 (rejecting argument "plac[ing] the right to arm oneself in public on equal footing with the right to arm oneself at home, *necessitating* that we apply strict scrutiny." (emphasis added)). Were this Court to jettison its existing precedent, it would blur the distinctions between law-abiding and non-law-abiding citizens set forth in *Heller*, violate *Heller*'s core holding that the home is where the Second Amendment's protections are at their zenith, and cast confusion upon the proper way to evaluate challenges brought under the Second Amendment.

The Supreme Court in *Heller* and *McDonald* exhaustively reviewed, dissected, analyzed, and debated the text as well as the history prior and subsequent to the Second Amendment to declare that the core right of self-defense in the home

---

curiam) (relying upon *Chester* for its Second Amendment framework but remanding the case to district court for both parties to develop a more fulsome record).

of law-abiding citizens could not be burdened by a complete prohibition of a class of popular firearms under any applicable standard of heightened scrutiny. This Court's robust Second Amendment precedent has already anticipated that at least strict scrutiny must apply here because the prohibitions burden that core right.

As the Supreme Court reiterated in *McDonald*, application of its Second Amendment jurisprudence will not "require judges to assess the costs and benefits of firearms restrictions and thus make difficult empirical judgments in an area in which they lack expertise." 130 S.Ct. at 3050. To the contrary, the Supreme Court recognized that "'[t]he very enumeration of the right takes out of the hands of government – even the Third Branch of government – the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.'" *Id.* (quoting *Heller*, 128 S.Ct. at 2821) (emphasis in original).

**B.** **This Court should maintain its precedent requiring the satisfaction of both elements of a conjunctive test.**

This Court should not overrule its existing precedent requiring that both elements of a test be satisfied when that test is conjunctive – i.e. for a firearm to be "dangerous and unusual" within the meaning of *Heller* it must be *both* dangerous *and* unusual.[29] The State has asked this Court to disregard this rule of construction

---

[29] As the Panel emphasized, "even a dangerous weapon may enjoy constitutional protection if it is widely employed for lawful purposes, i.e., not unusual." *Kolbe*, 813 F.3d at 178; *see also Caetano*, Slip Op. at 6 (Alito, J., concurring); *Staples*, 511 U.S.

here, but the State's argument is foreclosed by *Heller*, *Caetano*, and this Court's precedent.

The State's interpretation would twist the conjunctive "dangerous and unusual" into a heretofore-unheard-of "unusually dangerous" standard, eliminating entirely the second element of that two-pronged test. The State's novel standard has no basis in *Heller*, *McDonald*, or any of this Court's Second Amendment decisions. In *Heller*, the Supreme Court was faced with a challenge to a ban on handguns, which are used in the military, J.A. 2259, and are the firearms most frequently used in crime, J.A. 2297, including assaults on law enforcement officers. J.A. 2280. Under the State's reasoning, handguns would fall outside the Second Amendment's protections because they are indisputably more dangerous than the Banned Firearms here, yet the Supreme Court held handguns to be protected by the Second Amendment because they are commonly kept for lawful purposes, whatever the reason. *See Kolbe*, 813 F.3d at 177-78. Were the State's theory here correct, *Heller* would have come out the other way.

---

at 612 (noting that "precisely because guns falling outside those categories [regulated by Congress, *e.g.*, machineguns] traditionally have been widely accepted as lawful possessions, their destructive potential, while perhaps even greater than that of some items we would classify along with . . . hand grenades, cannot be said to put gun owners sufficiently on notice of the likelihood of regulation").

In *Caetano*, the Supreme Court declared that the Massachusetts court had "asked whether stun guns are dangerous per se at common law and unusual, in an attempt to apply one important limitation on the right to keep and carry arms[.]" *Caetano*, Slip Op. at 1. (internal quotation marks and citations omitted). The Supreme Court rejected this approach: "[b]y equating 'unusual' with 'in common use at the time of the Second Amendment's enactment,' the court's second explanation is the same as the first; it is inconsistent with *Heller* for the same reason." *Id.* at 2. Justice Alito explained, "[a]s the per curiam opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous and unusual." *Caetano*, Slip Op. at 6 (Alito, J., concurring) (emphasis in original).

Nor can the State's novel theory be squared with this Court's jurisprudence regarding conjunctive tests, as most recently articulated in *United States v. Robinson*, 814 F.3d 201 (4th Cir. 2016).[30] There, this Court addressed the issue of whether the

---

[30] *Cf. United States v. Medford*, 661 F.3d 746, 754 (4th Cir. 2011) ("Moreover, we used the conjunctive term 'and' when listing the four factors, signifying that those factors were requirements that all must be satisfied. Thus, a defendant seeking to sever his trial from a co-defendant's trial based on the asserted need for a codefendant's testimony must satisfy all four requirements articulated in [*United States v. Parodi*, 703 F.2d 768, 779 (4th Cir. 1983)]"); *United States v. Moore*, 27 F.3d 969, 978 (4th Cir. 1994) (listing the five factors of the "exculpatory no" exception to 18 U.S.C. § 1001 in the conjunctive and stating "[s]ince the factors of this test are listed in the conjunctive, failure to satisfy any one of them renders the narrow 'exculpatory no' exception inapplicable.").

conjunctive "armed and dangerous" standard required that both elements be met before an officer was justified in making a *Terry* stop. *Id.* at 203-04. This Court expressly relied upon the Supreme Court's "conjunctive 'armed and dangerous' formulation," *id.* at 206 n.2, to reject the argument that only one of the conjunctive criteria must be met.

Thus, under *Heller* and *Caetano*, the Second Amendment analysis requires that a firearm be both dangerous *and* unusual for it to lose its prima facie Second Amendment protection. There can be no doubt that the Prohibited Firearms and Magazines are in common use – indeed, every Court that has considered this issue has found or assumed that these arms are in common use. Because they are common, they cannot be unusual. Because they are not unusual, they cannot be *both* dangerous *and* unusual. Thus, they are protected under the Second Amendment. *See Caetano*, Slip Op. at 9 ("While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment.") (Alito, J., concurring).

As this Court and others (including the Supreme Court in *Heller*) have recognized, what distinguishes unprotected firearms from protected firearms is not their relative "dangerousness," but that they are unusual or uncommon. *See Kodak*, 342 Fed. App'x at 908-09 (armor piercing ammunition unprotected because it is not

*in common use*); *see also United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) (holding that machineguns are not protected by the Second Amendment because "[m]achine guns are not *in common use* by law-abiding citizens for lawful purposes and therefore fall within the category of *dangerous and unusual* weapons that the government can prohibit for individual use" (emphases added)). Thus, "in common use for lawful purposes" is the only appropriate standard for determining whether a firearm is protected, and there can be no doubt that the Banned Firearms and Magazines satisfy that standard.

> **C.  Abandoning this Court's precedent would produce anomalous and unjust results that are inconsistent with *Heller*.**

Maintaining the bright-line distinctions that this Court has drawn in Second Amendment cases is critical to providing clear guidance to the district courts, one of which has expressly relied upon the cases cited above to hold that strict scrutiny applies to a law that gave North Carolina the authority to suspend temporarily the right of law-abiding citizens to acquire firearms for use in the home during a declared state of emergency. *Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012). In *Bateman*, the court recognized that this Court's decisions require that "a law that burdens the 'fundamental' or 'core' Second Amendment right – a law abiding citizen's right to self-defense in the home – [be] subject to strict scrutiny." *Id.* at 715 (citing *Masciandaro*, 538 F.3d at 470). On the flip side, however, the court

46

recognized that "a law that burdens only the right to keep and bear arms outside of the home will survive constitutional challenge upon a lesser showing by the government." *Id.* at 715.

In the same way, the district court in *Sundowner Ass'n v. Wood Cnty. Comm'n*, Case No. 2:14-cv-00193, 2014 WL 3962495 (S.D. W. Va. Aug. 13, 2014), applied intermediate scrutiny to a request for injunctive relief to prevent the enforcement of cease-and-desist orders issued by the County Commission of Wood County, West Virginia, to cease operation of a private shooting range. *Id.* at *10. The district court relied upon *Chester* to frame its Second Amendment analysis. *Id.* at *8. After assuming for purposes of its analysis that the Second Amendment was implicated, the court applied intermediate scrutiny to the restriction on law-abiding citizens based on this Court's inside-the-home/outside-the-home distinction in *Masciandaro*. *Id.* at *10.

If this Court were to walk away from its existing Second Amendment jurisprudence, it would uproot the guideposts that district courts throughout the Circuit have relied upon to reach consistent decisions. Moreover, such a decision would further erode the rights of law-abiding citizens to own protected firearms to the point where they would be equated with criminals, domestic violence

misdemeanants, and illegal drug users.[31] The reason this Court held in *Chester* and *Carter* that strict scrutiny was not the appropriate level of scrutiny was that the defendants in those cases were not law-abiding citizens.[32] If this Court were to hold that intermediate scrutiny applied on the facts of this case, it would effectively be equating law-abiding citizens like Plaintiffs to criminals and others whose rights to possess firearms are, for good reason, entitled to less protection. That makes no sense, and Plaintiffs have certainly done nothing to warrant such treatment.

---

[31] This Court consistently has applied intermediate scrutiny to restrictions on possessions of firearms in the home where the individuals were not law-abiding. *See, e.g.*, *Mudlock*, 483 Fed. App'x 823 (relying upon *Chester* to hold that 18 U.S.C. § 922(g)(8) was constitutional as applied to defendant Mudlock under intermediate scrutiny, which this Court applied because Mudlock was not law-abiding); *Chapman*, 666 F.3d 220 (relying upon *Chester* to hold that 18 U.S.C. § 922(g)(8) was constitutional as applied to defendant Chapman under intermediate scrutiny, which this Court applied because "Chapman's claim is not within the core right identified in *Heller* – the right of a law-abiding, *responsible* citizen to possess and carry a weapon for self-defense" (emphasis in original)); *Staten*, 666 F.3d 154 (relying upon *Chester* and *Masciandaro* to hold that 18 U.S.C. § 922(g)(9) was constitutional under intermediate scrutiny, which this Court applied because Staten was not law-abiding); *Id.* at 159 n.3 ("We held that strict scrutiny did not apply because Chester's criminal history as a domestic violence misdemeanant took him outside the core right of the Second Amendment identified in *Heller*, which is the right of a law-abiding responsible citizen to possess and carry a weapon for self-defense.").

[32] Similarly, the reason that this Court held in *Carpio-Leon*, 701 F.3d 974, that the Second Amendment does not apply to illegal aliens is because they do not constitute part of "the people" inasmuch as they "do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection." *Id.* at 981.

Unsurprisingly, this Court has held otherwise at every given opportunity. There is no basis in *Heller* or *McDonald* – or common sense – for the result that would follow from the State's position.

## CONCLUSION

For the reasons stated above and in Plaintiffs' Opening and Reply Briefs, this Court should require at least strict scrutiny here to protect the core right of law-abiding Maryland citizens to defend their homes with popular firearms and standard magazines of their choice.

Respectfully submitted,

/s/ John Parker Sweeney
John Parker Sweeney
T. Sky Woodward
James W. Porter, III
Marc A. Nardone
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, DC 20036
(202) 393-8216
(202) 719-8316
Jsweeney@babc.com
Attorneys for Appellants

# CERTIFICATE OF COMPLIANCE

This Court's supplemental briefing Order did not set a type-volume limitation. Per instructions from the Clerk's office, this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,433 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as counted by the Microsoft Word counting function (including footnotes).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

Dated: April 11, 2016

/s/ John Parker Sweeney
John Parker Sweeney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of April, 2016, Appellants'
Supplemental En Banc Brief was served, via the Court's appellate CM/ECF system,
which will forward copies to Counsel of Record.

*/s/ John Parker Sweeney*
John Parker Sweeney
