No. 14–1945

# In the United States Court of Appeals for the Fourth Circuit

STEPHEN V. KOLBE, *et al.*,
*Plaintiffs-Appellants,*

v.

LAWRENCE J. HOGAN, JR., GOVERNOR, *et al.*,
*Defendants-Appellees.*

On En Banc Review of an Appeal from the
United States District Court for the District of Maryland

**SUPPLEMENTAL BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY IN SUPPORT OF APPELLEES AND AFFIRMANCE**

J. Adam Skaggs
Mark Anthony Frasetto
EVERYTOWN FOR GUN SAFETY
P.O. Box 4184
New York, NY 10163

Deepak Gupta
Jonathan E. Taylor
Neil K. Sawhney
GUPTA WESSLER PLLC
1735 20th Street
Washington, DC 20009
(202) 888-1742
*deepak@guptawessler.com*

*Counsel for Amicus Curiae
Everytown for Gun Safety*

April 18, 2016

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**
**DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS**

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _14-1945_     Caption: _Koble, et al. v. Hogan, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Everytown for Gun Safety_
(name of party/amicus)

who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                    ☐YES ☑NO
         If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              ☐YES ☑NO
         If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Deepak Gupta                    Date: April 18, 2016

Counsel for: Everytown for Gun Safety

## CERTIFICATE OF SERVICE
**************************

I certify that on _____April 18, 2016_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/ Deepak Gupta                               April 18, 2016
(signature)                                    (date)

# TABLE OF CONTENTS

Table of authorities ................................................................................................ ii

Introduction and interest of *amicus curiae* .................................................... 1

Argument ............................................................................................................... 3

    I.    The Second Amendment does not guarantee access to assault
weapons and large-capacity magazines. ..................................................... 3

        A.    The panel's "common use" test is illogical and
unprecedented. ............................................................................. 3

        B.    The plaintiffs have not shown that the regulated weapons
are commonly used or are reasonably necessary for self-
defense, and that adequate alternatives are unavailable. ............. 9

    II.    History confirms that the Second Amendment does not guarantee
access to assault weapons and large-capacity magazines. ...................... 16

Conclusion ........................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*American Legion Post 7 v. City of Durham,*
    239 F.3d 601 (4th Cir. 2001) ............................................................................ 11

*Caetano v. Massachusetts,*
    — S. Ct. —, 2016 WL 1078932 (Mar. 21, 2016) ................................................ 5

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) .................................................................................. *passim*

*Friedman v. City of Highland Park,*
    784 F.3d 406 (7th Cir. 2015) ...................................................................... *passim*

*Fyock v. Sunnyvale,*
    779 F.3d 991 (9th Cir. 2015) .......................................................................... 16

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ............................................................... 1, 9, 13

*Heller v. District of Columbia,*
    801 F.3d 264 (D.C. Cir. 2015) ........................................................................ 15

*Jackson v. City & County of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) ............................................................................ 7

*Kovacs v. Cooper,*
    336 U.S. 77 (1949) .......................................................................................... 15

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ...................................................................................... 7, 8

*N.Y. State Rifle & Pistol Association, Inc. v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) ............................................................... 1, 3, 15, 16

*Reynolds v. Middleton,*
    779 F.3d 222 (4th Cir. 2015) .......................................................................... 11

*United States v. Chester,*
    628 F.3d 673 (4th Cir. 2010) ..................................................................... 11, 16

*United States v. Decastro,*
 682 F.3d 160 (2d Cir. 2012) ........................................................ 12, 15

*United States v. Marzzarella,*
 614 F.3d 85 (3d Cir. 2010) .......................................................... 16

*United States v. Skoien,*
 614 F.3d 638 (7th Cir. 2010) (en banc) ...................................... 16, 17

**Statutes**

1837 Ala. Acts 7, § 1 ................................................................... 20

1838 Tenn. Pub. Acts 200, ch. 137 ............................................. 20

1879 Tenn. Pub. Acts 135, ch. 96 § 1 ......................................... 20

1881 Ark. Acts 191 ...................................................................... 20

1883 Tenn. Pub. Acts 17 .............................................................. 20

1893 Fla. Laws 71, chap. 4147 .................................................... 18

1903 S.C. Sess. Laws 127, § 1 ..................................................... 20

1907 Ala. Laws 80, § 1 ................................................................ 20

1909 Me. Laws 141 ...................................................................... 20

1912 Vt. Acts and Resolves 310, § 1 ........................................... 20

1913 Minn. Laws 55 .................................................................... 20

1927 Mich. Pub. Acts 888, § 3 .................................................... 17

1927 R.I. Pub. Laws 256, §§ 1, 4 ................................................. 17

1931 Ill. Laws 452, § 1 ................................................................ 19

District of Columbia Dangerous Weapons Act,
 47 Stat. 650 (1932), ch. 465, §§ 1, 14 ...................................... 18

1932 La. Acts 336, § 1 ................................................................. 19

1933 Cal. Acts 1169 ..................................................................... 18

1933 Minn. Laws 231 ........................................................................... 18

1933 Ohio Laws 189 ............................................................................. 18

1933 S.D. Sess. Laws 245, § 1 ............................................................. 19

1933 Tex. Gen. Laws 219, § 1 ............................................................. 19

1934 S.C. Acts 1288, § 1 ...................................................................... 19

1934 Va. Acts 137, §§ 1(a), 4(d) .......................................................... 18

**Legislative Materials**

H.R. Rep. 103-489 (1994) ...................................................................... 4

S. Rep. No. 575 (1932) ........................................................................ 19

**Books and articles**

Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J. on Legis. 279 (2016) .................................... *passim*

Cody J. Jacobs, *End the Popularity Contest*, 84 Tenn. L. Rev. 231 (2015) ............ 4, 6, 8

*Report of Firearms Committee*, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting (1928) ....................................................................................... 19

**INTRODUCTION AND INTEREST OF *AMICUS CURIAE***

Everytown for Gun Safety is the nation's largest gun-violence-prevention organization, with over three million supporters—including the mayors of cities across the country and a network of more than 1,000 survivors of gun violence who are leaders in campaigns to support common-sense gun laws in their communities. Everytown has drawn on its expertise to file briefs in several Second Amendment cases, offering historical and doctrinal analysis that might otherwise be overlooked. *See, e.g.*, *Peruta v. San Diego*, No. 10-56971 (9th Cir.) (en banc); *Wrenn v. District of Columbia*, No. 15-7057 (D.C. Cir.). It seeks to do the same here.[1]

This case involves a challenge to a Maryland law regulating large-capacity magazines and semiautomatic long guns with certain military-style features (guns that the law refers to as assault weapons). Three other circuits have heard challenges to similar laws, and all three upheld the laws as constitutional under the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008). *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) (*NYSRPA*); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015); *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*). A panel of this Court, however, disagreed. By a bare majority, it produced an extreme, unprecedented opinion

---

[1] An addendum of historical gun laws accompanies this brief. All parties consent to the filing of this brief, and no counsel for any party authored it in whole or part. Apart from *amicus curiae*, no person contributed money intended to fund the brief's preparation and submission.

that, if adopted by the full Court, would gravely imperil legislators' ability to enact laws they deem necessary to protect their constituents.

Everytown files this brief to highlight three errors in the panel's analysis, and to explain why Maryland's law comports with the Second Amendment. *First*, the panel erected a dangerous and illogical rule under which firearms become effectively immune from regulation as soon as they are deemed in "common use" based on nationwide sales and manufacturing figures. The panel's market-share "common use" test divorces the Second Amendment from the self-defense right it protects, and cannot be reconciled with either the Supreme Court's decision in *Heller* or the circuit decisions addressing the issue. Indeed, the Seventh Circuit expressly rejected this theory of "common use" as circular, and the D.C. Circuit implicitly rejected it in favor of a test more closely linked to the core Second Amendment right recognized in *Heller*: "the right of self-defense." 554 U.S. at 632.

*Second*, the panel failed to hold the plaintiffs to their burden of showing that the law substantially restricts their ability to defend themselves with firearms. The plaintiffs already own semiautomatic firearms, and Maryland's law allows them to keep those weapons for self-defense. The plaintiffs have not put forth any evidence showing that these weapons (and the hundreds of firearm models that Maryland permits) are inadequate for self-defense. Nor have they shown that the regulated firearms are reasonably necessary for self-defense.

*Third*, the panel overlooked a century's worth of semiautomatic-weapon regulations, some of them even more restrictive than Maryland's law. These regulations—which even the National Rifle Association endorsed at the time—confirm that the law is consistent with the historical understanding of the Second Amendment, and is thus constitutional under *Heller*.

## ARGUMENT

## I. The Second Amendment does not guarantee access to assault weapons and large-capacity magazines.

### A. The panel's "common use" test is illogical and unprecedented.

The Supreme Court held in *Heller* that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," but does not guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626, 635. It does not protect, for example, civilian access to the highly dangerous "weapons that are most useful in military service—M−16 rifles and the like"—which, the Court made clear, "may be banned." *Id.* at 627; *see NYSRPA*, 804 F.3d at 256 ("*Heller* expressly highlighted" that "the fully automatic M−16 rifle" could be prohibited "without implicating the Second Amendment."); *Friedman*, 784 F.3d at 408. At stake in this case is whether the result should be different for weapons that, in the judgment of Maryland's legislature, have the capacity to be nearly as

dangerous as the M–16, and that a prior Congress determined are "virtually indistinguishable in practical effect" from those that *Heller* found unprotected. H.R. Rep. 103-489 at 18 (1994).

The panel offered only one reason why the result should differ: because semiautomatic weapons with military features are "commonly possessed by law-abiding citizens for self-defense and other lawful purposes," whereas the M–16 is not commonly used because the federal government effectively prohibited its civilian use in 1986. Panel Op. 38. But the assault weapons that Maryland law regulates "constitute no more than 3% of the civilian gun stock, and ownership of such weapons is concentrated in less than 1% of the U.S. population." *Id.* at 70 (King, J., dissenting). That is a far cry from the absolute prohibition on handguns at issue in *Heller*.

It is anything but clear that these figures are enough to constitute "common use." "[W]hat line separates 'common' from 'uncommon' ownership is something [*Heller*] did not say." *Friedman*, 784 F.3d at 409 (finding "uncertainty" as to whether assault weapons are "commonly owned" based on sales totals); *see generally* Cody J. Jacobs, *End the Popularity Contest*, 84 Tenn. L. Rev. 231 (2015), *at* http://bit.ly/1gVsyGZ. Like *Heller*, the panel majority's opinion is silent on what numerical threshold must be reached before a firearm achieves "common use" sufficient to be constitutionally immune from regulation. If a million people own a

particular weapon, is that enough? How about a few hundred thousand? *See, e.g.*, *Caetano v. Massachusetts*, — S. Ct. —, 2016 WL 1078932, at *6 (Mar. 21, 2016) (Alito, J., concurring) (expressing his view that a weapon owned by 200,000 people—or .06% of the American population—is in common use). Is it a regional test or a national test? Does it look to ownership numbers or manufacturing numbers? If a survey revealed that half a million people own firearms without serial numbers, would the federal serialization requirement suddenly become unconstitutional because unmarked firearms are in common use? If not, why not? Neither the plaintiffs nor the panel have answered any of these questions.

More fundamentally, "relying on how common a weapon is at the time of litigation [is] circular." Panel Op. 72 (King, J., dissenting) (quoting *Friedman*, 784 F.3d at 409). As Judge Easterbrook pointed out in upholding a similar law, "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity." *Id.; see also* Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J. on Legis. 279, 288–89 (2016) (discussing the "central circularity" that plagues common use: "what is common depends largely on what is, and has been, subject to regulation").

Consider just some of the absurd results that the panel's market-share "common use" test would produce. By focusing on total sales and manufacturing figures, the test would give the firearms industry "the ability to unilaterally make new [highly dangerous] firearms protected simply by manufacturing and heavily marketing them" before the government has had the chance to assess their danger and determine whether to regulate them. Jacobs, *End the Popularity Contest*, at 33. On this theory, once gun manufacturers ensure that a particular gun has achieved whatever market penetration is enough to make it "common," that type of gun would then become constitutionally immune from regulation. *Id.* If that were the law, it would "put[] a great deal of power"—*constitutional* power—"into the hands of gun manufacturers." *Id.* at 36.

By doing so, it would create perverse incentives for manufacturers to overproduce the very types of firearms that most warrant regulatory attention, and to flood the market with firearms possessing new—and potentially dangerous—technology before regulators could assess their safety. That would undoubtedly "hinder efforts to require consumer safety features on guns." *Id.* Given the emergence of new firearm technology (like 3-D-printed gun components undetectable using traditional methods), and given the inevitability of future technological developments, the panel's common-use theory, if endorsed by this Court, would pose serious threats to public safety. *Id.*

And that is to say nothing of the federalism consequences of adopting a test that looks to nationwide manufacturing and sales totals. Under that test, whenever a new, potentially dangerous firearm feature became available, states would either have to prohibit it immediately, and in unison, or else forfeit their ability to do so going forward. If some states chose to gather more information before regulating, or if their citizens simply had a different position on gun policy, those legislative policy judgments would have constitutional effect far beyond those states' borders.

Legislators' decisions in some parts of the country, however, should not make laws in other parts any "more or less open to challenge under the Second Amendment." *Friedman*, 784 F.3d at 408. If they did, that "would imply that no jurisdiction other than the United States as a whole can regulate firearms. But that's not what *Heller* concluded." *Id.* at 412. Because our Constitution "establishes a federal republic where local differences are cherished as elements of liberty," federalism is "no less part of the Constitution than is the Second Amendment." *Id.* The Supreme Court's decision in *Heller* (as applied to the states in *McDonald v. City of Chicago*, 561 U.S. 742 (2010)) "does not foreclose all possibility of experimentation" by state and local governments, *Friedman*, 784 F.3d at 412, but rather permits them to do what they have long done in the realm of firearm legislation: "experiment with solutions to admittedly serious problems," *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 970 (9th Cir. 2014); *see also McDonald*,

561 U.S. at 784 (noting that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment"). The panel's test would eviscerate their ability to do so.

At the same time, the panel's test also has the potential to underprotect the Second Amendment right by "creat[ing] an incentive for governments that are interested in restricting access to firearms"—like a future Congress, perhaps—"to ban new weapons completely before they can become popular," even if those weapons would be "very effective for self-defense." Jacobs, *End the Popularity Contest*, at 34. But, as scholars have remarked, "[i]f heavy regulation can prevent a weapon from becoming a constitutionally protected 'Arm,' then the Second Amendment right seems hollow indeed." Blocher & Miller, *Lethality*, at 288.

The rights enumerated in our Constitution protect individual liberty by restraining the power of popularly elected legislators. Yet the panel's constitutional theory would give policymakers (as well as private industry) unprecedented power to define the scope of the Second Amendment right—either by broadening it or by narrowing it. That cannot be the law.

To see why, suppose that in 2004 Congress had renewed the federal prohibition on large-capacity magazines and assault weapons, rather than let it lapse. Had Congress made that policy decision, those weapons would not be in common use today, and thus would not be protected on the panel's market-share

theory. The answer should not be any different because Congress instead decided to let the law lapse. A single twenty-first-century legislative decision should not dictate whether a different legislative judgment made a decade later comports with the Second Amendment. Yet that is the upshot of the panel's common-use theory.

**B.   The plaintiffs have not shown that the regulated weapons are commonly used or are reasonably necessary for self-defense, and that adequate alternatives are unavailable.**

To the extent that "common use" should play any role in the constitutional analysis outside the context of a total prohibition on a class of arms (like the handgun prohibition at issue in *Heller*), it should be tied to "the purpose of the right to keep and bear arms." Blocher & Miller, *Lethality*, at 291. The test should focus, in other words, on whether the regulated firearms are commonly used or are reasonably necessary *for self-defense*, which *Heller* holds is the core of the right. *See* 554 U.S. at 635. The D.C. Circuit, in upholding a similar law, has adopted that approach and implicitly rejected the panel's market-share common-use test. *See Heller II*, 670 F.3d at 1261. This Court should follow the D.C. Circuit's lead and should instead ask whether assault weapons "are commonly used or are useful specifically for self-defense." *Id*.

This formulation of "common use" is more consistent with *Heller* than the panel's broad theory of common use, which considers any purpose that is not unlawful. The Supreme Court in *Heller* struck down Washington, D.C.'s handgun

law because it "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society *for th[e] lawful purpose*" of "*self-defense.*" 554 U.S. at 628 (emphasis added). And the Court gave "many reasons" for why "the American people have considered the handgun to be the quintessential self-defense weapon," including portability and flexibility, and hence why access to long guns (which D.C.'s law permitted) was not an adequate alternative. *Id.* at 629; *see Friedman*, 784 F.3d at 411 ("*Heller* held that the availability of long guns does not save a ban on handgun ownership," while listing "some of the reasons, including ease of accessibility and use, that citizens might prefer handguns to long guns for self-defense.").

The panel, by contrast, did nothing of the sort. Although it asserted that large-capacity magazines and assault weapons are "commonly possessed by law-abiding citizens for self-defense," it did not cite any evidence to support that assertion beyond total manufacturing and sales figures. Panel Op. 38; *see id.* at 21–22. Nor did it explain why military-style features (like grenade launchers) are reasonably necessary for self-defense.

Had the panel applied the proper test—asking whether large-capacity magazines and assault weapons are commonly used for or are reasonably necessary for self-defense—it would have upheld Maryland's law. The plaintiffs in this case have put forth no evidence establishing that these weapons are commonly used for

self-defense. Nor is there any evidence that the law substantially restricts the plaintiffs' ability to defend themselves, or that the weapons are reasonably necessary for self-defense. To the contrary, the law leaves in place ample alternatives for self-defense, and is thus constitutional.

**1. *There is no evidence that the regulated weapons are commonly used for self-defense.*** For starters, "[t]here is no known incident of anyone in Maryland using an assault weapon for self-defense." Panel Op. 71 (King, J., dissenting). And the plaintiffs have not produced any evidence showing that these weapons are commonly used for self-defense in other states. If there is no evidence that a weapon has ever been used for self-defense, then there can be no evidence that it is commonly used for that purpose.

**2. *The plaintiffs have not proved that the law substantially restricts their self-defense right.*** Nor have the plaintiffs shown that the law burdens their particular "right of self-defense." *Heller*, 554 U.S. at 632. As in the First Amendment context, which this Court has looked to in crafting its Second Amendment jurisprudence, *see United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010), the plaintiffs should bear "the initial burden of proving" that the law "restrict[s]" protected conduct, *Reynolds v. Middleton*, 779 F.3d 222, 226 (4th Cir. 2015); *see also Am. Legion Post 7 v. City of Durham*, 239 F.3d 601, 606 (4th Cir. 2001). The plaintiffs must therefore establish that Maryland's law "operate[s] as a

substantial burden" on their ability to defend themselves, *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012), by "substantially restrict[ing] their options for armed self-defense," *Friedman*, 784 F.3d at 411.

They have not done so. Andrew Turner, one of two individual plaintiffs, claims that his self-defense right has been infringed because he "intend[s] on assembling AR-15 style long guns for [his] own personal use," and Maryland's law prevents him from doing so. JA 1855. But he already owns three assault weapons and a "full-size semiautomatic handgun," JA 1855, and the law does not in any way restrict his ownership, possession, or use of these weapons for self-defense purposes. He has not provided any evidence showing how the law imposes any substantive burden on his self-defense right, or why a fourth assault weapon is reasonably necessary for his self-defense.

The other individual plaintiff, Stephen Kolbe, also "own[s] one full-size semiautomatic handgun." JA 1851. He says he wants to purchase an assault weapon to add to his handgun because it "possess[es] features which make [it] ideal for self-defense in the home." *Id.* But he does not explain what those features are or whether they are available on other firearms that Maryland permits. Nor does he claim (much less show) that the semiautomatic model he currently owns—in addition to the hundreds of guns that he may lawfully purchase in Maryland—is inadequate for self-protection.

True, the plaintiffs have submitted evidence supporting the notion that long guns *as a category* have certain advantages over handguns that may be useful for self-defense purposes. *See, e.g.*, JA 2131 ("handguns are inherently less accurate than long guns"); JA 2179–80 (comparing long guns to handguns); *but see Heller*, 554 U.S. at 628–29 (explaining that "the American people have considered the handgun"— not the long gun—"to be the quintessential self-defense weapon"). But Maryland's law does not prohibit all long guns, all rifles, or even all semiautomatic rifles. Rather, it prohibits only those semiautomatic rifles with certain military-style features (like grenade launchers, flare launchers, and flash suppressors) that Maryland's legislature has concluded are especially dangerous.

**3. The plaintiffs have not shown that the regulated weapons are reasonably necessary for self-defense.** When it comes to showing that assault weapons are reasonably necessary for self-defense—that is, "useful specifically for self-defense," *Heller II*, 670 F.3d at 1261—the plaintiffs offer nothing but conjecture. There is evidence in the record, for example, speculating that these weapons are more effective for self-defense because they are "more intimidating" than other firearms, and because criminals might have them, and people should be able to fight fire with fire. JA 2130; *id.* ("If a citizen is confronted by a criminal armed with an 'assault weapon' and a large capacity magazine it is unreasonable to require that citizen to defend herself with anything less than an 'assault weapon'

and a large capacity magazine."). But that logic has no stopping point. *See* Blocher & Miller, *Lethality*, at 289 (describing the "arms race" and "one-way ratchet" problem that would ensue on this constitutional theory: "Because the bad guys carry pistols, civilians need pistols; because the bad guys carry AR-15s (to counter the pistols), civilians need AR-15s; and so on"). And even if one might be able to conjure up scenarios in which military-style features might be useful for self-defense, speculation alone cannot render the judgment of Maryland's legislature unconstitutional. The plaintiffs have not presented any evidence that assault weapons are reasonably (or even plausibly) necessary for self-defense, and thus cannot succeed in their challenge.

Nor have the plaintiffs shown that large-capacity magazines are reasonably necessary for self-defense. Although they have put forth evidence hypothesizing that 12 rounds (rather than 10) might be required to stop an intruder, *see* JA 2179, they have not shown that someone has ever actually needed to use that many rounds for self-defense. Again, unsupported speculation is not sufficient to override the judgment of the people's elected representatives. And this logic too is limitless, for one could just as easily speculate that a 20-round magazine, or a 100-round drum, could (in some imaginable scenario) be needed for self-defense.

**4. The law leaves ample alternatives for armed self-defense.** The plaintiffs have not only failed to establish that the law makes it "considerably more

difficult" for them "to acquire and keep a firearm . . . for the purpose of self-defense in the home," *Heller v. District of Columbia*, 801 F.3d 264, 274 (D.C. Cir. 2015) (*Heller III*); they have also come up short on showing that the law leaves them without "adequate alternatives . . . to acquire a firearm for self-defense," *Decastro*, 682 F.3d at 168; *see Friedman*, 784 F.3d at 410–11 (finding that a similar prohibition leaves citizens "ample means to exercise the 'inherent right of self-defense' that the Second Amendment protects"); *NYSRPA*, 804 F.3d at 259 (holding that there is no "substantial burden" on the Second Amendment right "if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense").

Just as, in the First Amendment context, the Supreme Court "famously upheld a prohibition on mobile loudspeakers in public streets, because their voice caused a nuisance to others, and because various other avenues—'voice,' 'pamphlets,' 'newspapers'—were adequate to communicate the message," this Court should uphold Maryland's law because ample other avenues for armed self-defense remain available. Blocher & Miller, *Lethality*, at 291 (discussing *Kovacs v. Cooper*, 336 U.S. 77, 88 (1949)). The underlying value that the First Amendment protects is "conveying ideas," not "autonomous choice." *Id.* And the underlying value that the Second Amendment protects, according to *Heller*, is self-defense for purposes of personal safety. Adequate alternatives remain available in Maryland for that purpose, and the plaintiffs have not shown otherwise.

**II. History confirms that the Second Amendment does not guarantee access to assault weapons and large-capacity magazines.**

A historical assessment confirms that Maryland's law is constitutional. A law does not violate the Second Amendment if it does not infringe "conduct that was within the scope of the Second Amendment as historically understood." *Chester*, 628 F.3d at 680. Put differently, "longstanding prohibitions" fall outside the scope of the right; they are treated as tradition-based "exceptions" by virtue of their "historical justifications." *Heller*, 554 U.S. at 627, 635; *see Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) ("[L]ongstanding prohibitions . . . fall outside of the Second Amendment's scope."); *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) ("[L]ongstanding limitations are exceptions to the right to bear arms."); *NYSRPA*, 804 F.3d at 258 n.76 (concluding same).

To qualify as longstanding under *Heller*, a regulation need not "mirror limits that were on the books in 1791" (or for that matter, 1868). *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc); *see also United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011) ("[T]he legislative role did not end in 1791."). To the contrary, even "early twentieth century regulations" may qualify as longstanding. *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015). For example, "*Heller* deemed a ban on private possession of machine guns to be obviously valid" even though "states didn't begin to regulate private use of machine guns until 1927," and Congress didn't begin "regulating machine guns at the federal level" until 1934. *Friedman*,

784 F.3d at 408. *Heller* also considered "prohibitions on the possession of firearms by felons and the mentally ill" to be sufficiently longstanding, 554 U.S. at 626–27 & n.26, even though they too "are of 20th Century vintage," *Skoien*, 614 F.3d at 640–41 (explaining that [t]he first federal statute disqualifying felons from possessing firearms was not enacted until 1938," while "the ban on possession by all felons was not enacted until 1961"). Because states have regulated semiautomatic weapons for nearly a century, Maryland's law is consistent with our "historical tradition," and constitutional under *Heller*. 554 U.S. at 627.

States have restricted access to semiautomatic firearms since they first became common at the turn of the twentieth century, often regulating them—along with fully automatic weapons—as "machine guns." Some of these restrictions were in essence total prohibitions, and hence significantly broader than Maryland's law, which "reaches only a particular subset of semiautomatic long guns with military features." En Banc Pet. 11. A 1927 Rhode Island law, for instance, prohibited the "manufacture, s[ale], purchase or possess[ion]" of a "machine gun," defined as "any weapon which shoots more than twelve shots semi-automatically without reloading." 1927 R.I. Pub. Laws 256, §§ 1, 4; *see also* 1927 Mich. Pub. Acts 888, § 3 (prohibiting "any machine gun or firearm which can be fired more than sixteen times without reloading"). Likewise, in 1933, California made it a felony to possess "any firearms of the kind commonly known as a machine gun," defined as

any firearm "which [is] automatically fed after each discharge." 1933 Cal. Acts 1169. That same year, Minnesota did the same. 1933 Minn. Laws 231.

Other states subjected semiautomatic weapons to much stricter regulation than other firearms, often with requirements that were so onerous as to be tantamount to a prohibition. Ohio, for example, made it a felony to "possess" any "semi-automatic[]" firearm without a permit, which required the applicant to deposit a $5,000 bond. 1933 Ohio Laws 189; *see also* 1893 Fla. Laws 71, chap. 4147 (making it a crime "to carry or own a Winchester or other repeating rifle" that could fire multiple rounds without reloading, absent a license and a $100 bond). And Virginia, in 1934, made it illegal for residents to "[p]ossess[] or use" any gun "from which more than sixteen shots or bullets may be . . . semiautomatically or otherwise discharged without reloading" if ammunition was "in the immediate vicinity thereof." 1934 Va. Acts 137, §§ 1(a), 4(d).

Around the same time, Congress enacted a law "[t]o control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia," making it a crime to "possess any machine gun," defined as "any firearm which shoots . . . semiautomatically more than twelve shots without loading." 47 Stat. 650 (1932), ch. 465, §§ 1, 14. Notably, the National Rifle Association "urged" enactment of this law, writing to the bill's sponsor:

> It is our earnest hope that your committee will speedily report the bill favorably to the Senate as it is our desire this legislation be enacted for

the District of Columbia, in which case it can then be used as a guide throughout the States of the Union, some seven or eight of which have already enacted similar legislation.

S. Rep. No. 575, at 4–6 (1932). The NRA's endorsement was emblematic of a wider consensus on prohibiting certain semiautomatic weapons. Both the 1927 National Crime Commission Firearm Act and the 1928 Uniform Firearms Act, for example, criminalized possession of "any firearm which shoots more than twelve shots semi-automatically without reloading." *Report of Firearms Committee*, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928).

Throughout this period, legislatures also specifically regulated magazine size (in the context of laws regulating machine guns), adopting requirements that were stricter than Maryland's 10-round limit. To take just a few examples: South Dakota and Texas had a five-round limit, while Illinois, Louisiana, and South Carolina had an eight-round limit. 1933 S.D. Sess. Laws 245, § 1; 1933 Tex. Gen. Laws 219, § 1; 1931 Ill. Laws 452, § 1; 1932 La. Acts 336, § 1; 1934 S.C. Acts 1288, § 1.

More broadly, legislatures have long prohibited weapons with features that they believed posed heightened risks to public safety, either because those features were more lethal or because they were more suitable for use in crime. This tradition has included not only prohibitions on fully automatic machine guns, but also prohibitions on particularly dangerous knives like bowie knives or

switchblades, as well as silencers and certain highly concealable pistols—while leaving adequate alternatives for self-defense available. *See, e.g.*, 1837 Ala. Acts 7, § 1 (bowie knives); 1838 Tenn. Pub. Acts 200, ch. 137 (same); 1881 Ark. Acts 191 (pocket pistols and "any kind of cartridge for any pistol"); 1879 Tenn. Pub. Acts 135, ch. 96 § 1 ("belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol"); 1907 Ala. Laws 80, § 1 (similar); 1903 S.C. Sess. Laws 127, § 1 (similar); 1883 Tenn. Pub. Acts 17 ("any pistol cartridges"); 1909 Me. Laws 141 (silencers); 1912 Vt. Acts and Resolves 310, § 1 (same); 1913 Minn. Laws 55 (same).

This history demonstrates that Maryland's regulation of assault weapons and large-capacity magazines is "longstanding" under *Heller*. 554 U.S. at 605. And, like the early twentieth century regulations that *Heller* deemed longstanding—for instance, "prohibitions on possession of firearms by felons and the mentally ill"— Maryland's more limited regulation is "presumptively lawful." *Id.* at 626–27 n.26. It thus does not burden a "right secured by the Second Amendment." *Id.* at 626.

## CONCLUSION

The Court should affirm the district court's judgment.

Respectfully submitted,

*/s/ Deepak Gupta*
Deepak Gupta
Jonathan E. Taylor
Neil K. Sawhney

Gupta Wessler PLLC
1735 20th Street
Washington, DC 20009
(202) 888-1742
*deepak@guptawessler.com*

J. Adam Skaggs
Mark Anthony Frasetto
Everytown for Gun Safety
P.O. Box 4184
New York, NY 10163

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

April 18, 2016

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(d) and 32(a)(7) because it contains 4,821 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface (14-point Baskerville) using Microsoft Word 2010.

/s/ Deepak Gupta
Deepak Gupta
*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

April 18, 2016

# CERTIFICATE OF SERVICE

I certify that on April 18, 2016, the foregoing brief was served on all parties or their counsel of record through the CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta