No. 14-1945

# In The
# United States Court of Appeals
# for the Fourth Circuit

STEPHEN V. KOLBE, et al.,

*Plaintiffs-Appellants,*

v.

LAWRENCE J. HOGAN, JR., et al.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

## SUPPLEMENTAL AMICUS CURIAE BRIEF FOR NATIONAL RIFLE ASSOCIATION OF AMERICA, INC. IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL

Charles J. Cooper
David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
202-220-9600

*Counsel for Amicus Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _14-1945_    Caption: _Kolbe, et al. v. Hogan, et al._____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_National Rifle Association of America, Inc._____
(name of party/amicus)

_____

 who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                              ☐YES ☑NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐YES ☑NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☐ NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Charles J. Cooper    Date:    April 18, 2016

Counsel for: National Rifle Association of America

# CERTIFICATE OF SERVICE
**************************

I certify that on    April 18, 2016    the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

s/ Charles J. Cooper    April 18, 2016
(signature)    (date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... ii

INTEREST OF AMICUS CURIAE ...................................................................... 1

INRODUCTION ................................................................................................. 1

ARGUMENT ...................................................................................................... 3

I.     By Banning Firearms Commonly Used for Lawful Purposes,
Maryland's Law Strikes at the Very Core of the Second Amendment. .......... 5

      A.  The Firearms and Magazines Maryland Has Banned Are "In
Common Use." ............................................................................ 5

      B.  The "Common Use" Inquiry Established by *Heller* Is Not
Circular. ..................................................................................... 9

      C.  The Firearms and Magazines Maryland Has Banned Are Not
Unusually Dangerous ................................................................ 18

II.    Because It Bans Core Second Amendment Conduct, Maryland's Law
Is Categorically Unconstitutional. .............................................................. 23

CONCLUSION ................................................................................................. 29

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page**

*Blyth v. Birmingham Waterworks Co.*, 156 Eng. Rep. 1047 (Ex. 1856)................14

*Caetano v. Massachusetts*, 2016 WL 1078932 (U.S. Mar. 21, 2016).....6, 11, 16, 28

*Coker v. Georgia*, 433 U.S. 584 (1977).................................................................17

*Commonwealth v. Caetano*, 26 N.E.3d 688 (Mass. 2015). ....................................10

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................................*passim*

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015)..................12, 15

*Gideon v. Wainwright*, 372 U.S. 335 (1963) ..........................................................17

*Griswold v. Connecticut*, 381 U.S. 479 (1965).......................................................17

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)....................7, 8, 19

*Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966) ...........................17

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) ..............................................15

*Katz v. United States*, 389 U.S. 347 (1967) ...........................................................14

*Kennedy v. Louisiana*, 554 U.S. 407 (2008)...........................................................17

*Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016) ..................................................*passim*

*Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014) ......................................2, 24

*Lawrence v. Texas*, 539 U.S. 558 (2003)................................................................17

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) ........................15

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). .............................................13

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ......................................3, 4, 27

*Moore v. City of East Cleveland*, 431 U.S. 494 (1977).........................................17

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001)...........................................15, 16

*Poe v. Ullman*, 367 U.S. 497 (1961).......................................................................17

*Romer v. Evans*, 517 U.S. 620 (1996) ....................................................................17

*Staples v. United States*, 511 U.S. 600 (1994)..................................................7, 18

*United States v. Jones*, 132 S. Ct. 945 (2012) .......................................................15

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013)...........................................25

**Statutory Materials**

CONN. GEN. STAT. § 53-202a(1)(E) ...................................................21

D.C. CODE § 7-2501.01(3A)(A)(i)(IV) .............................................21

MD. CODE ANN., CRIM. LAW

    § 4-301 ..............................................................................................2

    § 4-303 ..............................................................................................2

    § 4-305 ..............................................................................................2

N.Y. PENAL LAW § 265.00(22) .........................................................21

1931 Cal. Stat. 2204, ch.1050 .............................................................7

**Other**

Frank H. Easterbrook, *Abstraction and Authority*, 59 U. CHI. L. REV. 349
    (1992)...........................................................................................17

NICHOLAS J. JOHNSON ET AL., FIREARMS LAW & THE SECOND AMENDMENT
    (2012).........................................................................................20

Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and
    the Abortion Analogue*, 60 HASTINGS L.J. 1285 (2009). ....................4

Michael J. Klarman, *Rethinking the Civil Rights and Civil Liberties
    Revolutions*, 82 VA. L. REV. 1 (1996)...............................................17

GARY KLECK, TARGETING GUNS (1997) .......................................6, 22, 26

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*,
    20 J. CONTEMP. L. 381 (1994)..........................................................22

Richard A. Posner, *The Uncertain Protection of Privacy by the Supreme
    Court*, 1979 SUP. CT. REV. 173.........................................................14

RESTATEMENT (SECOND) OF TORTS (AM. LAW INST. 1965)...................14

Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the Second
    Amendment*, 80 GEO. WASH. L. REV. 703 (2012)..............................27

JOSH SUGARMAN, ASSAULT WEAPONS AND ACCESSORIES IN AMERICA (1988),
    http://goo.gl/i9r8Nn ..................................................................18, 19

UNITED STATES DEP'T OF ARMY, RIFLE MARKSMANSHIP, M16-/M4-SERIES
    WEAPONS (2008), http://goo.gl/rFaiGW..........................................19

**INTEREST OF AMICUS CURIAE**

The National Rifle Association of America, Inc. ("NRA") is the oldest civil rights organization in America and the Nation's foremost defender of Second Amendment rights. Founded in 1871, the NRA has approximately five million members and is America's leading provider of firearms marksmanship and safety training for civilians. The NRA has a strong interest in this case because its outcome will affect the ability of the many NRA members who reside in Maryland to exercise their fundamental right to defend themselves and their families with commonly possessed arms.

Pursuant to Federal Rule of Appellate Procedure 29, the NRA certifies that this brief was not written in whole or in part by counsel for any party, that no party or party's counsel made a monetary contribution to the preparation and submission of this brief, and that no person or entity other than the NRA, its members, and its counsel has made such a monetary contribution. All parties have consented to the filing of this brief.

**INTRODUCTION**

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment "confer[s] an individual right to keep and bear arms" that applies to firearms "typically possessed by law-abiding citizens for lawful purposes." 554 U.S. 570, 595, 625 (2008). That right was "enshrined with the scope [it was]

understood to have when the people adopted [it]," necessarily taking "out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634–35.

The decision by the district court in this case illustrates the wisdom of *Heller*'s approach. In 2013, the State of Maryland concluded that the right to keep and bear arms was not really worth insisting upon. It banned numerous commonly owned firearms—arms it inaccurately calls "assault weapons"— along with ammunition magazines capable of holding more than ten rounds, which it incorrectly deems to be "large capacity." MD. CODE ANN., CRIM. LAW §§ 4-301, 4-303, 4-305. And the district court upheld this ban, judging that the Second Amendment's boundary-marks ought to be based on "*the government's* policy judgments," *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 792 (D. Md. 2014) (emphasis added), *aff'd in part*, *vacated in part*, *remanded sub nom. Kolbe v. Hogan*, 813 F.3d 160 (4th Cir.), *reh'g en banc granted*, 2016 WL 851670 (4th Cir. 2016), rather than the interest-balancing conducted by the People when they "elevate[d] above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *Heller*, 554 U.S. at 635.

The panel in this case reversed, taking an approach that is far more consistent with the Supreme Court's directions. By demanding that Maryland's ban

be analyzed under *strict* scrutiny, the panel's decision prescribes the minimum level of judicial review that is necessary to secure the core protections of an enumerated constitutional right that, like the Second Amendment, is "fundamental to our scheme of ordered liberty." *McDonald v. City of Chicago*, 561 U.S. 742, 764 (2010) (emphasis omitted).

If anything, the panel's prescription of strict scrutiny is *too lenient*. In *Heller*, the Supreme Court eschewed levels-of-scrutiny analysis altogether in striking down the District of Columbia's handgun ban, holding instead that the District's law was simply "off the table." 554 U.S. at 636. The Court reiterated the point in *McDonald*, explaining that after *Heller* "found that [the Second Amendment] right applies to handguns," it followed that "citizens *must* be permitted to use handguns for the core lawful purpose of self-defense." *McDonald*, 561 U.S. at 767–68 (emphasis added) (alterations omitted) (quotation marks omitted). To the extent the en banc Court decides to depart from the panel decision and this Court's precedent in any respect, it should clarify that *Heller* and *McDonald* mean what they say: flat bans on core Second Amendment conduct are unconstitutional, full stop.

## ARGUMENT

In *Heller*, the Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons." *Id.* at 592. The

"*central component*" of this right, *Heller* held, is "individual self-defense," *id.* at 599, and it thus applies with the highest clarity and insistence in "the home, where the need for defense of self, family, and property is most acute," *id.* at 628. *Heller* was quite explicit about the test future courts must use to assess the constitutionality of laws that ban "an entire class of 'arms,' " *id.* at 628: Has the government banned firearms "typically possessed by law-abiding citizens for lawful purposes," or "dangerous and unusual weapons" that are "highly unusual in society at large"? *Id.* at 625, 627. Here, the answer to that question cannot be in any doubt: the types of firearms Maryland has banned are owned by millions of law-abiding citizens nationwide. And under *Heller*, because the Second Amendment right "*applies* to" the arms in question "citizens *must* be permitted to use [them] for the core lawful purpose of self-defense." *McDonald*, 561 U.S. at 745, 767–68 (emphases added) (alterations omitted) (quotation marks omitted).

The dissent from the panel's decision in this case radically departs from the approach mandated by *Heller*. Though the dissent assumed at the outset that Maryland's law "burdens the Second Amendment right," it went on to conclude that the law "passes constitutional muster." *Kolbe*, 813 F.3d at 192, 196 (King, J., dissenting in part and concurring in part). But under *Heller*'s approach, the determination that the government has banned firearms "protected by the Second

Amendment," *id.*, is not the beginning of the Second Amendment analysis; it is the end of it.

**I.    By Banning Firearms Commonly Used for Lawful Purposes, Maryland's Law Strikes at the Very Core of the Second Amendment.**

**a.  The Firearms and Magazines Maryland Has Banned Are "In Common Use."**

The firearms banned by Maryland include some of the most popular firearms in America—including the AR-15, "the best-selling rifle type in the United States." Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). According to an analysis of records from the Bureau of Alcohol, Tobacco, Firearms, and Explosives, between 1990 and 2012 over eight million rifles like the ones banned by Maryland were manufactured or imported for domestic sale in the United States. JA-1877. In 2012, rifles of this kind made up 20% of all retail firearm sales. JA-1879–80. And since then, these numbers have only increased. *See* Appellants' Suppl. Br. at 14 (Apr. 11, 2016), Doc. 116.

These semi-automatic firearms are legal in the vast majority of the country (only six other States have outlier bans like Maryland's), and the millions of Americans who own them use them for the same lawful purposes as any other firearm: self-defense, hunting, and recreational shooting. JA-1917. Use of these firearms for unlawful purposes, by contrast, is exceedingly rare. As Christopher

Koper, one of Maryland's experts below, noted in a much-cited 2004 study, so-called "assault weapons" "are used in a small fraction of gun crimes," largely because they "are more expensive and more difficult to conceal than the types of handguns that are used most frequently in crime." JA-423–24 (citation omitted); *see also* GARY KLECK, TARGETING GUNS 112 (1997) (evidence indicates that "well under 1% [of crime guns] are 'assault rifles.' ").

The Supreme Court's recent, unanimous decision in *Caetano v. Massachusetts*, 2016 WL 1078932 (U.S. Mar. 21, 2016), further confirms that the arms banned by Maryland are in common use. That case concerned Massachusetts's ban on the possession of stun guns, which the Commonwealth's highest court had upheld on the basis that such weapons are not protected by the Second Amendment. In a brief *per curiam* opinion, the Supreme Court vacated that opinion. Though the Court remanded the case back to the state court without deciding whether stun guns are constitutionally protected, Justice Alito filed a concurring opinion expressly concluding that those arms "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that "hundreds of thousands of Tasers and stun guns have been sold to private citizens." 2016 WL 1078932, at *6 (Alito, J., concurring). It plainly follows that the semi-automatic arms banned here—over a *million* of which were produced

or imported for sale on the domestic market in 2012 alone, JA-1877—are in common use.

Nor is there, as amicus curiae Everytown for Gun Safety ("Everytown") suggests, a longstanding historical tradition of banning these firearms. Br. of Amicus Curiae Everytown for Gun Safety in Supp. of Appellees and Reh'g En Banc 4–7 (Feb. 25, 2016), Doc. 86-2. Everytown asserts that "the regulation and prohibition of semiautomatic rifles"—*all* semiautomatic rifles—"is 'longstanding,' " *id.* at 6, but that is simply false. To begin, Everytown's argument is flatly foreclosed by *Staples v. United States*, which held that semi-automatic rifles "traditionally have been widely accepted as lawful possessions." 511 U.S. 600, 612 (1994). The historical record confirms that the Supreme Court, not Everytown, has it right. "The first commercially available semi-automatic rifles . . . entered the market between 1903 and 1906" and were designed and marketed for commercial use, *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J. dissenting), yet Everytown cannot cite a single ban from the first two decades of sale, and it produces only four regulations from ensuing decades.

Those four regulations are outlier laws far outside our constitutional tradition—and one of those laws, from California, was not a ban at all but rather a permitting requirement. *See* 1931 Cal. Stat. 2204, ch. 1050, § 3. These few isolated

exceptions only prove the rule: there is no longstanding tradition of banning semi-automatic firearms. The mere existence of a few outlier statutes does not constitute a "tradition." If it did, *Heller* and *McDonald* would have come out the other way, for the handgun bans in those cases had been around for decades. The D.C. Circuit recognized as much in *Heller II*, holding that although there were a few isolated regulations of semi-automatic firearms, there nonetheless was no "evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity." *Heller II*, 670 F.3d at 1260 & n.*.

The magazines that Maryland bans are also commonly owned by Americans "for lawful purposes like self-defense." *Heller*, 554 U.S. at 624. Magazines with a capacity of over ten rounds are common to the point of ubiquity among law-abiding firearm owners, and they come standard on many of the nation's most popular firearms. *See* JA-1911 (60-80% of Modern Sporting Rifle owners use magazines with a capacity of more than ten rounds). According to a 2013 study, there are more than 75 million magazines with a capacity of over 10 rounds in circulation in the United States—nearly half of the Nation's total magazine stock. JA-2084. As the majority noted in *Heller II*, "[t]here may well be some capacity above which magazines are not in common use but . . . that capacity surely is not ten." 670 F.3d at 1261.

There thus can be little doubt that the firearms and magazines Maryland has banned are fully protected by the Second Amendment. Indeed, no Court of Appeals to have faced the question has concluded otherwise.

**b. The "Common Use" Inquiry Established by *Heller* Is Not Circular.**

1. Rather than dispute the unavoidable conclusion that it has banned firearms that are in common use, Maryland attempts to dodge it. The Second Amendment leaves the government free, it says, to ban not only firearms that are "unusual" but also those that are "unusually dangerous." *Kolbe*, 813 F.3d at 177. And the panel dissent echoes this point, suggesting that the "relative dangerousness" of the arms and magazines in question places them beyond the Constitution's protections. *Id.* at 195–96 (King, J., dissenting in part and concurring in part). But this argument that firearms in common use are nonetheless unprotected by the Second Amendment if they are somehow "unusually dangerous" is flatly inconsistent with *Heller*.

As the panel majority reasoned, *Heller*'s reference to "dangerous and unusual" weapons plainly was not meant to establish a free-floating "dangerousness" inquiry as a threshold test for Second Amendment protection. Rather, *Heller* adverted to "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' " as support for limiting the scope of the Second Amendment to those weapons "in common use . . . for lawful purposes," 554 U.S.

at 624, 627—a standard that says nothing about some undefined threshold of "dangerousness." Moreover, as the panel noted, "*Heller* refers to 'dangerous' *and* 'unusual' conjunctively, suggesting that even a dangerous weapon may enjoy constitutional protection if it is widely employed for lawful purposes, i.e., not unusual." *Kolbe*, 813 F.3d at 178. And that interpretation of *Heller* is reinforced by its conclusion that handguns—"the overwhelmingly favorite weapon of armed criminals," which are "7 times more likely to be lethal" when used in crime than "any other weapon," *Heller*, 554 U.S. at 682, 695 (Breyer, J., dissenting)—are protected by the Constitution *precisely because* "handguns are the most popular weapon chosen by Americans for self-defense in the home," *id.* at 629 (majority opinion).

This reading of *Heller* is confirmed by the recent decision in *Caetano*. In that case, as noted earlier, the Supreme Court vacated the Supreme Judicial Court of Massachusetts's conclusion that stun guns are unprotected by the Second Amendment. The state court had based its holding on the conclusion *both* that such weapons are *unusual*—because they were "not in common use at the time of enactment of the Second Amendment"—*and* that they are *dangerous*—because they would have been considered "dangerous per se at common law." *Commonwealth v. Caetano*, 26 N.E.3d 688, 692–93 (Mass. 2015). The Supreme Court vacated and remanded that opinion after repudiating only the state court's

conclusion that stun guns are unusual—necessarily if implicitly holding that the Supreme Judicial Court's separate holding on "dangerousness" was not enough to independently justify its decision under *Heller*. *Caetano*, 2016 WL 1078932, at *1. As Justice Alito explained in his concurrence, by declining "to consider the lower court's conclusion that [stun guns] are also 'dangerous,' " the Court necessarily recognized that *Heller* established "a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Id.* at *4 (Alito, J., concurring). And that means that "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Id.*

2.  The panel dissent's only serious attempt to justify the creation of a free-floating "relative dangerousness" inquiry is its suggestion that the inquiry *actually* established by *Heller*—whether the arms in question are commonly used for lawful purposes—is "circular." *Kolbe*, 813 F.3d at 194–95. A sure way of rendering a particular class of arms "unusual," the dissent apparently reasoned, is to ban it, and that implies that under *Heller*'s "common use" standard "the reason why a particular weapon can be banned is that there is a statute banning it"—which would plainly be absurd. *Id.* But this glib attempt to tar *Heller*'s standard for Second Amendment protection as circular fails.[1]

---

[1] The dissent also briefly suggests that interpreting the "dangerous and unusual" language as creating a conjunctive test would "render[ ] the word 'dangerous' superfluous." *Id.* at 195. That suggestion fails, though, since it is hardly

By anchoring the contours of the Second Amendment right to the types of arms that are "in common use at the time for lawful purposes like self-defense," *Heller*, 554 U.S. at 624 (quotation marks omitted), the Second Amendment entrusts to *the People* the right to decide which arms should receive constitutional protection. The traditions and practices of the American People themselves can be trusted, the Framers judged, to sort out those arms that are appropriately held by private citizens from those that are not. Those who would discard that common-use standard as "circular" would take a very different path, one that would give *the government*—the very entity the Second Amendment was designed *to bind*—the power to define the scope of its protections.

This is explicit in the decision from which the dissent drew its "circularity" objection, the Seventh Circuit's opinion in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015). "*Heller*," the Seventh Circuit concluded in the course of rejecting the common-use standard as circular, "contemplated that the weapons properly in private hands . . . might change through legal regulation." *Id.* at 409. But *Heller* contemplated nothing of the kind; indeed, such a theory is contrary to

_____

inconceivable that some "instruments that constitute bearable arms," *Heller*, 554 U.S. at 582, may be "unusual" in certain respects but also may not be particularly dangerous when compared to other protected arms—*e.g.*, an innovative firearm design that has yet to gain widespread ownership. *Heller*'s conjunctive test indicates that such arms are protected by the Second Amendment notwithstanding their rarity. It also further undermines the argument that whether a certain type of arm is protected will turn on how quickly the government acts to ban it.

the *first premises* of our constitutional order, since it would give to the government "a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803). No, our Constitution secures to *the People* the right to mark the boundary lines of the right they have secured to themselves. As *Heller* puts the point, those firearms that are commonly "chosen by Americans for self-defense in the home" are within the scope of Second Amendment protection "*[w]hatever the reason*" for the People's choice. *Heller*, 554 U.S. at 629. It matters not whether "future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634–35.

It should hardly be surprising, in a republic such as ours, where the People are sovereign, that legal regulation to some extent reflects the People's common usages and practices. Thus, the complete and utter *absence* of any widespread tradition of banning the types of arms at issue in this case is powerful evidence that the People do not deem them improper instruments for personal use. But that hardly renders *Heller*'s common-use standard vacuous or circular; indeed, this feature is shared by numerous legal tests that have been successfully employed throughout the law for centuries.

Since the middle of the nineteenth century, for example, common-law tort liability for negligence has depended on whether the defendant has done that

"which a reasonable man, guided upon those considerations which ordinarily regulate the conduct of human affairs, would do." *Blyth v. Birmingham Waterworks Co.*, 156 Eng. Rep. 1047, 1049 (Ex. 1856). Of course, one type of consideration which "ordinarily regulate[s] the conduct of human affairs" is the likely presence or absence of legal liability at tort. *See* RESTATEMENT (SECOND) OF TORTS § 292 cmt. b (AM. LAW INST. 1965) (noting that one factor in determining reasonableness is "a persistent course of [judicial] decisions"). Yet negligence law has flourished for centuries, and no one would suggest that the standards it has developed are empty or meaningless or circular.

In like form, the scope of the Fourth Amendment's protection against unreasonable searches and seizures depends in part on whether the individual who complains of a Fourth Amendment violation can show a "reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). Here, too, the People's expectations about privacy are dependent, in part, on the extent to which any given violation of that privacy would be held invalid, and that has occasionally given rise to the charge of circularity. *See, e.g.*, Richard A. Posner, *The Uncertain Protection of Privacy by the Supreme Court*, 1979 SUP. CT. REV. 173, 188. But the reasonable expectation of privacy standard has endured, *see United States v. Jones*, 132 S. Ct. 945, 950 (2012), and it clearly continues to impose real limits on government conduct.

The Court has confronted a similar claim even more directly in the Fifth Amendment "regulatory taking" context, and its resolution there is instructive here. While government regulation of private property can be deemed a "taking" of that property in certain circumstances if it interferes "with reasonable investment backed expectations," *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979), the Supreme Court has held that there is no taking if the regulation merely duplicates "the restrictions that background principles of the State's law of property and nuisance already place upon land ownership," *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1029 (1992). And just as some have claimed in the Second Amendment context that "the weapons properly in private hands . . . might change through legal regulation," *Highland Park*, 784 F.3d at 409, States for a time contended that they could "shape and define property rights and reasonable investment-backed expectations" through the very regulation being challenged, such that owners who took with "notice" of that regulation "cannot claim any injury from lost value," *Palazzolo v. Rhode Island*, 533 U.S. 606, 626 (2001).

In *Palazzolo v. Rhode Island*, the Supreme Court resoundingly rejected this attempt by the government to "absolve [itself] of its obligation to defend" its challenged regulatory acts and thereby "secure a windfall for itself," holding instead that "a regulation that otherwise would be unconstitutional absent compensation" cannot be "transformed into a background principle of the State's

law" by *ipse dixit* in this way. 533 U.S. at 627, 628, 629–30 (2001). So too here. The Second Amendment commands courts to look *to the People* to decide which firearms enjoy constitutional protection, not to the government. *Heller*'s inquiry is not circular because in asking whether a particular arm is "in common use . . . for lawful purposes," 554 U.S. at 624 (quotation marks omitted), a court must *set to one side* the particular restriction that has been challenged. *That* is the conclusion that follows from the principle that "[a] law's existence can't be the source of its own constitutional validity." *Kolbe*, 813 F.3d at 195 (King, J., dissenting in part and concurring in part).

*Heller*'s common-use standard serves other purposes as well. Because it looks to the practices of the American People *nationwide*, *see Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by *American society*" for self-defense (emphasis added)); *Caetano*, 2016 WL 1078932, at *6 (Alito, J., concurring) ("stun guns are widely owned and accepted as a legitimate means of self-defense *across the country*" (emphasis added)), it protects those who live in States or localities with a less-robust tradition of protecting that right from outlier legislation (like Maryland's bans here) that falls short of national standards. In this way, the Second Amendment is similar to many other constitutional guarantees that hold state and local governments to minimum standards that are acceptable nationwide, and the Court repeatedly has acted to bring what it views as outlier jurisdictions

into line with such standards.[2] Thus, "constitutional adjudication frequently involves the justices' seizing upon a dominant national consensus and imposing it on resisting local outliers." Michael J. Klarman, *Rethinking the Civil Rights and Civil Liberties Revolutions*, 82 VA. L. REV. 1, 16 (1996). More pithily, the Supreme Court "obliterates outliers." Frank H. Easterbrook, *Abstraction and Authority*, 59 U. CHI. L. REV. 349, 370 (1992). *Heller*'s common-use test facilitates a similar outcome in the Second Amendment context. *See, e.g.*, *Heller*, 554 U.S. at 629.

The short of it is this: the inquiry into whether certain arms are commonly used for lawful purposes is not circular; and even more importantly, it is the inquiry that *Heller* plainly requires. Because the firearms and magazines Maryland has banned are in common use, they are for that reason protected by the Second Amendment, and any further inquiry into whether those arms are "unusually dangerous" is unnecessary.

---

[2] *See, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407, 423 (2008); *Lawrence v. Texas*, 539 U.S. 558, 573 (2003); *Romer v. Evans*, 517 U.S. 620, 645 (1996); *Coker v. Georgia*, 433 U.S. 584, 595–96 (1977) (plurality); *Moore v. City of East Cleveland*, 431 U.S. 494, 496 (1977) (plurality); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 666 n.4 (1966); *Griswold v. Connecticut*, 381 U.S. 479 (1965) (*see Poe v. Ullman*, 367 U.S. 497, 554 (1961) (Harlan, J., dissenting)); *Gideon v. Wainwright*, 372 U.S. 335, 345 (1963).

### c. The Firearms and Magazines Maryland Has Banned Are Not Unusually Dangerous.

Even if the Second Amendment's protections did depend on some independent, threshold inquiry into the "relative dangerousness," *Kolbe*, 813 F.3d at 195 (King, J., dissenting in part and concurring in part), of the firearms in question (which it does not), Maryland has *still* wholly failed to show that its law is outside the scope of that constitutional provision. For the firearms and magazines it has banned simply are not "unusually dangerous" compared to arms that are concededly protected by the Constitution.

The panel dissent maintained that the firearms in question are "exceptionally lethal weapons of war" that "function[ ] almost identically" to the fully automatic "machine guns" used by the military. *Id.* at 193. That is not so. The firearms in question are *not* machine guns; while machine guns are *fully* automatic and "fire[ ] repeatedly with a single pull of the trigger," a *semi*-automatic firearm, like those Maryland has banned, "fires only one shot with each pull of the trigger." *Staples*, 511 U.S. at 602 n.1. Indeed, the *very term* "assault weapon"—used by Maryland and the panel dissent in an attempt to disparage the arms in question by definition—reflects a failure to appreciate this basic distinction. As the anti-gun Violence Policy Center has candidly acknowledged, that term was designed to exploit "the public's confusion over fully automatic machine guns versus semi-automatic assault weapons." JOSH SUGARMAN, ASSAULT WEAPONS AND

18

ACCESSORIES IN AMERICA (1988), http://goo.gl/i9r8Nn; *see also* JA-734–35 (ATF report acknowledging that "it is somewhat of a misnomer to refer to [semi-automatic] weapons as 'assault rifles' " because "[t]rue assault rifles are selective fire weapons that will fire in a fully automatic mode").

The dissent argued that this critical difference between semi-automatic and fully automatic fire is in fact "slight, in that automatic firing of all the ammunition in a thirty-round magazine takes two seconds, whereas a semi-automatic rifle can empty the same magazine in about five seconds." *Kolbe*, 813 F.3d at 193 (King, J., dissenting in part and concurring in part). But those numbers—which are drawn from the unsworn legislative testimony of a Brady Center lobbyist, *see Heller II*, 670 F.3d at 1263—are far from realistic. The training manual for the United States Army states the maximum effective rates of semi-automatic fire for various M4- and M16-series firearms to be between 45 and 65 rounds per minute—only about *five rounds* (not 30 rounds) in five seconds, and *far slower* than 150 to 200 rounds-per-minute that may effectively be fired by the same arms operating in fully automatic mode. *See* UNITED STATES DEP'T OF ARMY, RIFLE MARKSMANSHIP, M16-/M4-SERIES WEAPONS 2-1 (2008), http://goo.gl/rFaiGW.

Moreover, the unavoidable implication of the dissent's reasoning is that *all semi-automatic firearms* are "weapons of war" that are unprotected by the Second Amendment and may be freely banned; for "assault weapons" like the AR-15

targeted by Maryland are simply indistinguishable, in terms of their rate of fire, from any other semi-automatic firearm. But semi-automatic firearms are extraordinarily commonplace—they account for about 40% of the rifles sold in the United States, and over 80% of the handguns, according to recent statistics, NICHOLAS J. JOHNSON ET AL., FIREARMS LAW & THE SECOND AMENDMENT 8, 11 (2012)—and as noted above, the argument that they are outside the Second Amendment's scope is entirely devoid of merit.

Nor is there any truth to the dissent's suggestion that the class of semi-automatic rifles banned by Maryland are "unusually dangerous" because their rounds travel particularly "great distances" or more "easily penetrate" walls, "car doors," and "soft body armor." *Kolbe*, 813 F.3d at 194–95 (King, J., dissenting in part and concurring in part). In fact, most of the firearms Maryland bans, including the popular AR-15, typically use .223 caliber rounds—bullets that "are quite anemic in penetration capability and pale in destructive capacity when compared to common civilian hunting rifles," which commonly use much larger .260, .270, or .30-06 caliber rounds. JA-2095.

Finally, the dissent attempts to support its claim that so-called "assault weapons" are more dangerous than "other firearms in general, including other semiautomatic guns" by pointing to the "military-style features" that the banned arms generally possess, including "folding or telescoping stocks, pistol grips, flash

suppressors, grenade launchers, night sights, and the ability to accept detachable magazines and bayonets." *Kolbe*, 813 F.3d at 193. Here, at last, the dissent has arrived at a genuine distinction between "assault rifles" and ordinary semi-automatic arms. Indeed, many of the handful of other jurisdictions that have banned these types of firearms do so by *defining the category of banned arms* by reference to these disfavored "features." *See, e.g.*, CONN. GEN. STAT. § 53-202a(1)(E); D.C. CODE § 7-2501.01(3A)(A)(i)(IV); N.Y. PENAL LAW § 265.00(22). While these essentially cosmetic "features" do serve to distinguish the disparate class of semi-automatic rifles banned by Maryland from ordinary firearms, however, their principal effect—to the extent they have any effect on functionality at all—is only to make those firearms *safer*.

A telescoping stock, for example, is merely an adjustable shoulder stock, which allows a person to change the length of her gun to fit her stature, in the same way that she can change the height of an adjustable office chair. JA-2182. That allows people with shorter arms to use the firearm more accurately and effectively; it does not make the firearm somehow more dangerous or powerful. Similarly, a pistol grip is simply a handgrip that extends below the firearm and allows the user to comfortably grip it with the trigger hand when firing from the shoulder. That aids in firing the rifle accurately from a shoulder-mounted position and also increases the user's ability to hold onto her firearm if someone is trying to pull it

out of her hands. Both purposes make rifles with pistol grips attractive home-defense firearms. *See* David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 396 (1994). Neither makes them more dangerous or apt to be criminally misused.

The standard-capacity magazines at issue here are also not "unusually dangerous," as Maryland and the dissent would have it. As Professor Koper, the State's own expert, has acknowledged, for the majority of gun crimes possession of a magazine capable of holding more than ten rounds is simply *irrelevant*, since "available studies on shots fired show that assailants fire less than four shots on average." JA-498. And even with respect to mass shootings, the evidence shows that mass killers almost never "maintain[ ] a sustained rate of fire that could not also have been maintained—even taking reloading time into account—with either multiple guns or with an ordinary six-shot revolver and the common loading devices known as 'speedloaders.' " KLECK, TARGETING GUNS 125.

Any remaining doubt about whether the banned firearms and magazines are "unusually dangerous" compared to "other firearms in general, including other semiautomatic guns," *Kolbe*, 813 F.3d at 193 (King, J., dissenting in part and concurring in part), is dispelled by a look at the two comprehensive studies of the now-expired federal ban on a similar class of firearms and magazines commissioned by the Department of Justice and conducted by Professor Koper.

Professor Koper's own policy leanings on the subject of gun control can be discerned from his frequent appearance as an expert witness in support of anti-gun measures challenged as unconstitutional—including in this case. Yet after exhaustively studying the results of the now-defunct federal "assault weapon" ban, first in 1997 and then in 2004, Professor Koper was forced to conclude that there was "no statistical evidence of post-ban decreases in either the number of victims per gun homicide incident, the number of gunshot wounds per victim, or the proportion of gunshot victims with multiple wounds," JA-530, and that "[s]hould it be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement," JA-411.

## II.     Because It Bans Core Second Amendment Conduct, Maryland's Law Is Categorically Unconstitutional.

The firearms and magazines banned by Maryland are thus fully protected by the Second Amendment—under the "common use" standard established by *Heller* and even under the "unusually dangerous" standard favored by Defendants and the dissent. Indeed, though the dissent attempted to sow some doubt about whether the Constitution's protections extend to the arms in question, *Kolbe*, 813 F.3d at 195–96 (King, J., dissenting in part and concurring in part), it ultimately did not dispute the point. "We need not decide" whether the banned firearms and magazines are protected by the Second Amendment, the dissent opined, because "we can assume

they are so protected and yet rule that Maryland's [law] passes constitutional muster under . . . intermediate scrutiny." *Id.* at 196.

*Heller* charts a very different course. Because the Second Amendment "elevates" the rights it most centrally protects "above all other interests," a law that effectively *destroys* its "core protection" must be held unconstitutional categorically, not "subjected to a freestanding 'interest-balancing' approach." *Heller*, 554 U.S. at 634–35. This is just such a law. Maryland does not merely regulate or marginally restrict the use of protected arms; it *bans outright* the *very possession* of a whole class of arms commonly possessed for lawful purposes like self-defense.[3] And that ban, moreover, applies even in "the home, where the need for defense of self, family, and property is most acute." *Id.* at 628. Accordingly, Maryland's ban is unconstitutional per se.

Under *Heller*, all that needs to be done to resolve a challenge to a flat ban on possession of certain weapons is to determine whether they are "arms" protected

---

[3] The dissent argues that Maryland has not banned "an entire class" of firearms, since other semi-automatic rifles remain legal. *Kolbe*, 813 F.3d at 197 (King, J., dissenting in part and concurring in part). But the court below specifically found that "the bans remove a class of weapons that the plaintiffs desire to use for self-defense in the home," *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 790 (D. Md. 2014), and that is amply supported by the record evidence that the "modern sporting rifles" banned by Maryland are viewed in the industry as a separate category. *See* JA-1883. Moreover, nothing in *Heller* suggested that the result there would have been any different had the District of Columbia limited its ban to a subset of handguns that included the most popular and reliable models.

by the Second Amendment. Any further evaluation of allegedly competing public-policy considerations is foreclosed by the constitutional text. That text, after all is the "*product* of an interest balancing by the people," and "[t]he very enumeration of the right [to keep and bear arms] takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id*. at 634–35.

*Heller*, moreover, struck down the District of Columbia's ban on the possession of handguns *in the teeth* of social science indicating that such arms are much more commonly used in violent crime than the arms at issue here. As Justice Breyer noted in dissent in that case, it is indisputable that handguns "are the overwhelmingly favorite weapon of armed criminals." *Id.* at 682 (Breyer, J., dissenting). "From 1993 to 1997," for example, "81% of firearm-homicide victims were killed by handgun," and "[i]n a 1997 survey of inmates who were armed during the crime for which they were incarcerated, 83.2% of state inmates and 86.7% of federal inmates said that they were armed with a handgun." *Id*. at 697–98. In Maryland, criminals appear to favor handguns by an even more overwhelming margin. *See Woollard v. Gallagher*, 712 F.3d 865, 877 (4th Cir. 2013) (noting that in Maryland in 1997, "97.4% of all homicides by firearm were committed with handguns"). If there were *any plausible case* that the Government is justified in banning the semi-automatic rifles at issue here (which, again, are

responsible for "well under 1%" of gun crimes, KLECK, TARGETING GUNS 112) because of its "substantial interest in protecting the public safety and deterring criminal activity," *Kolbe*, 813 F.3d at 198 (King, J., dissenting in part and concurring in part), it would surely follow *a fortiori* that the ban in *Heller* was justified by this interest. Yet the majority in *Heller did not even discuss* the District's interest in preventing violent crime, except to note that while "[t]he Constitution leaves the District of Columbia a variety of tools for combating that problem, . . . the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home." *Heller*, 554 U.S. at 636.

*Heller*'s decision to elide any discussion of the government's public-safety interest was no accident. Here, too, Justice Breyer's dissenting opinion is illuminating. Justice Breyer advocated an "interest-balancing" approach to Second Amendment challenges that he expressly based on "First Amendment cases applying intermediate scrutiny." *Id*. at 704 (Breyer, J., dissenting). But the majority opinion *deliberately rejected* such a "judge-empowering 'interest-balancing inquiry' " as inconsistent with the very nature of the Second Amendment right, reasoning that "[a] constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Id.* at 634 (majority opinion). That deliberate choice cannot be squared with the intermediate-scrutiny analysis

advocated by the panel dissent and employed by the district court below. As even a former Brady Center attorney has recognized, those courts that have adopted such an analysis in the Second Amendment context have "effectively embraced the sort of interest-balancing approach" that the Supreme Court "condemned" in *Heller*. Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 GEO. WASH. L. REV. 703, 706–07 (2012).

Subsequent Supreme Court case law confirms that state restrictions that cut to the core of that right must be struck down categorically, not weighed under a judge-empowering "tiers-of-scrutiny" approach. In *McDonald*, the Supreme Court held that the Second Amendment is incorporated by the Fourteenth Amendment and thus applies to the States as well as the federal government. Writing again in dissent, Justice Breyer argued against this incorporation of the right to keep and bear arms, maintaining that "determining the constitutionality of a particular state gun law requires finding answers to complex empirically based questions." 561 U.S. at 922 (Breyer, J., dissenting). Justice Alito's controlling opinion squarely rejected this argument: "Justice BREYER is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions . . . . [W]hile his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion." *Id*. at 790–91 (plurality opinion). Instead, as the majority in *McDonald* put it, *Heller* "found that [the Second Amendment] right

*applies* to handguns," and it thus concluded that "citizens *must* be permitted to use" them. *Id.* at 767–68 (emphases added) (alterations omitted) (quotation marks omitted).

The Supreme Court's recent decision in *Caetano* further confirms that *Heller*'s categorical test is the governing one. As discussed above, that case vacated a state-court opinion upholding Massachusetts's ban on the possession of stun guns. While, as noted earlier, the Court remanded the case back to the state court rather than striking down Massachusetts's law outright, Justice Alito filed a concurring opinion emphasizing that under the correct Second-Amendment analysis—*Heller*'s categorical approach—the law is plainly unconstitutional. As Justice Alito put it, "[w]hile less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons *therefore violates the Second Amendment*." *Caetano*, 2016 WL 1078932, at * 6 (Alito, J., concurring) (emphasis added).

Like the bans at issue in *Caetano*, *McDonald*, and *Heller* itself, Maryland's law "amounts to a prohibition of an entire class of 'arms,' " *Heller*, 554 U.S. at 628, that "are widely owned and accepted as a legitimate means of self-defense across the country," *Caetano*, 2016 WL 1078932, at * 6 (Alito, J., concurring). Under all three of those opinions, that must be the end of the constitutional

28

analysis, not the beginning. The panel majority, by insisting that Maryland's ban at least be analyzed under strict scrutiny, hews far more faithfully to the Supreme Court's consistent teaching than the watered-down intermediate-scrutiny approach advocated by the dissent and the district court, and it follows directly from the Second Amendment decisions of prior panels of this Court. *See Kolbe*, 813 F.3d at 181–82. Of course, this Court sitting en banc is not bound by those previous panel decisions, but to the extent it departs from them at all it should take this opportunity to clarify that the governing Second Amendment standard is the one established by the Supreme Court: no matter how compelling a State's interest in public safety is, and no matter how narrowly it tailors its means to that end, a flat ban on the possession of arms that are in common use for lawful purposes is simply "off the table." *Heller*, 554 U.S. at 636.

## CONCLUSION

For the reasons given above, Amicus Curiae NRA respectfully submits that the district court's judgment should be reversed and Maryland's law should be struck down.

Dated: April 18, 2016                    Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper
David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC

1523 New Hampshire Ave., NW
Washington, D.C.  20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of FED R. APP. P. 29(d) because this brief contains 6,991 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements on FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

April 18, 2016                                         s/ Charles J. Cooper
                                                      Charles J. Cooper

                                                      *Counsel for Amicus Curiae.*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of

Court for the United States Court of Appeals for the Fourth Circuit by using the

appellate CM/ECF system on April 18, 2016. I certify that service will be

accomplished by the appellate CM/ECF system on all parties or their counsel.


April 18, 2016                                    s/ Charles J. Cooper
                                                  Charles J. Cooper

                                                  *Counsel for Amicus Curiae*